IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| BILLY WILLIAMS and<br>TERESA WILLIAMS,<br><br>    Plaintiffs,<br><br>vs.<br><br>BALBOA INSURANCE COMPANY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   CASE NO.  1:07-CV-549-WHA<br>)<br>)<br>)<br>)<br>) |

**DEFENDANT BALBOA INSURANCE COMPANY'S
MEMORANDUM OF LAW IN SUPPORT OF
<u>MOTION FOR SUMMARY JUDGMENT</u>**

Defendant Balboa Insurance Company, Inc. ("Balboa") has filed a motion for summary judgment on all of plaintiffs' claims with the Court. Balboa files this brief in support of that motion.

**I.  Introduction**

This Court should grant Balboa's Motion for Summary Judgment on each of plaintiffs' claims because plaintiffs lack standing to bring this action. Under the clear policy language, plaintiffs are not named insureds under the policy. Furthermore, plaintiffs are not additional insureds or intended third-party beneficiaries under the undisputed material facts of this case.

In addition, even assuming arguendo that plaintiffs had standing to bring this action, Balboa is entitled to summary judgment on plaintiffs' bad faith claim. Plaintiffs cannot show that they have a right to recover under the policy. Moreover, the undisputed material facts, the

policy language, and the case law, dictate that, at a minimum, Balboa had a reasonably legitimate or arguable reason for its determination on the claim and its payments to GMAC.

## II. Statement Of Undisputed Material Facts

Plaintiffs assert claims for breach of contract, bad faith, and claims as third-party beneficiaries, concerning a lender protection policy issued by Balboa to GMAC Mortgage and a claim on that policy following a fire. Based on the following undisputed material facts, Balboa is entitled to summary judgment on plaintiffs' claims.

On or about June 26, 2000, plaintiffs Billy and Teresa Williams executed a mortgage on the property located at 678 County Road 620, Enterprise, Alabama 36330. (Deposition of Teresa Williams, p. 17, attached as Exhibit 1 to Defendant's Evidentiary Submissions[1]). That mortgage secured to the lender the following: "(a) the repayment of the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the Note." (Mortgage, Exhibit 2 to the deposition of T. Williams).

The note secured by that mortgage is attached as Exhibit 3 to Teresa Williams' Deposition. The parties were operating under this mortgage and note at the time of the fire at issue in this case. (T. Williams Depo., p. 17). GMAC Mortgage ("GMAC") took over the servicing of plaintiffs' loan in May 2005. (Exhibit 10 to T. Williams Depo.).

The mortgage provides that "if the borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7." (Mortgage, GMAC0103).

---

[1] Exhibit 1 contains various pages and exhibits from the deposition of Teresa Williams.

On August 25, 2005, GMAC notified plaintiffs that GMAC's records did not reflect that they had current hazard insurance as required under the terms of their mortgage and that, if plaintiffs did not provide GMAC with proof of coverage, GMAC would purchase coverage "to protect our interest." (T. Williams Depo., pp. 42-43; Exhibit 12 to T. Williams Depo.).

Plaintiffs did not make any contact or attempt to communicate with GMAC after receipt of that letter. (T. Williams Depo., p. 43). Plaintiffs then received a letter dated October 9, 2005 informing them that: "since we have not received any evidence of hazard insurance, we will secure hazard coverage. The coverage will provide protection to us for loss to your dwelling up to a limit of $32,311.00, with a deductible of $500.00." (Exhibit 13 to T. Williams Depo.). That letter further provided that "the coverage is designed to protect the interest of GMAC Mortgage," and "[a]gain, we must remind you that the coverage we will obtain is intended to protect our interest…." (Exhibit 13 to T. Williams Depo.).

GMAC obtained coverage to protect its interest in the dwelling, pursuant to a lender's protection policy issued by Balboa Insurance Company. (Lender's Protection Policy, Balboa 00001-00021, attached as Exhibit 2 to Defendant's Evidentiary Submissions; Williams 00048-00049, Exhibit 14 to T. Williams Depo.). The "Named Insured" on that policy is GMAC Mortgage. (Policy at Balboa 00003). The policy provides that ""YOU," "YOUR," and "YOURS" means the Named Insured." (*Id.* at Balboa 00008).

The policy provides in relevant part that:

> In consideration of the premium paid, and subject to the limits of liability, exclusions, conditions and other terms contained in the Master Policy and this Residential Property Fire Insurance Form ("Residential Property Form"), we agree to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest in the RESIDENTIAL PROPERTY.

(Policy, Balboa 00008).

"Loss Payment" under the terms of the policy provides that:

> WE will adjust each LOSS with YOU and will pay YOU. If the amount of LOSS exceeds YOUR insurable interest, WE will pay the BORROWER any residual amount due for the LOSS, not exceeding the applicable Limit of Liability indicated on the EVIDENCE OF INSURANCE.

(Policy, Balboa 00012).

On February 5, 2006, a fire damaged the home on the property. (T. Williams Depo., p. 56). At the time of the fire, plaintiffs owed $43,041.07 on the mortgage loan. (Scott Zeitz Declaration, ¶3, attached as Exhibit 3 to Defendant's Evidentiary Submissions). Plaintiffs have made no payments on the loan since that time. (*Id.*, ¶4).

Plaintiffs' acknowledge that their loan has been in default since before the fire. (Exhibit 15 to T. Williams Depo.; T. Williams Depo., p. 117). They further acknowledge that they received a notice of foreclosure proceedings shortly after the fire. (*Id.* at 117; Exhibit 16 to T. Williams Depo.). Ms. Williams also acknowledged that they would not be able to pay off the loan on the house even if the house had been repaired and that they would still be subject to foreclosure proceedings. (T. Williams Depo., p. 118).

On February 8, 2006, Balboa sent a letter to GMAC acknowledging GMAC's claim for benefits as the claimant beneficiary under the policy. (Exhibit 23 to T. Williams Depo.). Balboa retained Cunningham Lindsey, Inc., an independent claims adjusting firm, to investigate the claim. (Dave Toellner Declaration, ¶ 2, attached as Exhibit 4 to Defendant's Evidentiary Submissions). Dave Toellner, a claims adjuster with Cunningham Lindsey, Inc., visited the property in February 2006. (*Id.*, ¶ 4). Toellner has over twenty years of experience as a property and casualty claims adjuster and has worked as an adjuster on over 1,000 fire damage claims.

(*Id.*, ¶ 3). Toellner inspected the property and took photographs. (*Id.*, ¶4). Toellner prepared an adjuster's report with an estimate of the loss in accordance with the terms of the policy. (*Id.*). Toellner prepared his estimate using the results of his inspection and his analysis of the damage and using claims estimating computer software from MSB, which provides local labor and materials pricing information by zip code. (*Id.*, ¶5). The MSB program is standard and customary in the claim adjusting industry, and Toellner has found the program to be reliable and accurate based on his twenty plus years of experience in adjusting claims. (*Id*, ¶5).

Based on Toellner's evaluation, Balboa issued payment to GMAC with a letter of explanation. (Exhibit 25 to T. Williams Depo.). Plaintiffs received a copy of this payment letter to GMAC with a copy of Toellner's estimate. (*Id.*; T. Williams Depo., pp. 69-71).

Subsequently, in May 2006, plaintiffs contacted Tancy Nelson with Balboa and forwarded her a letter with three handwritten, lump sum estimates for the repairs to the home, which were higher than Toellner's estimate. (T. Williams Depo., pp. 83-86). Nelson provided this information to Toellner, and Toellner requested that plaintiffs have one of the contractors complete an itemized estimate using a form that Toellner provided. (Toellner Declaration, ¶ 7). The form was completed by Eric Dingman of B&B Construction. (Itemized Estimate, attached as Exhibit C to Toellner Declaration; Toellner Declaration, ¶ 8).

Toellner reviewed that itemized estimate, compared it to the earlier estimate that he prepared, and provided a revised estimate to Balboa. (Toellner Declaration, ¶8; a copy of the revised estimate is attached as Exhibit D to Toellner Declaration).

Based on the revised estimate that Tancy Nelson received from Cunningham Lindsey, Inc., Nelson issued an additional draft to GMAC with a September 26, 2006 letter explaining the

payment. (Exhibit 31 to T. Williams Depo.). A copy of the revised estimate was enclosed with the letter.[2] (*Id.*).

The major differences between the revised estimate prepared by Toellner and the itemized estimate submitted by the plaintiffs' contractor, relate to Toellner's determination based on his investigation and experience that the bathrooms could be cleaned and did not need to be completely gutted with the replacement of all of the tile and fixtures. (Toellner Declaration, ¶9). Toellner indicated that the bathrooms in question did not suffer any fire damage, but rather suffered smoke damage that could be cleaned. (*Id*, ¶9). Furthermore, the itemized estimate prepared by B&B Construction contained prices for replacing acoustical ceilings with more expensive drywall ceilings, whereas Toellner's estimate calls for the replacement of acoustical ceilings with the same acoustical ceilings that were previously in place. (*Id*, ¶10). The contractor's estimate also included an overhead and profit of twenty-five percent rather than twenty-percent, which is the standard in the industry. (*Id*, ¶12).

The roofing costs for shingle removal and replacement were also unreasonably high on the contractor's estimate. (Toellner Declaration, ¶11). There was no disagreement relating to the scope of the work on the roof, rather the contractor's pricing was significantly higher on a number of items. (*Id*, ¶11). For example, to remove and replace approximately two and one-half squares of asphalt shingles, the contractor estimated $3,200.00, which is unreasonably high for that scope of work.[3] (*Id*, ¶11).

---

[2] Ms. Williams indicates that she does not think that she received a copy of the revised estimate with her copy of the September 26, 2006 letter, although the documentation indicates that a copy was enclosed. She indicated that she did see on the September 26, 2006 letter that it said "estimate enclosed," but she never asked anyone about obtaining a copy of the estimate. (T. Williams Depo., p. 96).
[3] A "square" is ten feet by ten feet. (Toellner Declaration, ¶11).

Furthermore, the itemized estimate provided for a charge of $2,200.00 to remove, replace, and paint 48 sq. ft. of horizontal lap siding. (Toellner Declaration, ¶11). The contractor also wanted to charge $350.00 for removing and replacing a gable vent, which is an inexpensive vent that would simply be placed in the existing hole and secured in place with nails or screws. (*Id.*). As another example, the contractor's estimate further provides for a charge of $200.00 to paint 52 linear feet of crown molding in the kitchen, which equals $4.00 per linear foot for painting standard crown molding. (*Id.*). All of those examples are unreasonably high on their face. (*Id.*).

After the receipt of a copy of the September 26, 2006 letter to GMAC indicating that additional funds had been paid to GMAC in accordance with the revised estimate, plaintiffs made no attempt to ask anyone any questions about the figures in the payment letter to GMAC. (T. Williams Depo., pp. 96-97). Furthermore, plaintiffs made no attempt to discuss the actual figures with anyone at GMAC. (*Id.*). Plaintiffs never talked with anyone about doing further work on the property. (*Id.*). There is no evidence that plaintiffs made any attempt to contact Balboa between the time of their receipt of the letter and March 2007. Plaintiffs never talked to any of the contractors again to ask them about performing the work for the amounts referenced in the letter to GMAC. (*Id.*, pp. 100-101, 104).

In March 2007, plaintiffs sent two of the same handwritten estimates that had been previously submitted to Tancy Nelson with Balboa and demanded "full payment be made to satisfy our mortgage immediately." (Exhibit 33 to T. Williams Depo.). Plaintiffs later filed this lawsuit, and now seek under their First Amended Complaint to recover for breach of contract, bad faith, and on the third-party beneficiary theory.

Based on the above and the law set forth below, this Court should grant Balboa's motion for summary judgment.

### III.    Argument

**I.    Plaintiffs Lack Standing to Bring the Claims Against Balboa.**

**A.    Under the facts of this case, plaintiffs are not parties the contract at issue in this case and have no right to recover under that contract.**

The Alabama Supreme Court has recognized that standing is a jurisdictional requirement for the court. *Dunning v. New England Life Ins. Co.*, 890 So.2d 92, 97 (Ala. 2003). The court in *Dunning* further recognized that "it is well said in the law that 'not a party to, or in privity with a contract, cannot sue for its breach'." (*Id.*) (quoting *Twine v. Liberty National Life Ins. Co.*, 294 Ala. 43, 50, 311 So.2d 299, 305 (1975)).

Under Alabama law, it is clear that a contract of insurance, like other contracts, is governed by the general rules of contracts. *State Farm Fire and Casualty Co. v. Shady Grove Baptist Church*, 838 So.2d 1039 (Ala. 2002). Alabama law provides that insurance companies are entitled to have their policies enforced as written. (*Id.*).

The contractual language clearly demonstrates that under the facts of this case, plaintiffs were not parties to, or in privity with the contract, and, therefore, cannot sue for its breach. It is undisputed that GMAC is the Named Insured on the policy. The policy provides that "YOU," "YOUR," and "YOURS" means the "Named Insured." (Policy, Balboa 00005). The policy further provides that Balboa agrees "to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance **over and above YOUR insurable interest in the RESIDENTIAL PROPERTY**." (*Id.*). (emphasis added).

As of the date of the fire, plaintiffs owed $43,041.07 on the mortgage loan, and they have made no payments since that time. (Zeitz Declaration, ¶¶3-4). The coverage limit under the policy is $32,311.00 with a deductible of $500.00; therefore, there were no residual amount of insurance coverage over and above GMAC's insurable interest in the residential property. (Exhibit 13 to T. Williams Depo.).

The United States District Court for the Eastern District of Louisiana recently addressed this same policy language in a case that is remarkably similar to the present case and held that the plaintiff lacked standing. *Graphia v. Balboa Insurance Company, Inc.*, 517 F.Supp.2d 854 (E.D.La. 2007). In *Graphia*, Financial Freedom, the mortgage holder on plaintiff's home, obtained insurance on plaintiff's home through Meritplan Insurance Company[4] after plaintiff's insurance lapsed. Plaintiff later contacted Meritplan about damage to the property, and Meritplan issued Financial Freedom a check for $21,945.50 for the damage. Subsequently, Meritplan issued another supplemental payment for roof repairs to the property. Later, plaintiff notified Meritplan that she could not complete the home repairs within the estimates that Meritplan provided. She then filed a lawsuit on the policy.

In addressing plaintiff's claims, the *Graphia* court recognized that the applicable law dictates that "if the policy wording is clear and it expresses the intent of the parties, the agreement must be enforced as written." *Graphia*, 517 F.Supp.2d at 857. Addressing the same exact language quoted above from the Balboa policy at issue in this case, the court held that the policy is unambiguous and clearly states that Financial Freedom, and not plaintiff, was the named insured in the policy. *Id.*

---

[4] While Balboa was a named party in that case, the facts demonstrated that the actual insurer involved was co-defendant, Meritplan.

The court then considered whether the plaintiff was an additional insured under the policy, quoting the following language from the master policy: "the BORROWER shall be considered an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest." *Graphia*, 517 F.Supp.2d at 857. The *Graphia* court held that, since plaintiff's claimed damages were less than the amount owed on her mortgage, no residual amounts of insurance were triggered in the case because the amount of the loss did not exceed Financial Freedom's insurable interest in the property. *Id*. Quoting the exact same Loss Payment provision found in the Balboa policy at issue in this case, the court held that "there was no amount 'due for the loss' that exceeds Financial Freedom's insurable interest." *Id*.

The holding in *Graphia* is consistent with Alabama law. Even without the specific policy language found in the present case, which clearly demonstrates that GMAC is the named insured and that plaintiffs are not additional insureds under the facts of this case, analogous Alabama law supports a holding that the borrower would not have standing under the present facts. In *Levine v. Insurance Co. of North America*, 440 F.2d 679 (5th Cir. 1971), the court explained as follows:

> the Supreme Court of Alabama established the rule in that state's jurisprudence that a mortgagor-insured can maintain suit against the insurer on a policy with a mortgagee loss payable clause only for the balance after deducting the amount due on the mortgage from the loss recoverable under the insurance policy. This, of course, imposes the burden on the plaintiff [the insured] of showing there was a balance after paying the mortgage, and the amount of such balance.

*Levine*, 440 F.2d at 681 (citations omitted).

Clearly in this case, since there would be no coverage available under the policy after deducting the amount owed on the mortgage, plaintiffs have no standing to maintain a suit against Balboa.

### B.  Plaintiffs cannot recover as third-party beneficiaries under the policy.

In plaintiffs' Amended Complaint, plaintiffs seek to recover as third-party beneficiaries under the policy. Under the language of the policy and the applicable law, plaintiffs cannot recover under that theory.

Under Alabama law, "one claiming to be a third-party beneficiary must establish that the contracting parties intended, upon execution of the contract, to bestow a direct, as opposed to an incidental benefit, upon the third-party." *Weathers Auto Glass, Inc. v. Alfa Mutual Ins. Co.*, 619 So.2d 1328 (Ala. 1993). *See also Keebler v. Glenwood Woodyard, Inc.*, 628 So.2d 566 (Ala. 1993); *Collins Co., Inc. v. City of Decatur*, 533 So.2d 1127 (Ala. 1988) (the court's inquiry may stop when it determines from the face of the contract that the parties did not intend to confer upon the third-party a direct benefit).

Based on analogous authority from Louisiana, the *Graphia* court rejected plaintiff's argument in that case that plaintiff could recover as a third-party beneficiary under the policy. The court held that "[t]he contract evidences no intent to give plaintiff personal rights in the insurance coverage for losses that do not exceed the mortgagee's insurable interest." *Graphia*, 517 F. Supp. 2d at 858. The court held that any benefit to the plaintiff in that circumstance was purely incidental to the contract between Meritplan and Financial Freedom. *Id.* The court concluded that plaintiff, therefore, lacked standing to assert claims as a third-party beneficiary. *Id. See also Harrison v. Safeco Ins. Co. of America*, 2007 WL 1244268 (E.D. La. 2007) (holding that plaintiffs were not third-party beneficiaries of insurance policies that their mortgage companies placed on their properties).

The contractual language in this case is clear as to the intent of the parties. The contract evidences no intent to give plaintiffs any rights in the insurance coverage where the losses

covered under that policy do not exceed GMAC's insurable interest. As the policy states, "WE agree to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance **over and above YOUR insurable interest in the RESIDENTIAL PROPERTY**." (Policy, Balboa 00008; emphasis added). As in *Graphia*, There is no reasonable basis for construing this language as showing an intent to directly benefit the plaintiffs where, as here, the amount owed on the loan exceeds the limits of the insurance coverage. Any benefits to plaintiffs in this circumstance is purely incidental to the contract between GMAC and Balboa.

Based on the above authority, plaintiffs lack standing to assert claims for breach of contract or bad faith on a third-party beneficiary theory.

> II. **Even If This Court Could Somehow Find that Plaintiffs had Standing to Sue on the Contract Claim as a Third-Party Beneficiaries, Plaintiffs Would Not be Able to Bring a Bad Faith Claim.**
>
> A. **There is no evidence to support plaintiffs' bad faith claim in this case because plaintiff would have no right to payment under the policy.**

In this case, it cannot be disputed that GMAC is the named insured under the contract. Plaintiffs would not have any right to payment under the contract unless the additional insured provision was triggered because the amount of the covered damage was in excess of the amount of GMAC's insurable interest. Based on the undisputed facts of this case as set out above, it is clear that the borrowers were not additional insureds because there were no residual amounts of insurance over and above GMAC's insurable interest in the property. Similarly, no obligation to pay benefits to plaintiffs under the policy was triggered under the loss payment provision. Alabama law is clear that, where plaintiff cannot prove that plaintiff is entitled to benefits, plaintiff cannot recover on a bad faith claim. *State Farm Fire and Casualty Company v. Slade*, 747 So.2d 293, 317 (Ala. 1999) ("the Alabama Supreme Court intended to limit liability under

the tort of bad faith to those instances in which the insured's losses were covered under the policy." *See also Parker v. J.C. Penny Life Ins. Co.*, _____ So.2d _____, 2007 WL 2405074 (Ala. Civ. App. 2007) (one who cannot prove entitlement to benefits under an insurance policy cannot recover on a bad faith claim). Accordingly, for this additional reason, this Court should grant Balboa's motion for summary judgment on plaintiffs' bad faith claim.

### B. There is no basis for finding that Balboa acted in bad faith.

Assuming arguendo, that plaintiffs somehow had standing to bring breach of contract and bad faith claims, Balboa would be entitled to summary judgment on plaintiffs' bad faith claim because the facts concerning the claim, the policy language, and the case law, provide, at a minimum, a reasonably legitimate or arguable reason for determining no additional payments were owed on the claim.

Under Alabama law, a plaintiff alleging bad faith must show as his or her *prima facia* case (1) that there was an insurance contract between the parties; (2) an intentional refusal to pay the insured's claims; (3) the absence of any reasonably legitimate or arguable reason for that refusal; (4) the insurer's actual knowledge of the absence of any legitimate or arguable reason; and (5) if the intentional failure to determine the existence of a wrongful basis is relied upon, the plaintiff must prove the insurer's intentional failure to determine whether there is a legitimate or arguable reason to refuse to pay the claim. *Smith v. MBL Life Assurance Corp.*, 589 So.2d 691, 697 (Ala. 1991) (citing *National Sec. Fire & Cas. Co. v. Bowen*, 417 So.2d 179, 183 (Ala. 1982)). Furthermore, "[t]o prove a bad faith claim, a plaintiff must go beyond merely showing non-payment; *i.e.*, it is incumbent on the plaintiff to show that the insurance company had no legal or factual defense to the claim." *Emanuelsen v. State Farm Auto Insurance Co.*, 651 So.2d

29, 31 (Ala. Civ. App. 1994). A plaintiff must show that the insurer had actual knowledge that it had no legitimate or arguable reason to deny the claim. *Thomas v. Principal Fin. Group*, 566 So.2d 735 (Ala. 1990). Bad faith "is not simply bad judgment or negligence. It imports a dishonest purpose and means a breach of known duty, *i.e.*, good faith and fair dealing, through some motive of self-interest or ill will." *Thomas*, 566 So. 2d at 741.

In this case, Balboa retained an independent adjuster from Cunningham Lindsey, Inc. to inspect plaintiffs' property and prepare an estimate of the damage claim pursuant to the terms of the policy. (Toellner Declaration, ¶2). Dave Toellner, an experienced adjuster, performed a detailed inspection of the damage to the home and prepared an estimate, listing the replacement costs, depreciation, and actual cash value, of the damage in accordance with the policy. (*Id.*, ¶4; original estimate, Exhibit A to Toellner Declaration). Based on Toellner's estimate and the policy terms, Balboa issued payment to GMAC as reflected in the March 6, 2006 letter to GMAC. (Exhibit 25 to T. Williams Depo.). The payment letter also pointed out that GMAC could recover additional money for refundable depreciation and for contractor's overhead and profit, upon the satisfaction of certain conditions set forth in the letter and the policy. (*Id.*).

After plaintiffs submitted handwritten, lump sum estimates from three contractors that were higher than the amount of Toellner's estimate, Tancy Nelson, the claim representative handling the file, forwarded those materials to Toellner. (Toellner Declaration, ¶7). Toellner provided plaintiffs with an estimate form for one of the contractors to provide an itemized detailed statement of the contractor's estimate. (*Id.*). After Toellner received the itemization from the contractor selected by plaintiffs, he evaluated the contractor's itemized estimate and revised his estimate. (*Id.*, ¶8, Exhibit D).

Within one day of receiving the revised estimate, Balboa issued an additional check to

GMAC reflecting the revised estimate. (Exhibit 31 to T. Williams Depo.). In accordance with the policy, the payment represented the actual cash value payment, and the letter informed GMAC that they could obtain refundable depreciation of $4,863.93 and a payment for contractor's profit and overhead totaling $3,207.76, upon the satisfaction of certain conditions pursuant to the terms of the policy. (*Id.*).

Toellner's revised estimate reflected adjustments to take into account a number of items from the contractor's itemization. (Toellner Declaration, ¶8). Based on his inspection of the property and his review of the contractor's itemized estimate, Toellner's revised estimate represented his evaluation as to the amount of the loss. While Toellner's estimate took into account and adjusted for a number of items in the contractor's estimate, Toellner believed that the tile and fixtures in the bathrooms, which suffered only smoke damage, could be cleaned rather than replaced. (*Id.*, ¶9). The contractor's estimate also provided for more expensive sheetrock ceilings in some of the rooms rather that the replacement of the acoustical ceilings that were in the home at the time of the fire. (*Id.*, ¶10).

The roofing costs for shingle removal and replacement were also unreasonably high on the contractor's estimate. (Toellner Declaration, ¶11). There was not any disagreement relating to the scope of the work on the roof, rather the contractor's pricing was significantly higher on a number of items. (*Id.*). For example, to remove approximately two and one-half squares of asphalt shingles and replace, the contractor estimated $3,200.00, which is unreasonably high for that scope of work. (*Id.*).

Furthermore, the itemized estimate provided for a charge totaling $2,200.00 to remove, replace, and paint 48 sq. ft. of horizontal lap siding. (Toellner Declaration, ¶11). The contractor

also wanted to charge $350.00 for removing and replacing a gable vent, which is an inexpensive vent that would simply be placed in the existing hole and secured in place with nails or screws. (*Id.*). The contractor's estimate further provides for a charge of $200.00 to paint 52 linear feet of crown molding in the kitchen, which equals $4.00 per linear foot for painting standard crown molding. (*Id.*). All of those examples are unreasonably high on their face. (*Id.*).

Clearly, given the above, there is no basis for a bad faith claim as a matter of law against Balboa in this case. Based on Toellner's estimates, Balboa had a reasonably legitimate, arguable reason for determining its determination as to the amount payable to GMAC on the claim. *Liberty National Life Ins. Co. v. Allen*, 699 So.2d. 138, 143 (Ala. 1997) ("to defeat a bad faith claim, the defendant does not have to show that its reason for denial was correct, only that it was arguable.").

There is also no basis for asserting that Balboa intentionally failed to investigate or intentionally failed to determine whether there was a legitimate or arguable reason to pay the claim. Balboa requested that Toellner inspect the property and provide an estimate. Balboa relied on that estimate in making payment to GMAC. When plaintiffs claimed that the amount paid to GMAC was insufficient, Balboa had Toellner review the materials submitted by plaintiffs. Toellner sought and obtained specific information from the contractor as to the basis of the contractor's estimate. Toellner subjected those additional materials to cognitive evaluation and revised his estimate. After applying the terms of the policy as to the payment of losses under the policy, Balboa issued additional payment to GMAC and notified GMAC of the possibility of obtaining further payment in accordance with the terms of the policy upon the satisfaction of certain conditions. This payment and notification adopted the full amount of Toellner's revised

estimate. Plaintiffs' claim appears to simply be that they dispute the amount paid by Balboa to GMAC as being too low. Clearly, this is not a bad faith claim; otherwise, anytime the insurer and a claimant disagreed on the amount payable on a claim, there would be a basis for a bad faith claim, which is clearly contrary to Alabama law. *Nobles v. Rural Community Insurance Services*, 303 F.Supp.2d. 1292 (M.D. Ala. 2004) ("the plaintiff's burden in making a bad-faith claim is a 'heavy' one").

Accordingly, Balboa would be entitled to summary judgment on plaintiffs' bad faith claim even if plaintiffs could overcome their lack of standing to bring this lawsuit.

## IV.   Conclusion

For the above reasons, this Court should grant Balboa's motion for summary judgment on all of plaintiffs' claims.

Respectfully submitted,

*s/Henry T. Morrissette*
HENRY T. MORRISSETTE
Bar No.: 7622-E54H

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama  36601
Telephone:   (251) 432-5511
Fax:              (251) 694-6375
E-Mail: hmorrissette@handarendall.com

STEPHEN N. FITTS, III
Bar No.: 9079-T52F

HAND ARENDALL, LLC

2001 Park Place North, Suite 1200
Birmingham, Alabama 35203
Telephone: (205) 324-4400
Facsimile: (205) 397-1316
E-Mail: sfitts@handarendall.com

                          Attorneys for Defendant Balboa Insurance Company

## CERTIFICATE OF SERVICE

I do certify that on **February 22, 2008**, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, and request the Court to serve the same electronically, on the following counsel:

Joseph Dan Talmadge , Jr.    dtalmadge@mcatlaw.com

                          s/Henry T. Morrissette
                          OF COUNSEL

730146