IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BILLY WILLIAMS and            )
TERESA WILLIAMS,              )
                             )
    Plaintiffs,          )
                             )
vs.                          )        CASE NO.    1:07-cv-549
                             )
BALBOA INSURANCE COMPANY,    )
                             )
    Defendant.           )

**EVIDENTIARY SUBMISSIONS IN SUPPORT OF
DEFENDANT BALBOA INSURANCE COMPANY
MEMORANDUM OF LAW IN SUPPORT OF ITS
MOTION FOR SUMMARY JDUGMENT**

Defendant Balboa Insurance Company hereby files the following Evidentiary

Submissions in Support of Defendant Balboa Company's Memorandum of Law in

Support of Its Motion for Summary Judgment:

1.    Deposition of Teresa Williams, pp. 17, 42-43, 56, 69-71, 83-86, 96-97,
100-101, 104, 117-118, and the following exhibits to that deposition:

        Exhibit 2 -  GMAC 0101-0108
        Exhibit 3 -  GMAC 0112-0113
        Exhibit 10 - Williams 00050-00051
        Exhibit 12 – GMAC 0024
        Exhibit 13 – GMAC 0025-0026
        Exhibit 14 – Williams 00048-00049
        Exhibit 15 – GMAC 0062-0063
        Exhibit 16 – GMAC 0061
        Exhibit 23 – Balboa 00041
        Exhibit 25 – Balboa 00078-00079
        Exhibit 31 – Balboa 00107-00108
        Exhibit 33 – Balboa 00110-00114

2.    Lender's Protection Policy, Balboa 00001-00021

3.    Scott Zeitz Declaration

4.    Dave Toellner Declaration, with attached Exhibit A – Toellner's original estimate; Exhibit B – property photographs; Exhibit C – itemized estimate from contractor; and Exhibit D – Toellner's revised estimate

5.    Billy Williams Deposition, pp. 44-45


s/Henry T. Morrissette
HENRY T. MORRISSETTE
Bar No.: 7622-E54H

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama  36601
Telephone:    (251) 432-5511
Fax:          (251) 694-6375
E-Mail: hmorrissette@handarendall.com


STEPHEN N. FITTS, III
Bar No.: 9079-T52F

HAND ARENDALL, LLC
2001 Park Place North, Suite 1200
Birmingham, Alabama  35203
Telephone: (205) 324-4400
Facsimile:  (205) 397-1316
E-Mail: sfitts@handarendall.com

Attorneys for Defendant Balboa Insurance Company

## CERTIFICATE OF SERVICE

I do certify that on **February 22, 2008**, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, and request the Court to serve the same electronically, on the following counsel:

Joseph Dan Talmadge , Jr.    dtalmadge@mcatlaw.com


s/Henry T. Morrissette
OF COUNSEL

732718

# FREEDOM COURT REPORTING

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  SOUTHERN DIVISION

 4

 5    BILLY WILLIAMS and

      TERESA WILLIAMS,

 6

          Plaintiffs,

 7

      vs.            CASE NO. 1:07-cv-549-WHA

 8

      BALBOA INSURANCE

 9    COMPANY,

10        Defendant.

11

12

13        * * * * * * * * * *

14        DEPOSITION OF TERESA GAIL WILLIAMS, taken

15    pursuant to stipulation and agreement before Sherry

16    McCaskey, Certified Court Reporter and Commissioner

17    for the State of Alabama at Large, in the Law

18    Offices of Morris, Cary, Andrews, Talmadge, Jones &

19    Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20    on Thursday, November 15, 2007, commencing at

21    approximately 10:15 a.m.

22        * * * * * * * * * *

23                              EXHIBIT 1
```

COPY

# FREEDOM COURT REPORTING

Page 17

1   7-Elevens of my youth are no longer around.
2       (Defendant's Exhibit 2 was marked
3       for identification.)
4   Q.  All right. I have marked as Exhibit 2 a copy
5       of what I believe to be the mortgage I got
6       with my GMAC documents, the mortgage on the
7       property that y'all were operating under at
8       the time of the fire. I'll ask you to look
9       through that and tell me if that's right.
10  A.  It looks right, yes, sir.
11  Q.  Okay. And for the Record, this is
12      Bates-labeled GMAC 0101 through GMAC 0108 and
13      is a mortgage purported to be between Billy
14      and Teresa Williams and Home Capital, Inc.
15      And is this you and your husband's
16      signatures here on the last page?
17  A.  Yes, sir.
18  Q.  And I believe on the second-to-last page?
19  A.  Yes, sir.
20  Q.  I'd like to kind of get a feel for who handles
21      what between you and your husband. It appears
22      that you had communications with Balboa, my
23      client, after the fire; is that correct?

Page 18

1   A.  Yes, sir.
2   Q.  Were you the person who handled the claim on
3       the house?
4   A.  Yes, sir.
5   Q.  Did your husband have any involvement with
6       that?
7   A.  He was there when Dave Toellner came out to do
8       the estimate.
9   Q.  But he didn't have any communications with
10      the --
11  A.  No, sir.
12  Q.  -- insurance company?
13  A.  He hasn't talked to them on the phone or
14      anything.
15  Q.  Okay. Do you pay the bills also?
16  A.  Yes, sir.
17  Q.  Between you and your husband, that would be
18      primarily your responsibility?
19  A.  Yes, sir.
20  Q.  Who between you would handle any discussions
21      with any other insurance company on the house?
22  A.  I would.
23  Q.  You would. For example, I saw in some of the

Page 19

1   documents that y'all produced that you had
2   some previous policies with various companies
3   on this property before the fire.
4   A.  Yes, sir.
5   Q.  Did you handle talking to the people about
6       buying those policies?
7   A.  No, sir. They were bought from the people
8       that held the mortgage at the time.
9   Q.  So you and your husband have never, since this
10      mortgage was signed, had your own personal
11      coverage on this house?
12  A.  One time.
13  Q.  Did you handle those discussions?
14  A.  Yes, sir.
15  Q.  Do you know how long y'all had that coverage
16      that you purchased?
17  A.  I'm not sure, but I know we had it one year.
18  Q.  Okay. Between you and your husband, who had
19      the contact with the people who came and
20      looked at the house for purposes of giving
21      y'all estimates on the repairs?
22  A.  I did with all three of them. He was there
23      when one came.

Page 20

1   Q.  And I think this is clear, but we paused a
2       little bit for you to look at it. So I want
3       to make sure I ask you.
4       This mortgage we've marked as Exhibit 2,
5       the one in front of you, was the mortgage that
6       you and your husband were operating under with
7       your house loan at the time of the fire?
8   A.  Yes.
9   Q.  Okay. Let me show you what I will mark as
10      Exhibit 3.
11      (Defendant's Exhibit 3 was marked
12      for identification.)
13  Q.  And I understand Exhibit 3, which I also got
14      from GMAC, to be the note that went with the
15      mortgage that we've just marked as Exhibit 2.
16      Is that correct?
17  A.  Yes, sir.
18  Q.  Okay. And this is also signed by you and your
19      husband on the second page?
20  A.  Yes, sir.
21  Q.  Let me show you a document I will mark as
22      Exhibit 4.
23      (Defendant's Exhibit 4 was marked

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

| | Page 41 |
|---|---|
| 1 | A. Because they were bought out. |
| 2 | Q. Okay. So during this time, you and your |
| 3 | husband never bought coverage -- |
| 4 | A. No, sir. |
| 5 | Q. -- on the property yourselves? |
| 6 | A. No, sir. |
| 7 | Q. And by this time, I'm referring to the |
| 8 | 2005-2006 time period. |
| 9 | A. We hadn't bought any. |
| 10 | (Defendant's Exhibit 12 was marked |
| 11 | for identification.) |
| 12 | Q. Did you ever make any attempts to get coverage |
| 13 | or talk to anybody about getting coverage -- |
| 14 | A. No, sir. |
| 15 | Q. -- on the property? |
| 16 | When was the last time you and your |
| 17 | husband tried to buy your own coverage on the |
| 18 | property? |
| 19 | A. When we did the mortgage. |
| 20 | Q. Why didn't you try to get coverage on the |
| 21 | property after that first policy lapse? |
| 22 | A. Provident had it, and they told me to let them |
| 23 | put it in with the payment, provident Bank. |

| | Page 42 |
|---|---|
| 1 | Q. Provident Bank. Okay. But that was a |
| 2 | lender-placed policy? |
| 3 | A. I guess, yes. |
| 4 | Q. But after Provident had it, it switched |
| 5 | companies again to Litton? |
| 6 | A. Went to Litton. |
| 7 | Q. But you understood, Litton gave you the |
| 8 | opportunity for you and your husband to buy |
| 9 | your own coverage on the property -- |
| 10 | A. Yes, sir. |
| 11 | Q. -- separately and to give them notice of |
| 12 | coverage? |
| 13 | A. Yes, sir. |
| 14 | Q. And you just never did that? |
| 15 | A. No, sir. |
| 16 | Q. But you knew you could do that? |
| 17 | A. Yes, sir. |
| 18 | Q. Let me show you a document I've marked as |
| 19 | Exhibit 12, which is a letter dated August |
| 20 | 25th, 2005. It's Bates-labeled GMAC 0024. |
| 21 | I'll ask you if you recognize that document? |
| 22 | A. Yes, sir. |
| 23 | Q. And you understood, this was a letter telling |

| | Page 43 |
|---|---|
| 1 | that you could get insurance on your house and |
| 2 | notify -- from somebody else, an insurance |
| 3 | carrier, and notify GMAC that you had |
| 4 | insurance? |
| 5 | A. Yes, sir. |
| 6 | Q. And if you didn't provide them with proof of |
| 7 | that insurance, then they were going to take |
| 8 | out a lender policy to protect their interest? |
| 9 | A. Yes, sir. |
| 10 | Q. Did you have any contact or communication with |
| 11 | GMAC after you that first letter? |
| 12 | A. No, sir. |
| 13 | Q. And by the letter, I'm referring to Exhibit |
| 14 | 12. |
| 15 | Why not? |
| 16 | A. I just understood they were going to place |
| 17 | insurance on it. |
| 18 | Q. Okay. Did you understand that the coverage |
| 19 | was going to provide protection to GMAC? |
| 20 | A. No, sir. |
| 21 | Q. You see where it says -- the second sentence |
| 22 | in that letter says, "The coverage will |
| 23 | provide protection to us for the loss of your |

| | Page 44 |
|---|---|
| 1 | dwelling up to the limit of $32,311? |
| 2 | A. On the one you just give me? It's not on |
| 3 | here. I don't see it. |
| 4 | Q. It's on the second letter. I'm sorry. I was |
| 5 | reading the wrong letter. |
| 6 | (Defendant's Exhibit 13 was marked |
| 7 | for identification.) |
| 8 | Q. I'll mark this one. It's a letter dated |
| 9 | October 9th, 2005, marked as Exhibit 13, |
| 10 | Bates-labeled GMAC 0025 to Billy and Teresa |
| 11 | Williams from GMAC Mortgage. Do you see that |
| 12 | document? |
| 13 | A. Yes, sir. |
| 14 | Q. You recall receiving that document? |
| 15 | A. Yes, sir. |
| 16 | Q. Okay. Now, let's see. The second sentence of |
| 17 | the first paragraph -- excuse me -- second |
| 18 | paragraph says, "Since we have not received |
| 19 | any evidence of hazard insurance, we will |
| 20 | insure hazard coverage. The coverage will |
| 21 | provide protection to us for loss to your |
| 22 | dwelling up to a limit of $32,311." |
| 23 | See that? |

11 (Pages 41 to 44)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 53

1    the property for the period May 27th, 2006, to
2    May 27, 2007. Do you see that?
3    A. Yes, sir.
4    Q. Did you and your husband do anything after
5    receiving that?
6    A. No, sir.
7    Q. Did you have any conversations with anybody at
8    GMAC about these two letters that we've marked
9    as 18 and 19?
10   A. Don't remember if we did.
11   Q. Okay. Did you discuss them with anybody?
12   A. Just my husband.
13   Q. Other than husband?
14   A. No, sir. Well, I think I talked to Chad.
15       MR. TALMADGE: He's a lawyer.
16   A. Yeah, Chad Stewart.
17   Q. Chad Stewart is a lawyer in Enterprise?
18   A. Yes, sir.
19   Q. When was the first time you talked to
20   Mr. Stewart?
21   A. I don't remember.
22   Q. Was it after the fire?
23   A. Yes, sir.

Page 54

1    Q. Had you talked to anybody, accountant, lawyer,
2    anybody before the fire about the house?
3    A. Not that I remember.
4    Q. Who was the bankruptcy lawyer that handled
5    your bankruptcy?
6    A. Oh, it was -- can't think of their name now.
7    Got a office here in Dothan and Enterprise. I
8    don't remember. Can't think of their names
9    right now.
10   Q. Have you talked to any lawyers other than that
11   Mr. Stewart and Mr. Talmadge?
12   A. I went to Bruce McLean first.
13   Q. Anybody else?
14   A. No.
15       (Defendant's Exhibit 21 was marked
16        for identification.)
17   Q. I'll show you a document I've marked as
18   Exhibit 21. It's Bates-labeled GMAC 0043-45
19   and appears to be a letter from GMAC or
20   statement from GMAC to Billy and Teresa
21   Williams, regarding payoff of the loan. Do
22   you recall receiving that?
23   A. I don't remember.

Page 55

1    Q. It's possible you did?
2    A. Yes, sir, it's possible.
3    Q. Okay. And this was dated November 15th, 2006
4    and list the total payoff on the loan as
5    $46,132.68?
6    A. That's what it says on here.
7    Q. Okay. I'll show you a document I'll mark as
8    Exhibit 20. Well, actually 22.
9        MR. TALMADGE: Did you skip 20?
10   Q. I skipped 20. All right. There we go. We'll
11   switch them up. Exhibit 20 now. Exhibit 20
12   is a payoff statement dated February 27th,
13   2007. And Exhibit 21 is a payoff statement
14   dated November 15th, 2006. Do you recall
15   seeing Exhibit 20?
16       (Defendant's Exhibit 20 were marked
17        for identification.)
18   A. I saw one of these, but I don't remember which
19   one it was.
20   Q. And that statement we marked as Exhibit 20
21   listed the total due on the loan as
22   $47,675.94?
23   A. Yes, sir.

Page 56

1        (Defendant's Exhibit 22 was marked
2         for identification.)
3    Q. I'll show you a document marked as Defendant's
4    Exhibit 22. And Exhibit 22 is a payoff
5    statement from GMAC Mortgage listing you and
6    your husband, dated April 9th, 2007,
7    Bates-labeled GMAC 0049-51. Do you recognize
8    that document?
9    A. No, sir.
10   Q. But it's another payoff statement?
11   A. I could have seen it. I just don't remember.
12       MR. MORRISSETTE: Let's take five.
13       (Brief recess)
14   Q. I want to talk about the fire at the house.
15   A. Okay.
16   Q. You were alone at the time?
17   A. Yes.
18   Q. And it was on February 5th --
19   A. Yes, sir.
20   Q. -- 2006?
21   A. Yes, sir.
22   Q. Was anyone else living at the house other than
23   you and your husband at that time?

14 (Pages 53 to 56)

# FREEDOM COURT REPORTING

Page 69

1  Q.  And you haven't had any further contact with
2     Mr. Toellner after that time?
3  A.  No, sir, not that I can remember that I talked
4     to him again.
5  Q.  Was there a time later when Mr. Toellner told
6     you to get some additional information from a
7     contactor?
8  A.  Tancy asked me.
9  Q.  Okay.
10  A.  But I understood it came from him. I don't
11     know.
12  Q.  We can talk about that in a while. But you've
13     now told me about all your contact with the
14     adjuster?
15  A.  Yes, sir.
16  Q.  I'll show you a document I've marked as
17     Exhibit 25, which purports to be a March 6th,
18     2006, letter to GMAC. On the second page at
19     the -- from Tancy Nelson -- and at the bottom
20     of the page, it carbon copies Billy Williams.
21     Do you see that? Do you recall getting a copy
22     of this letter?
23  A.  Yes, sir.

Page 70

1  Q.  And it's Bates-labeled Balboa 00078-79?
2  A.  Yes, sir.
3  Q.  But when you received this letter, did you
4     understand it to show what Balboa was offering
5     to pay on the damage to your home to GMAC?
6  A.  Well, I didn't understand all the -- you know,
7     the -- whatever you call it, the depreciation
8     and stuff like that.
9  Q.  Did you ask anybody about it?
10  A.  No.
11  Q.  What did you do once you got this
12     information? By "information," I'm referring
13     to Exhibit 25.
14  A.  I don't think I did anything then.
15  Q.  Okay. Then page two refers to an estimate
16     being enclosed, if you'll look at the document
17     25. See at the bottom of the page there?
18  A.  Uh-huh (positive response).
19  Q.  Did you ever receive any estimate as an
20     attachment, or did you just receive the
21     letter?
22  A.  I got -- some time or another, I got the thing
23     that Mr. Toellner done.

Page 71

1  Q.  Okay. I'll show you that.
2     (Defendant's Exhibit 26 was marked
3     for identification.)
4  Q.  I'll show you a document I've marked as
5     Exhibit 26. It says "Short Form" at the top
6     of it, and it's a Cunningham Lindsey
7     adjuster's report.
8  A.  Yes, sir.
9  Q.  Do you recall receiving this?
10  A.  Yes, sir.
11  Q.  Okay. And it's Bates-labeled Balboa 00055
12     through 60.
13  A.  I didn't get a top sheet like this, I don't
14     remember.
15  Q.  You got the estimate?
16  A.  I got the rest of it, the estimate.
17  Q.  Okay. That's fine. But you did receive it?
18  A.  Yes, sir.
19  Q.  Did you review the estimate?
20  A.  Yes, sir.
21  Q.  All right. What did you do with the estimate?
22  A.  I called people in the phonebook to get them
23     to come out and give me an estimate to see

Page 72

1     what it would cost to fix it, what they would
2     charge to do the work.
3  Q.  Okay. Did you have any conversations with
4     Ms. Nelson before you talked to any of the
5     folks about doing the work?
6  A.  I don't remember. I don't think so.
7  Q.  But you didn't have any conversations with
8     Mr. Toellner?
9  A.  No.
10  Q.  Okay. Did people come out to the house and
11     look at the damage and give you a price?
12  A.  Yes, sir.
13  Q.  Now, you've submitted proposals from Mr. Jerry
14     Gentle?
15  A.  Gentile.
16  Q.  Gentile. B&B Construction?
17  A.  Yes, sir.
18  Q.  And Grimes Roofing?
19  A.  Yes, sir.
20  Q.  Did anybody else come out to the house to look
21     at the property?
22  A.  Wouldn't nobody else come.
23  Q.  Excuse me?

18  (Pages 69 to 72)

# FREEDOM COURT REPORTING

Page 81

1  figures, and then we'll pay it. But then they
2  never did -- didn't pay it when I sent it to
3  them.
4  Q.  Okay. We'll get to that.
5       (Defendant's Exhibit 29 was marked
6       for identification.)
7  Q.  I'll show you a document I marked as Exhibit
8  29. It's the estimate from Grimes Roofing; is
9  that correct?
10 A.  Yes.
11 Q.  Did Mr. Grimes come out and look at the
12 property?
13 A.  Yes.
14 Q.  Were you the only person there when he did?
15 A.  I think so.
16 Q.  Did you have any conversations with him?
17 A.  He asked me how it happened, and he looked it
18 over and wrote up the paper and gave it to me
19 and told me to call and let him know.
20 Q.  Did he talk to you any about the damage?
21 A.  Not that I remember.
22 Q.  Okay. Did he talk to you any about the costs
23 other than just handing you the estimate?

Page 82

1  A.  No.
2  Q.  What did you do after you got these estimates?
3  A.  I wrote Tancy. I think I wrote her instead of
4  calling her and sent them to her.
5  Q.  Okay. And you hadn't had any conversations
6  with her ever since your initial conversation
7  in early February when you have a recorded
8  statement until you wrote her?
9  A.  Until I wrote her about the estimate?
10 Q.  Yes.
11 A.  I don't remember. I don't remember.
12 Q.  Okay. You don't remember any conversations?
13 A.  I was talking to her all the time, but I don't
14 remember when it was.
15 Q.  Okay. Let's try to break this down a little
16 bit. You talked to Ms. Nelson when you made
17 your claim --
18 A.  Yes, sir.
19 Q.  -- back in early February?
20      And then Mr. Toellner came out?
21 A.  Yes, sir.
22 Q.  And then you got the copy of the letter to
23 GMAC regarding payment with the estimate

Page 83

1  attached?
2  A.  Yes, sir.
3  Q.  Had you talked to Ms. Nelson at that point,
4  other than the initial time you talked to her?
5  A.  I don't think so.
6  Q.  Then after you got the letter with the
7  estimate attached, you had the contractors
8  come out to the house to look at it?
9  A.  Yes, sir.
10 Q.  And then you wrote Ms. Nelson?
11 A.  I think I wrote her, and then I had to fax it.
12 Q.  But you didn't talk to her in between that
13 time?
14 A.  I don't remember if I did.
15 Q.  You don't recall talking to her?
16 A.  I don't recall.
17 Q.  Okay. Let me show you a document I'll mark as
18 Defendant's Exhibit 30.
19      (Defendant's Exhibit 30 was marked
20      for identification.)
21 Q.  Which purports to be a May 3rd, 2006, letter
22 with an attached letter. It looks like you
23 may have written her and then had trouble

Page 84

1  getting the fax to her and wrote her again?
2  A.  I called her and couldn't get through. And
3  I'd call her, and I'd fax it. I don't know
4  how many times that I faxed paperwork to her,
5  and she didn't get it.
6  Q.  Do you know why she didn't get it?
7  A.  No, I don't. I carried it different places
8  and had it faxed.
9  Q.  But you don't know whether that was -- why
10 that happened?
11 A.  No.
12 Q.  But you never talked to her before this May
13 3rd, 2006, letter?
14 A.  I don't remember.
15 Q.  Okay. At the bottom of this letter that we've
16 marked as Exhibit 30, it says, "My attorney
17 told my husband to not pay to fax this again."
18 Had you already talked to an attorney at this
19 time?
20 A.  I had talked to Bruce McLean about the way
21 they was doing, and he said --
22      MR. TALMADGE: Now, wait a minute.
23 Q.  Don't tell me what he said.

21 (Pages 81 to 84)

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 85

1  MR. TALMADGE: You don't need to talk
2  about what a lawyer said. I mean,
3  obviously, you revealed what he said.
4  But beyond that, you don't need to
5  talk about it.
6  Q. I can ask you who you talked to but --
7  A. I just asked his advice.
8  Q. -- I can't ask you what he said.
9  MR. TALMADGE: That's all privileged.
10  Q. That's fine. That's fine. I don't want to
11  know about discussions you had with your
12  lawyers.
13  A. Okay.
14  Q. I'm just trying to identify who you talked
15  to. I think I'm entitled to that, but I don't
16  think I'm entitled to anything --
17  THE WITNESS: Slap me if I do wrong.
18  MR. TALMADGE: No, no, that wasn't wrong.
19  It's just, you know, that that's
20  something I needed to tell you. You
21  wouldn't know if you needed to talk
22  about that or not.
23  Q. You wrote her and attached the estimates?

Page 86

1  A. Yes, sir.
2  Q. Once she got the fax, did you talk to her?
3  A. Yes, sir.
4  Q. Do you know how long it took for -- how long
5  after she actually got the fax that you talked
6  to her?
7  A. I don't remember.
8  Q. Within a few days?
9  A. I assume. I don't know. Can't say for sure.
10  Q. Okay. And you don't have any reason to know
11  that the problems in getting the fax to
12  Ms. Nelson were caused by Balboa or what
13  caused them?
14  A. No, I have no idea what caused it.
15  Q. Okay. After she got the letter that we've
16  marked as Exhibit 30, did you have any further
17  conversations with Ms. Nelson?
18  A. Yes.
19  Q. What happened with those conversations?
20  A. I called her. Sometimes I couldn't get her.
21  And sometimes I could leave messages for her
22  and she didn't call back or I didn't get the
23  call and --

Page 87

1  Q. Did you have an answering machine during this
2  time?
3  A. No, sir.
4  Q. Okay. So it's possible she tried to call you
5  when you were out and didn't reach you?
6  A. Well, we had caller ID thing on the phone, and
7  I didn't see it on there. But --
8  Q. But you finally -- you talked to her?
9  A. Yes, I finally talked to her and asked her
10  what the insurance was going to do. And
11  that's -- sometime after that is when she told
12  me to pick one of those three contractors that
13  I wanted to do the job. And they would send a
14  form like Mr. Toellner filled out and have him
15  to fill it out and send it back to her. And
16  they would pay it.
17  Q. She said they would pay it if you sent the
18  form?
19  A. She said they would pay it if I'd get him to
20  fill it out and send it back, pick the one I
21  wanted. So Mr. Dingman filled it out.
22  Q. And you don't have a copy of what he filled
23  out?

Page 88

1  A. I don't have -- I sent it to her.
2  Q. Did you ever see what he filled out?
3  A. I had it in my hand and put it in the mail. I
4  didn't never really go over it.
5  Q. You didn't keep a copy of it?
6  A. But it was a form just like Mr. Toellner
7  filled out.
8  Q. Did you send that to Mr. Toellner or
9  Ms. Nelson?
10  A. I remember sending it to Tancy. That's the
11  way I remember it. I don't --
12  Q. And she said that if you sent a form, Balboa
13  would pay it?
14  A. That's what she said.
15  Q. Did she say what they would pay?
16  A. She said they would pay it. That's how she
17  said it.
18  Q. That's all she said though?
19  A. That's all she said.
20  Q. Okay. Do you remember when you got the form
21  back from Mr. Dingman?
22  A. I sure don't.
23  Q. Are you certain you sent the form to

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 93

1  Q.  A high voice.  You mean, she raised her
2      voice?
3  A.  Kind of, yeah.
4  Q.  Any other complaints about the way she handled
5      the claim?
6  A.  When another attorney asked her to --
7      THE WITNESS:  Can I talk about when Chad
8          asked her to --
9      MR. TALMADGE:  If he was talking to her.
10 A.  He asked her for an insurance policy on this,
11     and she told him to call -- she was kind of
12     rough talking that day.  She wanted him to
13     call GMAC for the policy.  And he called them,
14     and they told him to call her.  It was just
15     kind of back and forth.
16 Q.  You were present for that call?
17 A.  Yes, sir.
18 Q.  Do you remember anything else about that phone
19     call?
20 A.  No, sir.
21 Q.  Was anybody else on the phone that one time
22     you talked to her and she told you she wasn't
23     going to pay for your bathrooms?

Page 94

1  A.  No, sir.  That was in my home.
2  Q.  Have you now told me every complaint you have
3      about the way Ms. Nelson handled the claim?
4  A.  As best I remember, that's all.
5      MR. MORRISSETTE:  Let's take a break.
6          (Brief recess)
7      MR. TALMADGE:  She wants to add to a prior
8          answer.
9      MR. MORRISSETTE:  That's fine.
10 Q.  Your counsel stated that you wanted to add to
11     one of your prior answers?
12 A.  Yes, sir.
13 Q.  And what would you like to say?
14 A.  John Sizemore, he came out there and looked at
15     the fire damage.  I don't know who sent him,
16     but we didn't call him.  He never did say.
17 Q.  And he was with Century 21?
18 A.  Uh-huh (positive response).  And we talked --
19     he looked it over, and he said it would be
20     better just to tear it down and start over.
21 Q.  When did you talk to Mr. Sizemore?
22 A.  I don't remember what date it was.
23 Q.  Was it before you got these estimates?

Page 95

1  A.  It was after.
2  Q.  After.  Was it before you talked to
3      Ms. Nelson?
4  A.  It was after.
5  Q.  Was it after you -- well, I'll come back to
6      that.  Let's go further, and then I'll have
7      more context to put it in.
8  A.  My husband and I both were there talking to
9      him.
10 Q.  Okay.  I was going to ask you about him
11     anyway.  Y'all mentioned him in your discovery
12     responses, but I appreciate that.
13         (Defendant's Exhibit 31 was marked
14             for identification.)
15 Q.  I'm going to show you a letter dated September
16     26th, 2006, we've marked as Defendant's
17     Exhibit 31, and ask you if you recognize that
18     document.  It's a letter to GMAC, Loss Draft
19     Department, from Tancy Nelson, carbon copied
20     to Billy Williams.
21 A.  Yes.
22 Q.  And you received that letter?
23 A.  I think I've seen one like it.

Page 96

1  Q.  Okay.  And did you receive an estimate with
2      the letter?
3  A.  Didn't get one with this one, I don't think.
4      I got one with the other one you showed me.
5          (Defendant's Exhibit 32 was marked
6              for identification.)
7  Q.  I'll show you a document I've marked as
8      Exhibit 32, which purports to be a Cunningham
9      Lindsey report, short form and estimate, dated
10     September 26th, 2006.  Do you recall receiving
11     that?
12 A.  Never got it.
13 Q.  Did you see on the September 26th letter when
14     it said, estimate and check enclosed?
15 A.  Yes.  It wasn't in there.
16 Q.  Okay.  Did you ever ask anybody for the
17     estimate?
18 A.  I didn't even think about it.  I didn't notice
19     it.
20 Q.  Did you understand the payment made to GMAC on
21     page two of the -- explained on page two of
22     the September 26, 2006, letter?
23 A.  No.

24  (Pages 93 to 96)

# FREEDOM COURT REPORTING

Page 97

1  Q. Which, by the way, is Bates-labeled Balboa
2     00107-108.
3        Did you ask anybody questions about it?
4  A. No.
5  Q. What did you do when you got the letter?
6  A. Sometime after this I called GMAC, and they
7     told me how much they had received. But I
8     don't remember when it was.
9  Q. Did you understand that -- did you ever
10    discuss the actual figures with anyone at
11    GMAC?
12 A. No.
13 Q. Did you ever show this to anyone about doing
14    further work on the property?
15 A. No, sir.
16 Q. Did you ever -- after you got this September
17    26th letter, when is the next time you talked
18    with anyone about any aspect of your damage or
19    repair or insurance or anything?
20 A. I guess it was when I talked to Tancy.
21 Q. When was that? The text contact I have is --
22    it's in the diary which I produced -- but it's
23    March of 2007.

Page 98

1  A. No. There was conversations before then, I'm
2     sure. This was September --
3  Q. 2006.
4  A. -- 2006.
5  Q. Do you have any recollection of any specific
6     conversations between the time you received
7     that letter and March of 2007? By "that
8     letter," I'm referring to Exhibit 31.
9  A. After this, you're talking about?
10 Q. Yes.
11 A. I don't remember.
12 Q. Our records show, you talked to Ms. Nelson in
13    March of 2007. And you don't recall any
14    conversations in between that letter and March
15    2007?
16 A. I talked to her several times. I just don't
17    remember what dates.
18 Q. Do you remember what was said?
19 A. Just asking her about what the insurance was
20    going to do.
21 Q. Do you think that was before you received the
22    September 26th, 2006, letter?
23 A. I don't know.

Page 99

1  Q. Do you recall what was said in any of those
2     conversations beyond you asking her what the
3     insurance company was going to do?
4  A. No.
5  Q. Do you recall talking to her in March of 2007?
6  A. No. Unless that's when she told me about the
7     bathrooms.
8  Q. I think that probably is the one where you
9     talked to her about the bathrooms. Excuse me.
10 A. If that's the one where she was talking to me
11    about the bathrooms, yes.
12 Q. I mean, I'm not sure, but I believe -- that's
13    the next time that I have that you talked to
14    her.
15 A. Okay.
16 Q. What happened in that conversation?
17 A. That's when she just told me they weren't
18    going to pay for my bathrooms because they
19    could be cleaned. She wasn't going to replace
20    my bathrooms.
21 Q. What was your reaction to that?
22 A. I don't remember. Seems like I didn't say
23    anything to her about it. She told me to call

Page 100

1     GMAC and deal with them because they had the
2     check now, best I remember.
3  Q. So other than her telling you to call GMAC,
4     you don't remember anything else?
5  A. No.
6  Q. Did you ever talk to anybody about cleaning
7     the bathrooms?
8  A. No.
9  Q. Did you ever talk to anybody about whether
10    cleaning the bathrooms would have worked?
11 A. Well, the guys that give the estimates told me
12    that -- you know, they had made the remarks
13    that you couldn't clean that.
14 Q. When did you talk to them about cleaning the
15    bathrooms?
16 A. They made the remarks about it when -- they
17    said they -- couldn't nothing be cleaned, that
18    that all would have to be taken out.
19 Q. And this was in March of 2006?
20 A. When they gave the estimates, yeah.
21 Q. After they gave you the estimates, did you
22    have any conversations with anybody about
23    cleaning the bathrooms versus taking out the

25 (Pages 97 to 100)

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

# FREEDOM COURT REPORTING

|  | Page 101 |
|---|---|
| 1 | -- |
| 2 | A. No. |
| 3 | Q. Did you ever talk back with Mr. -- what's the |
| 4 | gentleman's name who did the detail sheet? |
| 5 | A. Dingman? |
| 6 | Q. Dingman. |
| 7 | A. No, I never talked to him anymore. |
| 8 | Q. So you never went back with this payment -- |
| 9 | September 26, 2006, payment where GMAC was |
| 10 | shown what Balboa was going to pay, you never |
| 11 | went back to Mr. Dingman and asked him what he |
| 12 | could do for that amount of money? |
| 13 | A. No. |
| 14 | Q. Why not? |
| 15 | A. I didn't know I needed to talk to him |
| 16 | anymore. I thought that's what he would |
| 17 | charge and what he put on his estimate. |
| 18 | Q. So you didn't try to see if Mr. Dingman or |
| 19 | anyone else would perform the work after you |
| 20 | got this September 26th letter? |
| 21 | A. No, because I already had three different |
| 22 | estimates, and they're all different prices. |
| 23 | Q. Now, you got three different estimates from |

|  | Page 102 |
|---|---|
| 1 | the contractors, and they were all different, |
| 2 | right? |
| 3 | A. Yes, sir. |
| 4 | Q. So those contractors couldn't agree on how |
| 5 | much it would cost to repair they property, |
| 6 | could they? |
| 7 | A. They just -- I don't know how close they were, |
| 8 | but that's what they said they would charge to |
| 9 | do it. |
| 10 | Q. Okay. And you never tried to negotiate with |
| 11 | any of them? |
| 12 | A. No, I didn't. |
| 13 | Q. And you never asked Mr. Dingman to follow up |
| 14 | on the September 26th letter? |
| 15 | A. No. |
| 16 | Q. Did you ever have any conversations with GMAC |
| 17 | about getting the payment that was referenced |
| 18 | in the September 26th letter? |
| 19 | A. I called them. I don't remember which date, |
| 20 | and they told me they had been reported that |
| 21 | somebody was living in the house and power was |
| 22 | on it. But I don't remember which date it |
| 23 | was. |

|  | Page 103 |
|---|---|
| 1 | Q. All right. Was that accurate? |
| 2 | A. No. There hadn't been any power on it since |
| 3 | the day it burned or the day after. They came |
| 4 | on Monday and took the meter off. |
| 5 | Q. You didn't know who gave them this report? |
| 6 | A. No. They didn't tell me, just that they had |
| 7 | been reported that. |
| 8 | Q. No indication that anybody from Balboa had |
| 9 | reported that? |
| 10 | A. No. Said we wouldn't answer the door. They |
| 11 | had knocked on the door, and we didn't answer |
| 12 | the door. |
| 13 | Q. But, again, that wasn't anyone related to |
| 14 | Balboa? |
| 15 | A. Not that I know of. |
| 16 | Q. Did you understand that Balboa also felt that |
| 17 | Mr. Dingman's detail of his work included |
| 18 | replacing the acoustical ceiling with |
| 19 | Sheetrock; did anybody discuss that with you? |
| 20 | A. I didn't understand what they were going to go |
| 21 | back with. |
| 22 | Q. You just didn't know either way on that? |
| 23 | A. I didn't even think about it. I just knew |

|  | Page 104 |
|---|---|
| 1 | they were going to replace it. |
| 2 | Q. But you never took the revised payment |
| 3 | schedule that GMAC received and got a copy of |
| 4 | that letter, right, the September 26th letter? |
| 5 | A. This one? |
| 6 | Q. Yes. |
| 7 | A. Exhibit 31? |
| 8 | Q. Yes. |
| 9 | A. I think I got a copy of the letter, but I |
| 10 | never got an estimate with it. |
| 11 | Q. But you never took the payment on the second |
| 12 | page and tried to see if anybody would do the |
| 13 | work for that price? |
| 14 | A. No. It was way under what the estimates were. |
| 15 | Q. Okay. And you never talked to anybody about |
| 16 | cleaning the bathrooms after Balboa wrote GMAC |
| 17 | and then she told you over the phone that the |
| 18 | company wasn't going to pay for the bathrooms? |
| 19 | A. No. |
| 20 | Q. What specifically did the contractors tell you |
| 21 | about the bathrooms in March when they looked |
| 22 | at it? |
| 23 | A. They said, all of it would have to be tore out |

## 367 VALLEY AVENUE
### (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 117

1 Q. Is there any reason your husband wouldn't be
2    able to work on the house if he had money to
3    buy supplies and materials?
4 A. I don't know. I don't know if he'd be too
5    busy with work or if he could do it or not.
6 Q. But y'all never talked to anybody about your
7    husband doing the work?
8 A. No.
9 Q. Has the fact that the mortgage is past due and
10   they've been talking about foreclosure
11   affected your desire to fix the house?
12 A. Rephrase that.
13 Q. Sure. The loan has been in default since
14   before the fire?
15 A. Yeah.
16 Q. And that shortly after the fire, they wrote
17   you about foreclosure proceedings on the
18   fire?
19 A. Okay.
20 Q. Has those proceedings being started, the
21   foreclosure proceedings, impacted your and
22   your husband's efforts to fix the house?
23 A. I still don't understand.

Page 118

1 Q. Has the foreclosure proceeding been a factor
2    in you and your husband's efforts to fix the
3    house?
4 A. No, I don't think so.
5 Q. If the house were miraculously repaired, just
6    if you woke up tomorrow and it was fixed,
7    would you be able to pay off the loan on the
8    house?
9 A. No.
10 Q. So you'd still be subject to foreclosure
11   proceedings?
12 A. Yeah.
13 Q. So even if Balboa had paid to fix the house,
14   whatever that costs, you wouldn't be able to
15   pay off the loan on the house?
16 A. No.
17 Q. And you wouldn't be able to stop foreclosure
18   proceedings?
19 A. I don't know.
20 Q. But you would still be delinquent on the
21   house?
22 A. Yes.
23 Q. And the repair of the house wouldn't change

Page 119

1    that?
2 A. No.
3 Q. Is there any reason, other than lack of money,
4    that you and your husband haven't made any
5    further payments on the house?
6 A. Well, we had to fix the trailer. We had to
7    have money for that, to get in it to have a
8    place to live.
9 Q. Okay. Any other reason?
10 A. I don't think -- I can't think of any.
11 Q. Other than your husband's -- your husband is
12   working now?
13 A. Yes, sir.
14 Q. What does he do?
15 A. Drywall.
16 Q. Other than your husband's work, do you and
17   your husband have any other source of income?
18 A. I draw disability.
19 Q. You personally?
20 A. Yeah.
21 Q. Social Security?
22 A. SSI.
23 Q. SSI. How much a month?

Page 120

1 A. Right now it's 440.
2 Q. Do you know what your husband's income from
3    the drywall business is?
4 A. Can't never tell because like Monday they
5    didn't do anything.
6 Q. What does it average a month?
7 A. I'd say 1200.
8 Q. Is that take-home or gross?
9 A. It's gross.
10 Q. Let's talk about the foreclosure proceedings.
11   What has happened -- you got the notice of the
12   foreclosure that we just referred to, the
13   March notice after the fire. Do you remember
14   that?
15 A. Yes, sir.
16 Q. What happened with the foreclosure proceedings
17   from that point?
18 A. It was stopped when the lawsuit was filed.
19 Q. Okay. Did you have any discussions with
20   anybody before that time about the
21   foreclosure?
22 A. Yeah, Chad Stewart.
23 Q. Okay. Does Mr. Stewart represent you in the

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

WHEN RECORDED MAIL TO:
HOME CAPITAL INC.
7 DUNWOODY PARK SUITE 104
ATLANTA, GEORGIA 30338

Loan Number 99-2057

―――――――――――――[Space Above This Line For Recording Data]―――――――――――――

# MORTGAGE

I hereby certify that this document is a true and exact copy of the original
By.―――――――――

THIS MORTGAGE ("Security Instrument") is given on JUNE 26, 2000
The grantor is BILLY L. WILLIAMS AND TERESA G. WILLIAMS, husband and wife

("Borrower"). This Security Instrument is given to

HOME CAPITAL INC., A GEORGIA CORPORATION

which is organized and existing under the laws of GEORGIA                    , and whose address is
7 DUNWOODY PARK SUITE 104, ATLANTA, GEORGIA 30338

("Lender"). Borrower owes Lender the principal sum of
THIRTY THREE THOUSAND SEVEN HUNDRED FIFTY AND 00/100
Dollars (U.S. $ 33,750.00        ). This debt is evidenced by Borrower's note dated the same date as this
Security Instrument ("Note"), which provides for monthly payments, with the full debt, if not paid earlier, due and
payable on JULY 1, 2020              . This Security Instrument secures to Lender: (a) the repayment of
the debt evidenced by the Note, with interest, and all renewals, extensions and modifications of the Note; (b) the
payment of all other sums, with interest, advanced under paragraph 7 to protect the security of this Security
Instrument; and (c) the performance of Borrower's covenants and agreements under this Security Instrument and the
Note. For this purpose, Borrower does hereby mortgage, grant and convey to Lender and Lender's successors and
assigns, with power of sale, the following described property located in
COFFEE                                                            County, Alabama:
SEE LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF AS
EXHIBIT "A".
A.P.N. #: 19-15-08-27-0-000-013.000

which has the address of 678 COUNTY ROAD 620                    ENTERPRISE
                          [Street]                              [City]

Alabama       36330                          ("Property Address");
              [Zip Code]

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT      Form 3001 9/90 (Page 1 of 7 Pages)

AI.1.MTG

DEFENDANT'S
EXHIBIT
2
PENGAD 800-631-6989

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal and Interest; Prepayment and Late Charges.** Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. **Funds for Taxes and Insurance.** Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured by this Security Instrument.

3. **Application of Payments.** Unless applicable law provides otherwise, all payments received by Lender under paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

ALABAMA – Single Family -- Fannie Mac/Freddie Mac UNIFORM INSTRUMENT                    Form 3001 9/90 (Page 2 of 7 Pages)

ALENFG

GMAC 0102

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.   Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of the payments. If under paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.   Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7.   Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this paragraph 7, Lender does not have to do so.

ALABAMA – Single Family – Fannie Mac/Freddie Mac UNIFORM INSTRUMENT                Form 3001 9/90 (Page 3 of 7 Pages)

114ITG

GMAC 0103

Any amounts disbursed by Lender under this paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8. **Mortgage Insurance.** If Lender required mortgage insurance as a condition of making the loan secured by his Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender requires) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9. **Inspection.** Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10. **Condemnation.** The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend postpone the due date of the monthly payments referred to in paragraphs 1 and 2 or change the amount of such payments.

11. **Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. **Successors and Assigns Bound; Joint and Several Liability; Co-signers.** The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

ALABAMA – Single Family -- Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3001 9/90 (Page 4 of 7 Pages)

14 Mfr.

GMAC 0104

13. **Loan Charges.** If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. **Notices.** Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. **Governing Law; Severability.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

16. **Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

17. **Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

18. **Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under paragraph 17.

19. **Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payments should be made. The notice will also contain any other information required by applicable law.

20. **Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is

ALABAMA – Single Family – Fannie Mac/Freddie Mac UNIFORM INSTRUMENT                      Form 3001 9/90 (Page 5 of 7 Pages)

15 MTG

GMAC 0105

necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, nd radioactive materials. As used in this paragraph 20, "Environmental Law" means federal laws and laws of the arisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

21. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give a copy of a notice to Borrower in the manner provided in paragraph 14. Lender shall publish the notice of sale once a week for three consecutive weeks in a newspaper published in COFFEE                 County, Alabama, and thereupon shall sell the Property to the highest bidder at public auction at the front door of the County Courthouse of this County. Lender shall deliver to the purchaser Lender's deed conveying the Property. Lender or its designee may purchase the Property at any sale. Borrower covenants and agrees that the proceeds of the sale shall be applied in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable attorneys' fees; (b) to all sums secured by this Security Instrument and (c) any excess to the person or persons legally entitled to it.

22. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument without charge to Borrower. Borrower shall pay any recordation costs.

23. Waivers. Borrower waives all right of homestead exemption in the Property and relinquishes all rights of curtesy and dower in the Property.

24. Riders to this Security Instrument. If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument.

[Check applicable box(es)]

| | | |
|---|---|---|
| ☐ Adjustable Rate Rider | ☐ Condominium Rider | ☐ 1-4 Family Rider |
| ☐ Graduated Payment Rider | ☐ Planned Unit Development Rider | ☐ Biweekly Payment Rider |
| ☐ Balloon Rider | ☐ Rate Improvement Rider | ☐ Second Home Rider |
| ☒ Other(s) [specify] Prepayment Rider | | |

ALABAMA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT                 Form 3001 9/90 (Page 6 of 7 Pages)

16 MFG

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

*Billy L. Williams* _____ (Seal)
BILLY L. WILLIAMS          -Borrower

*Teresa G. Williams* _____ (Seal)
TERESA G. WILLIAMS          -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

_____ (Seal)
                -Borrower

Witness:

Witness:

_____

_____

STATE OF ALABAMA, COFFEE                    County ss:

On this  26   day of    June, 2000  , I, the undersigned authority a Notary Public in and for said county and in said state, hereby certify that BILLY L. WILLIAMS, TERESA G. WILLIAMS

,   whose names(s)       are                signed to the foregoing conveyance, and who    are      known to me, acknowledged before me that, being informed of the contents of the conveyance, they     executed the same voluntarily and as    their      act on the day the same bears date.

Given under my hand and seal of office this the      26      day of     June, 2000.

My Commission expires: 10/18/03         *Nalinda Graham* _____
                                                    Notary Public

This instrument was prepared by  D. Bruce McLean, Attorney at Law
                                 111 East College, Enterprise, AL  36330

ALABAMA – Single Family -- Fannie Mac/Freddie Mac UNIFORM INSTRUMENT          Form 3001 9/90 (Page 7 of 7 Pages)

ALFORM

GMAC 0107

# PREPAYMENT RIDER

Loan No.: 99-2057

Date: JUNE 26, 2000

Borrower(s): BILLY L. WILLIAMS, TERESA G. WILLIAMS

FOR VALUE RECEIVED, the undersigned ("Borrower") agree(s) that the following provisions shall be incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed of even date herewith (the "Security Instrument") executed by Borrower, as trustor, in favor of HOME CAPITAL INC., A GEORGIA CORPORATION

("Lender"),
as beneficiary, and also into that certain promissory note (the "Note") of even date herewith executed by Borrower in favor of Lender. To the extent that the provisions of this Prepayment Rider (the "Rider") are inconsistent with the provisions of the Security Instrument and/or the Note, the provisions of the Rider shall prevail over and shall supersede any such inconsistent provisions of the Security Instrument and/or the Note.

Section 4 of the Note is amended to read in its entirety as follows:

" 4 . BORROWER'S RIGHT TO PREPAY

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a "prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so. The Note Holder will use all of my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial prepayment may reduce the amount of my monthly payments after the first Change Date following my partial prepayment.

If within ZERO                       ( 0   ) months from the date of execution of the Security Instrument I make a full prepayment or, in certain cases a partial prepayment, and the total of such prepayment(s) in any 12-month period exceeds TWENTY PERCENT
(    20    %) of the original principal amount of this loan, I will pay a prepayment charge in an amount equal to the payment of SIX              ( 6   ) months'advance interest on the amount by which the total of my prepayment(s) within that 12-month period exceeds TWENTY PERCENT (    20 %) of the original principal amount of the loan."

IN WITNESS WHEREOF, the Borrower has executed this Rider on the     26          day of June, 2000.

| | | | |
|---|---|---|---|
| _Billy L. Williams_ 6/26/00 | | _Teresa G. Williams_ 6/26/00 | |
| Borrower                     Date | | Borrower                     Date | |
| BILLY L. WILLIAMS | | TERESA G. WILLIAMS | |
| | | | |
| Borrower                     Date | | Borrower                     Date | |
| | | | |
| Borrower                     Date | | Borrower                     Date | |

MULTISTATE PREPAYMENT RIDER
Document Systems, Inc. (800) 649-1362

DSP RDR

GMAC 0108

# NOTE

JUNE  26  , 2000

ATLANTA            GEORGIA
(City)               (State)

Loan Number 99-2057

678 COUNTY ROAD 620, ENTERPRISE, ALABAMA 36330

(Property Address)

## 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S.  33,750.00    (this amount is called "principal"),
plus interest, to the order of the Lender. The Lender is HOME CAPITAL INC., A GEORGIA CORPORATION

I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled
to receive payments under this Note is called the "Note Holder."

## 2. INTEREST

Interest will be charged on unpaid principal until the full amount of principal has been paid. I will pay interest at a yearly rate
of   13.750 %. The interest rate required by this Section 2 is the rate I will pay both before and after any default described in
Section 6 (B) of this Note.

## 3. PAYMENTS

### (A) Time and Place of Payments

I will pay principal and interest by making payments every month.

I will make my monthly payments on the    1st    day of each month beginning on  AUGUST  1
2000    . I will make these payments every month until I have paid all of the principal and interest and any other charges
described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on
JULY  1                , 2020    , I still owe amounts under this Note, I will pay those amounts in full on
that date, which is called the "maturity date."

I will make my monthly payments at 7 DUNWOODY PARK SUITE 104, ATLANTA, GEORGIA
30338
or at a different place if required by the Note Holder.

### (B) Amount of Monthly Payments

My monthly payment will be in the amount of U.S. $ 413.57

## '. BORROWER'S RIGHT TO PREPAY ** See attached Prepayment Rider.

I have the right to make payments of principal at any time before they are due. A payment of principal only is known as a
"prepayment." When I make a prepayment, I will tell the Note Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without paying any prepayment charge. The Note Holder will use all of
my prepayments to reduce the amount of principal that I owe under this Note. If I make a partial prepayment, there will be no changes
in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

## 5. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan
charges collected or to be collected in connection with this loan exceed the permitted limits, then: (i) any such loan charge shall be reduced
by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted
limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by
making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

## 6. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charge for Overdue Payments

If the Note Holder has not received the full amount of any monthly payment by the end of   15     calendar days after
the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be    5.000    % of my overdue
payment of principal and interest. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain
date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that
I owe on that amount. That date must be at least 30 days after the date on which the notice is delivered or mailed to me.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the
Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid
back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include,
for example, reasonable attorneys' fees.

.ULTISTATE FIXED RATE NOTE - Single Family - FNMA/FHLMC UNIFORM INSTRUMENT          Form 3200 12/83
Document Systems, Inc.

DEFENDANT'S
EXHIBIT
3
PENGAD 800-631-6989

**7. GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of y different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**8. OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

**9. WAIVERS**

I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

**10. UNIFORM SECURED NOTE**

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower. If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)        _____ (Seal)
ILLY L. WILLIAMS                      Borrower       TERESA G. WILLIAMS                   Borrower

_____ (Seal)        _____ (Seal)
                                     Borrower                                           Borrower

_____ (Seal)        _____ (Seal)
                                     Borrower                                           Borrower

LTISTATE  FIXED RATE NOTE - Single Family - FNMA/FHLMC UNIFORM INSTRUMENT          Form 3200 12/83
Document Systems, Inc.

GMAC 0113

**First Mortgage Loan Servicing**
3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

# GMAC Mortgage

05/27/05

BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620

ENTERPRISE AL 36330-0000

RE·    Account Number        0833002922
       Property Address      678 CO RD 620

                             ENTERPRISE AL 36330-0000

Dear BILLY WILLIAMS
     TERESA WILLIAMS

Welcome to GMAC Mortgage Corporation        . You were
recently advised by LITTON LOAN SERVICING LP        the
servicing of your account has been transferred to our office
effective 05/16/05.  Your new GMAC Mortgage Corporation
account number is listed above.

Beginning 05/16/05, payments should be sent to
GMAC Mortgage Corporation        at the following address as
LITTON LOAN SERVICING LP        will be unable to accept
payments and apply them to your account on or after that date:

          GMAC Mortgage Corporation
          PO Box 79135
          Phoenix AZ 85062-9135

You will receive a mortgage account statement under separate
cover, which will include a payment coupon and return envelope
for making your payment to GMAC Mortgage Corporation        .
If you have already mailed your payment to
LITTON LOAN SERVICING LP        or our Payment Processing
Department in Waterloo, it will be applied.

Your homeowner's/hazard insurance will not be affected by this
transfer. A notification is being sent to your hazard insurance
carrier to send future insurance information to
GMAC Mortgage Corporation        .



DEFENDANT'S
EXHIBIT
10

Williams 00050
Re: Williams v. Balboa

05/27/05
Account Number 0833002922
Page Two

If you have been paying premiums for optional insurance (e.g., accidental death, life, disability, etc.) or optional products, in most instances, GMAC Mortgage Corporation          will continue this service at the same or comparable premium.  If a carrier change is necessary, you will receive new insurance policy information under separate cover.  In the event we are unable to continue this service, you will be notified in writing.

We also offer the opportunity to have your mortgage payment automatically deducted from your financial institution.  To learn more about our automatic payment deduction program, please contact Customer Care.  If you were enrolled in LITTON LOAN SERVICING LP              's automatic payment plan, additional information was sent to you under separate cover.

If you currently make your mortgage payment through a third-party entity (e.g., government allotment, biweekly, or bill-pay service), please take the necessary steps to advise them to change the payee to GMAC Mortgage Corporation          .  In the event of a payment change, it is your responsibility to notify the third party of the new payment amount.  If you pay your mortgage payment through a home banking PC application, please remember to update your payment address and account number.

Please be assured the transfer will have no effect on the terms or conditions of your loan documents other than those directly related to the servicing of your account.

You should also be aware of the following information, which is set out in more detail in section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the account servicing, a loan payment received by your old servicer before its due date may not be treated by the new account servicer as late and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a qualified written request to your account servicer concerning the servicing of your account, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A qualified written request is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number and your reason for the request.

**Williams  00051**
**Re: Williams v. Balboa**

# **GMAC** Mortgage

PO Box 4025
Coraopolis, PA 15108-6942

IMPORTANT INSURANCE INFORMATION

Notification Date:  08/25/2005

0000446 · 000505

BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620
ENTERPRISE, AL
            36330-5456

RE: **REFERENCE NUMBER: 5901**
    Loan Number: 5901-0000-0833002922
    Hazard Insurance Uninsured Date:   05/27/2005
    Property Location: 678 CO RD 620
                ENTERPRISE AL              36330

Dear Customer:

A review of our records indicates we have no evidence of a current hazard insurance policy in effect for your property.  As you know, under the terms of your mortgage, hazard insurance is a requirement.

If you do have a hazard policy in effect, please immediately forward a copy of the policy to our office, or fax a copy of your policy to us at (626) 927-4450.  In either case, please make sure that the appropriate loss payee clause naming us as the mortgagee is GMAC Mortgage Corporation, Its Successors and/or Assigns.  We recommend you speak with your insurance company or agent for assistance.

If you do not have current insurance in place, we urge you to immediately contact an insurance company or local insurance agency and arrange to purchase homeowners insurance or a similar form of dwelling coverage to adequately protect your equity in your property.

We must have a copy of evidence of insurance coverage with an effective date of 05/27/2005 in order to avoid GMAC Mortgage purchasing insurance to protect our interest.  Should we have to place such insurance, you will be responsible for any earned insurance charges incurred in order to ensure there is uninterrupted coverage on the property in accordance with the terms of your mortgage.  This insurance may cost more than insurance you are able to obtain on your own.

Should you have any questions regarding this matter, please do not hesitate to contact our office at (800) 256-9962 from 5 a.m. to 7 p.m. PST, Monday through Friday.  Your calls may be monitored for quality assurance.

Thank you,

Insurance Department
GMAC Mortgage Corporation

REMINDER...
MAIL POLICY TO:
GMAC Mortgage Corporation,
Its Successors and/or Assigns
P.O. Box 4025
Coraopolis, PA 15108-6942

Or Fax to: (626) 927-4450



DEFENDANT'S
EXHIBIT
12

**GMAC 0024**

# **GMAC** Mortgage

PO Box 4025
Coraopolis, PA 15108-6942

---

SECOND REQUEST FOR PROPERTY INSURANCE

Notification Date:  10/09/2005

0003069 - 0004252

BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620
ENTERPRISE, AL
            36330-5456


RE: REFERENCE NUMBER: 5901
    Loan Number: 5901-0000-0833002922
    Hazard Insurance Uninsured Date: 05/27/2005
    Property Location: 678 CO RD 620
                 ENTERPRISE AL                36330


Dear Customer:

We previously notified you that we had no evidence of a hazard insurance
policy in effect for the above property as required by the terms of your
mortgage. As of this date, we still have not received such evidence.

Since we have not received evidence of hazard insurance, we will secure
hazard insurance coverage.  The coverage will provide protection to us for
loss to your dwelling up to a limit of   $32,311 with a deductible of
$500.00 (except GU, NM, OK, VT and WV - Deductible $250.00). This deductible
may change if occupancy is different at the time of loss. If this is a
commercial property a deductible of $5,000.00 or 2%, whichever is greater,
will apply if the loss is the result of Vandalism and Malicious Mischief.

The coverage we obtain will only be sufficient to insure the principal
balance of your loan, and will not be adequate to protect the value of
your property that exceeds the amount of your mortgage. Also, the
coverage we obtain will not cover your personal property or provide
other dwelling coverage commonly available from a homeowner's insurance
policy. If you disagree with the amount of coverage that will be placed
on your property, please contact us at (800) 256-9962. The effective date
of coverage will be 05/27/2005. The annual charge for this coverage will be
your responsiblity for reimbursing us for the cost of the coverage
("insurance charges"). Any insurance charges not used will be credited to
your account.

After we obtain coverage, you may cancel the coverage at any time and
replace it with a policy of your own.  Upon prompt receipt of your policy,
the coverage will be cancelled.  There will be no charge to you if there
was no lapse in coverage.  Coverage will be placed at the principal balance
loan amount.  The full year insurance charges for this coverage is shown
above.  The insurance charges will be charged within 60 days of this notice.

If your property is located in the state of AK, AZ, AR, CA, CO, CT, DE,
IL, IN, KY, MD, MA, MN, MO, NC, NH, NY, OK, RI, SC, TN, VA, WA, or WV,
the coverage limit on this policy will be the lesser of the principal
balance on the loan at the time of placement or the last known amount
on any insurance policy which you previously purchased on your own.



DEFENDANT'S
EXHIBIT
13

**GMAC 0025**

Page 2

BILLY WILLIAMS
Loan Number: 5901-0000-0833002922

Please note that the coverage we purchase may be more expensive and
generally will provide less insurance protection than a policy you may be
able to secure from your own insurance company or agent. Also, the
coverage is designed to protect the interest of GMAC Mortgage. We urge
you to contact an insurance agent to help you determine your insurance
needs and to advise you whether other less expensive insurance is available.
If you have a hazard policy in effect, please immediately forward a copy of
the policy to our office. You may also fax a copy of your policy to the
number listed below.

If we advance the insurance charges for the coverage, we will request you to
choose from the following options for reimbursement:

A.  Send evidence of hazard insurance coverage effective 05/27/2005.
    This will allow us to cancel the lender-placed hazard insurance
    with no insurance charges to you.

B.  Reimburse us in full for the insurance. Please make your check
    payable to GMAC Mortgage in the amount of the insurance charges
    indicated above.

If we do not hear from you within 45 days, we will pay the insurance charges
and collect the insurance charges by adding it to your monthly mortgage
payment. New payment information will be forwarded to you at that time.

Again, we must remind you that the coverage we will obtain is intended to
protect our interest and may offer less coverage and be more expensive than
a standard homeowner's policy. We urge you to contact an insurance company
or agent to help you evaluate your insurance alternatives. GMAC and/or an
affiliate of our company may receive compensation as a result of the placing
of this insurance.

Should you have any questions regarding this matter, please do not hesitate
to contact our office at (800) 256-9962, from 5 a.m. to 7 p.m. PST, Monday
through Friday. Your call may be monitored for quality assurance.

Thank you,                          MAIL POLICY TO:

Insurance Department                GMAC Mortgage Corporation
GMAC Mortgage Corporation           P.O. Box 4025
                                    Coraopolis, PA 15108-6942

                                    Or Fax to: (866) 336-9021

GMAC 0026

0003069 · 0004153

# **GMAC Mortgage**

PO Box 4025
Coraopolis, PA 15108-6942

Notification Date:    11/27/2005

*att: Chad Stewart*

0002447 - 0003896  L
BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620
ENTERPRISE, AL
                36330-5456

## NOTICE OF PLACEMENT

RE: **REFERENCE NUMBER: 5901**
    Loan Number: 5901-0000-0833002922
    Hazard Insurance Uninsured Date:    05/27/2005
    Property Location: 678 CO RD 620
                ENTERPRISE AL                        36330

Certificate # :        B-7136890
Effective Date:        05/27/2005
Dwelling Limit:        $32,311          Expiration Date: 05/27/2006
Residential Deductible: $500.00 (except GU, NM, OK, VT and WV -    Annual Charge:        $518.00
Deductible $250.00)
Commercial Deductible: $500.00 (except CA, GU, NM and WV - Deductible
$1,000.00)
Commercial VMM Deductible: $5,000.00 or 2% whichever is greater
(Deductible may change if occupancy changes.)

Dear Customer:

We have obtained insurance coverage with BALBOA INSURANCE COMPANY to
provide the necessary insurance protection under the terms of your mortgage.
We have notified you during the past 90 days that this insurance would be
placed if we did not receive a copy of a valid hazard insurance policy.

The cost of the insurance in the amount of    $518.00 was advanced for the
period 05/27/2005 to 05/27/2006.  Appropriate changes to your monthly
payment will be made as indicated in our previous letter.

This insurance will remain in force unless we receive evidence of a hazard
insurance policy with an effective date on or before 05/27/2005.  Evidence
of a valid policy in effect at a later date will result in cancellation of
the coverage.  Any insurance charges not used will be credited to your
account.

### IMPORTANT NOTICE TO CUSTOMER
The insurance we obtained to protect our interest in your property applies
only to the dwelling at the coverage amount indicated.  Coverage does not
extend to contents or personal property and may not be adequate to protect
the equity in the property.  If your property is located in the state of
AK, AZ, AR, CA, CO, CT, DE, IN, KY, MA, MD, MN, MO, NC, NH, NY, OK, RI,
SC, TN, VA, WA, or WV, the coverage limit on this policy will be the
lesser of the principal balance on the loan at the time of placement or
the last known amount on any insurance policy which you previously
purchased on your own.  If your property is located in any other state
besides those listed in the previous sentence, the coverage will be
placed at the principal balance of the loan.  If the limit is only
sufficient to insure the principal balance of your loan then the force-
placed policy may not be adequate to protect the value of your property
that exceeds the amount of your mortgage.  Also, there is no coverage
for liability protection with this insurance.  This insurance may be more
expensive than coverage you could arrange on your own.  We recommend you
place full insurance coverage that adequately protects both your and the
lender's interest with a company of your choice.


DEFENDANT'S
EXHIBIT
14

Page 2

BILLY WILLIAMS
Loan Number: 5901-0000-0833002922

When you furnish acceptable proof of other insurance, the lender will cancel
the insurance coverage and you will be entitled to a refund of any insurance
charges not used.  GMAC and/or an affiliate of our company may receive
compensation as a result of the placing of this insurance.

Should you have any questions regarding this matter, please do not hesitate
to contact our office at (800) 256-9962 from 5 a.m. to 7 p.m. PST, Monday
through Friday.  If you would like to submit a claim, please call
(800) 323-7466.  Your call may be monitored for quality assurance.

Thank you,                          MAIL POLICY TO:

Insurance Department                GMAC Mortgage Corporation
GMAC Mortgage Corporation           P.O. Box 4025
                                    Coraopolis, PA 15108-6942

                                    Or Fax to: (866) 336-9021

{{DPLX}}

02/07/06

BILLY  WILLIAMS
TERESA  WILLIAMS
678 CO RD 620

ENTERPRISE                           AL 36330-0000

RE:    Account Number        0833002922
       Property Address       678 CO RD 620

                              ENTERPRISE AL 36330-0000

Dear BILLY WILLIAMS
     TERESA WILLIAMS

Our records indicate the above-referenced mortgage loan is in default.

Your account is due for 01/01/05, and succeeding payments. This is a demand for payment of the total amount due and owing as of the date of this letter, which is as follows:

Payments ...................... $        6593.86
Late Charges .................. $         268.71
Fees, Costs, and other amounts accrued
   to date .................... $        4152.43
Suspense ...................... $           0.00
Total Amount Due .............. $       11015.00

You may cure the default by paying the total amount due, indicated above, within thirty (30) days from the date of this letter. You are also responsible for paying any additional payments, fees, and charges that become due during this 30-day period. Payments must be made in certified funds or cashier's check. If funds tendered are not honored for any reason, the default will not be cured. Our acceptance of any funds less than the total amount due shall not constitute a waiver of our rights and/or remedies under the loan documents or applicable law.

(continued on back)



DEFENDANT'S
EXHIBIT
15

PENGAD 800-631-6989

GMAC 0062

02/07/06
Account Number  083300292922
Page Two

Unless we receive full payment of all past-due amounts, we will accelerate the maturity of the loan, declare the obligation due and payable without further demand, and begin foreclosure proceedings. This could result in the loss of your property. You have the right to assert or defend the non-existence of a default and you may have other rights under state law.

Once in foreclosure, you have the right to reinstate your account up to five days prior to the foreclosure sale of the property if: 1) you pay the total amount due plus any fees, costs and other amounts accrued through the reinstatement date, and 2) you take any other action reasonably required by us to assure the security of the property, as well as your obligations under the loan documents continue in full force and effect.

HUD-approved counseling is available on FHA guaranteed loans by calling 800-569-4287. If you would like to discuss any matter contained in this notice, we encourage you to contact our loan counselors immediately at 800-850-4622.

You are hereby notified your credit rating may be adversely affected if you fail to fulfill the terms of your credit obligations. You are also notified we may visit the above-referenced property from time to time to determine its condition and occupancy status, the costs of which you will be responsible for.

Collection Department
Loan Servicing

Notice - This is an attempt to collect a debt and any information received will be used for that purpose. If your debt has been discharged in bankruptcy, our rights are being exercised against the collateral for the above-referenced loan, not as a personal liability.

GMAC 0063


DEFENDANT'S
EXHIBIT
10
PENGAD 800-631-6989

GMAC 0061

03/09/06

BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620

ENTERPRISE AL 36330-0000

        YOUR IMMEDIATE ATTENTION IS REQUIRED

RE:  Account Number     0933002922
     Property Address    678 CO RD 620

                         ENTERPRISE AL 36330-0000

Dear  BILLY WILLIAMS
      TERESA WILLIAMS

You were previously notified of your default and the demand for
reinstatement on the above account.

Because you have failed to reinstate, your account may be sent to
an attorney to initiate foreclosure action. Upon referral, you
may incur substantial fees and costs, and the foreclosure status
will be reported to credit agencies.

Upon completion of the foreclosure:
  * You will lose title to the property.
  * You may be liable for the foreclosure costs, including
    attorney fees.
  * You may be personally liable for any remaining balance
    due.
  * The foreclosure will be reported to credit agencies and to
    the Internal Revenue Service.

If you wish to discuss possible alternatives to avoid the
foreclosure action, please contact us at 800-850-4622.

Notice - This is an attempt to collect a debt and any information
obtained will be used for that purpose. If your debt has been
discharged in bankruptcy, our rights are being exercised against
the collateral for the above-referenced account, not as a
personal liability.

Loss Mitigation Department
Loan Servicing
5025



February 8, 2006

GMAC
P.O. Box 8115
Cockeysville, MD 21030

RE:   Borrower:          Billy Williams
       Claim No.:         GM7136890, 1
       Date of Loss:       02/05/2006
       Loan No.:         5901-0000-0833002922
       Type of Loss:       FIRE
       Loss Location:      678 Co Rd 620  Enterprise, AL 36330

Dear GMAC Mortgage:

This will acknowledge receipt on 02/06/2006, of your claim for benefits as claimant/beneficiary under Policy No. GM7136890. We have started our claims process and a representative of our company will contact you. Please contact our office at 888-898-1546, ext. 1421, if you have any questions.

Please be advised the type of policy insuring the property is:

Policy Type:          LPP

Policy Effective Dates:     05/27/2005 - 05/27/2006

Policy Limits:        $32,311.00

Deductible:         $500.00

Please note that the LPP policy has dwelling cover but no coverage is provided for personal property, additional living expense or personal liability.

Sincerely,

*Tancy Nelson*

Tancy Nelson
Claim Representative
**Balboa Insurance Company**

CC:   Billy Williams



**Balboa  00041**
**Re: Williams v. Balboa**



March 6, 2006

GMAC
Loss Draft Dept.

RE:     Insured:            Billy Williams
        Claim No.:          GM7136890, 1
        Date of Loss:       02/05/2006
        Loan No.:           5901-0000-0833002922
        Type of Loss:       FIRE

Dear Loss Draft Dept.:

We are writing to provide you with a summary of the claim payment issued for your loss. The coverage limit of $32,311.00 is the maximum amount allowed. The money paid to date represents the actual cash value of your loss.

Under Section I-Conditions-Loss Settlement, certain property is settled based on actual cash value. Because the damage to your property is subject to this type of evaluation, we have based our actual cash settlement on the replacement cost of the property less depreciation. The depreciation factor applied is based on the age, use and condition of your property at the time of the loss. Our determination of the actual cash value using this formula allows our customer to receive a more beneficial settlement of the property. Please refer to the damage evaluation section of this letter for a complete breakdown.

You may recover the refundable depreciation by sending us a work completion certificate from your contractor or the receipts and invoices documenting the repair to the risk. Should you replace or repair the damage for less money than the amount allowed, we will pay the amount owed based on your actual cost. Under the terms of the policy, you have 180 days from the date of loss to file this additional claim.

**If a loss payment was not enclosed in this correspondence, then the actual cash value payment has been sent to GMAC. You may reach them at (504) 929-5728. A photocopy of our adjuster's estimate is enclosed for your records.**



**Balboa  00078**
**Re: Williams v. Balboa**

Page Two

| DAMAGE EVALUATION | |
|---|---|
| REPLACEMENT COST ESTIMATE (This is the amount it will take to properly repair your property) | $11,933.64 |
| LESS NON-REFUNDABLE DEPRECIATION: (This is the amount that you are not able to recover. These items are paid at actual cash value only and include carpet and pad.) | ($943.68) |
| REPLACEMENT COST AVAILABLE (This is the total amount it will take to properly repair your property minus the non refundable depreciation) | $10,989.96 |
| LESS REFUNDABLE DEPRECIATION (This is the amount deducted from the replacement cost per your policy to determine the actual cash value payment made to you. This amount will be refunded to you once the repairs are complete for replacing drywall, painting, flooring and insulation.) | ($3,293.47) |
| LESS DEDUCTIBLE (This is the amount you are responsible for) | ($500.00) |
| ACTUAL CASH VALUE PAYMENT (This is the amount of the loss payment issued) | $7,196.49 |

In addition to the Replacement Cost Available figure noted above, appropriate Profit and Overhead totaling $2279.83 charged by a general contractor will be allowed. To make a claim for the Profit and Overhead, please submit a copy of the signed Work Authorization. If additional damages are discovered, it is your responsibility to inform us of the additional damages and allow inspection before repairs are made. Failure to do so may jeopardize your ability to recover for the full amount of the additional damages. Balboa Insurance Company reserves the right to inspect the property or require additional information prior to the release of any additional funds.

Sincerely,

*Tancy Nelson*

Tancy Nelson
Claim Representative
**Balboa Insurance Company**
1 888-898-1546, Ext. 1421

Encl.:  Estimate AND CHECK

CC:    Billy Williams

**Balboa  00079**
**Re: Williams v. Balboa**



September 26, 2006

GMAC Mortgage (LPI)
Loss Draft Dept.

RE:    Insured:         Billy Williams
       Claim No.:       GM7136890, 1
       Date of Loss:    02/05/2006
       Loan No.:        5901-0000-0833002922
       Type of Loss:    FIRE

Dear Loss Draft Dept.

We are writing to provide you with a summary of the claim payment issued for your loss. The coverage limit of $32,311.00 is the maximum amount allowed. The money paid to date represents the actual cash value of your loss.

Under Section I-Conditions-Loss Settlement, certain property is settled based on actual cash value. Because the damage to your property is subject to this type of evaluation, we have based our actual cash settlement on the replacement cost of the property less depreciation. The depreciation factor applied is based on the age, use and condition of your property at the time of the loss. Our determination of the actual cash value using this formula allows our customer to receive a more beneficial settlement of the property. Please refer to the damage evaluation section of this letter for a complete breakdown.

You may recover the refundable depreciation by sending us a work completion certificate from your contractor or the receipts and invoices documenting the repair to the risk. Should you replace or repair the damage for less money than the amount allowed, we will pay the amount owed based on your actual cost. Under the terms of the policy, you have 180 days from the date of loss to file this additional claim.

**If a loss payment was not enclosed in this correspondence, then the actual cash value payment has been sent to GMAC Mortgage (LPI). You may reach them at 866-354-7281. A photocopy of our adjuster's estimate is enclosed for your records.**



**Balboa  00107**
Re: Williams v. Balboa

Page Two

| DAMAGE EVALUATION | |
|---|---|
| REPLACEMENT COST ESTIMATE (This is the amount it will take to properly repair your property) | $16,899.00 |
| LESS NON-REFUNDABLE DEPRECIATION: (This is the amount that you are not able to recover. These items are paid at actual cash value only and include carpet and pad.) | $943.68 |
| REPLACEMENT COST AVAILABLE (This is the total amount it will take to properly repair your property minus the non refundable depreciation) | $15,955.32 |
| LESS REFUNDABLE DEPRECIATION (This is the amount deducted from the replacement cost per your policy to determine the actual cash value payment made to you. This amount will be refunded to you once the repairs are complete for replacing drywall, painting, etc.) | $4,863.93 |
| LESS DEDUCTIBLE (This is the amount you are responsible for) | $500.00 |
| PRIOR PAYMENT: | $7,196.49 |
| ACTUAL CASH VALUE PAYMENT (This is the amount of the loss payment issued) | $3,394.90 |

In addition to the Replacement Cost Available figure noted above, appropriate Profit and Overhead totaling $3,207.76 charged by a general contractor will be allowed. To make a claim for the Profit and Overhead, please submit a copy of the signed Work Authorization. If additional damages are discovered, it is your responsibility to inform us of the additional damages and allow inspection before repairs are made. Failure to do so may jeopardize your ability to recover for the full amount of the additional damages. Balboa Insurance Company reserves the right to inspect the property or require additional information prior to the release of any additional funds.

Sincerely,

*Tancy Nelson*

Tancy Nelson
Claim Representative
**Balboa Insurance Company**
1 888-898-1546, Ext. 1421

Encl.:  Estimate AND CHECK

CC:  Billy Williams

March 23, 2007

## VIA OVERNIGHT MAIL

Balboa Insurance Group
Attn: Tancy Nelson, Claim Representative

Re:    Insured:        Billy Williams
       Claim No.:      GM7136890.1
       D/O/L.:         02-05-2006
       Loan No.:       5901-0000-0833002922
       Type of Loss:  FIRE

Dear Ms. Nelson:

Enclosed are two (2) estimates previously sent to you which reflect that the damage to our dwelling exceeds the policy limits of the insurance your company has our dwelling. However, Balboa has only paid a fraction of those damages and no contractor will do the repairs for the amount of your payment. We have repeatedly informed you of this, but you have apparently ignored our requests. As a result, foreclosure proceedings have been filed against us and our home is set for foreclosure sale in April. We dispute Balboa's claim payment and demand that full payment be made to satisfy our mortgage immediately.

Additionally, we have yet to receive a copy of the insurance policy at issue, despite numerous requests to you and to GMAC. We demand that a copy of the complete policy be delivered to us at once via facsimile at (334) 347-5578 .

Please be advised that if the above requests are not honored and/or if the foreclosure sale scheduled for April 17, 2007, goes through, legal action may be taken against Balboa.

Sincerely,

*Billy, Teresa Williams*

Billy and Teresa Williams

cc:    GMAC Mortgage
       P.O. Box 25142
       Santa Ana, CA 92799-9905

       GMAC Mortgage
       P.O. Box 780
       Waterloo, IA 50704-0780

DEFENDANT'S
EXHIBIT
33
PENGAD 800-631-6989

**Balboa  00110**
Re: Williams v. Balboa

**GMAC** Mortgage

P.O. Box 25144
Santa Ana, CA 92799-5144

November 15, 2006

Billy Williams
678 Co Rd 620
Enterprise, AL 36330-0000

RE: Property Address        :678 Co Rd 620  Enterprise, AL 36330-0000
    Tracking No             : 740x13
    Date of Loss            : 02/05/2006

Dear Billy Williams :

A review of your hazard insurance claim reflects a balance being held in escrow for restoration of the above-referenced property.

Please contact our office at 1-866-354-7281 to discuss the status of the repairs as soon as possible.

Sincerely,

Insurance Claims Center
FAX: (866)336-3811

*$10,549/36 recieved from Balboa*

*We wait to put this toward the mortgage until they pay the rest to you from Balboa.*
*Thanks.*
*Leann Williams*
*Billy Williams*

*We need to postpone the foreclosure until this is settled apply this money and do a repayment plan.*

Balboa  00112
Re: Williams v. Balboa


*Billy & Teresa Williams*
*678 Cnty Rd 620*
*Alabama*

Estimate/Bill                                    Contract # 537

# B&B Construction

Quality Work Done Right the First Time
Enterprise, Alabama
(334) 806-7778

Work to be Performed -

Tear out all damaged floor joist, decking, and floor covering (my [inlenmet])
replace damaged joist, decking, Tear out interior wall sheeting, replace w/ Drywall and finish to be ready to paint, tear out and replace damaged electrical wiring and fixtures. Tear out interior ceilings and replace w/ drywall to be finish to be able to paint. Tear out and replace bathroom fixtures (Tub toilet sink vanities) Tear out + replace kitchen cabinets + sink. Tear off all damaged roof rafters and decking + replace 10 original, tear off and replace shingle roof. Tear off + replace exterior damaged exterior siding + trim
Tear out + replace front windows

All Work listed above is to be performed for the below mentioned price, any additional work not listed above may be submitted in writing to below signed contractor, additional work not listed above may be added to said contract for an additional fee to be determined by said contractor, also any additional work may be declined by said contractor with no negative affects to regards to original agreement.

Fee to be paid as follows – A retainer of 45% of total price to be paid up front with remainder to be paid ~~immediately upon completion of job.~~
as follows. 20% to be paid upon completion of roof and the gutting of the house

Notes -
_____
_____
_____
_____

TOTAL 44,738⁰⁰

Paid _____
Balance remaining _____

Contractor                          Responsible Party
*Eric Dingman*                       _____
_____                _____

**Balboa  00113**
Re: Williams v. Balboa

## PROPOSAL

No.
Date 3-25-06
Sheet No.

Proposal Submitted To:

Name Jerry Gentle
Street Hwy 84
City New Brockton    State ALA
Phone 894-0869

Work To Be Performed At:

Billy Williams
Street 678 County Rd 620
City Enf    State ALA
Date of Plans    Architect

We hereby propose to furnish the materials and perform the labor necessary for the completion of

Replace Roof, Rafters, Decking & Shingles where Burnt.
Tear out Kitchen wall & ceiling & Replace Burnt
Framing
Replace Sheatrock & WALLS
Flooring Buckd & Install new flooring
Replace wiring where BURNT
Replace CARPET
Replace DOORS unit to side Room
Gut out entire Kitchen (New Cabinets)
Install Insulation
Paint Inside

Total = $41,500-00

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and
specifications submitted for above work and completed in a substantial workmanlike manner for the sum of
Forty one Thousand five five hundrod    Dollars ($41,500.00)
with payments to be made as follows:

Any alteration or deviation from above specifications involving extra
costs, will be executed only upon written orders, and will become an
extra charge over and above the estimate. All agreements contingent
upon strikes, accidents or delays beyond our control. Owner to carry
fire, tornado and other necessary insurance upon above work. Work-
men's Compensation and Public Liability Insurance on above work to be
taken out by

Respectfully submitted J.J. Dutle

Per

Note-This proposal may be withdrawn by us if not accepted
within 5 days.

ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified.
Payment will be made as outlined above.

Signature

Date

Signature

NEM 3050    ORIGINAL    MADE IN U.S.A.

Balboa 00114
Re: Williams v. Balboa

## COPY CERTIFICATION BY DOCUMENT CUSTODIAN

State of      California

County of      Orange

I,      Lawrence Serdenia      , hereby declare that the attached reproduction of

GMAC Mortgage, LLC Fire Insurance Policy

Description of Original Document

is a true, correct, and complete photocopy of a document in my possession or control.

*[signature]*

Signature of Custodian of Original Document

3349 Michelson Drive, Suite 200

Irvine, CA 92612-8893

Subscribed and sworn to before me this      14th      day of      June      , 2007 by

Lawrence Serdenia

personally known to me ~~or proved to me on the basis of satisfactory evidence~~ to be the person(s) who appeared before me.

*[signature]*

Signature of Notary Public

FLORENCE DIEP
Commission # 1603339
Notary Public — California
Orange County
My Comm. Expires Sep 26, 2009

**Further Description of Attached Document**

Title or Type of Document:      Lender's Protection Fire Insurance Policy

Document Date:      7/30/04            Number of Pages:      20

Signer or Issuing Agency:      n/a

Capacity Claimed by Custodian: Individual Trustee

Custodian is Representing:      n/a

# EXHIBIT 2

**Balboa  00001**
**Re: Williams v. Balboa**

**Lender's Protection  (Fire Insurance)**

Re:    **Billy and Teresa Williams**
       **678 CO Road 620, Enterprise, AL 36330**
       **Cert #: GM7136890**
       **Loan #: 0833002922**

The following forms are enclosed for your reference. Please note that coverage is not provided for your personal property or personal liability. Also, flood and earthquake are excluded.

| Form No. | Description |
|---|---|
| 01A09-MFDE0001-E1103 | Declaration |
| 01A09-MFMP0001-E1103 | Fire Insurance Policy Insuring Agreement |
| 01A09-MFPO0001-E1103 | Residential Property Fire Insurance Form |
| 01A09-MFPO0002-E1103 | Commercial Property Fire Insurance Form |
| 01A09-MFEN0001-E1103 | Unacceptable Risk Endorsement |
| F292E-R0894 | Automatic Coverage Endorsement |
| | |
| **State Specific Endorsements** | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

(PM7\MF1F\01A09MFDE0001E1103)                                                                STK# 00 0000

### FIRE INSURANCE MASTER POLICY
### DECLARATIONS PAGE

## BALBOA INSURANCE COMPANY
(a stock company)
Home Office
3349 Michelson Drive, Suite 200, Irvine, CA 92612-8893

### POLICY NUMBER  6043-0002

**Item 1.**  **NAMED INSURED:**

Name:  GENERAL MOTORS ACCEPTANCE CORP. MORTGAGE   Agent: Gen. Motors Acceptance Corp. Mortgage

Street:  100 Witmer Road                                               Street:  100 Witmer Road

City, State, Zip:  Horsham, PA 19044                    City, State, Zip: Horsham, PA 19044

Agent Code: 604

**Item 2.**  **POLICY PERIOD**

| FROM:<br>Month   Day   Year | TO:<br>Month   Day   Year |
|---|---|
| 10/01/04 | UNTIL CANCELLED |

12:01 A.M. standard time at the address of the Named Insured.

**Item 3. COVERAGE:** Coverage on residential and commercial properties shall be subject to The Fire Insurance Master Policy, the Residential Property Fire Insurance Form and the Commercial Property Fire Insurance Form, which is made part of this Policy. This coverage applies to direct physical loss or damage by the peril insured against to real property. No coverage is provided for contents, personal effects, additional living expense, fair rental value or liability.  NO COVERAGE IS PROVIDED UNDER THIS MASTER POLICY FOR LOSS CAUSED BY EARTHQUAKE OR FLOOD or any other cause of loss that is excluded by the Residential Property Fire Insurance Form or the Commercial Property Fire Insurance Form under which coverage is provided.

**Item 4.**  **PREMIUM:** The premium rates shall be computed as directed by the company.

**Item 5.**  **MAXIMUM AMOUNT OF INSURANCE:**

**Types of Eligible Property**           **Maximum Amount of Insurance**
Residential Property                 limits $  5,000,000   / per described location
Commercial Property               limits $  5,000,000   / per described location

**Item 6.**  **ENDORSEMENTS:** The endorsements listed below are attached to and form part of this policy.

See Attached List

**Item 7.**  **DEDUCTIBLE:** The following deductibles shall apply to each and every loss reported hereunder:
See Attached Schedule

Date of Issue  _____7/30/04_____          Countersignature  _____
                                                                              Authorized Representative

01A09-MFDE0001-E1103                          Page 1

**Balboa  00003**
**Re: Williams v. Balboa**

## Lenders Protection - Deductible Schedule
### Dwelling Fire Coverage

| | | Residential Occupied | Residential Vacant | Commercial Occupied | Commercial Vacant* | Comm. Vacant V&MM* | Status | Date Effective |
|---|---|---|---|---|---|---|---|---|
| 01 | Alabama | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 02 | Arizona | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 03 | Arkansas | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 04 | California | $500 | $750 | $1,000 | $1,000 | $5,000 | In Use | |
| 05 | Colorado | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 07 | Delaware | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 08 | District of Columbia | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 10 | Georgia | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 52 | Hawaii | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 12 | Illinois | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 13 | Indiana | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 14 | Iowa | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 16 | Kentucky | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 18 | Maine | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 19 | Maryland | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 21 | Michigan | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 22 | Minnesota | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 23 | Mississippi | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 24 | Missouri | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 25 | Montana | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 26 | Nebraska | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 27 | Nevada | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 28 | New Hampshire | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 29 | New Jersey | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 30 | New Mexico | $250 | $500 | $1,000 | $1,000 | $5,000 | In Use | |
| 32 | North Carolina | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 33 | North Dakota | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 34 | Ohio | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 35 | Oklahoma | $250 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 36 | Oregon | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 37 | Pennsylvania | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 39 | South Carolina | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 40 | South Dakota | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 41 | Tennessee | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 42 | Texas | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 43 | Utah | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 44 | Vermont | $250 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 47 | West Virginia | $250 | $1,000 | $500 | $1,000 | $5,000 | In Use | |
| 48 | Wisconsin | $500 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 49 | Wyoming | $500 | $500 | $500 | $1,000 | $5,000 | In Use | |

* deductible amount or 2%, whichever is greater

7/19/02

**Balboa  00004**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFMP0001E1103)                                                    STK# 00 0000

## FIRE INSURANCE MASTER POLICY

### Lenders Protection Program

### INSURING AGREEMENT

In consideration of the payment of the premium, and subject to all of the provisions of the policy forms issued under this Master Policy, WE agree to indemnify YOU or YOUR legal representatives for any amount that YOU may be entitled to recover as the result of a covered LOSS. The BORROWER shall be considered an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest.

### DEFINITIONS

Whenever used in this Master Policy, the following words shall have the meanings as shown herein:

"YOU", "YOUR", "YOURS" means the entity shown on the DECLARATIONS PAGE of this Master Policy; under the caption of "Named Insured," which has an interest in real property as the direct result of a mortgage, second mortgage, other lien instrument, or as the result of an agreement for the servicing of such contracts.

"WE", "US", "OUR" and "OURS" means the Company that underwrites this insurance.

"COMMERCIAL PROPERTY" means the buildings identified as the DESCRIBED LOCATION in the EVIDENCE OF INSURANCE, which are designed and intended for business purposes or designed, intended, or used for occupancy by five or more families.

COMMERCIAL PROPERTY includes additions, extensions, fixtures, machinery and other equipment attached to the building(s) for the support or service of that building. COMMERCIAL PROPERTY does not include:
1.  Land, including the land on which the COMMERCIAL PROPERTY is located;
2.  business inventory or supplies;
3.  business materials;
4.  records of any nature;
5.  animals;
6.  vehicles of any kind or use;
7.  outdoor signs, whether or not attached to the building or structure;
8.  trees; shrubs; plants;
9.  outdoor swimming pools;
10. fences;
11. piers; wharves; docks;
12. beach or diving platforms or appurtenances;
13. retaining walls not constituting a part of the building;
14. walks; roadways and other paved surfaces;
15. foundations of buildings, machinery, boilers or engines  that are below the surface of the ground or the undersurface of the lowest basement floor;
16. underground pilings, piers, pipes, flues and drains;

"DECLARATIONS PAGE" means page one of this Master Policy, which identifies, YOU, US and the effective date and time of coverage.

"DESCRIBED LOCATION" means the location named on an individual EVIDENCE OF INSURANCE issued under this Master Policy.

"EVIDENCE OF INSURANCE" refers to the form issued by US to the BORROWER as evidence of insurance purchased by YOU. An EVIDENCE OF INSURANCE form specifies the location, identity, and the amount and term of coverage for an individual RESIDENTIAL PROPERTY or COMMERCIAL PROPERTY that has been insured by US at YOUR request. The terms and conditions applying to the insurance referenced in an EVIDENCE OF INSURANCE may vary depending upon the forms approved by any individual state where the PROPERTY is located.

"LOSS" means direct, sudden and accidental physical damage to or theft of all or part of a covered PROPERTY.

01A09-MFMP0001-E1103

**Balboa  00005**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFMP0001E1103)                                                                    STK# 00 0000

"PROPERTY" means either RESIDENTIAL PROPERTY as defined in the Residential Property Fire Insurance Form or COMMERCIAL PROPERTY as defined in the Commercial Property Fire Insurance Form, which is insured under the terms of this Master Policy.

"RESIDENTIAL PROPERTY" means the one to four-unit structure identified as the DESCRIBED LOCATION in the EVIDENCE OF INSURANCE, which is designed, intended, and used principally for dwelling purposes and structures attached to the dwelling.  Land, including the land on which the RESIDENTIAL PROPERTY is located, is not covered property.

## COVERAGE

Coverage is provided for direct and accidental physical damage to, or loss of, insured PROPERTY subject to the terms, coverage, exclusions and conditions of the specific fire insurance form issued to cover that PROPERTY.  No coverage is provided for contents, personal effects, additional living expense, fair rental value, land, liability for property damage, or liability for bodily injury, illness or death of anyone.

## PREMIUM

The premium charged will be computed in compliance with the rates used by the Company on the effective date of the subject EVIDENCE OF INSURANCE.

## SPECIAL PROVISIONS

1. **COVERAGE LIMITATION**
   Coverage under this Master Policy is limited to only those mortgages on any PROPERTY in which YOU have an insurable interest and which is reported to US no later than 60 days after the effective date of coverage on the individual PROPERTY.

2. **LIMITS OF RECOVERY**
   The maximum amount of coverage applicable to any insured hereunder shall be the amount of insurance purchased by YOU, as stated on the EVIDENCE OF INSURANCE, less the applicable deductible.  OUR settlement options will be specified in the fire insurance form applying to the RESIDENTIAL PROPERTY or COMMERCIAL PROPERTY.

3. **OTHER INSURANCE**
   Coverage under this Master Policy is provided for a specific PROPERTY at YOUR request, based upon YOUR belief that no other insurance acceptable to YOU is in force covering YOUR interest in the subject  PROPERTY.  If it is determined that other insurance acceptable to YOU is in force, WE will cancel the insurance on the PROPERTY referenced in the EVIDENCE OF INSURANCE on the effective date of the other insurance or the effective date shown on the EVIDENCE OF INSURANCE, whichever is the more current date, even if the other insurance is discovered after the date of loss.

   WE will make no payment for any loss that is covered by other insurance acceptable to YOU.  In no event shall this insurance apply on a pro-rata or contributing basis.

4. **TERMINATION**
   YOU may cancel this Master Policy at any time by giving written notice to US stating when, thereafter, such cancellation shall be effective.  WE may cancel this Master Policy by mailing a notice of cancellation to YOU at YOUR last address known to US at least thirty (30) days in advance of the date of cancellation . This Master Policy shall cease at 12:01 A.M. (standard time) at YOUR address shown on the DECLARATIONS PAGE on the date of cancellation specified in the notice.

   If this Policy is cancelled, all in-force insurance on PROPERTY for which an EVIDENCE OF INSURANCE has been issued shall be cancelled concurrently unless the notice of cancellation states that the insurance referenced on the EVIDENCE OF INSURANCE will remain in effect. If the Company gives notice that any such coverage on specific PROPERTY will remain in effect after cancellation of the Policy, the coverage on the specific PROPERTY will then remain in force until the expiration date of such insurance or until the insurance on the specific PROPERTY has been

01A09-MFMP0001-E1103

**Balboa  00006**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFMP0001E1103)                                                          STK# 00 0000

cancelled in compliance with the cancellation provisions applying to the specific PROPERTY, except that the Company reserves the right to cancel insurance referenced in any or all EVIDENCES OF INSURANCE upon at least ten (10) days' written notice if such cancellation is for non-payment of premium, or at least thirty (30) days' written notice if cancellation is for any reason other than non-payment of premium.

## 5. INSPECTION AND AUDIT

WE shall be permitted, at all reasonable times, to inspect the insured PROPERTY and to examine YOUR books and records insofar as those records pertain to any payments made because of any LOSS. This includes, but is not limited to, the right to review YOUR records for information about other insurance provided by the BORROWER and the net loan balance both at the time the insurance referenced on the EVIDENCE OF INSURANCE is effective and at the date of LOSS. This right shall remain in force until all insurance referenced on the EVIDENCES OF INSURANCE issued under this Master Policy have been cancelled or expired and for 12 (twelve) months thereafter. This right shall remain in force for 12 (twelve) months after each LOSS has been fully closed by payment or otherwise.

IN WITNESS WHEREOF, __Balboa_____ Insurance Company has caused this Master Policy to be signed by its President and Secretary, at Irvine, California and countersigned on the DECLARATIONS PAGE by OUR authorized representative.

SECRETARY                                                    PRESIDENT

01A09-MFMP0001-E1103

**Balboa  00007**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFPO0001E1103)                                                                STK# 00 0000

## Residential Property Fire Insurance Form

## Lenders Protection Program

### INSURING AGREEMENT

In consideration of the premium paid, and subject to the limits of liability, exclusions, conditions and other terms contained in the Master Policy and this Residential Property Fire Insurance Form ("Residential Property Form"), we agree to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest in the RESIDENTIAL PROPERTY.

### DEFINITIONS

Whenever used in this Form, the following words shall have the meanings as shown herein:

"YOU," "YOUR," and "YOURS" means the Named Insured shown under Item 1 on the DECLARATIONS PAGE of the Master Policy, under which the insurance on the DESCRIBED LOCATION has been issued, which has an interest in the RESIDENTIAL PROPERTY described in the EVIDENCE OF INSURANCE as the direct result of a mortgage, second mortgage, other lien instrument, or an agreement for the servicing of such contracts.

"WE," "US," "OUR," and "OURS" means the Company that underwrites this insurance.

"ACTUAL CASH VALUE" means the amount it would take to repair or replace the damaged property on the DATE OF LOSS with material of like kind and quality, subject to deduction for deterioration, depreciation or obsolescence, and contractor's overhead and profit. ACTUAL CASH VALUE applies to valuation of property whether the property has sustained partial or total loss.

"BORROWER" means the person(s) or entity identified as the BORROWER on the EVIDENCE OF INSURANCE.

"DATE OF LOSS" means the date on which a LOSS occurred.

"DECLARATIONS PAGE" means the DECLARATIONS PAGE of the Master Policy, which identifies the Named Insured and the policy period applying to the Master Policy.

"DESCRIBED LOCATION" means the location identified as the DESCRIBED LOCATION on the EVIDENCE OF INSURANCE.

"EVIDENCE OF INSURANCE" refers to the form issued by US to the BORROWER as evidence of insurance purchased by YOU. An EVIDENCE OF INSURANCE form specifies the location, identity, and the amount and term of coverage for the individual RESIDENTIAL PROPERTY that has been insured by US at YOUR request. The terms and conditions applying to the insurance referenced in the EVIDENCE OF INSURANCE may vary depending upon the forms approved by any individual state where the RESIDENTIAL PROPERTY is located.

"FUNGI" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

"LOSS" means direct, sudden and accidental physical damage to the RESIDENTIAL PROPERTY or OTHER STRUCTURES caused by an insured peril, or the theft of all or part of the covered RESIDENTIAL PROPERTY or OTHER STRUCTURES.

"OTHER STRUCTURES" means structures on the DESCRIBED LOCATION, which are separated from the dwelling structure by clear space or connected to the dwelling structure by only a fence, utility line or similar connection. OTHER STRUCTURES do not include structures that are used or partially used for commercial, farming, or manufacturing purposes, or are rented or held for rental to any person not a tenant of the dwelling structure, unless used solely as a private garage. Land, including the land on which OTHER STRUCTURES are located, is not covered property.

01A09-MFPO0001-E1103                                  1

Balboa  00008
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                                                STK# 00 0000

"RESIDENTIAL PROPERTY" means the one to four-unit dwelling structure located at the DESCRIBED LOCATION, which is designed, intended, and used principally for dwelling purposes, and structures attached to the dwelling structure. Land, including the land on which the RESIDENTIAL PROPERTY is located, is not covered property.

"VOLCANIC EVENT" means loss caused by the blast or airborne shock waves, ash, dust, or flow of lava from the eruption of a volcano.

## OTHER COVERAGES

1. **Other Structures.** The policy provides coverage for OTHER STRUCTURES at the DESCRIBED LOCATION up to an amount equal to 10% of the RESIDENTIAL PROPERTY Limit of Liability shown on the EVIDENCE OF INSURANCE. This additional amount will not reduce the Limit of Liability on any other covered property.

2. **Debris Removal.** WE will pay YOUR reasonable expenses incurred for the removal of debris due to a LOSS covered by the Residential Property Form. This expense is included in the Limit of Liability that applies to the damaged property.

3. **Emergency Repairs.** In the event of a LOSS, WE will pay the reasonable cost incurred by the BORROWER or YOU for necessary repairs that are made solely to protect the RESIDENTIAL PROPERTY or OTHER STRUCTURES from further LOSS. This expense is included in the Limit of Liability that applies to the damaged property.

4. **Collapse.** WE will pay for LOSS to the RESIDENTIAL PROPERTY that results from the collapse of a building or any part of a building only if the collapse is caused by one or more of the following:
   a. hidden decay;
   b. hidden insect or vermin damage;
   c. weight of contents, equipment, animals or people;
   d. weight of rain that collects on a roof;
   e. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.

   Damage to an awning, fence, patio, pavement, underground pipe, swimming pool, flue, cesspool, septic tank, drain, foundation, retaining wall, bulkhead, pier, dock or wharf is not covered under this coverage unless the damage is a direct result of the collapse of a structure. This coverage does not include settling, cracking, shrinking, bulging or expansion.

   This coverage does not increase the Limit of Liability shown on the EVIDENCE OF INSURANCE.

## INSURED PERILS AND GENERAL EXCLUSIONS

We insure YOU for LOSS. However, WE do not insure YOU for damage caused directly or indirectly by, or resulting from, any of the following perils. Such damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the damage:

a. Wear and tear, marring, deterioration, inherent vice, latent defect, freezing, rust, corrosion, neglect before or after a LOSS, mechanical or structural breakdown or failure, abusive use, or defective, faulty, or inadequate maintenance, design, construction, remodeling, planning, zoning, surveying or siting of the RESIDENTIAL PROPERTY or OTHER STRUCTURES (incomplete remodeling is considered defective, faulty or inadequate remodeling); If the ensuing loss is a sudden and accidental escape of water from a plumbing, heating or air conditioning system or household appliance, we cover loss caused by the water. We also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance from which this water escaped. We do not cover loss to the system or appliance from which this water escaped.

b. Contamination, pollution, smog, smoke or vapors from agricultural or industrial operations;

**Balboa 00009**
                                                                                                              Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                                    STK# 00 0000

c.  Flood, meaning a general, temporary condition of complete or partial covering or inundation of normally dry land areas from:
    (1)  The overflow of tidal or inland water including streams, rivers or lakes; or
    (2)  The run-off or build-up of surface water from any source; or
    (3)  Mudslides or mudflows caused by the build-up of water on or under the ground; or
    (4)  The sinking, collapse or movement of land along the shore of a body of water, which results from undermining or erosion caused by waves, flow, or currents of water exceeding normal levels.
    Ensuing LOSS by fire or explosion will be covered;

d.  Water that backs up through or overflows from sewers, drains or sumps, however caused;

e.  Water below the surface of the ground or damage from the pressure exerted by such water, including its flow, seepage or leakage through foundations, walls, floors, basements, doors, windows, sidewalks, driveways, or any other opening;

f.  Earth movement caused by, resulting from, contributed to or aggravated by earthquake; landslide; the elevation, sinking, or shifting of land or soil, except a VOLCANIC EVENT, or unless direct damage by a fire or explosion ensues, in which case WE will pay only for the ensuing fire or explosion LOSS;

g.  War, whether declared or not, insurrection, revolution, civil war, rebellion, warlike act by a military force or the personnel of any military force, seizure, destruction or use for a military purpose including any consequence of any of these. The detonation or discharge of any nuclear weapon shall be deemed an act of war even if done accidentally;

h.  Nuclear reaction, radiation or radioactive contamination, or any consequence of any of these and LOSS caused by these shall not be considered LOSS by fire, explosion, or smoke whether those perils be covered or not by the Residential Property Form.

i.  Collapse, settling, shrinking, cracking, expansion or bulging of pavements, foundations, floors, walls, ceilings, patios, walkways or driveways, except as may be provided under the "Other Coverage" portion of the Residential Property Form;

j.  Freezing of any heating, plumbing or air conditioning system or any household appliance, or by the leakage, overflow or discharge from within the system or appliance caused by freezing during any period while the RESIDENTIAL PROPERTY or OTHER STRUCTURE is vacant, unoccupied or under construction unless YOU or the BORROWER have:
    1.  maintained heat in the building, or
    2.  turned off the water supply and drained water from the system and appliances;

k.  Freezing, thawing, or the pressure or weight of water, ice or snow, whether driven by wind or not, to a fence, pavement, patio, swimming pool, foundation, retaining wall bulkhead, pier, wharf or dock;

l.  Repeated seepage or leakage of water or steam over a period of time from a plumbing, heating or air conditioning system or any household appliance;

m.  Theft of any property not attached to or part of the RESIDENTIAL PROPERTY or OTHER STRUCTURE or theft of any part of the RESIDENTIAL PROPERTY or OTHER STRUCTURE while undergoing construction, remodeling or repair;

n.  Hail, ice, snow, sleet or wind to any outdoor antennas, dishes and aerials including their lead-in wiring, supports, towers and masts;

o.  Birds, insects, rodents, reptiles, animals, fish;

p.  FUNGI, wet or dry rot, viruses, bacteria, or pathogenic organisms, including spores, scents or by-products produced or released by any of these;

q.  Acts or decisions of any person, group, governmental body or organization, including the failure to act or decide;

01A09-MFPO0001-E1103                        3                        **Balboa  00010**
                                                              Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                                    STK# 00 0000

r.  Power outage.  Power outage means the interruption of power or other utility service if the interruption takes place away from the RESIDENTIAL PROPERTY.  If an ensuing loss to the RESIDENTIAL PROPERTY results from the power outage, we will pay for such ensuing loss if it is not otherwise excluded by this policy.

s.  Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair or demolition of a building or OTHER STRUCTURE, except as provided for under the Residential Property Form.

t.  Under paragraphs a, i, j, k, l, m, n and o, any ensuing loss caused by any of these if not otherwise excluded in this policy, is covered.

## CONDITIONS

The following conditions apply to this Residential Property Form:

1.  Period of Coverage.  The Residential Property Form applies only to LOSS that occurs during the coverage period shown on the EVIDENCE OF INSURANCE.

2.  Limit of Liability.  No matter how many people or entities have an insurable interest in the RESIDENTIAL PROPERTY or OTHER STRUCTURES, WE shall not be liable for an amount greater than the interest of YOU and the BORROWER or for the amount of coverage requested by YOU, as shown on the EVIDENCE OF INSURANCE, less the applicable deductible.

    OUR liability shall not exceed the least of the following, less the applicable deductible stated in the EVIDENCE OF INSURANCE:
    a.  The Limit of Liability that applies to the damaged structure as shown in the EVIDENCE OF INSURANCE;
    b.  The cost to replace or repair the damaged or destroyed structure with material of like kind and quality, without deduction for depreciation, payable after replacement or repair is completed within a reasonable amount of time after the LOSS.

3.  Fraud or Concealment.  WE will not provide coverage if YOU have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.  WE will not provide coverage to the BORROWER for his/her interest in the property if the BORROWER has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

4.  YOUR duties after LOSS.  When a LOSS has occurred to which the Residential Property Form may apply, YOU and the BORROWER shall see that the following duties are performed:

    a.  give US or OUR agent immediate notice of the LOSS;
    b.  protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of the cost of such repairs;
    c.  exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath;
    d.  submit to US, within 60 days after WE request, YOUR signed, sworn proof of loss, which sets forth, to the best of YOUR knowledge and belief:
        (1)  the time and cause of LOSS;
        (2)  YOUR interest and the interest of all others in the property and all encumbrances existing thereon;
        (3)  the details of any other insurance which may cover the LOSS;
        (4)  any changes in the title or occupancy of the property during the term referenced on the EVIDENCE OF INSURANCE;
        (5)  specifications of the damaged property and detailed estimates for repair of the damage;

5.  Loss Settlement.  A LOSS will be settled as follows:

    a.  OTHER STRUCTURES, at ACTUAL CASH VALUE at the time of LOSS, but not exceeding the amount necessary to repair or replace;
    b.  Installed carpeting, covered domestic equipment or appliances, awnings, outdoor antennas and outdoor equipment, whether or not attached to a structure, at ACTUAL CASH VALUE at the time of LOSS but not exceeding the amount necessary to repair or replace;

01A09-MFPO0001-E1103                              4

**Balboa  00011**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFPO0001E1103)                                                                STK# 00 0000

c.  The one to four-unit dwelling structure included in the RESIDENTIAL PROPERTY, at replacement cost without deduction for depreciation if repair or replacement has been completed within a reasonable time after LOSS; at ACTUAL CASH VALUE until such repair or replacement is completed.

6.  Pair or Set.  In settlement of covered damage to a pair or set, WE may elect to:
    a.  Replace or repair any part of the pair or set;
    b.  Pay the difference between the ACTUAL CASH VALUE of the pair or set before and after the loss.

7.  Replacement of Glass.  WE will pay to replace glass with safety glazing materials when required by ordinance or law.

8.  Appraisal.  If YOU and WE fail to agree on the amount of LOSS, either can make a written demand upon the other that the amount of LOSS be determined by appraisal.  Within 20 days of such written demand, each party shall select a competent and disinterested appraiser and notify the other of the appraiser selected.  The two appraisers shall then select a competent and impartial umpire.  If the appraisers do not agree on an umpire within 15 days, then, at the request of YOU or US, such umpire shall be selected by a judge of a court of record in the state where the RESIDENTIAL PROPERTY is located.  The appraisers shall then appraise the LOSS.  If the appraisers submit a written proof of agreement to US, the amount agreed upon shall prevail.  If the appraisers fail to agree, they shall submit their differences to the umpire within a reasonable time.  Written agreement signed by any two of these three shall be the amount used to settle the dispute.  The appraisal award shall be considered binding as to the amount of the LOSS.  WE shall pay all the expenses of OUR chosen appraiser, and YOU shall pay all the expenses of YOUR chosen appraiser.  Each party shall also pay for its own voluntarily-incurred expenses including, but limited to, attorney fees or expert witness fees.  Any other expenses of the appraisal and the compensation of the umpire shall be paid equally by YOU and US.

9.  Other Insurance.  YOU and WE agree that the insurance provided under the Residential Property Form has been requested by YOU because YOU believe that no other coverage acceptable to YOU is in force to protect YOUR interest in the RESIDENTIAL PROPERTY.

    Insurance under the Residential Property Form will automatically terminate on the effective date and time of any other policy or certificate of insurance acceptable to YOU.  WE shall not make any payment for any claim or LOSS if other insurance acceptable to YOU is in force on the DATE OF LOSS.

10. Subrogation.  WE shall be subrogated to any rights YOU have to recovery against any person(s).  However, WE shall not exercise this right against the BORROWER.  WE may require an assignment of rights of recovery from YOU to the extent that payment is made by US.  If an assignment is sought, YOU and the BORROWER shall sign and deliver all related papers, and shall otherwise cooperate with US and do nothing to impair OUR subrogation rights.

11. Suit against US.  No action may be brought unless there has been compliance with the provisions of the Residential Property Form, and the action is started within one year after the DATE OF LOSS.

12. Repair or Replacement Option.  WE may repair or replace any part of the damaged property with equivalent property if WE have given YOU or mailed to YOU at YOUR last known address, written notice of OUR intention to do so within 30 days after WE receive YOUR signed, sworn proof of loss.

13. Loss Payment.  WE will adjust each LOSS with YOU and will pay YOU.  If the amount of LOSS exceeds YOUR insurable interest, WE will pay the BORROWER any residual amount due for the LOSS, not exceeding the applicable Limit of Liability indicated on the EVIDENCE OF INSURANCE.  Payment for LOSS will be made within 30 days after WE reach agreement with YOU as to the amount of the LOSS, or failing that, the entry of a final judgment or the filing of an appraisal award with US.

14. Abandonment.  WE may take all, part, or none of the property for which WE have paid YOU or the BORROWER but neither YOU nor the BORROWER can abandon any property to US without our prior written approval.

15. No Benefit to Bailee.  WE will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of the Residential Property Form.

01A09-MFPO0001-E1103                               5

**Balboa  00012**
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                                                STK# 00 0000

16. Cancellation:

    a.  YOU may cancel the insurance provided under the Residential Property Form at any time by giving written notice to US and the BORROWER stating when, thereafter, such cancellation is to take effect.

    b.  The BORROWER may cancel the insurance provided under the Residential Property Form by providing proof of other insurance to YOU that is acceptable to YOU and which covers YOUR interest in the RESIDENTIAL PROPERTY and OTHER STRUCTURES. In such case, the effective date of cancellation will be the effective date of the insurance obtained by the BORROWER or the effective date of the insurance provided under the Residential Property Form, whichever is later.

    c.  WE may cancel the insurance provided under the Residential Property Form if YOU have not paid the premium and WE have given you 10 days' written notice at YOUR last address known to US. We may also cancel the insurance provided under the Residential Property Form if we discover that other insurance acceptable to YOU is in effect to protect YOUR interest in the RESIDENTIAL PROPERTY and OTHER STRUCTURES, even if such other insurance is discovered after a LOSS.

    d.  The completion of foreclosure proceedings on RESIDENTIAL PROPERTY by YOU shall terminate the insurance provided under the Residential Property Form, and notice of foreclosure by YOU to US will be YOUR request for cancellation. Cancellation will be effective on the date the RESIDENTIAL PROPERTY is conveyed to YOU or to a third party via the foreclosure process.

In the event of cancellation of the insurance provided under the Residential Property Form, any refund due will be computed on a pro-rata basis.

17. Expiration of Insurance. The Residential Property Form is written under the terms of the Master Policy that has been issued to YOU. If the Master Policy is in force upon expiration of the insurance provided under the Residential Property Form, YOU may request that new insurance under the Residential Property Form be issued to cover the RESIDENTIAL PROPERTY and OTHER STRUCTURES. If YOU fail to request the issuance of new insurance under the Residential Property Form, insurance on the RESIDENTIAL PROPERTY and OTHER STRUCTURES will cease upon the expiration date of the Residential Property Form as shown on the EVIDENCE OF INSURANCE.

If, upon expiration of the Residential Property Form, the MASTER POLICY is no longer in force, then all insurance under the Residential Property Form will end on its expiration date.

18. Changes of Provisions. No change may be made to any provision of the Residential Property Form except by written endorsement issued by US. No other written changes or oral changes will be valid. OUR request for appraisal or examination(s) under oath shall not waive any of our rights.

19. Assignment. There shall be no valid assignment of YOUR rights or the rights of the BORROWER under the Residential Property Form unless WE have given OUR advance written consent to YOU and the BORROWER.

IN WITNESS WHEREOF, Balboa Insurance Company has caused the Residential Property Form to be signed by its President and Secretary, at Irvine, California.

SECRETARY                                          PRESIDENT

01A09-MFPO0001-E1103                              6

**Balboa  00013**
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0002E1103)                                                STK# 00 0000

## Commercial Property Fire Insurance Form

### Lenders Protection Program

#### INSURING AGREEMENT

In consideration of the premium paid, and subject to the Limits of Liability, exclusions, conditions and other terms contained in the Master Policy and this Commercial Property Fire Insurance Form ("Commercial Property Form"), we agree to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest in the COMMERCIAL PROPERTY.

#### DEFINITIONS

Whenever used in this Commercial Property Form, the following words shall have the meanings as shown herein:

"YOU," "YOUR," and "YOURS" means the Named Insured shown under Item 1 on the DECLARATIONS PAGE of the Master Policy under which the insurance on the DESCRIBED LOCATION has been issued, which has an interest in the COMMERCIAL PROPERTY described on the EVIDENCE OF INSURANCE as the direct result of a mortgage, second mortgage, other lien instrument, or an agreement for the servicing of such contracts.

"WE," "US," "OUR," and "OURS" means the Company that underwrites this insurance.

"ACTUAL CASH VALUE" means the amount it would take to repair or replace the damaged property on the DATE OF LOSS with material of like kind and quality, subject to deduction for deterioration, depreciation or obsolescence, and contractor's overhead and profit.  ACTUAL CASH VALUE applies to valuation of property whether the property has sustained partial or total LOSS.

"BORROWER" means the person(s) or entity identified as the BORROWER in the EVIDENCE OF INSURANCE.

"CERTIFIED ACT OF TERRORISM" means an act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States to be an act of terrorism pursuant to the Terrorism Risk Insurance Act of 2002.

"COMMERCIAL PROPERTY" means the buildings designed and intended for business purposes and buildings designed, intended, or used for occupancy by five or more families, which are located on the DESCRIBED LOCATION.

COMMERCIAL PROPERTY includes additions, extensions, fixtures, machinery and other equipment attached to the building(s) for the support or service of that building(s).  COMMERCIAL PROPERTY does not include:
1.   Land, including the land on which the COMMERCIAL PROPERTY is located;
2.   business inventory or supplies;
3.   business materials;
4.   records of any nature;
5.   animals;
6.   vehicles of any kind or use;
7.   outdoor signs, whether or not attached to the building or structure;
8.   trees; shrubs; plants;
9.   outdoor swimming pools;
10. fences;
11. piers; wharves; docks;
12. beach or diving platforms or appurtenances;
13. retaining walls not constituting a part of the building;
14. walks; roadways and other paved surfaces;
15. foundations of buildings, machinery, boilers or engines  that are below the surface of the ground or the undersurface of the lowest basement floor;
16.  underground pilings, piers, pipes, flues and drains;

that may be located at the DESCRIBED LOCATION.

01A09-MFPO0002-E1103                              1

Balboa  00014
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0002E1103)                                                      STK# 00 0000

"DATE OF LOSS" means the date on which a LOSS occurred.

"DECLARATIONS PAGE" means the DECLARATIONS PAGE of the Master Policy, which identifies the Named Insured and the policy period applying to the Master Policy

"DESCRIBED LOCATION" means the location identified as the DESCRIBED LOCATION on the EVIDENCE OF INSURANCE.

"EVIDENCE OF INSURANCE" refers to the form issued by US to the BORROWER as evidence of insurance purchased by YOU. An EVIDENCE OF INSURANCE form specifies the location, identity, and the amount and term of coverage for the individual COMMERCIAL PROPERTY that has been insured by US at YOUR request.  The terms and conditions applying to the insurance referenced in the EVIDENCE OF INSURANCE may vary depending upon the forms approved by any individual state where the COMMERCIAL PROPERTY is located.

"FUNGI" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

"LOSS" means direct, sudden and accidental physical damage to the COMMERCIAL PROPERTY caused by a covered peril.

"NON-CERTIFIED ACT OF TERRORISM" means a violent act or an act that:
1.  is dangerous to human life, property or infrastructure, that is committed by an individual or individuals; and
2.  appears to be part of an effort to coerce a civilian population or to influence the policy or affect the conduct of any government by coercion; and
3.  is not a CERTIFIED ACT OF TERRORISM, except that an act of terrorism that is not deemed a CERTIFIED ACT OF TERRORISM by the Secretary of the Treasury solely because property and casualty insurance losses resulting from such act of terrorism, in the aggregate, do not exceed $5,000,000, shall not be deemed a NON-CERTIFIED ACT OF TERRORISM.

COVERED PERILS

The Commercial Property Form insures against LOSS caused by:

1.  Fire or lightning,
2.  Windstorm or Hail, except LOSS caused by frost or freezing, ice, snow or sleet, whether or not driven by wind.  We shall not be liable under this peril for damage  to the interior of the COMMERCIAL PROPERTY caused by:
    a.  Rain, snow, sand or dust whether or not driven by wind unless the COMMERCIAL PROPERTY sustains actual damage to roof or walls by the direct action of wind or hail, and then, WE shall only be liable for the damage to the interior of the COMMERCIAL PROPERTY caused by rain, snow, sand or dust entering through the openings in the roof or walls caused by their direct damage.
    WE will not be liable for windstorm or hail damage to:
    a.  Windmills, wind-driven pumps or their towers;
    b.  Crop silos or their contents;
    c.  Metal smokestacks;
    d.  Awnings or canopies of fabric or slat construction or their supports;
    e.  Radio or television antennas, their lead-in wiring, masts or towers.
3.  Smoke, other than smoke from agricultural smudging or industrial operations.
4.  Explosion, which includes explosion of accumulated gases or unconsumed fuel within any fired vessel or flues or passages designed to provide for the venting of gases from such combustion.  WE shall not be liable for damage caused by the explosion of steam boilers, steam turbines, steam engines, or steam pipes owned, leased or operated under the control of YOU or the BORROWER.
    WE shall not be liable under this peril for damage caused by:
    a.  Sonic boom;
    b.  Arcing or sparking of electricity;
    c.  Mechanical breakdown, rupture or bursting of moving parts of machinery;
    d.  Bursting, breaking, rupture or deterioration of water pipes or the contents of any building caused by or resulting from water or the pressure of water;
    e.  The failure or operation of any pressure relief devices.

**Balboa  00015**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFPO0002E1103)                                                    STK# 00 0000

5.  Riots, including acts of striking employees of the tenant(s) or owner of the COMMERCIAL PROPERTY, but WE shall not be responsible for damage due to change in temperature or humidity caused by this peril.

6.  Collision, meaning LOSS resulting from the collision of an aircraft or vehicle not owned or operated by YOU, the BORROWER or a tenant with the COMMERCIAL PROPERTY. This peril includes damage from objects falling from such aircraft.

7.  Vandalism or Malicious Mischief, meaning willful and malicious damage to or destruction of the COMMERCIAL PROPERTY. However, WE will not cover such damage to glass except to glass building blocks.

    Vandalism and malicious mischief do not include, and WE are not liable for, LOSS caused by theft, pilferage, burglary, or larceny.

## EXCLUSIONS

WE do not insure YOU for damage caused directly or indirectly by, or resulting from any of the following perils. Such damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the damage:

1.  NON-CERTIFIED ACT OF TERRORISM. We will not pay for loss or damage caused directly or indirectly by, contributed to by, resulting from, arising out of, or in connection with any NON-CERTIFIED ACT OF TERRORISM, regardless of any other cause or event contributing concurrently with or in any other sequence to the loss or damage. This exclusion shall apply when:

    (1) the NON-CERTIFIED ACT OF TERRORISM involves the use, release, dispersal, escape or application of any nuclear material, contaminant or pollutant, or that directly or indirectly results in any nuclear reaction, nuclear discharge, nuclear radiation, nuclear radioactive pollution, or nuclear or radioactive contamination; or
    (2) the NON-CERTIFIED ACT OF TERRORISM is carried out by means of the use, release, dispersal, escape or application of any pathogenic or poisonous biological material, contaminant or pollutant; or
    (3) the NON-CERTIFIED ACT OF TERRORISM is carried out by means of the use, release, dispersal, escape or application of any pathogenic or poisonous chemical material, contaminant or pollutant; or
    (4) the amount of loss and damage to all property, including loss of use and business interruption losses in the United States, attributable to one or more NON-CERTIFIED ACT OF TERRORISM, which occur within a 72-hour period, exceeds $25,000,000 in the aggregate.

    Ensuing loss or damage by fire will be covered. This Exclusion does not create coverage for any loss which would otherwise be excluded under this policy, nor does it supercede any other exclusion, including, but not limited to, Exclusion 3 "Nuclear Explosion" and Exclusion 5 "War."

2.  Electrical Equipment. WE will not pay for any damage to appliances, devices, fixtures or wiring resulting from electrical currents that are artificially generated. WE will pay for ensuing fire damage but only for that portion that is caused directly by fire.

3.  Nuclear Explosion. WE will not pay for damage caused by nuclear reaction,    nuclear explosion, nuclear radiation, or radioactive contamination.

4.  Ordinance or Law: WE will not pay for damage or debris removal expense, caused directly or indirectly by the enforcement of any ordinance or law regulating the use, construction, demolition or repair of the COMMERCIAL PROPERTY.

5.  War: WE will not pay for damage caused by or resulting from war whether declared or not, insurrection, revolution, civil war, rebellion, warlike act by a military force or the personnel of any military force, seizure, destruction or use for a military purpose including any consequence of any of these. WE will not pay for damage caused by the action of any governmental authority to resist, defend against or combat any of the above actions or acts. The detonation or discharge of any nuclear weapon shall be deemed an act of war even if done accidentally.

01A09-MFPO0002-E1103                            3

Balboa 00016
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0002E1103)                                                    STK# 00 0000

6.  Flood, meaning a general, temporary condition of complete or partial covering or inundation of normally dry land areas from:
    (1) The overflow of tidal or inland water including streams, rivers or lakes; or
    (2) The run-off or build-up of surface water from any source; or
    (3) Mudslides or mudflows caused by the build up of water on or under the ground; or
    (4) The sinking, collapse or movement of land along the shore of a body of water which results from undermining or erosion caused by waves, flow, or currents of water exceeding normal levels.

        Ensuing LOSS by fire or explosion will be covered;

7.  Water that backs up through or overflows from sewers, drains, or sumps, however caused;

8.  Water below the surface of the ground or damage from the pressure exerted by such water, including its flow, seepage or leakage through foundations, walls, floors, basements, doors, windows, sidewalks, driveways, or any other opening;

9.  FUNGI, wet or dry rot, viruses, bacteria, or pathogenic organisms, including spores, scents or by-products produced or released by any of these;

10. Earth movement: WE will not pay for damage caused  by, resulting from, contributed to or aggravated by earth movement including, but not limited to, earthquake, landslide, mudslide, mudflow, the sinking, collapse or shifting of land or soil unless direct damage by fire or explosion ensues, in which case WE will pay only for the ensuing fire or explosion LOSS.

11. Volcanic Event: WE will not pay for damage caused by the eruption, explosion or effusion of a volcano unless direct loss by fire or breakage of glass or safety glazing material ensues, in which case, WE will pay only for the ensuing fire damage and breakage of glass or glazing material.

## CONDITIONS

The following conditions apply to the CERTIFICATE and the Commercial Property Form:

1.  Period of Coverage.  The Commercial Property Form provides coverage only for LOSS that occurs during the coverage period shown on the EVIDENCE OF INSURANCE.

2.  Limit of Liability.  No matter how many people or entities have an insurable interest in the COMMERCIAL PROPERTY, WE shall not be liable for an amount greater than the interest of YOU and the BORROWER or for the maximum amount of insurance requested by YOU, as shown on the EVIDENCE OF INSURANCE, less the applicable deductible.

    OUR liability shall not exceed the least of the following, less the applicable deductible stated on the EVIDENCE OF INSURANCE:
    a.  The Limit of Liability shown on the EVIDENCE OF INSURANCE;
    b.  The cost to replace or repair the damaged or destroyed COMMERCIAL PROPERTY with material of like kind and quality, without deduction for depreciation, payable after replacement or repair is completed within a reasonable amount of time after the LOSS.

3.  Fraud or Concealment.  WE will not provide coverage if YOU have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.  WE will not provide coverage to the BORROWER for his interest in the COMMERCIAL PROPERTY if the BORROWER has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

4.  YOUR duties after LOSS.  When a LOSS has occurred to which this Commercial Property Form may apply, YOU or the BORROWER shall see that the following duties are performed:

    a.  Give US or OUR agent immediate notice of the LOSS;
    b.  Protect the COMMERCIAL PROPERTY from further damage, make reasonable and necessary repairs required to protect the COMMERCIAL PROPERTY, and keep an accurate record of the cost of such repairs;

01A09-MFPO0002-E1103                          4

**Balboa  00017**
Re: **Williams v. Balboa**

(PM7\MF1F\01A09MFPO0002E1103)                                                                STK# 00 0000

    c.  Exhibit the damaged COMMERCIAL PROPERTY to US or our representatives as often as WE reasonably require and submit to examination(s) under oath:
    d.  Submit to US, within 60 days after OUR request, YOUR signed, sworn proof of loss, which sets forth, to the best of YOUR knowledge and belief:
        (1)  the date, time and cause of LOSS;
        (2)  YOUR interest and the interest of all others in the COMMERCIAL PROPERTY and all encumbrances existing thereon;
        (3)  the details of any other insurance that may cover the loss;
        (4)  any changes in the title or occupancy of the property during the term stated on the EVIDENCE OF INSURANCE;
        (5)  specifications of the damaged COMMERCIAL PROPERTY and detailed estimates for repair of the damage.

5.  Pair or Set. In settlement of covered damage to a pair or set, WE may elect to:
    a.  Replace or repair any part of the pair or set;
    b.  Pay the difference between the ACTUAL CASH VALUE of the pair or set before and after the LOSS.

6.  Appraisal.  If YOU and WE fail to agree on the amount of LOSS, either can make a written demand upon the other that the amount of LOSS be determined by appraisal.  Within 20 days of such written demand, each party shall select a competent and disinterested appraiser and notify the other of the appraiser selected. The two appraisers shall then select a competent and impartial umpire.  If the appraisers do not agree on an umpire within 15 days, then, on the request of YOU or US, such umpire shall be selected by a judge of a court of record in the state where the COMMERCIAL PROPERTY is located.  The appraisers shall then appraise the LOSS.  If the appraisers submit a written proof of agreement to US, the amount agreed upon shall prevail.  If the appraisers fail to agree, they shall submit their differences to the umpire within a reasonable time.  Written agreement signed by any two of these three shall be the amount used to settle the dispute.  The appraisal award shall be considered binding as to the amount of the LOSS. WE shall pay all the expenses of OUR chosen appraiser and YOU shall pay all of the expenses of YOUR chosen appraiser.  Each party shall also pay for its own voluntarily-incurred expenses including, but limited to, attorney fees or expert witness fees. Any other expenses of the appraisal and the compensation of the umpire shall be paid equally by YOU and US.

7.  Other Insurance.  YOU and WE agree that the insurance provided under the Commercial Property Form has been requested by YOU because YOU believe that no other coverage acceptable to YOU is in force to protect YOUR interest in the COMMERCIAL PROPERTY.

    Coverage under the Commercial Property Form will automatically terminate on the effective date and time of any other policy or certificate of insurance acceptable to YOU.  WE shall not make any payment for any claim or LOSS if other coverage acceptable to YOU is in force on the DATE OF LOSS.

8.  Subrogation.  WE shall be subrogated to any right YOU have to recover against any person(s).  However, WE shall not exercise this right against the BORROWER. WE may require an assignment of rights of recovery from YOU to the extent that payment is made by US.  If an assignment is sought, YOU and the BORROWER shall sign and deliver all requested documents, and will otherwise cooperate with US and do nothing to impair OUR subrogation rights.

9.  Suit against US.  No action may be brought unless there has been compliance with the provisions of the Commercial Property Form and the action is started within one year after the DATE OF LOSS.

10. Repair or Replacement Option.  WE may repair or replace any part of the damaged property with equivalent property if WE have given YOU or mailed to YOU at YOUR last known address, written notice of OUR intention to do so within 30 days after WE receive YOUR signed, sworn proof of loss.

11. Loss Payment.  WE will adjust each LOSS with YOU, and WE will pay YOU.   If the amount of LOSS exceeds YOUR insurable interest, WE will pay the BORROWER    any residual amount due for the LOSS, not exceeding the Limit of Liability indicated on the EVIDENCE OF INSURANCE.  Payment for LOSS will be made within 30 days after WE reach agreement with YOU as to the amount of the LOSS or, failing that, the entry of a final judgment or the filing of an appraisal award with US.

12. Abandonment.  WE have the right to take all, part, or none of the property for which WE have paid YOU or the BORROWER, but neither YOU nor the BORROWER can abandon any property to US without OUR prior written approval.

01A09-MFPO0002-E1103                                  5

**Balboa  00018**
**Re: Williams v. Balboa**

(PM7\MF1F\01A09MFPO0002E1103)                                                    STK# 00 0000

13. No benefit to Bailee.  WE will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of the Commercial Property Form.

14. Cancellation:

   a.  YOU may cancel the insurance provided under the Commercial Property Form at any time by giving written notice to both US and the BORROWER stating when, thereafter, such cancellation is to take effect.
   b.  The BORROWER may cancel the insurance provided under the Commercial Property Form by providing proof of other acceptable insurance to YOU, which covers YOUR interest in the COMMERCIAL PROPERTY.  In such case, the effective date of cancellation will be the effective date of the coverage obtained by the BORROWER or the effective date of the insurance provided under the Commercial Property Form, whichever is later.
   c.  WE may cancel the insurance provided under the Commercial Property Form if YOU have not paid the premium, and WE have given YOU 10 days' written notice at YOUR last address known to us. We may also cancel the insurance provided under the Commercial Property Form if we discover that other insurance acceptable to YOU is in effect to protect YOUR interest in the COMMERCIAL PROPERTY, even if such other insurance is discovered after a LOSS.
   d.  The completion of foreclosure proceedings on COMMERCIAL PROPERTY by YOU shall terminate insurance provided under the Commercial Property Form, and notice of foreclosure by YOU to US will be YOUR request for cancellation.  Cancellation will be effective on the date the COMMERCIAL PROPERTY is conveyed to YOU or to a third party via the foreclosure process.

   In the event of cancellation of the insurance provided under the Commercial Property Form, any refund will be computed on a pro-rata basis.

15. Expiration of Insurance.  The Commercial Property Form is written under the terms of the Master Policy that has been issued to YOU.  If the Master Policy is in force upon expiration of the insurance provided under the Commercial Property Form, YOU may request that new insurance under the Commercial Property Form be issued to cover the COMMERCIAL PROPERTY.  If you fail to request the issuance of new insurance under the Commercial Property Form, the insurance on the COMMERCIAL PROPERTY will cease upon the expiration date stated in the EVIDENCE OF INSURANCE. If the Master Policy is no longer in force upon expiration of the Commercial Property Form, then all insurance under the Commercial Property Form will end at its expiration date.

16. Changes of Provisions.  No change may be made to any provision of the Commercial Property Form except by written endorsement issued by US.  No other written changes or oral changes will be valid.  OUR request for appraisal or examination(s) under oath shall not waive any of our rights.

17. Assignment. There shall be no valid assignment of YOUR rights or the rights of the BORROWER under the Commercial Property Form unless WE have given OUR advance written consent to YOU and the BORROWER.

   IN WITNESS WHEREOF, Balboa Insurance Company has caused the Commercial Property Form to be signed by its President and Secretary, at Irvine, California.

SECRETARY                                    PRESIDENT

01A09-MFPO0002-E1103                          6

Balboa  00019
Re: Williams v. Balboa

(PM7\MF1F\01A09MFEN0001E1103)                                                    STK# 00 0000

## BALBOA Life and Casualty
3349 Michelson Drive, Suite 200, Irvine, CA 92612-8893

☑ Balboa Insurance Company   ☐ Meritplan Insurance Company   ☐ Newport Insurance Company

### UNACCEPTABLE RISK ENDORSEMENT

It is hereby understood and agreed that the Master Policy coverages shall not apply to any of the following risks:

A. Institutional occupancies (ie: schools, dormitories, jails, hospitals, clinics, retirement homes, convalescent homes, etc.):
B. Railroad or aviation risks:
C. Builders risk policies or any publicly owned buildings;
D. Bridges, piers, wharfs, docks and drydocks;
E. Camps and recreational facilities;
F. Chemical works or petrochemical plants, or any operations which include fireworks or fuse manufacturing;
G. Oil or gas plants or public utilities or offshore oil risks;
H. Lumber mills or mining operations;
I. Livestock mortality;
J. Loss or damage to growing and/or standing crops;
K. Amusement parks;
L. Boilers and machinery;
M. Any asbestos operations;
N. Contents and liability;
O. Property pollution;
P. Churches;
Q. Moveable mobile homes (ie: mobile homes without a permanent foundation and permanently connected plumbing, electricity and gas).

All other terms and conditions of the Master Policy remain the same.

01A09-MFEN0001-E1103

**Balboa  00020**
**Re: Williams v. Balboa**

STK# 00 1401

# BALBOA LIFE AND CASUALTY
## HOME OFFICE - IRVINE, CA - A STOCK COMPANY

- ☑ **BALBOA INSURANCE COMPANY**
- ☐ **MERITPLAN INSURANCE COMPANY**
- ☐ **NEWPORT INSURANCE COMPANY**

LENDERS PROTECTION PROGRAM
AUTOMATIC COVERAGE ENDORSEMENT

| **Named Insured** | **Master Policy** |
|---|---|
| General Motors Acceptance Corp. Mortgage | 6043-0002 thru 0005 |

Effective Date: Same as Master Policy effective date unless otherwise indicated     10/01/04

Beginning on the effective date of this endorsement:

If there is a loss to residential or commercial property that is eligible for coverage under this Policy; and

Other acceptable physical damage insurance was terminated prior to the loss; and

If no notification has been issued to the Borrower that coverage has been placed on the property, then we will:

Cover that loss up to your interest in the property at the time of loss and issue notification to the borrower that coverage protecting only your interest has been placed on the property, effective the date other acceptable physical damage insurance terminated.

This does not apply to properties that acceptable physical damage insurance terminated prior to the effective date of this Policy or to property in which the Borrower no longer has an interest as a result of foreclosure proceeding. It only applies to property on which there is an outstanding mortgage.

Automatic coverage is limited to only those risk in which the amount of force placed coverage would have been less than $     5,000,000

F292E-R0894

COPY

**Balboa  00021**
**Re: Williams v. Balboa**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **BILLY WILLIAMS and** | ) | |
| **TERESA WILLIAMS,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO.   1:07-cv-549** |
| | ) | |
| **BALBOA INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### DECLARATION OF SCOTT ZEITZ

I, Scott Zeitz, state the following:

1.     My name is Scott Zeitz.  I am over the age of nineteen years and competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.     I am a Performance Review Analyst with GMAC Mortgage, L.L.C.

3.     As of February 5, 2006, Billy and Teresa Williams owed a total of $43,041.07 on their mortgage loan, account number 833002922, on the property located at 678 County Road 620, Enterprise, Alabama 36330.

4.     No additional payments have been made on that loan since that date.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _Felruay        19____, 2008.


_____
SCOTT ZEITZ

1

**EXHIBIT 3**

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BILLY WILLIAMS and )
TERESA WILLIAMS, )
                    )
    Plaintiffs, )
                    )
vs. )    CASE NO.   1:07-cv-549
                    )
BALBOA INSURANCE COMPANY, )
                    )
    Defendant. )

### DECLARATION OF DAVID N. TOELLNER

I, David N. Toellner, state the following:

1.    My name is David N. Toellner.  I am over the age of nineteen years and competent to make this Declaration.  I have personal knowledge of the matters set forth below.

2.    At the time of the evaluation of the claim on the property located at 678 County Road 620, Enterprise, Alabama 36330, I was employed as a claims adjuster with Cunningham Lindsey, an independent claim adjusting firm.  Cunningham Lindsey is not affiliated with any insurance company.

3.    I worked with Cunningham Lindsey from approximately April 2005 through November 15, 2007.  Prior to that time, I worked as a property and casualty claims adjuster for approximately twenty years, with a couple of short breaks working in other fields. I have worked at various times with Scotland Assurant Co., Gulf American Fire and Casualty Co., Home Insurance, Farmers Insurance, and Crawford and Company.  During that time, I have worked as an adjuster on more than one-thousand fire damage claims involving homes.

**EXHIBIT 4**

4.      In February 2006, I was asked by Cunningham Lindsey to inspect the property located at 678 County Road 620, Enterprise, Alabama 36330 following a fire in the home located on that property. I traveled to the location of the home, inspected the property, and took measurements and photographs of the damage. From that inspection and evaluation, I prepared an estimate, which is attached hereto as Exhibit A.

5.      I prepared the estimate using the results of my inspection and analysis of the damage and using a claims estimating computer program from MSB. The MSB software provides local labor and materials pricing information by zip code, which is updated on a quarterly basis. The use of this program is standard and customary in the claim adjusting industry, and I have found it to be reliable and accurate based on my twenty plus years of experience in adjusting claims.

6.      I provided the estimate to Balboa, along with photographs of the property. Copies of those photographs are attached hereto as Exhibit B.

7.      Later, I was contacted by Tancy Nelson with Balboa and provided with lump sum repair estimates supplied by Ms. Williams purportedly from contractors concerning the property. Since the estimates provided by Ms. Williams were lump sum estimates with no detail as to the specific repairs or the costs, I requested that Ms. Williams have one of the contractors complete a detailed itemization of their estimate using a form generated from the MSB program.

8.      I received back the handwritten completed form, which is attached hereto as Exhibit C. I reviewed the contractor's itemization and compared it to the original estimate that I prepared. I made some changes in the scope of the work where I believed that the contractor's suggested scope of work items were reasonable. I then produced a revised estimate, which is attached hereto as Exhibit D.

9.     My revised estimate disagreed with the contractor's estimate on some points. For example, the bathrooms were not directly impacted by the fire, but they received smoke damage. From my experience and based on my inspection, the bathrooms could be cleaned rather than replacing the ceramic tile and fixtures.

10.    In addition, the contractor's estimate called for the replacement of acoustical ceilings with more expensive drywall ceilings, whereas my estimate provided for the replacement of the same type acoustical ceilings that were present in the home at the time of the fire.

11.    In addition to the scope of the work, there were a number of items in the contractor's estimate concerning pricing that were either unreasonably high or inconsistent.  For example, with the roof, the contractor's estimate charged $600.00 for the removal of two and one-half squares (a square is ten feet by ten feet) of shingles and $2,600.00 to replace that roofing using three squares of asphalt shingles. Furthermore, the itemized estimate provided for a charge of $2,200.00 to remove, replace, and paint, 48 sq. ft. of horizontal lap siding.  As another example, the contractor proposed a charge of $350.00 for removing and replacing a gable vent, which is an inexpensive vent that would simply be placed in the existing hole and secured in place with screws or nails.  The contractor's estimate further provides for a charge of $200.00 to paint 52 linear feet of crown molding in the kitchen, which equals almost $4.00 per linear foot for painting the standard molding. Those charges are unreasonably high on their face.

12.    The contractor's estimate also provides for 25% profit and overhead, rather than 20%, which is the industry standard in my experience.

13.    With the adjustments that I made in light of the contractor's proposal, it is my opinion that my revised estimate is an accurate estimate concerning the amount of the loss.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on ~Fobruary 2-1~~~~~~~~~~, 2008.

DAVID N. TOELLNER

# Short Form

Claim # 200657216430

| Adjuster | **Cunningham Lindsey Inc.** | |
|---|---|---|
| David Toellner | 300 Century Park South | February 26, 2006 |
| Phone | Suite 200 | |
| Fax | Birmingham, AL 35226 | |
| | Phone (205) 823-8338  Fax (205) 823-8341 | |

| | | | |
|---|---|---|---|
| Insured | Williams, Billy | | |
| Loss Address | 678 Co Rd 620, Enterprise, AL 36330 | | |
| Phone Number | (334) 406-7738 | Policy # GM47136890 | |
| Other Phone | | Ins Claim # GM7136890-1 | |
| Ins Company | BALBOA INSURANCE COMPANY | | Date of Loss  2/6/2006 |

## Coverage

Policy Type
Effective  -
Deductible  $500.00

Mortgagee  None Showing

| Coverage | Description | Coverage Amt | Value Requirement |
|---|---|---|---|
| BLDG | Coverage A - Building | $32,311.00 | None |
| APS | Coverage B - APS | $3,231.10 | None |
| UPP | Coverage UPP - Contents | $16,155.50 | None |
| ALE/FMV | Coverage D - ALE/FMV | $6,462.20 | None |

## Adjuster's Report

Assigned  2/8/2006    Contacted 2/8/2006    Inspected 2/13/2006
Apparent Cause of Loss/Scope        damage by Fire
Items Subject to Exclusions/Limitations
Salvage or Subrogation Potential

## Loss Recap

| Coverage | RC Loss | Depreciation | ACV Loss | Recov. Depr. | TOTAL |
|---|---|---|---|---|---|
| BLDG | $14,261.16 | $5,312.85 | $8,948.31 | $5,312.85 | $14,261.16 |
| TOTALS | $14,261.16 | $5,312.85 | $8,948.31 | $5,312.85 | $14,261.16 |

## Enclosures

☒ Estimates    ☒ Photos    ☐ Proof of Loss    ☐ Adjuster Summary    ☐ Estimate Recap    ☐ Statement of Loss    ☐ Invoice
☐ Claim Summary    ☐ Diagrams    ☐ R/C Proof    ☐ PILR    Other:    Fire Report

## Recommendations

| Payment Recommendations: Initial | $8,448.31 | Deductible and insured's participation | $500.00 |
|---|---|---|---|
| Upon Completion | $5,312.85 | Recommended Adjustment | $13,761.16 |

Payee  Williams, Billy

Inspection of fire damage to the insured dwelling found a kitchen fire at the stove ignited the wall behind the stove and travelled up into the attic. Fire damage in the kitchen with fire damage also in an adjoining bedroom. Smoke and water damage to other rooms.

We have obtained a copy of the fire report which is attached. Mrs Williams advised was frying bacon when left the kitchen and upon return found flames coming up at the rear of the stove. Mr. Williams was out of town at this time. Insured called 911 and Battens Volunteer Fire Department arrived to extinguish the fire.

We recommend closing this claim per the attached estimate. We will be closing our file and thank you for allowing Cunningham Lindsey the opportunity to handle this matter for you.

---

Short Form (MS/B 0110)                                         - 1 -                                         Feb 26, 2006
Claim # 200657216430

Cunningham 00038

# EXHIBIT A

# Estimate

**Claim #**     200657216430
**Coverage BLDG**

| | |
|---|---|
| **Adjuster**<br>David Toellner | **Cunningham Lindsey Inc.** |

**Cunningham Lindsey Inc.**

300 Century Park South
Suite 200
Birmingham, AL 35226
Phone (205) 823-8338   Fax (205) 823-8341

February 26, 2006
Coverage A - Building

**Insured**     Williams, Billy
**Loss Address**   678 Co Rd 620, Enterprise, AL 36330
**Phone Number** (334) 406-7738    **Policy #**    GM47136890
                            **Ins Claim #** GM7136890-1
**Ins Company**   BALBOA INSURANCE COMPANY

**Date of Loss**   2/6/2006

## Living Room (15' x 14' 6" x 8')

| 315 sf Floor | 608 sf Wall | 315 sf Ceiling | 76 lf Floor | 76 lf Ceiling | 2,522 cf Volume |
|---|---|---|---|---|---|
| | Offset(s)   11'6" x 8'6" | | | | |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ $0.25 | $152.00 | $0.00 | $152.00 | | |
| Replace Wallpaper | 711.36 SF @ $0.40 | $284.54 | Material | | | |
| | 608 SF @ $0.34 | $206.72 | Labor | | | |
| | | $491.26 | $327.51 | $163.75 | | |
| Remove Carpet & Pad (SF) | 315 SF @ $0.17 | $53.55 | $0.00 | $53.55 | | |
| Replace Carpet & Pad (SF) | 333.9 SF @ $1.37 | $457.44 | Material | | | |
| | 315 SF @ $0.46 | $144.90 | Labor | | | |
| | | $602.34 | $451.76 | $150.58 | | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ $0.22 | $69.30 | $0.00 | $69.30 | | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ $1.11 | $356.64 | Material | | | |
| | 315 SF @ $0.29 | $91.35 | Labor | | | |
| | | $447.99 | $224.00 | $223.99 | | |
| Remove Crown Molding | 76 LF @ $0.18 | $13.68 | $0.00 | $13.68 | | |
| Replace Crown Molding | 80.56 LF @ $1.89 | $152.26 | Material | | | |
| | 76 LF @ $0.69 | $52.44 | Labor | | | |
| | | $204.70 | $81.88 | $122.82 | | |
| Paint Crown Molding | 76 LF @ $0.58 | $44.08 | $33.06 | $11.02 | | |
| Clean Window, Casement, Wood | 5 EA @ $5.01 | $25.05 | $0.00 | $25.05 | | N |
| Clean Door, Interior, Pre-Hung | 1 EA @ $3.23 | $3.23 | $0.00 | $3.23 | | N |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| | | **$2,120.72** | **$1,118.21** | **$1,002.51** | | |

## Kitchen (14' 6" x 11' 6" x 8')

| 167 sf Floor | 416 sf Wall | 167 sf Ceiling | 52 lf Floor | 52 lf Ceiling | 1,334 cf Volume |
|---|---|---|---|---|---|

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ $0.22 | $36.74 | $0.00 | $36.74 | | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ $1.11 | $189.08 | Material | | | |
| | 167 SF @ $0.29 | $48.43 | Labor | | | |
| | | $237.51 | $118.76 | $118.75 | | |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| Clean Window, Casement, Wood | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | | N |

Estimate (MS/B 0410)
Claim # 200657216430

\- 1 -

Feb 26, 2006

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ $0.18 | $30.06 | $0.00 | $30.06 | | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ $0.31 | $54.36 | Material | | | |
| | 167 SF @ $0.56 | $93.52 | Labor | | | |
| | | $147.88 | $26.89 | $120.99 | | |
| Rem/Reset Ceiling Fixture | 1 EA @ $19.01 | $19.01 | $0.00 | $19.01 | | |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 | | N |
| Remove Drywall, Wall | 416 SF @ $0.16 | $66.56 | $0.00 | $66.56 | | |
| Replace Drywall, Wall | 440.96 SF @ $0.39 | $171.97 | Material | | | |
| | 416 SF @ $0.56 | $232.96 | Labor | | | |
| | | $404.93 | $161.97 | $242.96 | | |
| Paint Drywall, Wall | 416 SF @ $0.35 | $145.60 | $109.20 | $36.40 | | |
| Remove Crown Molding | 52 LF @ $0.18 | $9.36 | $0.00 | $9.36 | | |
| Replace Crown Molding | 55.12 LF @ $1.89 | $104.18 | Material | | | |
| | 52 LF @ $0.69 | $35.88 | Labor | | | |
| | | $140.06 | $56.02 | $84.04 | | |
| Paint Crown Molding | 52 LF @ $0.58 | $30.16 | $22.62 | $7.54 | | |
| Remove Door, Interior, Pre-Hung | 1 EA @ $10.01 | $10.01 | $0.00 | $10.01 | | |
| Replace Door, Interior, Pre-Hung | 1 EA @ $221.73 | $221.73 | $110.87 | $110.86 | | |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 | $28.74 | $21.56 | $7.18 | | |
| Remove Subfloor | 167 SF @ $0.14 | $23.38 | $0.00 | $23.38 | | |
| Replace Subfloor | 175.35 SF @ $0.78 | $136.77 | Material | | | |
| | 167 SF @ $0.26 | $43.42 | Labor | | | |
| | | $180.19 | $32.76 | $147.43 | | |
| Remove Underlayment | 167 SF @ $0.12 | $20.04 | $0.00 | $20.04 | | |
| Replace Underlayment | 175.35 SF @ $0.38 | $66.63 | Material | | | |
| | 167 SF @ $0.22 | $36.74 | Labor | | | |
| | | $103.37 | $18.79 | $84.58 | | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ $0.21 | $35.07 | $0.00 | $35.07 | | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ $1.35 | $238.98 | Material | | | |
| | 167 SF @ $0.86 | $143.62 | Labor | | | |
| | | $382.60 | $273.29 | $109.31 | | |
| Rem/Reset Ceiling/Paddle Fan | 1 EA @ $43.50 | $43.50 | $0.00 | $43.50 | | |
| Clean Ceiling/Paddle Fan | 1 EA @ $5.52 | $5.52 | $0.00 | $5.52 | | N |
| Clean Door, Interior, Pre-Hung | 1 EA @ $3.23 | $3.23 | $0.00 | $3.23 | | N |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 | $28.74 | $21.56 | $7.18 | | |
| Clean Countertop, Formica | 10 LF @ $0.24 | $2.40 | $0.00 | $2.40 | | N |
| Remove Cabinet, Wall (LF) | 7 LF @ $3.99 | $27.93 | $0.00 | $27.93 | | |
| Replace Cabinet, Wall (LF) | 7 LF @ $129.64 | $907.48 | $362.99 | $544.49 | | |
| | | $3,316.93 | $1,337.28 | $1,979.65 | | |

## Family Room (17' 4" x 11' 6" x 8')

| 217 sf Floor | 512 sf Wall | 217 sf Ceiling | 64 lf Floor | 64 lf Ceiling | 1,736 cf Volume |
|---|---|---|---|---|---|
| Offset(s) | 5' 7" x 3' 2" | | | | |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ $0.17 | $36.89 | $0.00 | $36.89 | | |
| Replace Carpet & Pad (SF) | 230.02 SF @ $1.37 | $315.13 | Material | | | |
| | 217 SF @ $0.46 | $99.82 | Labor | | | |
| | | $414.95 | $311.21 | $103.74 | | |
| Remove Drywall, Ceiling | 217 SF @ $0.20 | $43.40 | $0.00 | $43.40 | | |
| Replace Drywall, Ceiling | 227.85 SF @ $0.41 | $93.42 | Material | | | |

Cunningham 00040

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| | 217 SF @ $0.63 | $136.71 | Labor | | | |
| | | $230.13 | $92.05 | $138.08 | | |
| Paint Drywall, Ceiling | 217 SF @ $0.49 | $106.33 | $79.75 | $26.58 | | |
| Remove Paneling, Pine | 512 SF @ $0.17 | $87.04 | $0.00 | $87.04 | | |
| Replace Paneling, Pine | 537.6 SF @ $0.70 | $376.32 | Material | | | |
| | 512 SF @ $0.44 | $225.28 | Labor | | | |
| | | $601.60 | $240.64 | $360.96 | | |
| Clean Door, Interior, Pre-Hung | 2 EA @ $3.23 | $6.46 | $0.00 | $6.46 | | N |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| | | $1,540.34 | $723.65 | $816.69 | | |

### Hall Bath (5' 10" x 7' 10" x 8')

| 46 sf Floor | 219 sf Wall | 46 sf Ceiling | 27 lf Floor | 27 lf Ceiling | | 366 cf Volume | |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 219 SF @ $0.16 | $35.04 | $0.00 | $35.04 | | N |
| Clean Ceramic Floor, Thin Set | 46 SF @ $0.16 | $7.36 | $0.00 | $7.36 | | N |
| Clean Drywall, Ceiling | 46 SF @ $0.15 | $6.90 | $0.00 | $6.90 | | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 | $10.25 | $0.00 | $10.25 | | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 | $4.99 | $0.00 | $4.99 | | N |
| Clean Toilet Seat | 1 EA @ $1.47 | $1.47 | $0.00 | $1.47 | | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 | | N |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ $0.22 | $10.12 | $0.00 | $10.12 | | |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ $1.11 | $52.08 | Material | | | |
| | 46 SF @ $0.29 | $13.34 | Labor | | | |
| | | $65.42 | $32.71 | $32.71 | | |
| | | $153.14 | $32.71 | $120.43 | | |

### Bedroom (11' 6" x 11' x 8')

| 126 sf Floor | 360 sf Wall | 126 sf Ceiling | 45 lf Floor | 45 lf Ceiling | | 1,012 cf Volume | |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ $0.17 | $21.42 | $0.00 | $21.42 | | |
| Replace Carpet & Pad (SF) | 133.56 SF @ $1.37 | $182.98 | Material | | | |
| | 126 SF @ $0.46 | $57.96 | Labor | | | |
| | | $240.94 | $180.71 | $60.23 | | |
| Remove Acoustical Ceiling, 12x12 | 126 SF @ $0.22 | $27.72 | $0.00 | $27.72 | | |
| Replace Acoustical Ceiling, 12x12 | 128.52 SF @ $1.11 | $142.66 | Material | | | |
| | 126 SF @ $0.29 | $36.54 | Labor | | | |
| | | $179.20 | $89.60 | $89.60 | | |
| Remove Paneling, Pine | 360 SF @ $0.17 | $61.20 | $0.00 | $61.20 | | |
| Replace Paneling, Pine | 378 SF @ $0.70 | $264.60 | Material | | | |
| | 360 SF @ $0.44 | $158.40 | Labor | | | |
| | | $423.00 | $169.20 | $253.80 | | |
| Clean Door, Interior, Pre-Hung | 2 EA @ $3.23 | $6.46 | $0.00 | $6.46 | | N |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| Clean Window, Casement, Wood | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | | N |
| Remove Furring Strips, Ceiling (SF), 12" oc | 126 SF @ $0.18 | $22.68 | $0.00 | $22.68 | | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 132.3 SF @ $0.31 | $41.01 | Material | | | |

Cunningham 00041

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
|  | 126 SF @ $0.56 | $70.56 | Labor |  |  |  |
|  |  | $111.57 | $20.29 | $91.28 |  |  |
| Rem/Reset Ceiling Fixture | 1 EA @ $19.01 | $19.01 | $0.00 | $19.01 |  |  |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 |  | N |
|  |  | $1,138.33 | $459.80 | $678.53 |  |  |

## Roof

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ $25.16 | $251.60 | $0.00 | $251.60 |  |  |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ $164.86 | $1,648.60 | $299.75 | $1,348.85 |  |  |
| Remove Sheathing, Roof | 240 SF @ $0.12 | $28.80 | $0.00 | $28.80 |  |  |
| Replace Sheathing, Roof | 264 SF @ $0.78 | $205.92 | $37.44 | $168.48 |  |  |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ $16.81 | $42.03 | $0.00 | $42.03 |  |  |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ $118.19 | $354.57 | $141.83 | $212.74 |  |  |
| Replace Felt | 3 SQ @ $16.29 | $48.87 | $30.54 | $18.33 |  |  |
| Paint Siding, Painting | 48 SF @ $0.50 | $24.00 | $18.00 | $6.00 |  |  |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $0.15 | $7.20 | $0.00 | $7.20 |  |  |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $1.32 | $63.36 | Material |  |  |  |
|  | 0 SF @ $1.01 | $0.00 |  |  |  |  |
|  |  | $63.36 | $21.12 | $42.24 |  |  |
| Remove Gable Vent | 1 EA @ $2.53 | $2.53 | $0.00 | $2.53 |  |  |
| Replace Gable Vent | 1 EA @ $42.04 | $42.04 | $16.82 | $25.22 |  |  |
|  |  | $2,719.52 | $565.50 | $2,154.02 |  |  |

## Bathroom  (8' 6"  x  5' 4"  x  8')

| 45 sf Floor | 221 sf Wall | 45 sf Ceiling | 28 lf Floor | 28 lf Ceiling | | 363 cf Volume |

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 221 SF @ $0.16 | $35.36 | $0.00 | $35.36 |  | N |
| Clean Ceramic Floor, Thin Set | 45 SF @ $0.16 | $7.20 | $0.00 | $7.20 |  | N |
| Clean Drywall, Ceiling | 45 SF @ $0.15 | $6.75 | $0.00 | $6.75 |  | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 | $10.25 | $0.00 | $10.25 |  | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 |  | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 | $4.99 | $0.00 | $4.99 |  | N |
| Clean Toilet Seat | 1 EA @ $1.47 | $1.47 | $0.00 | $1.47 |  | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 |  | N |
|  |  | $77.61 | $0.00 | $77.61 |  |  |

## Exterior

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Special Dumpster, 20 Yard | 1 EA @ $380.08 | $380.08 | $0.00 | $380.08 |  |  |
|  |  | $380.08 | $0.00 | $380.08 |  |  |

Cunningham 00042

| | Repl. Cost | Depr. | ACV |
|---|---|---|---|
| Estimate Totals | $11,446.67 | $4,237.15 | $7,209.52 |
| Contractor's Overhead & Profit (20%) | $2,289.33 | $847.43 | $1,441.90 |
| Total With Overhead & Profit | $13,736.00 | $5,084.58 | $8,651.42 |
| Sales Tax | $525.16 | $228.27 | $296.89 |
| Total With Tax | $14,261.16 | $5,312.85 | $8,948.31 |

**Price Database Legend**
All prices from TCD05D1101.

Cunningham 00043

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1    **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David    **Prepared by:** Smith, Philip    **Date :** 11/27/2007 15:17:37



Front of insured dwelling.



Rear and right side

1

**EXHIBIT B**

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1    **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David    **Prepared by:** Smith, Philip    **Date :** 11/27/2007 15:17:37



Rear of dwelling



Left side

2

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1    **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David    **Prepared by:** Smith, Philip    **Date :** 11/27/2007 15:17:37



Living room



Living room to rear of dwelling.

Insured : Williams , Billy
Co. Claim No. : GM7136890-1     Our File No. : 200657216430
Primary Adjuster : Toellner, David     Prepared by: Smith, Philip     Date : 11/27/2007 15:17:37



From living room into kitchen



Rear of living room used as dining area

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1    **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David    **Prepared by:** Smith, Philip    **Date :** 11/27/2007 15:17:37



Wallpaper with smoke and water damage in living room



Kitchen behind stove and origin of the fire.

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1    **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David    **Prepared by:** Smith, Philip    **Date :** 11/27/2007 15:17:37



Ceiling over kitchen into attic area



Gable vent in attic

Insured : Williams , Billy
Co. Claim No. : GM7136890-1    Our File No. : 200657216430
Primary Adjuster : Toellner, David    Prepared by: Smith, Philip    Date : 11/27/2007 15:17:37



Family room next to kitchen



Family room

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1     **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David     **Prepared by:** Smith, Philip     **Date :** 11/27/2007 15:17:37



Ceiling in family room



Looking into bathroom

| | | |
|---|---|---|
| **Insured :** Williams , Billy | | |
| **Co. Claim No. :** GM7136890-1 | **Our File No. :** 200657216430 | |
| **Primary Adjuster :** Toellner, David | **Prepared by:** Smith, Philip | **Date :** 11/27/2007 15:17:37 |



Bathroom



Bedroom

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1     **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David     **Prepared by:** Smith, Philip     **Date :** 11/27/2007 15:17:37



Bedroom



Bedroom

10

**Insured :** Williams , Billy
**Co. Claim No. :** GM7136890-1     **Our File No. :** 200657216430
**Primary Adjuster :** Toellner, David     **Prepared by:** Smith, Philip     **Date :** 11/27/2007 15:17:37



Bedroom ceiling



Bedroom floor

Insured : Williams , Billy
Co. Claim No. : GM7136890-1    Our File No. : 200657216430
Primary Adjuster : Toellner, David    Prepared by: Smith, Philip    Date : 11/27/2007 15:17:37



Burned wall cabinetry in carport



Rear slope of Roof.  Will do roof repairs as shingles fairly new and can be
matched after trusses are replaced.

12

Insured : Williams , Billy
Co. Claim No. : GM7136890-1    Our File No. : 200657216430
Primary Adjuster : Toellner, David    Prepared by: Smith, Philip    Date : 11/27/2007 15:17:37



Front slope of roof



Front right slope

13

Insured : Williams , Billy
Co. Claim No. : GM7136890-1     Our File No. : 200657216430
Primary Adjuster : Toellner, David     Prepared by: Smith, Philip     Date : 11/27/2007 15:17:37



Gable end



Into attic from gable end.

# Estimate   4A190

Claim #   200657216430
Coverage BLDG

| | |
|---|---|
| Adjuster<br>David Toellner | **Cunningham Lindsey Inc.** |

**Cunningham Lindsey Inc.**
300 Century Park South
Suite 200
Birmingham, AL 35226
Phone (205) 823-8338  Fax (205) 823-8341

February 26, 2006
Coverage A - Building

Insured    Williams, Billy
Loss Address   678 Co Rd 620, Enterprise, AL 36330
Phone Number (334) 406-7738
             (334)308-1555
Policy #    GM47136890
Ins Claim # GM7136890-1
Ins Company   BALBOA INSURANCE COMPANY

Date of Loss   2/6/2006

---

## Living Room (15' x 14' 6" x 8')

315 sf Floor     608 sf Wall     315 sf Ceiling     76 lf Floor     76 lf Ceiling     2,522 cf Volume

Offset(s)   11' 6" x 8' 6"

| | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ | | | | |
| Replace Wallpaper | 711.36 SF @ 400 Material | | | | |
| | 608 SF @ 600 Labor | | | | |
| Remove Carpet & Pad (SF) | 315 SF @ 200 | | | | |
| Replace Carpet & Pad (SF) | 333.9 SF @ 600 Material | | | | |
| | 315 SF @ 1000 Labor | | | | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ 400 | | | | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ 1100 Material | | | | |
| | 315 SF @ 1500 Labor | | | | |
| Remove Crown Molding | 76 LF @ 100 | | | | |
| Replace Crown Molding | 80.56 LF @ 400 Material | | | | |
| | 76 LF @ 500 Labor | | | | |
| Paint Crown Molding | 76 LF @ 200 | | | | |
| Clean Window, Casement, Wood | 5 EA @ 150 | | | | N |
| Clean Door, Interior, Pre-Hung | 1 EA @ 450 | | | | N |
| Special Check & Test Electric | 1 EA @ | | | | |

8350   9350

---

## Kitchen (14' 6" x 11' 6" x 8')

167 sf Floor     416 sf Wall     167 sf Ceiling     52 lf Floor     52 lf Ceiling     1,334 cf Volume

| | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ 400 | | | | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ 1000 Material | | | | |
| | 167 SF @ 400 Labor | | | | |
| Special Check & Test Electric | 1 EA @ | | | | |
| Clean Window, Casement, Wood | 1 EA @ 300 | | | | N |

Estimate (MS/B 0410)
Claim # 200657216430

- 1 -

Feb 26, 2006

Cunningham 00022

# EXHIBIT C

|  |  | Total |  |
|---|---|---|---|
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ ~~300~~ | 200 |  |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ _____ | 400 | Material |
|  | 167 SF @ _____ | | Non-Matl |
|  | | 900 | |
| Rem/Reset Ceiling Fixture | 1 EA @ _____ | | |
| Clean Ceiling Fixture | 1 EA @ _____ | 250 | |
| Remove Drywall, Wall | 416 SF @ _____ | 400 | |
| Replace Drywall, Wall | 440.96 SF @ _____ | 800 | Material |
|  | 416 SF @ _____ | | Non-Matl |
|  | | 1450 | |
| Paint Drywall, Wall | 416 SF @ _____ | 400 | |
| Remove Crown Molding | 52 LF @ _____ | 100 | |
| Replace Crown Molding | 55.12 LF @ _____ | 400 | Material |
|  | 52 LF @ _____ | | Non-Matl |
|  | | 900 | |
| Paint Crown Molding | 52 LF @ _____ | 200 | |
| Remove Door, Interior, Pre-Hung | 1 EA @ _____ | 100 | |
| Replace Door, Interior, Pre-Hung | 1 EA @ _____ | 350 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ _____ | 50 | |
| Remove Subfloor | 167 SF @ _____ | 500 | |
| Replace Subfloor | 175.35 SF @ _____ | 2000 | Material |
| To include danage flor josts | 167 SF @ _____ | | Non-Matl |
|  | | 3200 | |
| Remove Underlayment | 167 SF @ _____ | 300 | |
| Replace Underlayment | 175.35 SF @ _____ | 600 | Material |
|  | 167 SF @ _____ | | Non-Matl |
|  | | 900 | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ _____ | 100 | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ _____ | 850 | Material |
|  | 167 SF @ _____ | | Non-Matl |
|  | | 950 | |
| Rem/Reset Ceiling/Paddle Fan | 1 EA @ _____ | 50 | |
| ~~Clean~~ Ceiling/Paddle Fan | 1 EA @ _____ | 250 | |
| ~~Clean~~ Door, Interior, Pre-Hung | 1 EA @ _____ | 400 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ _____ | 50 | |
| ~~Clean~~ Countertop, Formica | 10 LF @ _____ | 850 | |
| Remove Cabinet, Wall (LF) | 7 LF @ _____ | 200 | } 3800 |
| Replace Cabinet, Wall (LF) | 7 LF @ _____ | 2000 | |

Kitchen Total    (10690)  12690  ~~3500~~

---

## Family Room (17' 4"  x  11' 6"  x  8')

217 sf Floor    512 sf Wall    217 sf Ceiling    64 lf Floor    64 lf Ceiling    1,736 cf Volume

Offset(s)    5' 7" x 3' 2"

|  |  | Total |  |
|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ _____ | 100 | |
| Replace Carpet & Pad (SF) | 230.02 SF @ _____ | 850 | Material |
|  | 217 SF @ _____ | | Non-Matl |
|  | | 950 | |
| Remove Drywall, Ceiling | 217 SF @ _____ | 200 | |
| Replace Drywall, Ceiling | 227.85 SF @ _____ | 800 | Material |

Cunningham 00023

|  |  | Total |  |
|---|---|---|---|
|  | 217 SF @ _____ |  | Non-Matl |
|  |  | 1000° |  |
| Paint Drywall, Ceiling | 217 SF @ _____ | 200 |  |
| Remove Paneling, Pine | 512 SF @ _____ | 100 |  |
| Replace Paneling, Pine | 537.6 SF @ _____ | 500 | Material |
|  | 512 SF @ _____ |  | Non-Matl |
| *remove & replace* |  | 1100 |  |
| ~~Clean~~ Door, Interior, Pre-Hung | 2 EA @ _____ | 450 |  |
| Special Check & Test Electric | 1 EA @ _____ |  |  |
| **Family Room Total** |  | 3500° |  |

---

## Hall Bath (5' 10" x 7' 10" x 8')

| 46 sf Floor | 219 sf Wall | 46 sf Ceiling | 27 lf Floor | 27 lf Ceiling | 366 cf Volume |
|---|---|---|---|---|---|

|  |  | Total |  |
|---|---|---|---|
| *remove replace* ~~Clean~~ Ceramic Wall, Thin Set | 219 SF @ _____ | 850 |  |
| *remove replace* ~~Clean~~ Ceramic Floor, Thin Set | 46 SF @ _____ | 1400 |  |
| *remove replace* ~~Clean~~ Drywall, Ceiling | 46 SF @ _____ | 800 |  |
| *remove replace* ~~Clean~~ Bath Tub, Good | 1 EA @ _____ | 850 |  |
| *remove replace* ~~Clean~~ Lavatory, Porcelain Enamel | 1 EA @ _____ | 600 |  |
| *remove replace* ~~Clean~~ Toilet/Water Closet, Floor Mounted | 1 EA @ _____ | 300 |  |
| *remove replace* ~~Clean~~ Toilet Seat | 1 EA @ _____ | 50 |  |
| *remove replace* ~~Clean~~ Ceiling Fixture | 1 EA @ _____ | 150 |  |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ _____ | 200 |  |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ _____ | 700 | Material |
| *Replace Drywall ceiling* | 46 SF @ _____ |  | Non-Matl |
| **Hall Bath Total** |  | 5400° ⟨5400°⟩ |  |

---

## Bedroom (11' 6" x 11' x 8')

| 126 sf Floor | 360 sf Wall | 126 sf Ceiling | 45 lf Floor | 45 lf Ceiling | 1,012 cf Volume |
|---|---|---|---|---|---|

|  |  | Total |  |
|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ _____ | 100 |  |
| Replace Carpet & Pad (SF) | 133.56 SF @ _____ | 800 | Material |
|  | 126 SF @ _____ |  | Non-Matl |
|  |  | 900 |  |
| Remove Acoustical Ceiling, 12x12 | 126 SF @ _____ | 200 |  |
| Replace Acoustical Ceiling, 12x12 | 128.52 SF @ _____ | 800 | Material |
| *remove replace drywall ceiling* | 126 SF @ _____ |  | Non-Matl |
|  |  | 1000 |  |
| Remove Paneling, Pine | 360 SF @ _____ | 200 |  |
| Replace Paneling, Pine | 378 SF @ _____ | 1200 | Material |
|  | 360 SF @ _____ |  | Non-Matl |
| *Replace* |  | 1400 |  |
| ~~Clean~~ Door, Interior, Pre-Hung | 2 EA @ _____ | 450 |  |
| Special Check & Test Electric | 1 EA @ _____ |  |  |
| *replace* ~~Clean~~ Window, Casement, Wood | 1 EA @ _____ | 300 |  |
| Remove Furring Strips, Ceiling (SF), 12" oc | 126 SF @ _____ | 100 |  |
| Replace Furring Strips, Ceiling (SF), 12" oc | 132.3 SF @ _____ | 400 | Material |

---

Cunningham 00024

|  |  | Total |  |
|---|---|---|---|
|  | 126 SF @ _____ | 1150 | Non-Matl |
| Rem/Reset Ceiling Fixture | 1 EA @ _____ | 50 |  |
| Clean Ceiling Fixture | 1 EA @ _____ | 250 | 4500 |
|  | **Bedroom Total** | 4750 |  |

## Roof

|  | Total |  |
|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ _____ | 500 |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ _____ | 1100 |
| Remove Sheathing, Roof | 240 SF @ _____ | 300 |
| Replace Sheathing, Roof | 264 SF @ _____ | 900 |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ _____ | 600 |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ _____ | 2600 |
| Replace Felt | 3 SQ @ _____ | 300 |
| Paint Siding, Painting | 48 SF @ _____ | 600 |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ _____ | 300 |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ _____ | 1200 | Material |
|  | 0 SF @ _____ | 8500 | Non-Matl |
| Remove Gable Vent | 1 EA @ _____ | 50 |
| Replace Gable Vent | 1 EA @ _____ | 300 |
|  | **Roof Total** | 8850 | 8350 |

## Bathroom (8' 6" x 5' 4" x 8')

45 sf Floor        221 sf Wall        45 sf Ceiling        28 lf Floor        28 lf Ceiling        363 cf Volume

| remove, repair |  | Total |
|---|---|---|
| Clean Ceramic Wall, Thin Set | 221 SF @ _____ | 400 |
| Clean Ceramic Floor, Thin Set | 45 SF @ _____ | 500 |
| Clean Drywall, Ceiling | 45 SF @ _____ | 1100 |
| Clean Bath Tub, Good | 1 EA @ _____ | 700 |
| Clean Lavatory, Porcelain Enamel | 1 EA @ _____ | 600 |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ _____ | 250 |
| Clean Toilet Seat | 1 EA @ _____ | 50 |
| Clean Ceiling Fixture | 1 EA @ _____ | 250 |
|  | **Bathroom Total** | 4750  4000 |

## Exterior

|  |  | Total |
|---|---|---|
| Special Dumpster, 20 Yard | 1 EA @ _____ | 400 |
|  | **Exterior Total** | 400 |

Cunningham 00025

| | |
|---|---|
| **Total Before Overhead & Profit** | 35832°° |
| **Overhead & Profit** | 8958°° |
| **Total Bid** | ~~44790°°~~ |
| | 44738°° |

Cunningham 00026

# Short Form

Claim # 200657216430

| | | |
|---|---|---|
| **Adjuster** David Toellner | **Cunningham Lindsey U.S., Inc.** | |
| **Phone** | 300 Century Park South | **September 25, 2006** |
| **Fax** | Suite 200 | |
| | Birmingham, AL. 35226 | |
| | Phone (205) 823-8338  Fax (205) 823-8341 | |

**Insured**  Williams, Billy
**Loss Address**  678 Co Rd 620, Enterprise, AL  36330
**Phone Number** (334) 406-7738     **Policy #**   GM47136890
**Other Phone**     **Ins Claim #** GM7136890-1
**Ins Company**  BALBOA INSURANCE COMPANY     **Date of Loss**   2/6/2006

## Coverage

**Policy Type**
**Effective**   -     **Mortgagee** None Showing
**Deductible** $500.00

| Coverage | Description | Coverage Amt | Value Requirement |
|---|---|---|---|
| BLDG | Coverage A - Building | $32,311.00 | None |
| APS | Coverage B - APS | $3,231.10 | None |
| UPP | Coverage UPP - Contents | $16,155.50 | None |
| ALE/FMV | Coverage D - ALE/FMV | $6,462.20 | None |

## Adjuster's Report

**Assigned** 2/8/2006    **Contacted** 2/8/2006    **Inspected** 2/13/2006
**Apparent Cause of Loss/Scope**     damage by Fire
**Items Subject to Exclusions/Limitations**
**Salvage or Subrogation Potential**

## Loss Recap

| Coverage | RC Loss | Depreciation | ACV Loss | Recov. Depr. | TOTAL |
|---|---|---|---|---|---|
| BLDG | $20,106.76 | $7,323.04 | $12,783.72 | $7,323.04 | $20,106.76 |
| TOTALS | $20,106.76 | $7,323.04 | $12,783.72 | $7,323.04 | $20,106.76 |

## Enclosures

☒ Estimates   ☐ Photos   ☐ Proof of Loss   ☐ Adjuster Summary   ☐ Estimate Recap   ☐ Statement of Loss   ☐ Invoice
☐ Claim Summary   ☐ Diagrams   ☐ R/C Proof   ☐ P.H.R   Other:

## Recommendations

**Payment Recommendations: Initial**    $12,283.72    **Deductible and insured's participation**    $500.00
     **Upon Completion**    $7,323.04    **Recommended Adjustment**    $19,606.76

**Payee**  Williams, Billy

Attached is the new estimate with changes as would be necessary after review of the contractors input. The replacing acoustical ceiling with drywall was not included as well as the complete remodel of the bathrooms. There is no reason not to clean Ceramic tile, toilet and bathtub in each of the bathrooms. The two bathrooms make up about $10,000 of the contractors estimate.

We are concluding with this new estimate and will be closing our file.

Cunningham 00003

# EXHIBIT D

# Estimate

Claim #       **200657216430**
Coverage BLDG

## Cunningham Lindsey U.S., Inc.

| | | |
|---|---|---|
| **Adjuster**<br>David Toellner | 300 Century Park South<br>Suite 200<br>Birmingham, AL 35226<br>Phone (205) 823-8338   Fax (205) 823-8341 | September 25, 2006<br>Coverage A - Building |

| | | |
|---|---|---|
| **Insured** | Williams, Billy | |
| **Loss Address** | 678 Co Rd 620, Enterprise, AL 36330 | |
| **Phone Number** | (334) 406-7738 | **Policy #**   GM47136890 |
| | | **Ins Claim #** GM7136890-1 |
| **Ins Company** | BALBOA INSURANCE COMPANY | **Date of Loss**   2/6/2006 |

### Living Room (15' x 14' 6" x 8')

| 315 sf Floor | 608 sf Wall | 315 sf Ceiling | 76 lf Floor | 76 lf Ceiling | 2,522 cf Volume |
|---|---|---|---|---|---|
| Offset(s)  11' 6" x 8' 6" | | | | | |

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ $0.25 [a] | $152.00 | $0.00 | $152.00 | |
| Replace Wallpaper | 711.36 SF @ $0.40 [a] | $284.54 | Material | | |
| | 608 SF @ $0.34 | $206.72 | Labor | | |
| | | $491.26 | $327.51 | $163.75 | |
| Remove Carpet & Pad (SF) | 315 SF @ $0.17 [a] | $53.55 | $0.00 | $53.55 | |
| Replace Carpet & Pad (SF) | 333.9 SF @ $1.37 [a] | $457.44 | Material | | |
| | 315 SF @ $0.46 | $144.90 | Labor | | |
| | | $602.34 | $451.76 | $150.58 | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ $0.22 [a] | $69.30 | $0.00 | $69.30 | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ $1.11 [a] | $356.64 | Material | | |
| | 315 SF @ $0.29 | $91.35 | Labor | | |
| | | $447.99 | $224.00 | $223.99 | |
| Remove Crown Molding | 76 LF @ $0.18 [a] | $13.68 | $0.00 | $13.68 | |
| Replace Crown Molding | 80.56 LF @ $1.89 [a] | $152.26 | Material | | |
| | 76 LF @ $0.69 | $52.44 | Labor | | |
| | | $204.70 | $81.88 | $122.82 | |
| Paint Crown Molding | 76 LF @ $0.58 [a] | $44.08 | $33.06 | $11.02 | |
| Special Check & Test Electric | 1 EA @ $13.54 [a] | $13.54 | $0.00 | $13.54 | |
| Remove Window, Casement, Aluminum | 5 EA @ $10.50 [a] | $52.50 | $0.00 | $52.50 | |
| Replace Window, Casement, Aluminum | 5 EA @ $494.56 [b] | $2,472.80 | $1,248.84 | $1,223.96 | |
| Remove Door Only, Interior | 1 EA @ $1.97 [b] | $1.97 | $0.00 | $1.97 | |
| Replace Door Only, Interior | 1 EA @ $147.57 [b] | $147.57 | $49.36 | $98.21 | |
| | | $4,767.28 | $2,416.41 | $2,350.87 | |

### Kitchen (14' 6" x 11' 6" x 8')

| 167 sf Floor | 416 sf Wall | 167 sf Ceiling | 52 lf Floor | 52 lf Ceiling | 1,334 cf Volume |
|---|---|---|---|---|---|

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ $0.22 [a] | $36.74 | $0.00 | $36.74 | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ $1.11 [a] | $189.08 | Material | | |
| | 167 SF @ $0.29 | $48.43 | Labor | | |
| | | $237.51 | $138.76 | $118.75 | |

Estimate (MS/B 0410)
Claim # 200657216430

Sep 25, 2006

Cunningham 00004

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Special Check & Test Electric | 1 EA @ $13.54 [a] | $13.54 | $0.00 | $13.54 | | |
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ $0.18 [a] | $30.06 | $0.00 | $30.06 | | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ $0.31 [a] | $54.36 | Material | | | |
|  | 167 SF @ $0.56 | $93.52 | Labor | | | |
|  |  | $147.88 | $26.89 | $120.99 | | |
| Remove Ceiling Fixture | 1 EA @ $10.86 [b] | $10.86 | $0.00 | $10.86 | | |
| Replace Ceiling Fixture | 1 EA @ $140.71 [b] | $140.71 | $22.49 | $118.22 | | |
| Remove Ceiling/Paddle Fan | 1 EA @ $16.68 [b] | $16.68 | $0.00 | $16.68 | | |
| Replace Ceiling/Paddle Fan | 1 EA @ $290.16 [b] | $290.16 | $0.00 | $290.16 | | |
| Remove Drywall, Wall | 416 SF @ $0.16 [a] | $66.56 | $0.00 | $66.56 | | |
| Replace Drywall, Wall | 440.96 SF @ $0.39 [a] | $171.97 | Material | | | |
|  | 416 SF @ $0.56 | $232.96 | Labor | | | |
|  |  | $404.93 | $161.97 | $242.96 | | |
| Paint Drywall, Wall | 416 SF @ $0.35 [a] | $145.60 | $109.20 | $36.40 | | |
| Remove Crown Molding | 52 LF @ $0.18 [a] | $9.36 | $0.00 | $9.36 | | |
| Replace Crown Molding | 55.12 LF @ $1.89 [a] | $104.18 | Material | | | |
|  | 52 LF @ $0.69 | $35.88 | Labor | | | |
|  |  | $140.06 | $56.02 | $84.04 | | |
| Paint Crown Molding | 52 LF @ $0.58 [a] | $30.16 | $22.62 | $7.54 | | |
| Remove Door, Interior, Pre-Hung | 1 EA @ $10.01 [a] | $10.01 | $0.00 | $10.01 | | |
| Replace Door, Interior, Pre-Hung | 1 EA @ $221.73 [a] | $221.73 | $110.87 | $110.86 | | |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 [a] | $28.74 | $21.56 | $7.18 | | |
| Remove Subfloor | 167 SF @ $0.14 [a] | $23.38 | $0.00 | $23.38 | | |
| Replace Subfloor | 175.35 SF @ $0.78 [a] | $136.77 | Material | | | |
|  | 167 SF @ $0.26 | $43.42 | Labor | | | |
|  |  | $180.19 | $32.76 | $147.43 | | |
| Remove Underlayment | 167 SF @ $0.12 [a] | $20.04 | $0.00 | $20.04 | | |
| Replace Underlayment | 175.35 SF @ $0.38 [a] | $66.63 | Material | | | |
|  | 167 SF @ $0.22 | $36.74 | Labor | | | |
|  |  | $103.37 | $18.79 | $84.58 | | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ $0.21 [a] | $35.07 | $0.00 | $35.07 | | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ $1.35 [a] | $238.98 | Material | | | |
|  | 167 SF @ $0.86 | $143.62 | Labor | | | |
|  |  | $382.60 | $273.29 | $109.31 | | |
| Clean Door, Interior, Pre-Hung | 1 EA @ $3.23 [a] | $3.23 | $0.00 | $3.23 | N | |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 [a] | $28.74 | $21.56 | $7.18 | | |
| Clean Countertop, Formica | 10 LF @ $0.24 [a] | $2.40 | $0.00 | $2.40 | N | |
| Remove Cabinet, Wall (LF) | 7 LF @ $3.99 [a] | $27.93 | $0.00 | $27.93 | | |
| Remove Window, Casement, Aluminum | 1 EA @ $10.50 [b] | $10.50 | $0.00 | $10.50 | | |
| Replace Window, Casement, Aluminum | 1 EA @ $494.56 [b] | $494.56 | $249.77 | $244.79 | | |
| Replace Cabinet, Wall (LF) | 7 LF @ $129.64 [a] | $907.48 | $362.99 | $544.49 | | |
|  |  | $4,200.78 | $1,609.54 | $2,591.24 | | |

---

**Family Room (17' 4" x 11' 6" x 8')**

| 217 sf Floor | 512 sf Wall | 217 sf Ceiling | 64 lf Floor | 64 lf Ceiling | 1,736 cf Volume |
|---|---|---|---|---|---|

Cunningham 00005

Offset(s)    5' 7" x 3' 2"

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ $0.17 [a] | $36.89 | $0.00 | $36.89 | | |
| Replace Carpet & Pad (SF) | 230.02 SF @ $1.37 [a] | $315.13 | Material | | | |
| | 217 SF @ $0.46 | $99.82 | Labor | | | |
| | | $414.95 | $311.21 | $103.74 | | |
| Remove Drywall, Ceiling | 217 SF @ $0.20 [a] | $43.40 | $0.00 | $43.40 | | |
| Replace Drywall, Ceiling | 227.85 SF @ $0.41 [a] | $93.42 | Material | | | |
| | 217 SF @ $0.63 | $136.71 | Labor | | | |
| | | $230.13 | $92.05 | $138.08 | | |
| Paint Drywall, Ceiling | 217 SF @ $0.49 [a] | $106.33 | $79.75 | $26.58 | | |
| Remove Paneling, Pine | 512 SF @ $0.17 [a] | $87.04 | $0.00 | $87.04 | | |
| Replace Paneling, Pine | 537.6 SF @ $0.70 [a] | $376.32 | Material | | | |
| | 512 SF @ $0.44 | $225.28 | Labor | | | |
| | | $601.60 | $240.64 | $360.96 | | |
| Remove Door Only, Interior | 2 EA @ $1.97 [b] | $3.94 | $0.00 | $3.94 | | |
| Replace Door Only, Interior | 2 EA @ $147.57 [b] | $295.14 | $0.00 | $295.14 | | |
| Special Check & Test Electric | 1 EA @ $13.54 [a] | $13.54 | $0.00 | $13.54 | | |
| | | $1,832.96 | $723.65 | $1,109.31 | | |

## Hall Bath (5' 10" x 7' 10" x 8')

| 46 sf Floor | 219 sf Wall | 46 sf Ceiling | 27 lf Floor | 27 lf Ceiling | 366 cf Volume |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 219 SF @ $0.16 [a] | $35.04 | $0.00 | $35.04 | | N |
| Clean Ceramic Floor, Thin Set | 46 SF @ $0.16 [a] | $7.36 | $0.00 | $7.36 | | N |
| Clean Drywall, Ceiling | 46 SF @ $0.15 [a] | $6.90 | $0.00 | $6.90 | | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 [a] | $10.25 | $0.00 | $10.25 | | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 [a] | $5.01 | $0.00 | $5.01 | | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 [a] | $4.99 | $0.00 | $4.99 | | N |
| Clean Toilet Seat | 1 EA @ $1.47 [b] | $1.47 | $0.00 | $1.47 | | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 [a] | $6.58 | $0.00 | $6.58 | | N |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ $0.22 [a] | $10.12 | $0.00 | $10.12 | | |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ $1.11 [a] | $52.08 | Material | | | |
| | 46 SF @ $0.29 | $13.34 | Labor | | | |
| | | $65.42 | $32.71 | $32.71 | | |
| | | $153.14 | $32.71 | $120.43 | | |

## Bedroom (11' 6" x 11' x 8')

| 126 sf Floor | 360 sf Wall | 126 sf Ceiling | 45 lf Floor | 45 lf Ceiling | 1,012 cf Volume |

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ $0.17 [a] | $21.42 | $0.00 | $21.42 | | |
| Replace Carpet & Pad (SF) | 133.56 SF @ $1.37 [a] | $182.98 | Material | | | |
| | 126 SF @ $0.46 | $57.96 | Labor | | | |
| | | $240.94 | $180.71 | $60.23 | | |
| Remove Acoustical Ceiling, 12x12 | 126 SF @ $0.22 [a] | $27.72 | $0.00 | $27.72 | | |
| Replace Acoustical Ceiling, 12x12 | 128.52 SF @ $1.11 [a] | $142.66 | Material | | | |
| | 126 SF @ $0.29 | $36.54 | Labor | | | |
| | | $179.20 | $89.60 | $89.60 | | |
| Remove Paneling, Pine | 360 SF @ $0.17 [a] | $61.20 | $0.00 | $61.20 | | |
| Replace Paneling, Pine | 378 SF @ $0.70 [a] | $264.60 | Material | | | |

Cunningham 00006

|  |  | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
|  | 360 SF @ $0.44 | $158.40 | Labor |  |  |
|  |  | $423.00 | $169.20 | $253.80 |  |
| Remove Door Only, Interior | 1 EA @ $1.97 [b] | $1.97 | $0.00 | $1.97 |  |
| Replace Door Only, Interior | 1 EA @ $147.57 [b] | $147.57 | $0.00 | $147.57 |  |
| Special Check & Test Electric | 1 EA @ $13.54 [a] | $13.54 | $0.00 | $13.54 |  |
| Remove Window, Casement, Aluminum | 1 EA @ $10.50 [b] | $10.50 | $0.00 | $10.50 |  |
| Replace Window, Casement, Aluminum | 1 EA @ $494.56 [b] | $494.56 | $0.00 | $494.56 |  |
| Remove Furring Strips, Ceiling (SF), 12" oc | 126 SF @ $0.18 [a] | $22.68 | $0.00 | $22.68 |  |
| Replace Furring Strips, Ceiling (SF), 12" oc | 132.3 SF @ $0.31 [a] | $41.01 | Material |  |  |
|  | 126 SF @ $0.56 | $70.56 | Labor |  |  |
|  |  | $111.57 | $20.29 | $91.28 |  |
| Remove Ceiling Fixture | 1 EA @ $10.86 [b] | $10.86 | $0.00 | $10.86 |  |
| Replace Ceiling Fixture | 1 EA @ $140.71 [b] | $140.71 | $0.00 | $140.71 |  |
|  |  | $1,907.44 | $459.80 | $1,447.64 |  |

## Roof

|  |  | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ $25.16 [a] | $251.60 | $0.00 | $251.60 |  |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ $164.86 [a] | $1,648.60 | $299.75 | $1,348.85 |  |
| Remove Sheathing, Roof | 240 SF @ $0.12 [a] | $28.80 | $0.00 | $28.80 |  |
| Replace Sheathing, Roof | 264 SF @ $0.78 [a] | $205.92 | $37.44 | $168.48 |  |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ $16.81 [a] | $42.03 | $0.00 | $42.03 |  |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ $118.19 [a] | $354.57 | $141.83 | $212.74 |  |
| Replace Felt | 3 SQ @ $16.29 [a] | $48.87 | $30.54 | $18.33 |  |
| Paint Siding, Painting | 48 SF @ $0.50 [a] | $24.00 | $18.00 | $6.00 |  |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $0.15 [a] | $7.20 | $0.00 | $7.20 |  |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $1.32 [a] | $63.36 | Material |  |  |
|  | 0 SF @ $1.01 | $0.00 |  |  |  |
|  |  | $63.36 | $21.12 | $42.24 |  |
| Remove Gable Vent | 1 EA @ $2.53 [a] | $2.53 | $0.00 | $2.53 |  |
| Replace Gable Vent | 1 EA @ $42.04 [a] | $42.04 | $16.82 | $25.22 |  |
|  |  | $2,719.52 | $565.50 | $2,154.02 |  |

## Bathroom (8' 6" x 5' 4" x 8')

| 45 sf Floor | 221 sf Wall | 45 sf Ceiling | 28 lf Floor | 28 lf Ceiling | 363 cf Volume |

|  |  | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 221 SF @ $0.16 [a] | $35.36 | $0.00 | $35.36 | N |
| Clean Ceramic Floor, Thin Set | 45 SF @ $0.16 [a] | $7.20 | $0.00 | $7.20 | N |
| Clean Drywall, Ceiling | 45 SF @ $0.15 [a] | $6.75 | $0.00 | $6.75 | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 [a] | $10.25 | $0.00 | $10.25 | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 [a] | $5.01 | $0.00 | $5.01 | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 [a] | $4.99 | $0.00 | $4.99 | N |
| Clean Toilet Seat | 1 EA @ $1.47 [a] | $1.47 | $0.00 | $1.47 | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 [a] | $6.58 | $0.00 | $6.58 | N |
|  |  | $77.61 | $0.00 | $77.61 |  |

Cunningham 00007

## Exterior

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Special Dumpster, 20 Yard | 1 EA @ $380.08 [a] | $380.08 | $0.00 | $380.08 | | |
| | | $380.08 | $0.00 | $380.08 | | |

| | Repl. Cost | Depr. | ACV |
|---|---|---|---|
| Estimate Totals | $16,038.81 | $5,807.61 | $10,231.20 |
| Contractor's Overhead & Profit (20%) | $3,207.76 | $1,161.52 | $2,046.24 |
| Total With Overhead & Profit | $19,246.57 | $6,969.13 | $12,277.44 |
| Sales Tax | $860.19 | $353.91 | $506.28 |
| Total With Tax | $20,106.76 | $7,323.04 | $12,783.72 |

**Price Database Legend**
a = TCD05D1101.
b = TCD06B0504.

Cunningham 00008

# FREEDOM COURT REPORTING

Page 1

```
1              IN THE UNITED STATES DISTRICT COURT

2              FOR THE MIDDLE DISTRICT OF ALABAMA

3                     SOUTHERN DIVISION

4

5   BILLY WILLIAMS and

    TERESA WILLIAMS,

6

         Plaintiffs,

7

    vs.              CASE NO. 1:07-cv-549-WHA

8

    BALBOA INSURANCE

9   COMPANY,

10       Defendant.

11

12

13          *  *  *  *  *  *  *  *  *  *  *

14          DEPOSITION OF BILLY L. WILLIAMS, taken

15   pursuant to stipulation and agreement before Sherry

16   McCaskey, Certified Court Reporter and Commissioner

17   for the State of Alabama at Large, in the Law

18   Offices of Morris, Cary, Andrews, Talmadge, Jones &

19   Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20   on Thursday, November 15, 2007, commencing at

21   approximately 2:10 p.m.

22          *  *  *  *  *  *  *  *  *  *  *

23
```

**EXHIBIT 5**

# FREEDOM COURT REPORTING

Page 44

1    A.    I don't.

2    Q.    You agree with me, the loan was in default at

3          the time of the fire?

4    A.    Yes, sir.

5    Q.    What do you want out of this lawsuit?

6          MR. TALMADGE:  Object to the form of the

7                question.

8                You can answer it.

9    A.    All I ever wanted was fair treatment.  But now

10         that it's gone this far, I'm going to let my

11         wife and Mr. Talmadge handle it.

12   Q.    What do you consider fair treatment to be?

13   A.    Well --

14         MR. TALMADGE:  Object to the form.  Go

15               ahead.

16   A.    I'll allow Mr. Talmadge to --

17   Q.    You don't have any opinion of what fair

18         treatment would be in this lawsuit?

19   A.    Well, I don't want to say.  That's the reason

20         Mr. Talmadge is my attorney.

21   Q.    I understand that.  But if you have any

22         opinion as to what fair treatment is, I'm

23         entitled to get that.

# FREEDOM COURT REPORTING

Page 45

```
 1              MR. TALMADGE:  Object to the form of the

 2              question.

 3     A.  Well, we paid -- you know, the insurance was

 4              paid on the home and fire treatment -- I don't

 5              really know what to tell you.  I really

 6              don't.  But I think the time has past that

 7              nobody has made any effort to be fair.

 8     Q.  Did you ever read any of the documents from

 9              the insurance company or from GMAC about the

10              insurance that GMAC was securing on the house?

11     A.  No, sir, not that I -- not that I recall.

12     Q.  Okay.  Do you have any understanding of what

13              the terms of the insurance that GMAC purchased

14              were?

15     A.  No, sir.

16     Q.  Did you ever make any effort to find out?

17     A.  No, sir.

18     Q.  Why not?

19     A.  My wife handles that.

20     Q.  Okay.  How has the handling of the claim on

21              the property relating to the fire impacted

22              you?

23     A.  Well, lot of sleepless nights, stressful at
```