**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BILLY WILLIAMS, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:07-CV-549-WHA** |
| | ) | |
| **BALBOA INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' STATEMENT IN OPPOSITION TO DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**

Plaintiffs hereby submit the following statement in opposition to defendant's motion for summary judgment:

**I.     INTRODUCTION**

On May 27, 2005, defendant issued a policy of insurance insuring the home of plaintiffs Billy Williams and Teresa Williams (hereinafter "plaintiffs") located at 680 County Road 620 in Enterprise, Alabama against loss by fire and other perils.  The policy provided insurance coverage on the home for the period of May 27, 2005 through May 27, 2006.  On February 5, 2006, plaintiffs' home was damaged by fire.  Defendant refused to pay the full amount due under its insurance contract for the damage to the home.

Plaintiffs filed a complaint against defendant alleging breach contract (Count One), bad faith denial of an insurance claim (Count Two) and breach of contract as a third party beneficiary (Count Three).  Defendant moved for summary judgment arguing that plaintiffs lack standing to assert these claims and further arguing that there is no basis for a finding of bad faith. Defendants' motion for summary judgment is due to be denied because plaintiffs have standing and there is substantial evidence of bad faith.

## II.     SUMMARY JUDGMENT STANDARD

Under Rule 56 (c) of the Federal Rules of Civil Procedure, summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Id. at 323.

If the moving party meets its initial burden, then the nonmoving party is required "to go beyond the pleadings and by [its] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324. "To avoid summary judgment, the nonmoving party 'must do more than show that there is some metaphysical doubt as to the material facts.'" Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "On the other hand, the evidence of the non-movant must be believed and all justifiable inferences must be drawn in its favor." Jackson v. E&R Mfg. Co., 2007 U.S. Dist. Lexis 71895, at *3 (M.D. Ala. Sept. 25, 2007).

## III.     STATEMENT OF FACTS

Plaintiffs have been married to each other for thirty-four years. (T. Williams dep. at 13:4-5.) They own the property located at 680 County Road 620, Enterprise, Alabama and have lived there for twenty-four years. (T. Williams dep. at 11:2-4;  B. Williams dep. at 7:11-15.). Plaintiff Teresa Williams was born and raised in the house on the property. (T. Williams dep. at

10:17-21.)  Plaintiffs lived in the house until it was damaged by fire on February 5, 2006.  (T. Williams dep. at 56:14-23;  57:1-2.)  Plaintiffs could not live in the house in the condition it was in after the fire.  (Id. 131:23;  132:1-9.)  The damage to the house has never been repaired.  (Id. at 112:8-10.)  The condition of the house has gotten worse during the two years since the fire.  (Id. at 115:2-4.)  Plaintiffs now live in a single wide mobile home on the property next to the damaged house.  (Id. at 112:11-13.)

On June 26, 2000, plaintiffs obtained a loan using the property as collateral.  (Mortgage, Ex. 2 to T. Williams dep. at GMAC 0101)  Plaintiffs initially purchased insurance on the house through Cotton States.  (T. Williams dep. at 21:20-23;  22:1-2.)  After the first year and continuing through the date of the fire, the home was insured through lender placed insurance. (Id. at 22:6-14.)  GMAC Mortgage ("GMAC") took over the servicing of plaintiffs' loan in May 2005.  (Ex. 10 to T. William dep.)  GMAC notified plaintiffs that GMAC was going to place insurance on the house.  (T. Williams dep. at 43:6-9.)  Plaintiffs did not understand or believe that this coverage would only provide protection to GMAC.  (Id. at 43:18-20.)  Plaintiffs understood that this was their insurance.  (Id. at 45:2-3.)  Plaintiffs were paying for the insurance. (Id.)

On October 9, 2005, GMAC sent plaintiffs a letter concerning the lender placed coverage.  (Ex. 13 to T. Williams dep.)  The letter stated that the coverage would be sufficient to insure the "principal balance" of plaintiffs' loan and the coverage limit would be $32,311.00. (Id.)  The letter also stated that plaintiffs would be responsible for reimbursing GMAC for the cost of the insurance and that this cost would be added to the monthly mortgage payment.  (Id.) On November 11, 2005, GMAC sent another letter informing plaintiffs that insurance coverage

had been placed with defendant and that the coverage was effective for the period of May 27, 2005 through May 27, 2006.  (Ex. 14 to T. Williams dep.)

The policy issued by defendant provides coverage for direct and accidental physical damage to the property located at 680 County Road 620, Enterprise, Alabama.  (Ex. 1 to Nelson dep. at Balboa 0006.)  The policy provides that plaintiffs, identified generically as "borrower" in the definitions section and specifically on the evidence of insurance, are additional insureds with respect to any residual amounts of insurance over and above GMAC's "insurable interest."  (Id. at Balboa 0008.)  The term "insurable interest" is not defined in the policy.  (Id. at Balboa 0008-0009.)  Under the policy, defendant limits its liability to the amount of the interest of GMAC and borrower or the total amount of coverage requested by GMAC less the applicable deductible.  (Id. at Balboa 00011.)  The policy sets out a list of duties that the borrower must perform in the event of a loss to the insured property.  (Id. at Balboa 00011.)  The policy requires that defendant pay for damage to insured property at replacement cost without deduction for depreciation if repair or replacement has been completed within a reasonable time after the loss and at actual cash value until such repair or replacement is completed.  (Id. at Balboa 00012.)  The amount that defendant pays under the policy directly affects whether a borrower can have his or her property repaired.  (Nelson dep. at 154:18-25;  155:1-10.)  Plaintiffs were never provided with a copy of the policy before the fire.  (Ex. 1 to Nelson dep. at Balboa 00110.)

Plaintiff Teresa Williams contacted defendant after the fire and spoke with its adjuster, Tancy Nelson.  (T. Williams dep. at 59:6-23;  60:1-16.)  On February 8, 2006, Nelson opened a claim file with defendant and began the process of adjusting the fire loss.  (Nelson dep. at 67:18-25;  68:1-9.)  At the beginning of the claim, Nelson determined from defendant's records that the "secured balance" owed by plaintiffs on the loan against the house was $31,951.07—an amount

which was less than the available policy limits.  (Nelson dep. at 59:20-25;  60:1-24;  61:1-25;  62:1-8;  Ex. 1 to Nelson dep. at Balboa 00022.)  GMAC records reflect that $31,951.07 was, in fact, the amount of the principal balance owed on the loan.  (Ex. 20 to T. Williams dep., GMAC 0046.)  Nelson was working out of defendant's principal office in Texas at the time and did not arrange to inspect the damage to the house herself.  (Nelson dep. at 49:10-14.)  Instead, Nelson contacted Cunningham Lindsey, an outside adjusting firm in Birmingham, and requested that it inspect the house.  (Id. at 68:7-25;  69:2.)  Nelson instructed Cunningham Lindsey to inspect the property and provide a repair estimate based on unit costs figures for material, tax and labor and to include appropriate depreciation figures for materials.  (Ex. 1 to Nelson dep. at Balboa 00038-00039.)  Nelson further instructed Cunningham Lindsey to complete the assignment within ten days of February 8, 2006.  (Id.)

Cunningham Lindsey sent its adjuster, David Toellner, to inspect the damage to plaintiffs' home.  (Nelson dep. at 69:3-5.)  Toellner has never worked a general contractor.  (Toellner dep. 50:8-10.)  Toellner was the only property adjuster for Cunningham Lindsey and his job required him to cover the entire State of Alabama.  (Id. at 62:5-22.)  Toellner had a heavy workload and was required to travel a lot at that time.  (Id. at 86:12-13;  87:4-20.)  This sometimes affected his ability to finish assignments on time.  (Id. at 101:11-17.)  Upon his arrival at the property, Toellner asked plaintiffs if he could go fishing in their pond.  (T. Williams dep. 64:5-14.)  Toellner then went into the house and spent a "short" time inspecting it.  (B. Williams dep. 22:10-23;  23:1-3.)  After completing the inspection, Toellner went fishing.  (Toellner dep. at 73:11-19.)

Defendant required Cunningham Lindsey to use the MSB computer software program in order to generate the estimate.  (Toellner dep. at 44:8-16.)  The MSB program automatically

generates labor and material costs in response to the scope of work input by the adjuster. (Toellner at 41:19-22; 42:1-5.)  The adjuster is required to trust the accuracy of the information being generated by the program.  (Id. at 42:6-11.)  There is no evidence in this case that any testing has ever been done to check the accuracy of the MSB program against the real world cost of labor and materials.  (Id. at 43:21-23; 44:1-4.)  In fact, Toellner testified to occasions during his career as an adjuster career when the MSB program generated cost numbers that were wrong and lower than the existing price in a given area.  (Id. at 47:8-22; 48:5-23; 49:1-17.)  Likewise, Nelson testified to more than twenty occasions during her eight-year career as an adjuster wherein the prices generated by the MSB program were wrong and "unfair to the homeowner." (Nelson dep. at 37:6-25; 38:1-25; 39:1-25; 40:1-14.)

On February 26, 2006, Toellner generated an estimate to repair the plaintiffs' house using MSB computer software.  (Ex. 1 to Nelson dep. at Balboa 00055-00060)  Toellner input the scope of work and a description of the property and the computer program gave him the prices of material and amount of depreciation.  (Toellner dep. 55:3-23;  56:1-23;  57:1-23;  58:5-10.) Toellner does not know who input the price or depreciation figures into the computer program. (Id. at 58:11-16.)  Toellner testified that the costs of labor and materials are dictated by local market conditions, yet Toellner did not get prices from local building supply stores or consult with any local contractors before completing his initial estimate.  (Id. at 37:20-23;  38:1-3; 40:13-16;  52:2-4.)  The MSB program determined that the replacement cost to repair plaintiffs' house was $14,261.16, the depreciation was $5,312.85 and the actual cash value was $8,948.31. (Ex. 1 to Nelson dep. at Balboa 00060)  Toellner recommended to Nelson that defendant pay $8,448.41 initially and an additional $5,312.85 upon completion of the repairs.  (Id. at Balboa 00055.)

On March 6, 2006, defendant sent plaintiffs a copy of a letter addressed to GMAC explaining that it was paying the amount of $7,196.49 on the fire claim.  (Ex. 1 to Nelson depo. at Balboa 00078-00079.)  This letter referred to plaintiff Billy Williams as the "insured."  (Id.) After receiving the letter, plaintiff Teresa Williams called local contractors in the phone book to find out what they would charge to fix the house.  (T. Williams dep. at 71:22-23;  72:1-2.)  She called everybody in the phone book that would do that type of work.  (Id. at 73:2-5.)  Eleven of the contractors she called refused to provide an estimate either because they did not do that type work or felt the damage was too much to fix.  (Ex. 1 to Nelson dep. at Balboa 00085-00086.) Three local contractors did provide estimates.  (Id. at Balboa 00086-00089.)  Jerry Gentile provided an estimate in the amount of $41,500.00.  (Id. at Balboa 00087)  Grimes Roofing provided an estimate in the amount of $55,893.00.  (Id. at Balboa 00089.)  Eric Dingman of B&B Construction provided an estimate in the amount of $44,738.00 (Id. at Balboa 00088.) Dingman, a licensed contractor who owns his own construction business in Enterprise, testified that the scope of the work detailed in his estimate was all necessary and the cost of labor and materials was reasonable for the area.  (Dingman aff.)  Plaintiff Teresa Williams faxed the estimates to Nelson numerous times, but Nelson claims not to have received them until early May 2006.  (T. Williams dep. at 83:17-23;  84:1-11;  Ex. 1 to Nelson dep. at Balboa 00085.) After calling several times, plaintiff Teresa Williams finally reached Nelson and asked her "what the insurance was going to do."  (T. Williams dep. at 87:8-10.)  Nelson told plaintiff Teresa Williams at that time to pick the contractor that would perform the work, have him complete an itemized form and defendant would pay the estimate.  (Id. at 87:8-21;  80:18-23;  81:1-3.) Plaintiffs selected Eric Dingman to perform the work and had him complete an itemized

estimate, but defendant refused to pay the estimate.  (Id. at 79:11-23;  80:1-9;  80:18-23;  81:1-3.)

On May 10, 2006, Nelson contacted Cunningham Lindsey again and requested that it perform a "re-inspection" of the property and provide another estimate.  (Ex. 1 to Nelson dep., Balboa 00082-00083.)  Nelson referred to the re-inspection as a "rush assignment" and mandated that the assignment be completed within ten days.  (Id.)  Toellner provided the itemization form or scope sheet to plaintiffs which plaintiffs had Dingman complete and return.  (Toellner dep. at 81:2-23;  82:3-18.)  Toellner received the scope sheet back from Dingman by at least June 20, 2006.  (Ex. 11 to Toellner dep., last page;  Toellner dep. at 110:8-23;  111:1-17.)  Toellner eventually revised his estimate to increase the scope of the work after reviewing Dingman's scope sheet itemization.  (Ex. 1 to Nelson dep. at Balboa 00094-00099.)  However, Toellner did not complete and submit his revised estimate until more than three months later on September 25, 2006.  (Id.)  Toellner testified he was delayed in completing the assignment because of his workload.  (Toellner dep. at 101:6-17.)  Nelson testified that Cunningham Lindsey failed to complete the re-inspection assignment in a timely manner.  (Nelson dep. at 112:20-25;  113:3-25; 114:1-11.)

Once Toellner made the changes in the scope of the work in his September 2006 estimate the MSB computer software generated new cost and material pricing.  (Toellner dep. at 112:3-8.) The MSB program determined that the revised replacement cost to repair plaintiffs' house was $20,106.76, the revised depreciation was $7,323.04 and the actual cash value was $12,783.72. (Ex. 1 to Nelson dep. at Balboa 00099)  Toellner recommended to Nelson that defendant pay $12,283.72 initially and an additional $7,323.04 upon completion of the repairs.  (Id. at Balboa 00094.)  Toellner never gave a copy of the scope sheet itemization completed by Dingman to

Nelson. (Toellner dep. at 105:21-23.) Nelson testified that she did not find out the Dingman scope sheet itemization even existed until the time of her deposition on March 12, 2008. (Nelson dep. at 134:1-16.) Nelson testified that she would have liked to have reviewed the document before closing the file and she would have considered it before making a final decision on the claim. (Id. at 134:17-25; 135:1.)

On September 26, 2006, defendant sent plaintiffs a copy of a letter addressed to GMAC explaining that it was paying an additional $3,394.00 on the fire claim. (Ex. 1 to Nelson depo. at Balboa 00107-108.) The letter further stated that the amount of the "refundable depreciation" would be paid upon sending defendant a "work completion certificate from your contractor or the receipts and invoices documenting the repair to the risk." (Id.) The letter again referred to plaintiff Billy Williams as the "insured." (Id.) After sending the letter, Nelson closed the claim file and defendant has made no further payments. (Nelson dep. at 137:2-25; 138:1.)

Plaintiff Billy Williams started working in the construction business after the eleventh grade. (B. Williams dep. at 9:10-11; 10:17-19.) He now works for a drywall contractor in the local area. (Id. at 9:17-19.) Over the years he has performed framing, roofing, plumbing and electrical work for a living. (Id. at 10:17-23; 11:1-2.) Plaintiff Billy Williams testified that the amount of money paid on the insurance claim by defendant was so low that it would be an "insult to a contractor" to request the work be performed for that price. (Id. at 39:15-20; 40:3-8.)

IV.    **ARGUMENT**

    **A.**    **Plaintiffs have standing to bring their claims.**

        **1.**    **Plaintiffs are parties to the insurance contract.**

In its brief, defendant correctly states that a stranger to a contract cannot sue for its breach. However, in the present case, plaintiffs are far from strangers to the contract. Plaintiffs are, in fact, parties to the contract.

Plaintiffs paid premiums for the insurance. Defendant identified plaintiff Billy Williams as the insured in both letters that accompanied defendant's payments under the policy. Both Cunningham Lindsey estimates identified plaintiff Billy Williams as the insured. Plaintiffs had duties and obligations to defendant under the insurance contract. The insurance contract itself identifies the "borrower" as an "additional insured." Under the policy, the borrower has coverage with respect to "any residual amounts of insurance" over and above GMAC's "insurable interest" in the insured property.

The term "insurable interest" is not defined in the policy. The term is at a minimum ambiguous and thus to be construed against defendant as drafter of the policy. See First Mercury Syndicate v. Franklin County, 623 So. 2d 1075, 1077 (Ala. 1993). The term can be interpreted as encompassing only the principal balance of plaintiffs' loan. This interpretation is strengthened by the conduct of both GMAC and defendant in connection with the contract. GMAC indicated to plaintiffs in the letter dated October 9, 2005 that the coverage with defendant would insure the principal balance. As of the date of loss, the principal balance of the loan was $31,951.07. When the claim file was opened, Tancy Nelson identified the "secured balance" on plaintiffs' loan as $31,951.07. The amount of the policy limits were and are $32,311.00. Based on the affidavit of Eric Dingman, which must be accepted as true for purposes of summary judgment, the amount of the loss in this case exceeds those limits. This leaves a residual amount of $359.93 over and above GMAC's insurable interest. The $500.00 deductible would be absorbed pro rata between plaintiffs and GMAC and would not extinguish

plaintiffs' interest.  Though this may be a very small amount of coverage, it is enough coverage to enable plaintiffs to sue for defendant's breach of the contract.

The facts set forth in <u>Graphia v. Balboa Insurance Company, Inc.</u>, 517 F. Supp. 2d 854 (E.D. La. 2007), cited by defendant, do not indicate how much of the plaintiffs' debt was principal and how much was interest.  The opinion only says that she owed between $110,000.00 and $132,000.09 and total damage to the property was only $56,542.91.  <u>Graphia</u> is distinguishable on those grounds and, in any event, not binding authority on this Court.

### 2.    Plaintiffs are third party beneficiaries of the insurance contract.

If plaintiffs are not parties to the contract, they at a minimum have standing to sue as third party beneficiaries.  "To recover on a third party beneficiary theory, the complainant must show (1) that the contracting parties intended, at the time the contract was created, to bestow a direct benefit on the third party, (2) that the complainant was the intended beneficiary of the contract and (3) that the contract was breached."  <u>Locke v. Ozark City Board of Education</u>, 910 So. 2d 1247, 1250 (Ala. 2005).  Forseeability of harm is a factor bearing on the question of whether contracting parties intended to benefit third parties.  <u>See</u> <u>Harris Moran Seed Company, Inc. v. Phillips</u>, 949 So. 2d 916, 923 (Ala. Civ. App. 2006).  However, "[i]t is not essential to the creation of a right in an intended beneficiary that he be identified when a contract containing the promise is made."  <u>Beverly v. Macy</u>, 702 F. 2d 931, 940 (11th Cir. 1983) (noting that the general principles adopted by the court were also accepted under Alabama law.)  "[W]hen determining whether the parties to a contract intended to bestow a direct benefit on a third party, a court may look beyond the contract to the circumstances surrounding its formation."  <u>Id.</u>  "The economic motivation of the parties is not dispositive;  rather, 'the intention of the parties disclosed by the writing and surrounding circumstances known to the parties, and not their motive, determines the

rights of the third party beneficiary.'" Id. at 941 citing Mutual Benefit Health & Accident Ass'n of Omaha v. Bullard, 120 So. 2d 714, 723 (Ala. 1960).

In Bullard, the plaintiff filed an action to recover benefits payable under an accident insurance policy issued by the insurer to his employer. Id. at 717. The insurer had insured each employee of the employer against accidental injury at work. Id. at 716. Employer was named as the beneficiary of the insurance proceeds under the terms of the policy. Id. at 717. Plaintiff was injured at work and made a claim under the policy directly against the insurer. Id. The insurer denied the claim arguing that the contract was made for the benefit of the employer and the employer alone was entitled to recover under the policy. Id. at 718. The Alabama Supreme Court determined that the insurance contract was made for the plaintiff's benefit and that he was entitled to maintain an action for its breach. Id. at 724.

In the present case, plaintiffs' house was insured under the contract between GMAC and defendant. GMAC's primary motivation for protecting the house is not determinative of plaintiffs' rights under the policy. Rather, plaintiffs' rights are determined by the contract and the surrounding circumstances known to GMAC and defendant. The policy itself contemplates that the insurance proceeds would be used to repair or replace the house. GMAC and defendant knew that plaintiffs owned the house. Plaintiffs are "borrowers" are specifically mentioned in the contract and were certainly within the contemplation of the parties when the contract was formed. Clearly, plaintiffs were intended beneficiaries of defendant's contractual promise to pay for the repair or replacement of the house. Obviously, it was foreseeable that plaintiffs could be harmed as a result of defendant's breach of this promise. Harm has, in fact, resulted to plaintiffs as a result of the breach. Plaintiffs have not been able to live in their house since the fire and

cannot live in the house until it is repaired.  The house cannot be repaired until the insurance proceeds are released.

The <u>Graphia</u> case cited by defendant as persuasive authority is simply not consistent with Alabama third party beneficiary law.  The result in <u>Graphia</u> would have been different had the principles announced in <u>Locke</u>, <u>Harris</u>, <u>Beverly</u> and <u>Bullard</u> been applied the facts of that case.

**B.    There is substantial evidence to support the bad faith claim.**

"An actionable tort arises from for an insurer's intentional refusal to settle a direct claim where there is (1) no lawful basis for the refusal coupled with actual knowledge of that fact or (2) intentional failure to determine whether or not there was any lawful basis for such refusal." <u>United Services Automobile Association v. Wade</u>, 544 So. 2d 906, 913 (Ala. 1989).  "The insured in a bad faith case may prove his case either by showing that the insurer refused to pay the claim, knowing there was no legitimate reason to refuse payment, or by showing that the insurer intentionally failed to investigate the claim to determine whether there was a legitimate reason for refusing payment."  <u>Id.</u>  "In regard to the intentional-failure-to-investigate aspect of bad faith, the relevant question before the trier of fact would be whether a claim was properly investigated and whether the results of the investigation were subjected to cognitive evaluation and review."  <u>Id.</u>  "Implicit in that test is the conclusion that the knowledge or reckless disregard of the lack of a legitimate or reasonable basis may be inferred and imputed to an insurance company when there is a reckless indifference to facts or to proof submitted by the insured."  <u>Id.</u>

Defendant failed to properly and timely investigate the claim.  David Toellner inspected the house for a "short" time and seemed more interested in fishing that day.  Toellner took more than four months to perform the "re-inspection" assignment that Nelson wanted finished in ten days.  Nelson admitted that Toellner's revised estimate was not submitted in a timely manner.

The entire claim process took more than seven months. Nelson testified that Toellner did not provide her with the itemized estimate generated by Eric Dingman. Nelson testified that she would have liked to have been able to consider this evidence before making a final decision on the claim. Nelson testified that she did not even know that this document existed until her deposition.

Defendant refused to pay the amount necessary to repair or replace the house and instead offered a lesser amount based upon the MSB computer software program. There is no evidence that the accuracy of the pricing information generated by this program has ever been tested in any meaningful way. In fact, both David Toellner and Tancy Nelson have on past occasions found the prices generated by the program to be inaccurate. Nelson, the adjuster that ultimately made the payment decision on this claim, testified that the computer program has produced results that were "unfair to the homeowner" more than twenty times in the last eight years. Defendant did not use the actual costs of labor and materials in the Enterprise area to adjust the claim. The estimates from the local contractors, which were greatly in excess of the computer generated estimate, were ignored. According to Billy Williams, the amount of money offered by defendant was so low that it would have been insulting to a contractor to request that the work be performed for that amount.

Defendant made false promises to plaintiffs concerning the claim. Teresa Williams testified that Nelson told her she would pay the Dingman estimate if he would complete an itemization. Toellner testified that plaintiffs provided him with the completed itemization. Nevertheless, defendant refused to pay the estimate.

There is substantial evidence from which a reasonable juror could infer the existence of bad faith in this case.

14

V.     <u>**CONCLUSION**</u>

Based on the foregoing, defendant's motion for summary judgment should be denied in

its entirety.

/s/ Dan Talmadge
Dan Talmadge (TAL013)
Attorney for Plaintiffs
MORRIS, CARY, ANDREWS,
TALMADGE & DRIGGERS, LLC
Post Office Box 1649
Dothan, Alabama 36302
Telephone:  (334) 792-1420
Facsimile:  (334) 673-0077
E-mail:  dtalmadge@mcatlaw.com

<u>**CERTIFICATE OF SERVICE**</u>

I do hereby certify that on March 17, 2008, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, and request that the Court serve the same electronically, on the following counsel:

Henry T. Morrissette          hmorrissette@handarendall.com
Stephen Fitts                 sfitts@handarendall.com

/s/ Dan Talmadge

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **BILLY WILLIAMS, et al.** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 1:07-CV-549-WHA** |
| | ) | |
| **BALBOA INSURANCE COMPANY,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' EVIDENTIARY SUBMISSIONS IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff hereby files the following evidentiary submissions in opposition to defendant's

motion for summary judgment.

1.  Deposition of Teresa Williams, pp. 10, 11, 13, 21, 22, 43, 45, 56, 57, 59, 60, 64, 71, 72, 73, 79, 80, 81, 83, 84, 87, 112, 115, 131, 132, and the following exhibits to that deposition:

    | Exhibit 10 | Williams 00050-00051 |
    |---|---|
    | Exhibit 13 | GMAC 0025-0026 |
    | Exhibit 14 | Williams 00048-00049 |
    | Exhibit 20 | GMAC 00046-00048 |

2.  Deposition of Billy Williams, pp. 7, 9, 10, 11, 22, 23, 39, 40.

3.  Deposition of Tancy Nelson, pp. 37, 38, 39, 40, 49, 59, 60, 61, 62, 67, 68, 69, 112, 113, 114, 134, 135, 137, 138, 154, 155, 156, 157, and the following exhibits to that deposition:

    | Exhibit 1 | Balboa 0001-00013 |
    |---|---|
    | | Balboa 00110 |
    | | Balboa 00022-00037 |
    | | Balboa 00038-00039 |
    | | Balboa 00055-00060 |
    | | Balboa 00078-00079 |
    | | Balboa 00082-00083 |
    | | Balboa 00085-00089 |
    | | Balboa 00094-00099 |
    | | Balboa 00107-00108 |

4.      Deposition of David Toellner, pp. 41, 42, 43, 44, 47, 48, 49, 50, 52, 55, 56, 57, 58, 62, 73, 81, 82, 86, 87, 101, 105, 110, 111, 112, and the following exhibit to that deposition:

        Exhibit 11     Balboa 00051 and last page

5.      Affidavit of Eric Dingman and exhibits.

/s/ Dan Talmadge
Dan Talmadge (TAL013)
Attorney for Plaintiffs
MORRIS, CARY, ANDREWS,
TALMADGE & DRIGGERS, LLC
Post Office Box 1649
Dothan, Alabama 36302
Telephone:  (334) 792-1420
Facsimile:  (334) 673-0077
E-mail:  dtalmadge@mcatlaw.com

## CERTIFICATE OF SERVICE

I do hereby certify that on March 17, 2008, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, and request that the Court serve the same electronically, on the following counsel:

Henry T. Morrissette       hmorrissette@handarendall.com
Stephen Fitts          sfitts@handarendall.com


/s/ Dan Talmadge

# FREEDOM COURT REPORTING

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    BILLY WILLIAMS and

     TERESA WILLIAMS,

6

          Plaintiffs,

7

     vs.                CASE NO. 1:07-cv-549-WHA

8

     BALBOA INSURANCE

9    COMPANY,

10        Defendant.

11

12

13              * * * * * * * * * * *

14        DEPOSITION OF TERESA GAIL WILLIAMS, taken

15   pursuant to stipulation and agreement before Sherry

16   McCaskey, Certified Court Reporter and Commissioner

17   for the State of Alabama at Large, in the Law

18   Offices of Morris, Cary, Andrews, Talmadge, Jones &

19   Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20   on Thursday, November 15, 2007, commencing at

21   approximately 10:15 a.m.

22              * * * * * * * * * * *

23

COPY

PLAINTIFF'S EXHIBIT

1

# FREEDOM COURT REPORTING

Page 10

1          trying to remember.

2    Q.    Do you remember reviewing the request for

3          production responses?

4    A.    Yes, sir.

5    Q.    Have you given me all the documents that were

6          called for in the request for production

7          responses, other than documents between you

8          and your lawyer?

9    A.    Yes, sir.

10   Q.    Okay.  I didn't see any photographs of the

11         property in your production.  Do y'all have

12         any photographs of the property and the damage

13         and that type thing?

14   A.    No, sir.

15   Q.    Let me flip through these real quick.

16                    (Brief pause)

17   Q.    How long have you lived at the 680 County Road

18         620 address?

19   A.    I was born and raised there.

20   Q.    Same house?

21   A.    Yes, sir.

22   Q.    Have you ever not lived there?

23   A.    Oh, yes, sir.  We lived a few months in

# FREEDOM COURT REPORTING

Page 11

| | | |
|---|---|---|
| 1 | | Maryland and a year in Montgomery. |
| 2 | Q. | Well, how long have you been living at the 680 |
| 3 | | County Road 620 address continuously? |
| 4 | A. | This last time, 24 years. |
| 5 | Q. | Okay.  Then I won't ask you about those prior |
| 6 | | addresses.  That's where I was going.  All |
| 7 | | right.  Have you lived anywhere else since the |
| 8 | | fire? |
| 9 | A. | Across the road. |
| 10 | Q. | Okay.  Same piece of property? |
| 11 | A. | No.  My grandmother's house. |
| 12 | Q. | Okay.  How long were you at that property? |
| 13 | A. | I'm not sure, but I think about eight months. |
| 14 | Q. | Eight months.  So from the -- the fire was |
| 15 | | February 5th, 2006? |
| 16 | A. | Uh-huh (positive response). |
| 17 | Q. | And you lived there about eight months.  Was |
| 18 | | anybody in the house other than you and your |
| 19 | | husband? |
| 20 | A. | No. |
| 21 | Q. | So it was vacant when you moved into it? |
| 22 | A. | Yes, sir. |
| 23 | Q. | All right.  Do you know the address there? |

# FREEDOM COURT REPORTING

Page 13

1          across the street?

2     A.    No.  It was something 5510.  393-5510 or

3           308-5510.  I'm not sure.

4     Q.    How long have y'all been married?

5     A.    Thirty-four years.

6     Q.    Do you have any children?

7     A.    Two.

8     Q.    How old are they?

9     A.    One is 23 and one is 33.

10    Q.    Thirty --

11    A.    33.  I'm sorry.

12    Q.    What are their names?

13    A.    BJ.

14    Q.    BJ is 23?

15    A.    Uh-huh (positive response).

16    Q.    Male?

17    A.    Male.  Well, he's Billy Junior.  We call him

18          BJ.  And Laura, she's a Phillips.

19    Q.    Phillips?

20    A.    Uh-huh (positive response).

21    Q.    That's her married name?

22    A.    Yes, sir.

23    Q.    All right.  Where do they both live?

# FREEDOM COURT REPORTING

Page 21

1           for identification.)

2    Q.    Which was produced by you and your husband.

3          And it's difficult to read but it looks like

4          it's from sometime in 2004.  I don't know if

5          y'all can make that out better than I can.

6              It purports to be evidence of insurance

7          from Lloyds of London or underwriters of

8          Lloyds of London.  Is this the policy that you

9          and your husband purchased on the property for

10         a period of time?

11   A.    No, sir.

12   Q.    This was also lender-placed coverage?

13   A.    From Litton Loan.

14   Q.    Is this policy the policy that was on the

15         house at the time of Hurricane Ivan?

16   A.    I believe it is, yes, sir.

17   Q.    You and your husband had some damage to your

18         house from Hurricane Ivan, correct?

19   A.    Yes, sir.

20   Q.    Do you remember when you had the insurance on

21         the house that you and your husband purchased

22         for yourselves?

23   A.    I think when the mortgage was first done.

# FREEDOM COURT REPORTING

Page 22

1    Q.    Do you remember who that was with?

2    A.    Cotton States.

3    Q.    But after about a year, that policy lapsed and

4          the lender again placed a lender policy on the

5          property?

6    A.    I know we had it for a year, but I'm not sure

7          if we had it any longer.

8    Q.    Anyway, after that Cotton States insurance;

9          after that, you had only lender-placed

10         coverage?

11   A.    Yes, sir.

12   Q.    Or the lender had placed coverage on the

13         house?

14   A.    Yes, sir.

15                (Defendant's Exhibit 5 was marked

16                   for identification.)

17   Q.    Let me you show you what I have marked Exhibit

18         5, which purports to be a certificate from

19         American Modern Home Insurance Company, dated

20         October 2nd -- for a period October 2nd, 2002,

21         to October 2nd, 2003.  Was this lender-placed

22         coverage after the Cotton States coverage

23         lapsed?

# FREEDOM COURT REPORTING

Page 43

1       that you could get insurance on your house and

2       notify -- from somebody else, an insurance

3       carrier, and notify GMAC that you had

4       insurance?

5    A.  Yes, sir.

6    Q.  And if you didn't provide them with proof of

7       that insurance, then they were going to take

8       out a lender policy to protect their interest?

9    A.  Yes, sir.

10   Q.  Did you have any contact or communication with

11      GMAC after you that first letter?

12   A.  No, sir.

13   Q.  And by the letter, I'm referring to Exhibit

14      12.

15          Why not?

16   A.  I just understood they were going to place

17      insurance on it.

18   Q.  Okay.  Did you understand that the coverage

19      was going to provide protection to GMAC?

20   A.  No, sir.

21   Q.  You see where it says -- the second sentence

22      in that letter says, "The coverage will

23      provide protection to us for the loss of your

## FREEDOM COURT REPORTING

Page 45

1    A.    Yes, sir.

2    Q.    And you understood "us" to refer to GMAC?

3    A.    I understood it was our insurance; we were

4          paying for it.

5    Q.    But the letter says "us," does it not?

6    A.    Yes, sir.

7    Q.    Since GMAC sent the letter, it would refer to

8          GMAC, wouldn't it?

9    A.    I guess.

10               (Defendant's Exhibit 14 was marked

11                 for identification.)

12   Q.    Let me show you a letter dated November 27th,

13         2005, I've marked Exhibit 14 to Billy and

14         Teresa Williams from GMAC Mortgage.  Do you

15         see that?

16   A.    Yes, sir.

17   Q.    Do you recall receive this letter?

18   A.    Yes, sir.

19   Q.    And this letter informs you that GMAC

20         recommends you obtain your own coverage that

21         adequately protects yours and the lender's

22         interest with a company of your choice.  See

23         at the bottom of the page?

## FREEDOM COURT REPORTING

Page 56

1                    (Defendant's Exhibit 22 was marked

2                        for identification.)

3     Q.   I'll show you a document marked as Defendant's

4          Exhibit 22.  And Exhibit 22 is a payoff

5          statement from GMAC Mortgage listing you and

6          your husband, dated April 9th, 2007,

7          Bates-labeled GMAC 0049-51.  Do you recognize

8          that document?

9     A.   No, sir.

10    Q.   But it's another payoff statement?

11    A.   I could have seen it.  I just don't remember.

12              MR. MORRISSETTE:  Let's take five.

13                    (Brief recess)

14    Q.   I want to talk about the fire at the house.

15    A.   Okay.

16    Q.   You were alone at the time?

17    A.   Yes.

18    Q.   And it was on February 5th --

19    A.   Yes, sir.

20    Q.   -- 2006?

21    A.   Yes, sir.

22    Q.   Was anyone else living at the house other than

23          you and your husband at that time?

# FREEDOM COURT REPORTING

Page 57

1    A.    No. My son still had belongings in the house,

2          but he wasn't actually living there.

3    Q.    Okay. All right. Tell me what happened.

4    A.    I got up and put all the sheets and stuff in

5          the washer, got all that started. And I was

6          going to fix breakfast, and I started that.

7          And I heard the machine making a noise, and I

8          went to see about that. And I forgot turning

9          on the stove. I don't actually remember

10         turning that on. And I come back in the

11         kitchen door. When I did, the flames were up

12         in the cabinets.

13    Q.    From a pan on the stove?

14    A.    Uh-huh (positive response).

15    Q.    There were cabinets over the stove?

16    A.    Uh-huh (positive response.)

17    Q.    Go ahead. I'm sorry.

18    A.    And I couldn't go in through that door to the

19         phone, so I went around the back to the

20         house. Come around to the front and could

21         just see to get in the door to get the phone.

22         And the purse, I grabbed my purse and went on

23         the front porch and called the fire

## FREEDOM COURT REPORTING

Page 59

1          Sheetrock.

2     Q.   Was your son's room damaged?

3     A.   Yes, sir.

4     Q.   And that's all you remember?

5     A.   Right now, that's all I can think of.

6     Q.   After the fire was out, who did you notify?

7     A.   After the fire was out?

8     Q.   Did you notify GMAC or --

9     A.   Not till the next day.  I called the

10         insurance.  I can't remember if I called GMAC

11         or the insurance.

12    Q.   How did you -- do you have a number for

13         Balboa?

14    A.   I don't remember.  I think I did.

15    Q.   Do you know where you got that number?

16    A.   I don't remember.  That's all a blur to me

17         that week.  I was so scared that day.

18    Q.   Is it possible that you called GMAC first?

19    A.   Yeah, it's possible.

20    Q.   And they told you who to call?

21    A.   Yeah.

22    Q.   Anyway, you ultimately talked to a woman named

23         Tancy Nelson at Balboa?

# FREEDOM COURT REPORTING

Page 60

1    A.    Yes, sir.

2    Q.    Did you ever talk to anyone else at Balboa

3          other than Tancy Nelson?

4    A.    Not that I know of I hadn't.

5    Q.    To date?

6    A.    No, sir.

7    Q.    What happened with your first contact with

8          Ms. Nelson?

9    A.    They asked me questions about the fire, made a

10         claim.

11   Q.    I gave your lawyer a little mini-cassette tape

12         before your deposition, and I understand that

13         you've listened to it.

14   A.    Yes, sir.

15   Q.    And is it accurate?

16   A.    As best I can remember.

17         MR. MORRISSETTE:  Can we agree so I can

18              put it on the Record that the tape I

19              gave you is what she's testifying

20              about?

21         MR. TALMADGE:  Yes.  The thing you

22              listened to this morning is the

23              conversation you're talking about,

# FREEDOM COURT REPORTING

1     to your house?

2    A.   No, sir.  You mean nobody came with him?

3    Q.   Nobody came with him?

4    A.   Nobody came with him.  Yes, sir.

5    Q.   Did you speak with Mr. Toellner?

6    A.   My husband and I both did.

7    Q.   So both you and your husband had contact with

8    Mr. Toellner?

9    A.   Yes, sir.

10    Q.   What did Mr. Toellner say to you?

11    A.   I remember him asking my husband could he go

12    fishing in his pond, and he was looking at the

13    house.  And I went outside.  He finished

14    talking to him about the damage to the house.

15    Q.   Okay.  So you didn't have any conversations

16    about the damage with Mr. Toellner?

17    A.   I don't remember talking to him anything about

18    the damage.  I think he asked me how it

19    happened.

20    Q.   Anything else you recall, other than him

21    asking you how it happened?

22    A.   No, sir.

23    Q.   Did you walk through the house with him --

## FREEDOM COURT REPORTING

Page 71

```
1   Q.   Okay.  I'll show you that.

2              (Defendant's Exhibit 26 was marked

3                 for identification.)

4   Q.   I'll show you a document I've marked as

5        Exhibit 26.  It says "Short Form" at the top

6        of it, and it's a Cunningham Lindsey

7        adjuster's report.

8   A.   Yes, sir.

9   Q.   Do you recall receiving this?

10  A.   Yes, sir.

11  Q.   Okay.  And it's Bates-labeled Balboa 00055

12       through 60.

13  A.   I didn't get a top sheet like this, I don't

14       remember.

15  Q.   You got the estimate?

16  A.   I got the rest of it, the estimate.

17  Q.   Okay.  That's fine.  But you did  receive it?

18  A.   Yes, sir.

19  Q.   Did you review the estimate?

20  A.   Yes, sir.

21  Q.   All right.  What did you do with the estimate?

22  A.   I called people in the phonebook to get them

23       to come out and give me an estimate to see
```

## FREEDOM COURT REPORTING

Page 72

1           what it would cost to fix it, what they would

2           charge to do the work.

3      Q.   Okay.  Did you have any conversations with

4           Ms. Nelson before you talked to any of the

5           folks about doing the work?

6      A.   I don't remember.  I don't think so.

7      Q.   But you didn't have any conversations with

8           Mr. Toellner?

9      A.   No.

10     Q.   Okay.  Did people come out to the house and

11          look at the damage and give you a price?

12     A.   Yes, sir.

13     Q.   Now, you've submitted proposals from Mr. Jerry

14          Gentle?

15     A.   Gentile.

16     Q.   Gentile.  B&B Construction?

17     A.   Yes, sir.

18     Q.   And Grimes Roofing?

19     A.   Yes, sir.

20     Q.   Did anybody else come out to the house to look

21          at the property?

22     A.   Wouldn't nobody else come.

23     Q.   Excuse me?

# FREEDOM COURT REPORTING

Page 73

1    A.    Wouldn't anybody else come.

2    Q.    You called them but they didn't come?

3    A.    That's right.  I called just about everybody

4          in the phonebook that would do that kind of

5          work.

6    Q.    Okay.  I noticed the estimate that we marked

7          as Exhibit 26 was not in the materials you

8          produced to me.  You didn't keep a copy of it

9          or --

10   A.    I gave that estimate.

11              MR. TALMADGE:  I thought we did produce

12                 it.

13              MR. MORRISSETTE:  Maybe it's in there.

14              MR. TALMADGE:  Let me double check.

15              MR. MORRISSETTE:  I don't recall seeing

16                 it.  I could have just missed it.

17   A.    But I don't remember seeing the top sheet like

18         this.

19              MR. TALMADGE:  We didn't have a top

20                 sheet.  But let's look.  Now, it would

21                 not have been in the request for

22                 production.

23              MR. MORRISSETTE:  Would've been in the

# FREEDOM COURT REPORTING

Page 79

1              documentation of your discussions with

2              Mr. Dingman?

3    A.    No.

4    Q.    Any other documentation regarding B&B in any

5          way?

6    A.    No.

7              MR. TALMADGE:  Wasn't he the one that did

8                  the itemization for you, or was that a

9                  different guy?

10             THE WITNESS:  Yeah, that was Eric.

11   Q.    But that was Mr. Dingman that did the

12         itemization?

13   A.    Oh, yeah.

14             MR. MORRISSETTE:  You didn't tell him

15                 about that.

16             THE WITNESS:  I forgot.  I'm sorry.

17             MR. MORRISSETTE:  I don't think I've got a

18                 copy of that.

19             MR. TALMADGE:  We don't either.  I think

20                 that we will find that Cunningham

21                 Lindsey probably has it in their

22                 file.  I'll send a subpoena to them.

23             MR. MORRISSETTE:  Okay.

# FREEDOM COURT REPORTING

Page 80

1            MR. TALMADGE:  You need to correct your

2            answer.

3            THE WITNESS:  Oh, okay.

4      A.   Yes, I did.

5      Q.   So you had further contact?

6      A.   Yes, with Eric.

7      Q.   Did you get him to do the later itemization of

8           the charges?

9      A.   Yes, sir.

10     Q.   Why did you get Mr. Dingman to do the

11          itemization as opposed to the other two

12          gentlemen that looked at the house?

13     A.   I just liked him, and he said he needed the

14          work, that he'd do it.

15     Q.   Okay.  But his proposal was higher than

16          Mr. Gentile's, right?

17     A.   Let's see.  It is.  Yes.

18     Q.   And the only reason you asked him instead of

19          Mr. Gentile was that you liked him?

20     A.   Well, Tancy had told me to pick the one that I

21          wanted to do the work.  And she said, get him

22          to write it up on the estimate sheet we send

23          you like Mr. Toellner did, how he gets his

## FREEDOM COURT REPORTING

Page 81

```
 1        figures, and then we'll pay it.  But then they

 2        never did -- didn't pay it when I sent it to

 3        them.

 4   Q.   Okay.  We'll get to that.

 5              (Defendant's Exhibit 29 was marked

 6              for identification.)

 7   Q.   I'll show you a document I marked as Exhibit

 8        29.  It's the estimate from Grimes Roofing; is

 9        that correct?

10   A.   Yes.

11   Q.   Did Mr. Grimes come out and look at the

12        property?

13   A.   Yes.

14   Q.   Were you the only person there when he did?

15   A.   I think so.

16   Q.   Did you have any conversations with him?

17   A.   He asked me how it happened, and he looked it

18        over and wrote up the paper and gave it to me

19        and told me to call and let him know.

20   Q.   Did he talk to you any about the damage?

21   A.   Not that I remember.

22   Q.   Okay.  Did he talk to you any about the costs

23        other than just handing you the estimate?
```

# FREEDOM COURT REPORTING

Page 83

1       attached?

2   A.   Yes, sir.

3   Q.   Had you talked to Ms. Nelson at that point,

4       other than the initial time you talked to her?

5   A.   I don't think so.

6   Q.   Then after you got the letter with the

7       estimate attached, you had the contractors

8       come out to the house to look at it?

9   A.   Yes, sir.

10   Q.   And then you wrote Ms. Nelson?

11   A.   I think I wrote her, and then I had to fax it.

12   Q.   But you didn't talk to her in between that

13       time?

14   A.   I don't remember if I did.

15   Q.   You don't recall talking to her?

16   A.   I don't recall.

17   Q.   Okay.  Let me show you a document I'll mark as

18       Defendant's Exhibit 30.

19           (Defendant's Exhibit 30 was marked

20            for identification.)

21   Q.   Which purports to be a May 3rd, 2006, letter

22       with an attached letter.  It looks like you

23       may have written her and then had trouble

# FREEDOM COURT REPORTING

Page 84

```
 1        getting the fax to her and wrote her again?

 2   A.   I called her and couldn't get through.  And

 3        I'd call her, and I'd fax it.  I don't know

 4        how many times that I faxed paperwork to her,

 5        and she didn't get it.

 6   Q.   Do you know why she didn't get it?

 7   A.   No, I don't.  I carried it different places

 8        and had it faxed.

 9   Q.   But you don't know whether that was -- why

10        that happened?

11   A.   No.

12   Q.   But you never talked to her before this May

13        3rd, 2006, letter?

14   A.   I don't remember.

15   Q.   Okay.  At the bottom of this letter that we've

16        marked as Exhibit 30, it says, "My attorney

17        told my husband to not pay to fax this again."

18        Had you already talked to an attorney at this

19        time?

20   A.   I had talked to Bruce McLean about the way

21        they was doing, and he said --

22            MR. TALMADGE:  Now, wait a minute.

23   Q.   Don't tell me what he said.
```

# FREEDOM COURT REPORTING

Page 87

1    Q.    Did you have an answering machine during this

2          time?

3    A.    No, sir.

4    Q.    Okay.  So it's possible she tried to call you

5          when you were out and didn't reach you?

6    A.    Well, we had caller ID thing on the phone, and

7          I didn't see it on there.  But --

8    Q.    But you finally -- you talked to her?

9    A.    Yes, I finally talked to her and asked her

10         what the insurance was going to do.  And

11         that's -- sometime after that is when she told

12         me to pick one of those three contractors that

13         I wanted to do the job.  And they would send a

14         form like Mr. Toellner filled out and have him

15         to fill it out and send it back to her.  And

16         they would pay it.

17   Q.    She said they would pay it if you sent the

18         form?

19   A.    She said they would pay it if I'd get him to

20         fill it out and send it back, pick the one I

21         wanted.  So Mr. Dingman filled it out.

22   Q.    And you don't have a copy of what he filled

23         out?

## FREEDOM COURT REPORTING

Page 112

```
 1            anybody else that's looked at it?

 2    A.      Don't know anything about it.

 3    Q.      We covered already that Mr. Adams was before

 4            the fire when he looked at it.

 5    A.      Yes.

 6    Q.      Mr. Eddie Adams.

 7    A.      He was the water damage.

 8    Q.      Has there been any work on the house at all

 9            since the fire?

10    A.      Not since the fire.

11    Q.      Where are you living?

12    A.      We live in a single-wide mobile home next to

13            the house.

14    Q.      You lived in your grandmother's house for

15            eight months?

16    A.      About that.

17    Q.      Why did you move out of your grandmother's

18            house?

19    A.      Because they didn't want anybody living in it,

20            other relatives that own it.  We just use it

21            for dinners and things.

22    Q.      They asked y'all to leave?

23    A.      They told us to try to hurry and get a  place
```

## FREEDOM COURT REPORTING

Page 115

1   A.   No.

2   Q.   And the house is in the same condition it was

3        after the fire?

4   A.   It's worse now.

5   Q.   In what way?

6   A.   The ceiling has fell in, in my son's room, all

7        the way out.  The -- just run down.  The

8        floors are buckled up from the -- where the

9        water dried out, the wood floors.

10  Q.   But they were damaged after the fire

11       initially, right?

12  A.   Yeah.

13  Q.   Anything else?

14  A.   I don't know.  I haven't been out there but

15       one time.

16  Q.   How far is your trailer from the house?

17  A.   About as far as from here to that front door

18       right there (indicating).

19  Q.   Thirty feet?

20  A.   About that.

21  Q.   Is there any tarp covering the roof of the

22       house or anything like that?

23  A.   No.

## FREEDOM COURT REPORTING

Page 131

1    A.    Dr. Mark Ellis.

2    Q.    I'm sorry.  Who did you say?

3    A.    Mark Ellis.  It's for depression.

4    Q.    Did he change your medicine?

5    A.    I've got two different ones now for the same

6          thing.

7    Q.    Do you remember what the new one you got was?

8    A.    Elavil.

9    Q.    Okay.  Have you specifically discussed with

10         Mr. Ellis the --

11   A.    It's not called -- it's amitriptyline, is what

12         it says on the bottle.

13   Q.    Excuse me?

14   A.    Amitriptyline, but I think it's generic for

15         Elavil.

16   Q.    Have you discussed specifically with Dr. Ellis

17         the issues relating to the insurance claim on

18         the house?

19   A.    No.

20   Q.    Did the foreclosure proceeding on the house

21         cause you stress?

22   A.    Oh, yeah.

23   Q.    If your brother had bought the house at

# FREEDOM COURT REPORTING

Page 132

1        foreclosure, would you and your husband have

2        continued to live in it?

3    A.  We couldn't live in the house.

4    Q.  Okay.  If the house had been fixed after your

5        brother purchased it, was it planned for you

6        to live in it?

7    A.  If we had come up with the money to fix it, we

8        could live in it.  I think he was just going

9        to use it for storage.

10   Q.  Okay.  Do you have any basis for believing

11       that Ms. Nelson did not pay what she

12       thought -- did not authorize what she thought

13       was the correct amount to repair the damage to

14       the house?

15            MR. TALMADGE:  Object to the form.  You

16                 may answer.

17   A.  I don't understand.

18   Q.  Sure.  Do you have any information that would

19       indicate to you that Ms. Nelson did not

20       authorize what she thought was the correct

21       amount to pay for the repairs on the house?

22            MR. TALMADGE:  Object to the form.  Go

23                 ahead.

```
 1                      REPORTER'S CERTIFICATE

 2

 3  STATE OF ALABAMA

 4  HOUSTON COUNTY

 5

 6           I, Sherry McCaskey, Certified Court Reporter

 7  and Commissioner for the State of Alabama at Large,

 8  hereby certify that I reported the TESTIMONY AND

 9  PROCEEDINGS in the matter of the foregoing cause, and

10  that all contain a true and accurate transcription of

11  said proceedings.

12           I further certify that I am neither kin nor

13  of counsel to the parties to said cause, nor in any

14  manner interested in the results thereof.

15

16

17

18

19

20  SHERRY McCASKEY, CCR
    Commissioner for the
21  State of Alabama at Large

22  CERTIFIED COURT REPORTER NO.:  230

23
```

**First Mortgage Loan Servicing**
3451 Hammond Ave
P.O. Box 780
Waterloo, IA 50704-0780

# GMAC Mortgage

05/27/05

BILLY   WILLIAMS
TERESA   WILLIAMS
678 CO RD 620

ENTERPRISE AL 36330-0000

RE·    Account Number        0833002922
       Property Address      678 CO RD 620

                          ENTERPRISE AL 36330-0000

Dear BILLY   WILLIAMS
     TERESA   WILLIAMS

Welcome to GMAC Mortgage Corporation        . You were
recently advised by LITTON LOAN SERVICING LP           the
servicing of your account has been transferred to our office
effective 05/16/05.  Your new GMAC Mortgage Corporation
account number is listed above.

Beginning 05/16/05, payments should be sent to
GMAC Mortgage Corporation        at the following address as
LITTON LOAN SERVICING LP         will be unable to accept
payments and apply them to your account on or after that date:

          GMAC Mortgage Corporation
          PO Box 79135
          Phoenix AZ  85062-9135

You will receive a mortgage account statement under separate
cover, which will include a payment coupon and return envelope
for making your payment to GMAC Mortgage Corporation
If you have already mailed your payment to
LITTON LOAN SERVICING LP        or our Payment Processing
Department in Waterloo, it will be applied.

Your homeowner's/hazard insurance will not be affected by this
transfer. A notification is being sent to your hazard insurance
carrier to send future insurance information to
GMAC Mortgage Corporation



DEFENDANT'S
EXHIBIT
10

PENGAD 800-631-6989

Williams  00050
Re: Williams v. Balboa

05/27/05
Account Number 0833002922
Page Two

If you have been paying premiums for optional insurance (e.g., accidental death, life, disability, etc.) or optional products, in most instances, GMAC Mortgage Corporation        will continue this service at the same or comparable premium.  If a carrier change is necessary, you will receive new insurance policy information under separate cover.  In the event we are unable to continue this service, you will be notified in writing.

We also offer the opportunity to have your mortgage payment automatically deducted from your financial institution.  To learn more about our automatic payment deduction program, please contact Customer Care.  If you were enrolled in
LITTON LOAN SERVICING LP         's automatic payment plan, additional information was sent to you under separate cover.

If you currently make your mortgage payment through a third-party entity (e.g., government allotment, biweekly, or bill-pay service), please take the necessary steps to advise them to change the payee to GMAC Mortgage Corporation        .  In the event of a payment change, it is your responsibility to notify the third party of the new payment amount.  If you pay your mortgage payment through a home banking PC application, please remember to update your payment address and account number.

Please be assured the transfer will have no effect on the terms or conditions of your loan documents other than those directly related to the servicing of your account.

You should also be aware of the following information, which is set out in more detail in section 6 of the Real Estate Settlement Procedures Act (RESPA) (12 U.S.C. 2605):

During the 60-day period following the effective date of the transfer of the account servicing, a loan payment received by your old servicer before its due date may not be treated by the new account servicer as late and a late fee may not be imposed on you.

Section 6 of RESPA (12 U.S.C. 2605) gives you certain consumer rights. If you send a qualified written request to your account servicer concerning the servicing of your account, your servicer must provide you with a written acknowledgment within 20 business days of receipt of your request. A qualified written request is written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, which includes your name and account number and your reason for the request.

**Williams  00051**
**Re: Williams v. Balboa**

# **GMAC** Mortgage

PO Box 4025
Coraopolis, PA 15108-6942

SECOND REQUEST FOR PROPERTY INSURANCE

Notification Date: 10/09/2005

0003069 · 0004252

BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620
ENTERPRISE, AL
          36330-5456

RE: **REFERENCE NUMBER**: 5901
    Loan Number: 5901-0000-0833002922
    Hazard Insurance Uninsured Date: 05/27/2005
    Property Location: 678 CO RD 620
                ENTERPRISE AL        36330

Dear Customer:

We previously notified you that we had no evidence of a hazard insurance policy in effect for the above property as required by the terms of your mortgage. As of this date, we still have not received such evidence.

Since we have not received evidence of hazard insurance, we will secure hazard insurance coverage. The coverage will provide protection to us for loss to your dwelling up to a limit of $32,311 with a deductible of $500.00 (except GU, NM, OK, VT and WV - Deductible $250.00). This deductible may change if occupancy is different at the time of loss. If this is a commercial property a deductible of $5,000.00 or 2%, whichever is greater, will apply if the loss is the result of Vandalism and Malicious Mischief.

The coverage we obtain will only be sufficient to insure the principal balance of your loan, and will not be adequate to protect the value of your property that exceeds the amount of your mortgage. Also, the coverage we obtain will not cover your personal property or provide other dwelling coverage commonly available from a homeowner's insurance policy. If you disagree with the amount of coverage that will be placed on your property, please contact us at (800) 256-9962. The effective date of coverage will be 05/27/2005. The annual charge for this coverage will be your responsiblity for reimbursing us for the cost of the coverage ("insurance charges"). Any insurance charges not used will be credited to your account.

After we obtain coverage, you may cancel the coverage at any time and replace it with a policy of your own. Upon prompt receipt of your policy, the coverage will be cancelled. There will be no charge to you if there was no lapse in coverage. Coverage will be placed at the principal balance loan amount. The full year insurance charges for this coverage is shown above. The insurance charges will be charged within 60 days of this notice.

If your property is located in the state of AK, AZ, AR, CA, CO, CT, DE, IL, IN, KY, MD, MA, MN, MO, NC, NH, NY, OK, RI, SC, TN, VA, WA, or WV, the coverage limit on this policy will be the lesser of the principal balance on the loan at the time of placement or the last known amount on any insurance policy which you previously purchased on your own.



DEFENDANT'S
EXHIBIT
13

**GMAC 0025**

Page 2

BILLY WILLIAMS
Loan Number: 5901-0000-0833002922

Please note that the coverage we purchase may be more expensive and
generally will provide less insurance protection than a policy you may be
able to secure from your own insurance company or agent. Also, the
coverage is designed to protect the interest of GMAC Mortgage. We urge
you to contact an insurance agent to help you determine your insurance
needs and to advise you whether other less expensive insurance is available.
If you have a hazard policy in effect, please immediately forward a copy of
the policy to our office. You may also fax a copy of your policy to the
number listed below.

If we advance the insurance charges for the coverage, we will request you to
choose from the following options for reimbursement:

A.  Send evidence of hazard insurance coverage effective 05/27/2005.
    This will allow us to cancel the lender-placed hazard insurance
    with no insurance charges to you.

B.  Reimburse us in full for the insurance. Please make your check
    payable to GMAC Mortgage in the amount of the insurance charges
    indicated above.

If we do not hear from you within 45 days, we will pay the insurance charges
and collect the insurance charges by adding it to your monthly mortgage
payment. New payment information will be forwarded to you at that time.

Again, we must remind you that the coverage we will obtain is intended to
protect our interest and may offer less coverage and be more expensive than
a standard homeowner's policy. We urge you to contact an insurance company
or agent to help you evaluate your insurance alternatives. GMAC and/or an
affiliate of our company may receive compensation as a result of the placing
of this insurance.

Should you have any questions regarding this matter, please do not hesitate
to contact our office at (800) 256-9962, from 5 a.m. to 7 p.m. PST, Monday
through Friday. Your call may be monitored for quality assurance.

Thank you,                        MAIL POLICY TO:

Insurance Department              GMAC Mortgage Corporation
GMAC Mortgage Corporation         P.O. Box 4025
                                  Coraopolis, PA 15108-6942

                                  Or Fax to: (866) 336-9021

# GMAC Mortgage

PO Box 4025
Coraopolis, PA 15108-6942

Notification Date:   11/27/2005

*Att. Chad Stewart*

0003647 - 0003898  L
BILLY WILLIAMS
TERESA WILLIAMS
678 CO RD 620
ENTERPRISE, AL
                    36330-5456

**NOTICE OF PLACEMENT**

RE: **REFERENCE NUMBER: 5901**
    Loan Number: 5901-0000-0833002922
    Hazard Insurance Uninsured Date:   05/27/2005
    Property Location: 678 CO RD 620
                       ENTERPRISE AL              36330

Certificate # :      B-7136890
Effective Date:      05/27/2005          Expiration Date: 05/27/2006
Dwelling Limit:      $32,311             Annual Charge:      $518.00
Residential Deductible: $500.00 (except GU, NM, OK, VT and WV -
Deductible $250.00)
Commercial Deductible: $500.00 (except CA, GU, NM and WV - Deductible
$1,000.00)
Commercial VMM Deductible: $5,000.00 or 2% whichever is greater
(Deductible may change if occupancy changes.)

Dear Customer:

We have obtained insurance coverage with BALBOA INSURANCE COMPANY to
provide the necessary insurance protection under the terms of your mortgage.
We have notified you during the past 90 days that this insurance would be
placed if we did not receive a copy of a valid hazard insurance policy.

The cost of the insurance in the amount of   $518.00 was advanced for the
period 05/27/2005 to 05/27/2006.  Appropriate changes to your monthly
payment will be made as indicated in our previous letter.

This insurance will remain in force unless we receive evidence of a hazard
insurance policy with an effective date on or before 05/27/2005.  Evidence
of a valid policy in effect at a later date will result in cancellation of
the coverage.  Any insurance charges not used will be credited to your
account.

### IMPORTANT NOTICE TO CUSTOMER
The insurance we obtained to protect our interest in your property applies
only to the dwelling at the coverage amount indicated.  Coverage does not
extend to contents or personal property and may not be adequate to protect
the equity in the property.  If your property is located in the state of
AK, AZ, AR, CA, CO, CT, DE, IN, KY, MA, MD, MN, MO, NC, NH, NY, OK, RI,
SC, TN, VA, WA, or WV, the coverage limit on this policy will be the
lesser of the principal balance on the loan at the time of placement or
the last known amount on any insurance policy which you previously
purchased on your own.  If your property is located in any other state
besides those listed in the previous sentence, the coverage will be
placed at the principal balance of the loan.  If the limit is only
sufficient to insure the principal balance of your loan then the force-
placed policy may not be adequate to protect the value of your property
that exceeds the amount of your mortgage.  Also, there is no coverage
for liability protection with this insurance.  This insurance may be more
expensive than coverage you could arrange on your own.  We recommend you
place full insurance coverage that adequately protects both your and the
lender's interest with a company of your choice.



DEFENDANT'S
EXHIBIT
14

**Williams  00048**
**Re: Williams v. Balboa**

Page 2

BILLY WILLIAMS
Loan Number: 5901-0000-0833002922

When you furnish acceptable proof of other insurance, the lender will cancel
the insurance coverage and you will be entitled to a refund of any insurance
charges not used.  GMAC and/or an affiliate of our company may receive
compensation as a result of the placing of this insurance.

Should you have any questions regarding this matter, please do not hesitate
to contact our office at (800) 256-9962 from 5 a.m. to 7 p.m. PST, Monday
through Friday.  If you would like to submit a claim, please call
(800) 323-7466.  Your call may be monitored for quality assurance.

Thank you,                          MAIL POLICY TO:

Insurance Department                GMAC Mortgage Corporation
GMAC Mortgage Corporation           P.O. Box 4025
                                    Coraopolis, PA 15108-6942

                                    Or Fax to: (866) 336-9021

Williams 00049
Re: Williams v. Balboa

## PAYOFF STATEMENT

**GMAC Mortgage**
PO Box 780
Waterloo IA 50704-0780

02/27/07

Loan No.: 0833002922

| | |
|---|---|
| Borrower:  BILLY WILLIAMS | Property: |
| TERESA WILLIAMS | 678 CO RD 610 |
| FCLS/BANK, FEES GOOD THRU 03/05/07 | |
| THIS DEMAND EXPIRES ON 03/05/07 | ENTERPRISE    AL |
| ENTERPRISE    AL 36330-0000 | 36330-0000 |

Statement Sent to Name:  AMBER GIOVANNIELLO
Statement Sent to Fax Number: 866-314-9883

As of 02/27/07, the status of this loan is as follows:

| | | | |
|---|---|---|---|
| Next Payment Due: | 01/01/05 | Loan Type: | CONVENTIONAL |
| Matures: | 07/2020 | Note Rate: | 13.75000% |
| Escrow Balance: | $-668.22 | Escrow Retained (**pg. 2): | $0.00 |
| | | Mortgage Insurance: | $0.00 |

### * **THE FOLLOWING FIGURES ARE SUBJECT TO FINAL VERIFICATION BASED ON THE RECEIPT OF FUNDS BY GMAC Mortgage** *

| ITEMS | AMOUNT DUE |
|---|---|
| Principal | $31951.07 |
| Interest Calculated to but not including 03/06/07 | $9945.15 |
| Escrow/Impound Funds Due (see P.3, Item G) | $668.22 |
| Late Charges Outstanding | $537.42 |
| Unapplied Funds | $0.00 |
| Statement Fee | $20.00 |
| Recording Fee | $15.00 |
| Reconveyance/Trust | $0.00 |
| Release Fee | $0.00 |
| Fax Fee | $0.00 |
| Other Fees and Costs | $4539.08 |
| Deferred Amount | $.00 |
| Prepayment Penalty/Early Termination Fee | $0.00 |
| Optional Products | $0.00 |
| Uncollected P&I | $.00 |
| **TOTAL DUE** | **$47675.94** |
| Per Diem Interest | $12.0364 |

For Home Equity Line of Credit:  We require written authorization from our borrower(s) to close and terminate a line of credit account and release the lien (please see below).  If we do not receive signed notification from the borrower(s) with the amount necessary to pay off the line of credit, the line of credit will remain open.  Please call to verify account closure.

Please close my line of credit.

_____          _____
Signature                                          Signature



Page 2
`33002922

**\*\*ESTIMATED ESCROW/IMPOUND DISBURSEMENTS**

If any tax or insurance amounts are due within 45 days of the date interest is calculated to, these amounts are included in required funds and may be disbursed prior to payoff funds being received.

Items            Next due        Amount

### PAYOFF FUNDS REMITTANCE INSTRUCTIONS

To receive same-day credit and avoid additional day(s) interest, payoff funds must be remitted via wire by 2:00 P.M. Eastern Time, along with all of the required information provided below. Please include $5.00 in addition to the total figures above for the incoming wire fee.

> JPMorgan Chase Bank, N.A.
> For GMAC Mortgage
> ABA #021000021
> Account #662631175
> GMAC Mortgage Account #0833002922
> Name: BILLY WILLIAMS
> Remitter Name:
> Remitter Phone #:

To receive next-day credit and avoid additional day(s) interest, payoff funds must be remitted in U.S. Dollars by cashier's check, certified check, or title company check by 2:00 P.M. Eastern Time. All payoff funds received after 2:00 P.M. Eastern Time will be applied with interest on the next business day. Payoff funds will not be applied or credited on weekends or holidays.

When remitting by check, please include the following information on the check: Customer's name, account number, remitter's name and remitter's phone number. Please forward to the following address:

> GMAC Mortgage
> Payoff Processing Unit
> 6716 Grade Lane
> Building 9, Suite 910C
> Louisville KY 40213-1407

**\*\*\* You are responsible for the compliance of this document. \*\*\***

Important information regarding the loan payoff:

A) Add daily per diem interest from the interest through date to the date payoff funds are processed in the GMAC Mortgage office. Interest is calculated on a 365-day year on a partial-month basis. If interest is collected for 30 days, due date to due date, interest is calculated on a 360-day basis (February is calculated on 30 days). You will be responsible for any additional interest due we would need to collect due to an improper calculation method.

GMAC 0047

Page 3
0833002922

B) If you are currently enrolled in our monthly ACH program and your scheduled draft date is three days or fewer after your anticipated payoff date, your draft will still be deducted. To cancel your drafting, call 800-766-4622.

C) A late charge may be assessed for any payment or payoff not received within the grace period.

D) The amount necessary to pay this loan in full is subject to final verification by the note holder. Title/escrow will be held liable for any shortage resulting from a returned item. Do not "stop payment" on any previous payment (check or draft) which has been credited to this account.

E) If this is an adjustable rate mortgage, it may be subject to interest rate changes and principal balance increases. Please contact our office prior to closing escrow.

F) If there is a prepayment penalty fee on your account, it will be included in the total funds due for payoff. If your mortgage note indicates that the prepayment penalty can be waived due to sale of the property, you will need to include copies of 1) certified final HUD1 and 2) sales contract, both of which are signed by the buyer and seller. These documents should be included with your payoff funds. If your payoff is wired, they can be faxed to 1-614-417-5768. The prepayment penalty will not be removed until receipt of the funds

G) If the funds received are not sufficient to pay the account in full, we will utilize funds from the escrow account to complete the payoff. If there is not an escrow account, or the funds in the account are not sufficient to pay the account in full, we will return the payoff funds in the same manner as they were remitted. Interest will continue to accrue and late charges may be incurred until sufficient funds are received to pay the account in full. To avoid a short payoff, please confirm the actual payoff amount by calling 800-766-4622.

H) If your loan has a Homestrength/Homestretch/Silent Second, the outstanding balance owed is included in the Other Fees and Costs on page 1 of the statement.

I) All payments on this loan must be kept current. The escrow holder is responsible for determining the current status of this loan prior to closing of the escrow. **Issuance of this statement does not suspend the contract requirements to make monthly mortgage payments when due.**

J) Escrow account: Issuance of this statement does not alter GMAC Mortgage's responsibility to pay taxes and insurance. If a bill for these items is received prior to the receipt of payoff funds, we will pay them from the escrow account. Payment of a deficit is required before the loan can be paid in full. GMAC Mortgage is not responsible for private agreements between the mortgagor and a third party with regard to the disbursement of the escrow funds. If funds have accumulated in an escrow account, and if we have been required to pay interest on said funds as provided by state law, interest will be paid to the date the escrow closes. Any excess funds, after payoff is complete, will be remitted back to the customer. If forced place insurance has been charged to the escrow account prior to loan payoff, the full amount will be required to pay off the loan. If appropriate evidence of insurance is received, the applicable refund will be refunded to borrowers of record within 4-6 weeks. Any escrow balance will be refunded after payoff, provided the last payment applied to the account has cleared the institution on which it was drawn.

K) If this account is 2 months or more past due, in foreclosure and/or bankruptcy, you must obtain an amended statement for updated fees within 5 business days of closing.

L) As a courtesy to our customers and to expedite the processing of the payoff, please provide GMAC Mortgage with as much information as possible to complete the release of lien (i.e. book, page, instrument number, legal description). This information can be faxed to 1-866-340-6131.

M) The reconveyance/satisfaction of mortgage will be forwarded to the county recorder's office after receipt of payoff funds.

N) If you have new address information, please contact Customer Care at 800-766-4622. Updating your address information will ensure timely return of any refund you may be due, as well as allowing your release and year-end information to be sent directly to you.

7:70

GMAC 0048

# FREEDOM COURT REPORTING

Page 1

1                   IN THE UNITED STATES DISTRICT COURT

2                   FOR THE MIDDLE DISTRICT OF ALABAMA

3                         SOUTHERN DIVISION

4

5       BILLY WILLIAMS and

        TERESA WILLIAMS,

6

                Plaintiffs,

7

        vs.                 CASE NO. 1:07-cv-549-WHA

8

        BALBOA INSURANCE

9       COMPANY,

10              Defendant.

11

12

13                  * * * * * * * * * * *

14              DEPOSITION OF BILLY L. WILLIAMS, taken

15      pursuant to stipulation and agreement before Sherry

16      McCaskey, Certified Court Reporter and Commissioner

17      for the State of Alabama at Large, in the Law

18      Offices of Morris, Cary, Andrews, Talmadge, Jones &

19      Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20      on Thursday, November 15, 2007, commencing at

21      approximately 2:10 p.m.

22                  * * * * * * * * * * * *

23

PLAINTIFF'S EXHIBIT 2

## 367 VALLEY AVENUE
## (205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660

# FREEDOM COURT REPORTING

Page 7

1           knowledge of the documents.

2      Q.   Okay.  And you also live at 678 County Road

3           620, Enterprise, 36330?

4      A.   Yes.  We live at 680 now.

5      Q.   Okay.  And that's the trailer, 680?

6      A.   Yes, sir.

7      Q.   Is that a separate lot, or is it the same lot

8           as your house?

9      A.   Basically the same.  It's just beside the

10          house.

11     Q.   Okay.  Do y'all own the property that the

12          trailer is on as well right next door?

13     A.   Yes, sir.

14     Q.   Do you know if those are two separate lots?

15     A.   I think it's all one section.

16     Q.   Okay.  I guess I'll rephrase that.  Is the

17          mortgage on the whole piece of property or

18          just the lot that the house is on?

19     A.   It's on all.

20     Q.   All that piece of property?

21     A.   All that land, yes, sir.

22     Q.   Do you understand in this deposition, you're

23          under oath to tell the truth?

# FREEDOM COURT REPORTING

Page 9

1    years, have you ever lived anywhere else?

2    A.    Not that I remember, no, sir.

3    Q.    All right.  Do you receive mail anywhere else?

4    A.    No, sir.

5    Q.    Where did you grow up?

6    A.    Enterprise.

7    Q.    Enterprise.  Did you go to school in

8          Enterprise?

9    A.    Yes, sir.

10   Q.    How far did you go?

11   A.    Eleventh.

12   Q.    Did you go to any technical training or

13         anything after that?

14   A.    No, sir.

15   Q.    Started working?

16   A.    Yes, sir.

17   Q.    Who do you work with?

18   A.    I work with Ricky Paul now.  He's a drywall

19         contractor.

20   Q.    What's his name?  I'm sorry.

21   A.    Ricky Paul.

22   Q.    How do you spell that last name, Powell?

23   A.    P-A-U-L.

# FREEDOM COURT REPORTING

Page 10

1    Q.    Paul.  Gotcha.  Drywall contractor?

2    A.    Yes, sir.

3    Q.    He's in Enterprise?

4    A.    Yes, sir.

5    Q.    You do mostly residential or --

6    A.    Yes, sir, mostly residential.

7    Q.    Do y'all do anything else besides drywall?

8    A.    No, sir.

9    Q.    Have you ever done any other construction work

10         other than drywall?

11   A.    A little framing, roofing.

12   Q.    Anything else?

13   A.    Not that I remember.  Could be.

14   Q.    You've been doing drywall work since you

15         started working?

16   A.    Yes, sir.

17   Q.    Have you ever done anything else, other types

18         of jobs?

19   A.    Just construction.

20   Q.    So you've done some framing, some roofing, and

21         mostly drywall?

22   A.    Yes, sir.  I have done some -- a little bit of

23         plumbing.

# FREEDOM COURT REPORTING

Page 11

1    Q.    Okay.  Any electrical?

2    A.    Some.

3    Q.    How long have you been working with Mr. Paul?

4    A.    To the best of my knowledge, about ten, ten

5          and a half months.

6    Q.    What did you do before that?

7    A.    I was a contractor myself.

8    Q.    Drywall or --

9    A.    Drywall.

10   Q.    Did you have your own business?

11   A.    Yes, sir.

12   Q.    Did you work with anybody, or did you just

13         work --

14   A.    Well, I worked for Saliba Homes for a while.

15   Q.    Saliba Homes?

16   A.    Over here in Dothan.

17   Q.    S-A-L-I-B-A?

18   A.    Uh-huh (positive response).

19   Q.    As just one of their subs?

20   A.    Yes, sir.

21   Q.    Did you work by yourself, or did you have a

22         crew?

23   A.    There was two that worked with me.

Page 22

1    Q.    Okay.  When did you first see the fire damage?

2    A.    It was that Sunday afternoon when I got home.

3    Q.    So you came back that same day?

4    A.    Yes, sir.

5    Q.    Now, Mr. Toellner came out and looked at the

6          property?

7    A.    Yes, sir.

8    Q.    And you were there for that?

9    A.    Yes, sir.

10   Q.    All right.  Did you have any conversations

11         with him?

12   A.    Well, when he pulled up, he got out of the

13         car.  And he noticed the fish pond down there,

14         and he asked me whose pond it was.  And I told

15         him, it was mine.  And he asked me were there

16         any fish in it.  I told him, yes, sir.  And he

17         said, he didn't ever get a change to go

18         fishing, but he kept his reels and his tackle

19         box in his vehicle.  So I told him I didn't

20         have a problem with him fishing.

21   Q.    Sure.  All right.  What else happened?

22   A.    Well, he went inside and was taking pictures

23         for a short time.  And I asked him about the

**FREEDOM COURT REPORTING**

Page 23

```
1       assessment, and he said he wouldn't be through

2       with the assessment until he got back to his

3       office and --

4    Q.  The estimate?  Okay.

5    A.  So he didn't give me any kind of figures or

6       anything.

7    Q.  Did you discuss any of the damage with him?

8    A.  Well, I was just walking through showing him,

9       you know, and he was walking through with me.

10   Q.  All right.  Do you remember anything about

11      those conversations?

12   A.  No, sir, just that he would walk through and

13      take pictures and look.

14   Q.  And he didn't say anything to you about the

15      scope of damage or how much --

16   A.  No, sir, he didn't.

17   Q.  -- you'd get paid on it?

18          I'll show you a document we marked as

19      Exhibit 24 to your wife's deposition.  We're

20      going to keep these same exhibits.

21          Are those pictures of the house?

22   A.  Yes, sir.

23   Q.  Anything about the damage not shown in those
```

# FREEDOM COURT REPORTING

Page 39

1    Q.    Are you familiar with other subcontractors

2          negotiating pricing?

3    A.    Not that I could say for sure.

4    Q.    So you've never changed your price after

5          negotiating with anybody after you gave them

6          the original price?

7    A.    No, sir.  When I give a price, it's

8          non-negotiable.

9    Q.    But you don't know about other contractors?

10   A.    I don't know about other contractors.

11   Q.    Okay.  Did you understand any of the details

12         behind the payments listed on page 108 of this

13         Exhibit 31?

14   A.    I don't understand that really.

15   Q.    Did you ever try to talk to any contractor

16         about whether they could make the job work

17         using these payments?

18   A.    No, sir.

19   Q.    Why not?

20   A.    I didn't see where that was sufficient money

21         at all for anybody to work on.

22   Q.    But you never discussed it with anybody?

23   A.    I never discussed it with them, no, sir.

## FREEDOM COURT REPORTING

Page 40

```
1    Q.   Didn't even try?

2    A.   No, sir.

3    Q.   And the only thing you say is that you didn't

4         think that was sufficient money?

5    A.   It wasn't sufficient money, is my opinion.

6    Q.   Okay.

7    A.   It would have been an insult to a contractor,

8         in my -- in my opinion.

9    Q.   And that's why you never did it?

10   A.   Yes, sir.

11   Q.   Any other reason?

12   A.   Like I say, my wife handles those matters.

13   Q.   Okay.  So you thought it would be an insult to

14        offer somebody $16,000 to --

15   A.   To furnish material and do the work?  Yes,

16        sir, I did.

17   Q.   Okay.  Did you ever discuss with anybody

18        whether the bathrooms could be cleaned rather

19        than replace --

20   A.   No, sir.

21   Q.   -- the fixtures?

22   A.   No, sir.

23   Q.   You put an acoustical ceiling in the living
```

1                           REPORTER'S CERTIFICATE

2

3   STATE OF ALABAMA

4   HOUSTON COUNTY

5

6           I, Sherry McCaskey, Certified Court Reporter

7   and Commissioner for the State of Alabama at Large,

8   hereby certify that I reported the TESTIMONY AND

9   PROCEEDINGS in the matter of the foregoing cause, and

10  that all contain a true and accurate transcription of

11  said proceedings.

12          I further certify that I am neither kin nor

13  of counsel to the parties to said cause, nor in any

14  manner interested in the results thereof.

15

16

17

18

19              *Sherry McCaskey*

20              SHERRY McCASKEY, CCR
                Commissioner for the
21              State of Alabama at Large

22              CERTIFIED COURT REPORTER NO.:   230

23

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

1

1   IN THE UNITED STATE DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF ALABAMA
2                SOUTHERN DIVISION
3   BILLY WILLIAMS and          )
    TERESA WILLIAMS,            )
4                               )
         Plaintiffs,            )
5                               )
    VS.                         ) CASE NO. 1:07-CV-549-WHA
6                               )
    BALBOA INSURANCE COMPANY,   )
7                               )
         Defendant.             )
8

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

9

10              ORAL DEPOSITION OF

11              TANCY NELSON

12              March 12, 2008

13              Volume 1

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

14

15      ORAL DEPOSITION OF TANCY NELSON, produced as a
16  witness at the instance of the PLAINTIFFS, and duly
17  sworn, was taken in the above-styled and numbered cause
18  on the 12th day of March, 2008, from 10:05 a.m. to
19  2:52 p.m., before Tonie Thompson, Certified Shorthand
20  Reporter in and for the State of Texas, reported by
21  machine shorthand, at the offices of U.S. Legal Support,
22  located at 5910 North Central Expressway, Suite 100,
23  Dallas, Texas 75206, pursuant to the Federal Rules of
24  Civil Procedure and the Provisions stated on the record
25  or attached hereto.

PLAINTIFF'S
EXHIBIT
3

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of: TANCY NELSON

3/12/2008

37

1    Enterprise, Alabama, area would have more knowledge than

2    you about the cost of labor and materials in that area?

3            MR. MORRISSETTE:  Object to the form.

4        A.    We have the -- we have our estimating program

5    to run our numbers and our prices.

6        Q.    (BY MR. TALMADGE)  Okay.  I'm going to ask the

7    question again.  Do you think that a contractor that

8    works in the Enterprise, Alabama, area would have more

9    knowledge than you, Ms. Nelson, about the cost of labor

10   and materials in the Enterprise, Alabama market?

11           MR. MORRISSETTE:  Object to the form.

12       A.    I don't know.

13       Q.    (BY MR. TALMADGE)  Okay.  You mentioned that

14   there are local prices that are somehow input into this

15   computer system, and the reason that you know that is

16   somebody told you that, correct?

17       A.    Correct.

18       Q.    Who is the person that inputs the pricing?  Who

19   is that person?

20       A.    I do not know.

21       Q.    If I wanted to know who that was, who would I

22   ask?  Where would I go to ask him questions about how he

23   arrived at his information?

24       A.    I don't know.

25       Q.    Over the course of your claims adjusting

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

38

1    career, have you ever looked at one of these printouts

2    from a computer software program and felt like it was

3    wrong?

4          A.   Yes.

5          Q.   What did you do when you felt like it was

6    wrong?

7          A.   Contacted the firm, the independent adjusting

8    firm.

9          Q.   And what happened?

10         A.   And requested them to revise it or reinspect

11   the property.

12         Q.   How many occasions did that happen since you've

13   been an adjuster?

14         A.   I couldn't tell you.  Several.

15         Q.   Has it be more than ten times?

16         A.   Yes.

17         Q.   And when I use the word "fair," I'm talking

18   about fair from the standpoint of the homeowner, where

19   you felt like this amount for materials or for labor is

20   not fair to the homeowner.

21              MR. MORRISSETTE:  Object to the form.

22         Q.   (BY MR. TALMADGE)  Have there been occasions

23   where you felt that an item in a computer software

24   program was not fair to the homeowner?

25              MR. MORRISSETTE:  Object to the form.  You

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

39

1    mean an item in the computer software or an item in the

2    estimate she received?

3        Q.    (BY MR. TALMADGE)  Well, aren't they one in the

4    same, Ms. Nelson?

5        A.    Can you rephrase the question?

6        Q.    What I'm getting at is:  It's my understanding

7    that, as an inside claims adjuster, what happens is you

8    send the outside adjuster out and he figures out what he

9    thinks the damage is and punches in material.  And

10   there's a computer program that spits out a price for

11   that material.

12           The outside adjuster doesn't go to Lowes

13   or Wal-Mart or Townsend Building Supply to get prices.

14   The computer gives it to him, right?

15       A.    Yes.

16       Q.    Okay.  And so what I'm concerned about is the

17   computer giving the adjuster a price that is unfair, in

18   your opinion, to the homeowner.  That's what I'm asking

19   about.

20           MR. MORRISSETTE:  Object to form.

21       Q.    (BY MR. TALMADGE)  Have there been occasions

22   where you felt prices contained in a estimate generated

23   by this computer software were unfair to the homeowner?

24           MR. MORRISSETTE:  Object to the form.

25       A.    Yes.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

40

1      Q.   (BY MR. TALMADGE)  And how many times has that

2   occurred, in your opinion?

3      A.   A few.  Several.  I couldn't tell -- I couldn't

4   tell you how many times.

5      Q.   Was it more than ten times?

6      A.   I'm sure it has been.

7      Q.   Was it more than twenty times?

8      A.   I'm sure it has been.  I've handled a lot of

9   claims.  I couldn't give you numbers on exactly how many

10  times I've disputed an estimate or not.

11     Q.   But you can remember having done that and you

12  can remember having contacted the outside adjuster and

13  brought that to their attention; is that correct?

14     A.   Yes, yes.

15          MR. MORRISSETTE:  Object to form.

16     Q.   (BY MR. TALMADGE)  And you can remember times

17  where the outside adjuster bumped up the cost reflected

18  in his estimate based on a phone call from you?

19          MR. MORRISSETTE:  Object to the form.

20     A.   That he's revised his estimate.  I can't

21  specifically say that he's upped his pricing on

22  something.

23     Q.   (BY MR. TALMADGE)  Well, in what other way

24  would he revise it?  I'm confused about that.  My

25  question was about pricing.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

49

```
 1    lender-placed insurance?

 2        A.   Yes.

 3        Q.   Is that all that they do?

 4        A.   No.

 5        Q.   What all kind of work does Balboa do?

 6             MR. MORRISSETTE:  Object to the form.

 7        A.   I don't know everything, but I know that we do

 8    lender-placed, homeowner's, auto, I think -- yeah.

 9    That's all I know off the top of my head.

10        Q.   (BY MR. TALMADGE)  Where is Balboa based?

11    Where is their home office?

12        A.   We work out of two facilities:  One in Plano --

13    well, they're both considered Plano.  Sorry.  Both

14    facilities are in Plano.

15        Q.   So the principle office for Balboa is in Texas,

16    correct?

17        A.   Yes.

18        Q.   Now, were you given training by Balboa as to

19    how to deal with adjusting a claim under a lender-placed

20    policy?

21        A.   Yes.

22        Q.   Were you given training by Balboa as to

23    adjusting a claim under a homeowner's policy that's not

24    lender-placed?

25             MR. MORRISSETTE:  Object to form.
```

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

59

1      A.    Yes.  It is a computer screen.

2      Q.    Is that the HCCS screen, or is that something

3 different?

4      A.    That is the HCCS screen.

5      Q.    Okay.  And there are several pages behind that

6 going -- it looks like going through 46.  Does that

7 appear to be similar?

8      A.    Yes, sir.

9      Q.    Are those all HCCS screens?

10     A.    Yes, sir.

11     Q.    Okay.  And then beginning at 27, the typing

12 looks a little different -- maybe not.  Is that on 27,

13 an HCCS screen?

14     A.    No, sir, it's not.  It's the diary.

15     Q.    That's your claim diary?

16     A.    Yes, sir.

17     Q.    So that starts on 27 and continues on all the

18 way to 37.

19     A.    Yes, sir.

20     Q.    Okay.  So tell me when you first became aware

21 that the Williams' were not additional insureds under

22 the policy.

23     A.    At the beginning of the claim, we look at the

24 HCCS screen.

25     Q.    Okay.  And what did it say?

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

60

1       A.   It gave the amount of the 31,000 for the

2    secured balance, 31,951.07.

3       Q.   Okay.  And what were the policy limits?

4       A.   32,311.

5       Q.   If the policy limits were higher than the

6    secured balance, then why wouldn't the Williams' have

7    been additional insureds at that time?

8       A.   Because we don't know if the loss exceeds the

9    policy limit.

10      Q.   Okay.  Assuming at that time that the loss did

11   exceed the policy limit, would the Williams' have been

12   additional insureds on that date?

13           MR. MORRISSETTE:  Object to form.

14      A.   I wouldn't have -- I wouldn't have assumed.

15   I'm just -- I would have gone by the amounts that were

16   shown to me, and then until I got the estimate, that's

17   when a determination would have been made.

18      Q.   (BY MR. TALMADGE)  So it was possible, then, at

19   the time that you opened the claim, that the Williams'

20   could have possibly been additional insureds under

21   certain circumstances --

22           MR. MORRISSETTE:  Object to --

23      Q.   (BY MR. TALMADGE)  -- depending on the extent of

24   the loss?

25           MR. MORRISSETTE:  Object to the form.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

61

1       A.   At that -- everything that I reviewed that day

2   showed me that all -- at that point, they were just

3   borrowers, until I received different information.

4       Q.   (BY MR. TALMADGE)  In other words, you didn't

5   know, though; you didn't know one way or the other

6   because you didn't --

7               MR. MORRISSETTE:  Same objection.

8       Q.   (BY MR. TALMADGE) -- because you didn't know

9   how bad the loss was at that time?

10      A.   But given the information that I had, it was --

11  they were borrowers at this time.

12      Q.   What information was that?

13      A.   The fact the secured -- the secured balance

14  didn't -- I mean, at this point, it's, as the policy

15  states, that the borrowers is an additional insured,

16  until the residual amount is over and above the

17  insurable interest.

18               At this point, I didn't -- I don't have

19  anything showing that it was, that the loss exceeded the

20  policy limits or the --

21      Q.   Right.

22      A.   -- insurable interest.

23      Q.   You did not -- what did you know about the

24  loss?

25      A.   At that point, nothing.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

62

1      Q.    Well, how could you know how bad it was?

2      A.    I didn't know how bad it was.

3      Q.    The loss could have been a $50,000 loss, or it

4   could have been a $10,000 loss, for all you knew, at the

5   time?

6           MR. MORRISSETTE:  Object to the form.

7      A.    Right.  But I don't -- on my claims handling, I

8   don't pick up every claim and assume that until I'm

9   given facts.  And the facts at this point, I did not

10  know if -- how bad the estimate or damage was.

11          So at this point -- at this point of the

12  claim, they were only borrowers.

13     Q.    (BY MR. TALMADGE)  So they were assumed by you

14  to be borrowers and not additional insureds until proven

15  otherwise?

16          MR. MORRISSETTE:  Object to the form.

17     A.    They're borrowers until it's shown through the

18  information that we find if there is a residual amount.

19     Q.    (BY MR. TALMADGE)  At what point do you, as a

20  claims adjuster, owe a duty to the borrower in a lender-

21  placed policy?

22          MR. MORRISSETTE:  Object to the form;

23  calls for a legal conclusion.

24          THE WITNESS:  Do I still answer it?

25          MR. MORRISSETTE:  You can answer it, if

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

67

1    copied to Billy Williams?

2        A.    Yes.

3        Q.    And does that letter, again, refer to

4    Billy Williams as an insured?

5        A.    Yes, it does say that.

6        Q.    And I'm sorry to skip around like this, but

7    going back to the first letter we talked about, which is

8    at Balboa 107 and 108.

9        A.    Yes, sir.

10       Q.    On page 108, does it appear that that letter

11   was sent to Billy Williams as well?

12       A.    Yes.

13            THE WITNESS:  Do I need to explain that

14   this letter is a template?

15            MR. MORRISSETTE:  No.

16            (Sotto voce conversation between

17            Mr. Morrissette and the Witness.)

18       Q.    (BY MR. TALMADGE)  How did you first become

19   involved with the claim that's at issue in this case?

20       A.    It was assigned to me.

21       Q.    And how did that happen?

22       A.    Through our by Picasso system.

23       Q.    Is it just a random assignment?

24       A.    Yes, it is.

25       Q.    And what date did you get the assignment?  And

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

68

1      feel free to refer to your claim notes, or any documents

2      that you want to, in Plaintiffs' 1.

3           A.   It appears on February 8th, 2006.

4           Q.   And on February 8th, 2006 -- are you looking at

5      Balboa No. 27?

6           A.   Yes, sir, I am.

7           Q.   Okay.  And that is your claim notes.  Tell me

8      what you did, if anything, to open the file and begin

9      your work on this case.

10          A.   I contacted the borrower and assigned out

11     Cunningham Lindsey to inspect the property.

12          Q.   Why did you pick Cunningham Lindsey?

13          A.   I don't remember.

14          Q.   Do you know where the Cunningham Lindsey office

15     was located that you picked?

16          A.   No, sir, I don't.

17          Q.   Would it be your typical practice to try to

18     pick an outside adjusting company closest to the loss

19     geographically?

20          A.   We had a list for each state, and then we would

21     just choose off that.

22          Q.   Okay.  So for this case, there would have been

23     a list for Alabama?

24          A.   Yes.

25          Q.   And Cunningham Lindsey would have been on that

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

69

1    list, and that's the list you picked them off of?

2        A.    Yes.

3        Q.    Now, the outside adjuster that actually went

4    out to the property was David Toellner, right?

5        A.    Yes, sir.

6        Q.    Now, did you pick him, or did Cunningham

7    Lindsey pick him?

8        A.    Cunningham Lindsey did.

9        Q.    Did you know Dave Toellner before this time?

10        A.    No.  I don't know if I've ever had a claim with

11    him.  I don't recall it, but --

12        Q.    Do you know him now?

13        A.    No.  I don't know him.

14        Q.    Have you talked to him about this case?

15        A.    No.

16        Q.    Have you talked to him at all since this

17    lawsuit has been filed?

18        A.    No, sir, I haven't.

19        Q.    Do you know anything about his background?

20        A.    No, sir, I don't.

21        Q.    Do you know if he has any background at all in

22    the construction industry?

23        A.    No, sir, I don't.

24        Q.    All right.  You mentioned that you had a -- did

25    you call the Williams'?

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

112

1    supplemental estimate from Cunningham Lindsey?

2        A.   It doesn't appear that way.

3        Q.   Going back to your diary -- and I hate to keep

4    jumping around, but I'm trying to stay on topic

5    somewhat -- Balboa 34.  And it looks like you're just

6    noting in your file your pending supplement estimate

7    from the adjuster --

8        A.   Yes.

9        Q.   -- on August 24th?

10       A.   Yes.

11       Q.   And it's still pending on September the 25th.

12            So our last correspondence with

13   Cunningham, by report, had been in August, I believe.

14   Wasn't that the last update report you got?

15       A.   Yes.

16       Q.   And so still, even after getting that update

17   report on September 25th, you still hadn't gotten the

18   estimate, correct?

19       A.   Yes.

20       Q.   And when you look back at the date that you

21   assigned the claim to Cunningham Lindsey for the

22   reinspection, wasn't that May 10th?

23       A.   Yes.

24       Q.   And so now this has been more than four months,

25   and you have gotten no supplemental estimate; isn't that

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of: TANCY NELSON

3/12/2008

113

1    correct?

2    A.    Yes.

3    Q.    Don't you think four months is an unreasonable

4    period of time for Cunningham Lindsey to have completed

5    their work in?

6            MR. MORRISSETTE:  Object to form.

7    A.    I wish we would have gotten it earlier, or

8    sooner.

9    Q.    (BY MR. TALMADGE)  That period of time was not

10   a reasonable period of time, was it?

11           MR. MORRISSETTE:  Object to form.

12   A.    It should have been sooner.

13   Q.    (BY MR. TALMADGE)  Okay.  Do you think

14   Cunningham Lindsey was careless in the way that they

15   conducted themselves after you sent the reinspection

16   request?

17           MR. MORRISSETTE:  Object to form.

18   A.    I wish they would have been more prompt.

19   Q.    (BY MR. TALMADGE)  Do you think they were

20   careless?

21           MR. MORRISSETTE:  Same objection.

22   A.    I mean, I thought that I answered that

23   question, just saying that I wish they would have been

24   more prompt.

25   Q.    (BY MR. TALMADGE)  Well, my question was, Do

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of: TANCY NELSON

3/12/2008

114

1    you think they're careless, not did you think they were

2    prompt.  Do you think they were careless?

3            MR. MORRISSETTE:  Same objection.

4    A.   I wouldn't say careless.

5    Q.   (BY MR. TALMADGE)  Do you think they were

6    unprofessional?

7            MR. MORRISSETTE:  Object to form.

8    A.   I would -- I thought that they were untimely.

9    Q.   (BY MR. TALMADGE)  But not unprofessional?

10           MR. MORRISSETTE:  Same objection.

11    A.   No.  I just thought they were untimely.

12    Q.   (BY MR. TALMADGE)  Okay.  It looks like you

13    sent an e-mail, again, on Balboa No. 34, that on

14    September 25th, '06, you sent another e-mail to

15    Cunningham Lindsey, right?

16    A.   Yes.

17    Q.   And so you were continually prompting them to

18    do their job; were you not?

19    A.   I was requesting the supplement.

20    Q.   That's the second e-mail you had to send to

21    them about it, right?

22    A.   Yes.

23    Q.   After they got that second e-mail, did they

24    finally do their job?

25           MR. MORRISSETTE:  Object to the form.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

134

1      Q.   Isn't it true that you closed this claim file

2   without ever having seen the itemization that was

3   prepared by the contractor named Eric Deanman

4   (phonetic)?

5      A.   Yes.

6      Q.   Did you know that such a document existed; that

7   he had -- he had gone in on a document generated by

8   Cunningham Lindsey, that appears to have been generated

9   by the computer software program, and wrote in the

10  various prices for different work that needed to be

11  done.  Do you know he did that?

12     A.   No, sir, I didn't.

13     Q.   Okay.  Do you know that he did it now?

14     A.   I do now.

15     Q.   And when did you find it out; today?

16     A.   Today.

17     Q.   Okay.  Well, if you had known that Mr. Deanman

18  went in and itemized all his work and put prices down by

19  that, is that a document that you would have liked to

20  have had before making the final decision on this claim?

21     A.   I would have liked to have seen it, yes.

22     Q.   Would you have considered that in your

23  adjustment of this claim?

24     A.   I would have had to look at the document.

25     Q.   Okay.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON
3/12/2008

135

```
 1        A.   I would have considered it.

 2             MR. TALMADGE:  Okay.  Henry, there is a

 3   document there that I sent to the court reporter, and it

 4   has a blue piece of paper on it that says either Dave

 5   Toellner documents or Cunningham Lindsey documents?

 6             MR. MORRISSETTE:  Yes.

 7             MR. TALMADGE:  Okay.  Could I mark that

 8   one as Plaintiffs' No. 2, please, just a collective.

 9             MR. MORRISSETTE:  The whole thing?

10             MR. TALMADGE:  Yes.  The whole thing.

11             MR. MORRISSETTE:  Yes.

12             (Deposition Exhibit No. 2 marked.)

13             MR. MORRISSETTE:  Can I run to the

14   restroom right quick?

15             MR. TALMADGE:  Yeah.  Sure.

16             MR. MORRISSETTE:  I'll be right back.

17             THE WITNESS:  Oh, w hat am I supposed to

18   be looking at?  I don't know where we're at.  Sorry.

19             MR. MORRISSETTE:  Anyway, you can stay

20   there.

21             MR. TALMADGE:  We're off the record.

22             (Recess taken from 1:59 p.m. to 2:03 p.m.)

23             THE WITNESS:  Just for clarification, I

24   knew that the adjuster, the independent adjuster

25   received an itemized estimate.  I was not aware that it
```

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

137

1      A.   No, it was not.

2      Q.   Okay.  Now, I believe you told me that you

3  closed the claim on the 26th of September.  And so in

4  going back -- going back in time, the claim was

5  initially reported to you, I believe, on February the

6  8th, because that's your first diary entry; is that

7  true?

8      A.   Can you repeat your question, and what -- what

9  Bates number I'm supposed to be looking at?

10     Q.   Yeah.  I apologize.

11     A.   That's okay.

12     Q.   I was just trying to put a beginning period on

13  the start of your claims handling, and then an end

14  period.  That's what I was trying to do.

15     A.   Okay.

16     Q.   And on Balboa No. 28, it looks like that your

17  claims handling, as we've discussed, started on February

18  the 8th of '06.

19     A.   Yes.

20     Q.   And then if we look on Balboa No. 36, it looks

21  like your claim handling was over by September 26th of

22  '06.

23     A.   Yes.

24     Q.   So is that claims handling activity

25  approximately six to seven months long on this case?

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

138

1    A.   Yes.

2              MR. MORRISSETTE:  Object to form.

3              You can answer.

4    Q.   (BY MR. TALMADGE)  Do you believe that it

5    should have taken six to seven months to properly handle

6    this claim?

7              MR. MORRISSETTE:  Object to the form.

8    A.   I think it took -- it did take that long.  I

9    would have liked to have gotten the estimate, the

10   supplemental estimate earlier; however, it did take the

11   amount of time it took.

12   Q.   (BY MR. TALMADGE)  Do you think that six to

13   seven months is an unreasonably long period of time

14   within which to adjust and settle a claim such as this

15   claim?

16             MR. MORRISSETTE:  Object to form.

17   A.   Do I think -- can you repeat the question

18   again?  I'm sorry.

19   Q.   (BY MR. TALMADGE)  Do you think that a six- to

20   seven-month period of time is an unreasonably long

21   period of time for you to have taken to adjust and

22   settle this claim?

23             MR. MORRISSETTE:  Object to form.

24   A.   Well, we actually -- I guess you're considering

25   when it was actually closed versus our initial payment,

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

154

1    is:  Did the Williams' have any rights whatsoever in

2    this policy that we're here about today?

3                MR. MORRISSETTE:  Object to form.

4        A.    What do you mean by "rights"?  What do you

5    mean?

6        Q.    (BY MR. TALMADGE)  Well, any rights under the

7    policy at all, any benefits that flowed to them as a

8    result of the policy.

9        A.    Only if their --

10               MR. MORRISSETTE:  Object to form.

11       A.    Only if the residual amount -- the same thing

12   that we read.

13               MR. MORRISSETTE:  Let her finish her

14   answer.

15       Q.    (BY MR. TALMADGE)  Go ahead.

16       A.    I was just going to say, the same thing that

17   we've read two or three times, the insuring agreement.

18       Q.    Okay.  Do you think that the amount that Balboa

19   pays to the mortgage company, in settlement of a claim

20   under this policy, has any effect whatsoever on the

21   borrower?

22       A.    What do you mean?

23       Q.    Well, I don't know how to fix that question.

24               Do you think that the amount that Balboa

25   pays to the lender, in settlement of this claim, has any

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

155

1    effect on the borrower?

2        A.   I'm sure it does.

3        Q.   What kind of effect does it have?

4        A.   On how it's -- on if they get the repairs done

5    or not.

6        Q.   Exactly.  And in this case, if they can live in

7    their house or not, right?

8            MR. MORRISSETTE:  Object to form.

9        Q.   (BY MR. TALMADGE)  Isn't that right?

10       A.   Yes.

11           MR. TALMADGE:  Ms. Nelson, thank you for

12   your time today.  That's all the questions I have.

13           But before I kind of sign off, I would

14   like to mark as Plaintiffs' Exhibit No. 3 the February

15   25th, 2006 estimate that we discussed earlier, with the

16   understanding that it contains a notation from Henry's

17   office that will be redacted off if the document is used

18   at trial.

19           (Deposition Exhibit No. 3 marked.)

20           I would also, you know, just for purposes

21   of good housekeeping, with respect to the documents

22   we've been referring to today as Plaintiffs' Exhibit

23   No. 1, all those documents -- there's 115 documents.

24       Q.   (BY MR. TALMADGE)  Were those documents made

25   and kept in the ordinary course of business by Balboa

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

156

```
 1    Insurance Company?
 2         A.   Yes, sir.
 3         Q.   And is it the regular and routine practice of
 4    Balboa Insurance Company to make and keep records such
 5    as those contained in Exhibit 1?
 6         A.   Yes, sir.
 7         Q.   And were the records themselves generated, or
 8    made, at or near the time of the events recorded in the
 9    records?
10         A.   If the copy here -- I'm sorry, could you --
11         Q.   The documents I'm referring to are Plaintiffs'
12    Exhibit No. 1.  There's 115 documents that we've been
13    going through all day today.
14         A.   There's only 93 on here.
15              MR. MORRISSETTE:  I'm sorry.  What did you
16    look at?  Oh, you're looking at the wrong stack.  This
17    is --
18              THE WITNESS:  Oh.  No, it says Exhibit 1.
19              MR. MORRISSETTE:  Unless we're missing
20    some, or they're out of order.
21              THE WITNESS:  Are they out of order?
22              MR. MORRISSETTE:  I don't know.
23              THE WITNESS:  Oh, here's -- here they are.
24              MR. MORRISSETTE:  We found them.
25              THE WITNESS:  What number is it?
```

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON                    3/12/2008

157

1              MR. TALMADGE:  Henry, do I need to go

2     through this again with Plaintiffs' Exhibit No. 1?  Are

3     they the business records of Balboa --

4              MR. MORRISSETTE:  I don't think that we

5     dispute that this is a copy of our claim file.

6              MR. TALMADGE:  Okay.

7         Q.   (BY MR. TALMADGE)  And that is it made and kept

8     in the ordinary course of business?

9         A.   Correct.

10        Q.   Okay.  And that it is the regular and routine

11    practice of Balboa to make and keep records such as

12    those contained in Exhibit 1?

13        A.   Yes, sir.

14        Q.   And that the records themselves were made at or

15    near the time of the events that are recorded in the

16    records?

17        A.   Yes, sir.

18        Q.   And that Plaintiffs' Exhibit 1 are the business

19    records of Balboa Insurance Company, right?

20        A.   Are there records of Balboa?  Yes.

21        Q.   Yeah.  Those are your business records --

22        A.   Yes.

23        Q.   -- right?

24        A.   Yes.

25        Q.   Okay.  All right.

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of:  TANCY NELSON

3/12/2008

166

1    deposition officer at the time said testimony was taken,
2    the following includes counsel for all parties of
3    record:
4        Mr. Dan T. Talmadge, Attorney for Plaintiffs;
         Mr. Henry T. Morrissette, Attorney for Defendant.
5
6        I further certify that I am neither counsel for,
7    related to, nor employed by any of the parties or
8    attorneys in the action in which this proceeding was
9    taken, and further that I am not financially or
10   otherwise interested in the outcome of the action.
11       Further certification requirements pursuant to Rule
12   203 of TRCP will be certified to after they have
13   occurred.
14       Certified to by me this 13th day of March,
15   2008.
16
17       Tonie Thompson
18       Tonie Thompson
         Texas CSR Number 8348
19       Expiration Date:  12/31/08
         U.S. Legal Support, Inc.
20       Firm Registration No. 343
         5910 North Central Expressway
21       Suite 100
         Dallas, Texas 75206
22       Phone: (214)741-6001
         Fax: (214)741-6821
23       www.uslegalsupport.com
24
25

# COPY CERTIFICATION BY DOCUMENT CUSTODIAN

State of    California

County of    Orange

I,    Lawrence Serdenia    , hereby declare that the attached reproduction of

GMAC Mortgage, LLC Fire Insurance Policy
Description of Original Document

is a true, correct, and complete photocopy of a document in my possession or control.

*Serdenia*
Signature of Custodian of Original Document

3349 Michelson Drive, Suite 200

Irvine, CA 92612-8893

Subscribed and sworn to before me this    14th    day of    June    , 2007 by

Lawrence Serdenia

personally known to me ~~or proved to me on the basis of satisfactory evidence~~ to be the person(s) who appeared before me.

Signature of Notary Public

FLORENCE DIEP
Commission # 1603339
Notary Public — California
Orange County
My Comm. Expires Sep 26, 2009

## Further Description of Attached Document

Title or Type of Document:    Lender's Protection Fire Insurance Policy

Document Date:    7/30/04    Number of Pages:    20

Signer or Issuing Agency:    n/a

Capacity Claimed by Custodian: Individual Trustee

Custodian is Representing:    n/a

**Balboa  00001**
Re: Williams v. Balboa

**Lender's Protection  (Fire Insurance)**

Re:     **Billy and Teresa Williams**
           **678 CO Road 620, Enterprise, AL 36330**
           **Cert #: GM7136890**
           **Loan #: 0833002922**

The following forms are enclosed for your reference. Please note that coverage is not provided for your personal property or personal liability. Also, flood and earthquake are excluded.

| | |
|---|---|
| 01A09-MFDE0001-E1103 | Declaration |
| 01A09-MFMP0001-E1103 | Fire Insurance Policy Insert Endorsement |
| 01A09-MFPO0001-E1103 | Residential Property Fire Insurance Form |
| 01A09-MFPO0002-E1103 | Commercial Property Fire Insurance Form |
| 01A09-MFEN0001-E1103 | Unacceptable Risk Endorsement |
| F292E-R0894 | Automatic Coverage Endorsement |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

**Balboa  00002**
Re: Williams v. Balboa

(PM7\MF1F\01A09MFDE0001E1103)

STK# 00 0000

### FIRE INSURANCE MASTER POLICY
### DECLARATIONS PAGE

## BALBOA INSURANCE COMPANY
(a stock company)
Home Office
3349 Michelson Drive, Suite 200, Irvine, CA 92612-8893

### POLICY NUMBER  6043-0002

**Item 1.    NAMED INSURED:**

Name:  GENERAL MOTORS ACCEPTANCE CORP. MORTGAGE    Agent: Gen. Motors Acceptance Corp. Mortgage

Street:  100 Witmer Road                                           Street:  100 Witmer Road

City, State, Zip:  Horsham, PA 19044                     City, State, Zip: Horsham, PA 19044

                                                                                      Agent Code: 60

**Item 2.    POLICY PERIOD**

| FROM: Month  Day  Year | TO: Month  Day  Year |
|---|---|
| 10/01/04 | UNTIL CANCELLED |

12:01 A.M. standard time at the address of the Named Insured

**Item 3. COVERAGE:** Coverage on residential and commercial properties shall be subject to The Fire Insurance Master Policy, the Residential Property Fire Insurance Form and the Commercial Property Fire Insurance Form, which is made part of this Policy. This coverage applies to direct physical loss or damage by the peril insured against to real property. No coverage is provided for contents, personal effects, additional living expense, fair rental value or liability. NO COVERAGE IS PROVIDED UNDER THIS MASTER POLICY FOR LOSS CAUSED BY EARTHQUAKE OR FLOOD or any other cause of loss that is excluded by the Residential Property Fire Insurance Form or the Commercial Property Fire Insurance Form under which coverage is provided.

**Item 4.    PREMIUM:** The premium rates shall be computed as directed by the company.

**Item 5.    MAXIMUM AMOUNT OF INSURANCE:**

| Types of Eligible Property | Maximum Amount of Insurance | |
|---|---|---|
| Residential Property | limits $  5,000,000 | / per described location |
| Commercial Property | limits $  5,000,000 | / per described location |

**Item 6.    ENDORSEMENTS:** The endorsements listed below are attached to and form part of this policy.
See Attached List

**Item 7.    DEDUCTIBLE:** The following deductibles shall apply to each and every loss reported hereunder:
See Attached Schedule

Date of Issue ____7/30/04____          Countersignature _____

                                                                          Authorized Representative

01A09-MFDE0001-E1103                              Page 1

Balboa  00003
Re: Williams v. Balboa

## Lenders Protection - Deductible Schedule
### Dwelling Fire Coverage

| | | Residential Occupied | Residential Vacant | Commercial Occupied | Commercial Vacant* | Comm. Vacant V&MM* | Status | Date Effective |
|---|---|---|---|---|---|---|---|---|
| 01 | Alabama | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 02 | Arizona | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 03 | Arkansas | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 04 | California | $500 | $750 | $1,000 | $1,000 | $5,000 | In Use | |
| 05 | Colorado | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 07 | Delaware | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 08 | District of Columbia | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 10 | Georgia | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 52 | Hawaii | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 12 | Illinois | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 13 | Indiana | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 14 | Iowa | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 16 | Kentucky | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 18 | Maine | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 19 | Maryland | $500 | $750 | $500 | $1,000 | | In Use | |
| 21 | Michigan | $500 | $750 | $500 | | | In Use | |
| 22 | Minnesota | $500 | $750 | $500 | $1,000 | | In Use | |
| 23 | Mississippi | $500 | $750 | $500 | | $5,000 | In Use | |
| 24 | Missouri | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 25 | Montana | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 26 | Nebraska | $500 | $750 | $500 | | $5,000 | In Use | |
| 27 | Nevada | $500 | $750 | | | $5,000 | In Use | |
| 28 | New Hampshire | $500 | $7 | | | $5,000 | In Use | |
| 29 | New Jersey | $500 | | $500 | | $5,000 | In Use | |
| 30 | New Mexico | $250 | | $1,000 | $1,000 | $5,000 | In Use | |
| 32 | North Carolina | $500 | | $500 | $1,000 | $5,000 | In Use | |
| 33 | North Dakota | | $750 | $500 | $1,000 | $5,000 | In Use | |
| 34 | Ohio | | $750 | | $1,000 | $5,000 | In Use | |
| 35 | Oklahoma | $250 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 36 | Oregon | $500 | | $500 | $1,000 | $5,000 | In Use | |
| 37 | Pennsylvania | | | $500 | $1,000 | $5,000 | In Use | |
| 39 | South Carolina | | | $500 | $1,000 | $5,000 | In Use | |
| 40 | South Dakota | | $750 | $500 | $1,000 | $5,000 | In Use | |
| 41 | Tennessee | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 42 | Texas | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 43 | Utah | $500 | $750 | $500 | $1,000 | $5,000 | In Use | |
| 44 | Vermont | $250 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 47 | West Virginia | $250 | $1,000 | $500 | $1,000 | $5,000 | In Use | |
| 48 | Wisconsin | $500 | $500 | $500 | $1,000 | $5,000 | In Use | |
| 49 | Wyoming | $500 | $500 | $500 | $1,000 | $5,000 | In Use | |

* deductible amount or 2%, whichever is greater

7/19/02

Balboa 00004
Re: Williams v. Balboa

(PM7\MF1F\01A09MFMP0001E1103)

STK# 00 0000

# FIRE INSURANCE MASTER POLICY

### Lenders Protection Program

### INSURING AGREEMENT

In consideration of the payment of the premium, and subject to all of the provisions of the policy forms issued under this Master Policy, WE agree to indemnify YOU or YOUR legal representatives for any amount that YOU may be entitled to recover as the result of a covered LOSS. The BORROWER shall be considered an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest.

### DEFINITIONS

Whenever used in this Master Policy, the following words shall have the meanings as shown herein:

"YOU", "YOUR", "YOURS" means the entity shown on the DECLARATIONS PAGE of this Master Policy, under the caption of "Named Insured," which has an interest in real property as the direct result of a mortgage, second mortgage, other lien instrument, or as the result of an agreement for the servicing of such contracts.

"WE", "US", "OUR" and "OURS" means the Company that underwrites this Insurance.

"COMMERCIAL PROPERTY" means the buildings identified as the DESCRIBED LOCATION in the EVIDENCE OF INSURANCE, which are designed and intended for business purposes, or designed, intended, or used for occupancy by five or more families.

COMMERCIAL PROPERTY includes additions, extensions, fixtures, machinery and other equipment attached to the building(s) for the support or service of that building. COMMERCIAL PROPERTY does not include:
1.  Land, including the land on which the COMMERCIAL PROPERTY is located;
2.  business inventory or supplies;
3.  business materials;
4.  records of any nature;
5.  animals;
6.  vehicles of any kind or use;
7.  outdoor signs, whether or not attached to the building structure;
8.  trees; shrubs; plants;
9.  outdoor swimming pools;
10. fences;
11. piers; wharves; docks;
12. beach or diving platforms and appurtenances;
13. retaining walls not constituting a part of the building;
14. walks; roadways and other paved surfaces;
15. foundations of buildings, machinery, boilers or engines that are below the surface of the ground or the undersurface of the lowest basement floor;
16. underground pilings, piers, pipes, flues and drains;

"DECLARATIONS PAGE" means page one of this Master Policy, which identifies, YOU, US and the effective date and time of coverage.

"DESCRIBED LOCATION" means the location named on an individual EVIDENCE OF INSURANCE issued under this Master Policy.

"EVIDENCE OF INSURANCE" refers to the form issued by US to the BORROWER as evidence of insurance purchased by YOU. An EVIDENCE OF INSURANCE form specifies the location, identity, and the amount and term of coverage for an individual RESIDENTIAL PROPERTY or COMMERCIAL PROPERTY that has been insured by US at YOUR request. The terms and conditions applying to the insurance referenced in an EVIDENCE OF INSURANCE may vary depending upon the forms approved by any individual state where the PROPERTY is located.

"LOSS" means direct, sudden and accidental physical damage to or theft of all or part of a covered PROPERTY.

01A09-MFMP0001-E1103

Balboa 00005
Re: Williams v. Balboa

(PM7\MF1F01A09MFMP0001E1103)                                                   STK# 00 0000

"PROPERTY" means either RESIDENTIAL PROPERTY as defined in the Residential Property Fire Insurance Form or COMMERCIAL PROPERTY as defined in the Commercial Property Fire Insurance Form, which is insured under the terms of this Master Policy.

"RESIDENTIAL PROPERTY" means the one to four-unit structure identified as the DESCRIBED LOCATION in the EVIDENCE OF INSURANCE, which is designed, intended, and used principally for dwelling purposes and structures attached to the dwelling.  Land, including the land on which the RESIDENTIAL PROPERTY is located, is not covered property.

## COVERAGE

Coverage is provided for direct and accidental physical damage to, or loss of, insured PROPERTY subject to the terms, coverage, exclusions and conditions of the specific fire insurance form issued to cover that PROPERTY.  No coverage is provided for contents, personal effects, additional living expense, fair rental value, land, liability for property damage, or liability for bodily injury, illness or death of anyone.

## PREMIUM

The premium charged will be computed in compliance with the rates used by the ~~Company~~ on the effective date of the subject EVIDENCE OF INSURANCE.

## SPECIAL PROVISIONS

1. **COVERAGE LIMITATION**
   Coverage under this Master Policy is limited to only ~~those mortgages~~ on any PROPERTY in which YOU have an insurable interest and which is reported to US no later than 60 days after the effective date of coverage on the individual PROPERTY.

2. **LIMITS OF RECOVERY**
   The maximum amount of coverage applicable to the insured hereunder shall be the amount of insurance purchased by YOU, as stated on the EVIDENCE OF INSURANCE, less the applicable deductible.  OUR settlement options will be specified in the fire insurance form applying to the RESIDENTIAL PROPERTY or COMMERCIAL PROPERTY.

3. **OTHER INSURANCE**
   Coverage under this Master Policy is provided for a specific PROPERTY at YOUR request, based upon YOUR belief that no other insurance acceptable to YOU is in force covering YOUR interest in the subject  PROPERTY.  If it is determined that other insurance acceptable to YOU is in force, WE will cancel the insurance on the PROPERTY referenced in the EVIDENCE OF INSURANCE on the effective date of the other insurance or the effective date shown on the EVIDENCE OF INSURANCE, whichever is the more current date, even if the other insurance is discovered after the date of loss.

   WE will make no payment for any loss that is covered by other insurance acceptable to YOU.  In no event shall this insurance apply on a pro-rata or contributing basis.

4. **TERMINATION**
   YOU may cancel this Master Policy at any time by giving written notice to US stating when, thereafter, such cancellation shall be effective.  WE may cancel this Master Policy by mailing a notice of cancellation to YOU at YOUR last address known to US at least thirty (30) days in advance of the date of cancellation .  This Master Policy shall cease at 12:01 A.M. (standard time) at YOUR address shown on the DECLARATIONS PAGE on the date of cancellation specified in the notice.

   If this Policy is cancelled, all in-force insurance on PROPERTY for which an EVIDENCE OF INSURANCE has been issued shall be cancelled concurrently unless the notice of cancellation states that the insurance referenced on the EVIDENCE OF INSURANCE will remain in effect.  If the Company gives notice that any such coverage on specific PROPERTY will remain in effect after cancellation of the Policy, the coverage on the specific PROPERTY will then remain in force until the expiration date of such insurance or until the insurance on the specific PROPERTY has been

01A09-MFMP0001-E1103

Balboa 00006
Re: Williams v. Balboa

(PM7WF1F01A09MFMP0001E1103)

STK# 00 0000

cancelled in compliance with the cancellation provisions applying to the specific PROPERTY, except that the Company reserves the right to cancel insurance referenced in any or all EVIDENCES OF INSURANCE upon at least ten (10) days' written notice if such cancellation is for non-payment of premium, or at least thirty (30) days' written notice if cancellation is for any reason other than non-payment of premium.

## 5. INSPECTION AND AUDIT

WE shall be permitted, at all reasonable times, to inspect the insured PROPERTY and to examine YOUR books and records insofar as those records pertain to any payments made because of any LOSS. This includes, but is not limited to, the right to review YOUR records for information about other insurance provided by the BORROWER and the net loan balance both at the time the insurance referenced on the EVIDENCE OF INSURANCE is effective and at the date of LOSS. This right shall remain in force until all insurance referenced on the EVIDENCES OF INSURANCE issued under this Master Policy have been cancelled or expired and for 12 (twelve) months thereafter. This right shall remain in force for 12 (twelve) months after each LOSS has been fully closed by payment or otherwise.

IN WITNESS WHEREOF,  Balboa _____ Insurance Company has caused this Master Policy to be signed by its President and Secretary, at Irvine, California and countersigned on the DECLARATIONS PAGE by OUR authorized representative.

SECRETARY                                    PRESIDENT

01A09-MFMP0001-E1103

Balboa  00007
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)

STK# 00 0000

## Residential Property Fire Insurance Form

## Lenders Protection Program

### INSURING AGREEMENT

In consideration of the premium paid, and subject to the limits of liability, exclusions, conditions and other terms contained in the Master Policy and this Residential Property Fire Insurance Form ("Residential Property Form"), we agree to indemnify YOU for a LOSS, to the extent of YOUR insurable interest in such LOSS. The BORROWER is an additional insured with respect to any residual amounts of insurance over and above YOUR insurable interest in the RESIDENTIAL PROPERTY.

### DEFINITIONS

Whenever used in this Form, the following words shall have the meanings as shown here

"YOU," "YOUR," and "YOURS" means the Named Insured shown under the DECLARATIONS PAGE of the Master Policy, under which the insurance on the DESCRIBED LOCATION has been and, which has an interest in the RESIDENTIAL PROPERTY described in the EVIDENCE OF INSURANCE as the direct result of a mortgage, second mortgage, other lien instrument, or an agreement for the servicing of such contracts.

"WE," "US," "OUR," and "OURS" means the Company that underwrites this insurance.

"ACTUAL CASH VALUE" means the amount it would cost to repair or replace the damaged property on the DATE OF LOSS with material of like kind and quality, subject to deduction for deterioration, depreciation or obsolescence, and contractor's overhead and profit. ACTUAL CASH VALUE applies to the valuation of property whether the property has sustained partial or total loss.

"BORROWER" means the person or entity identified as the BORROWER on the EVIDENCE OF INSURANCE.

"DATE OF LOSS" means the date on which a LOSS occurred.

"DECLARATIONS PAGE" means the DECLARATIONS PAGE of the Master Policy, which identifies the Named Insured and the policy period applying to the Master Policy.

"DESCRIBED LOCATION" means the location identified as the DESCRIBED LOCATION on the EVIDENCE OF INSURANCE.

"EVIDENCE OF INSURANCE" refers to the form issued by US to the BORROWER as evidence of insurance purchased by YOU. An EVIDENCE OF INSURANCE form specifies the location, identity, and the amount and term of coverage for the individual RESIDENTIAL PROPERTY that has been insured by US at YOUR request.  The terms and conditions applying to the insurance referenced in the EVIDENCE OF INSURANCE may vary depending upon the forms approved by any individual state where the RESIDENTIAL PROPERTY is located.

"FUNGI" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by fungi.

"LOSS" means direct, sudden and accidental physical damage to the RESIDENTIAL PROPERTY or OTHER STRUCTURES caused by an insured peril, or the theft of all or part of the covered RESIDENTIAL PROPERTY or OTHER STRUCTURES.

"OTHER STRUCTURES" means structures on the DESCRIBED LOCATION, which are separated from the dwelling structure by clear space or connected to the dwelling structure by only a fence, utility line or similar connection.  OTHER STRUCTURES do not include structures that are used or partially used for commercial, farming, or manufacturing purposes, or are rented or held for rental to any person not a tenant of the dwelling structure, unless used solely as a private garage. Land, including the land on which OTHER STRUCTURES are located, is not covered property.

01A09-MFPO0001-E1103

1

Balboa 00008
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                                    STK# 00 0000

"RESIDENTIAL PROPERTY" means the one to four-unit dwelling structure located at the DESCRIBED LOCATION, which is designed, intended, and used principally for dwelling purposes, and structures attached to the dwelling structure. Land, including the land on which the RESIDENTIAL PROPERTY is located, is not covered property.

"VOLCANIC EVENT" means loss caused by the blast or airborne shock waves, ash, dust, or flow of lava from the eruption of a volcano.

## OTHER COVERAGES

1. **Other Structures.** The policy provides coverage for OTHER STRUCTURES at the DESCRIBED LOCATION up to an amount equal to 10% of the RESIDENTIAL PROPERTY Limit of Liability shown on the EVIDENCE OF INSURANCE. This additional amount will not reduce the Limit of Liability on any other covered property.

2. **Debris Removal.** WE will pay YOUR reasonable expenses incurred for the removal of debris due to a LOSS covered by the Residential Property Form. This expense is included in the Limit of Liability that applies to the damaged property.

3. **Emergency Repairs.** In the event of a LOSS, WE will pay the reasonable cost incurred by the BORROWER or YOU for necessary repairs that are made solely to protect the RESIDENTIAL PROPERTY or OTHER STRUCTURES from further LOSS. This expense is included in the Limit of Liability that applies to the damaged property.

4. **Collapse.** WE will pay for LOSS to the RESIDENTIAL PROPERTY that results from the collapse of a building or any part of a building only if the collapse is caused by one or more of the following:
   a. hidden decay;
   b. hidden insect or vermin damage;
   c. weight of contents, equipment, animals or people;
   d. weight of rain that collects on a roof;
   e. use of defective material or methods in construction, remodeling or renovation if the collapse occurs during the course of construction, remodeling or renovation.

   Damage to an awning, fence, patio, pavement, underground pipe, swimming pool, flue, cesspool, septic tank, drain, foundation, retaining wall, bulkhead, pier, or dock is not covered under this coverage unless the damage is a direct result of the collapse of a structure. This coverage does not include settling, cracking, shrinking, bulging or expansion.

   This coverage does not increase the Limit of Liability shown on the EVIDENCE OF INSURANCE.

## INSURED PERILS AND GENERAL EXCLUSIONS

We insure YOU for LOSS. However, WE do not insure YOU for damage caused directly or indirectly by, or resulting from, any of the following perils. Such damage is excluded regardless of any other cause or event contributing concurrently or in any sequence to the damage:

a. Wear and tear, marring, deterioration, inherent vice, latent defect, freezing, rust, corrosion, neglect before or after a LOSS, mechanical or structural breakdown or failure, abusive use, or defective, faulty, or inadequate maintenance, design, construction, remodeling, planning, zoning, surveying or siting of the RESIDENTIAL PROPERTY or OTHER STRUCTURES (incomplete remodeling is considered defective, faulty or inadequate remodeling); If the ensuing loss is a sudden and accidental escape of water from a plumbing, heating or air conditioning system or household appliance, we cover loss caused by the water. We also cover the cost of tearing out and replacing any part of a building necessary to repair the system or appliance from which this water escaped. We do not cover loss to the system or appliance from which this water escaped.

b. Contamination, pollution, smog, smoke or vapors from agricultural or industrial operations;

01A09-MFPO0001-E1103                                    2

Balboa  00009
Re: Williams v. Balboa

(PM7WF1F\01A09MFPO0001E1103)                                                                STK# 00 0000

c.  Flood, meaning a general, temporary condition of complete or partial covering or inundation of normally dry land areas from:
    (1)  The overflow of tidal or inland water including streams, rivers or lakes; or
    (2)  The run-off or build-up of surface water from any source; or
    (3)  Mudslides or mudflows caused by the build-up of water on or under the ground; or
    (4)  The sinking, collapse or movement of land along the shore of a body of water, which results from undermining or erosion caused by waves, flow, or currents of water exceeding normal levels.
    Ensuing LOSS by fire or explosion will be covered;

d.  Water that backs up through or overflows from sewers, drains or sumps, however caused;

e.  Water below the surface of the ground or damage from the pressure exerted by such water, including its flow, seepage or leakage through foundations, walls, floors, basements, doors, windows, sidewalks, driveways, or any other opening;

f.  Earth movement caused by, resulting from, contributed to or aggravated by earthquake; landslide; the elevation, sinking, or shifting of land or soil, except a VOLCANIC EVENT, or unless direct damage by a fire or explosion ensues, in which case WE will pay only for the ensuing fire or explosion LOSS;

g.  War, whether declared or not, insurrection, revolution, civil war, rebellion, or any act by a military force or the personnel of any military force, seizure, destruction or use for a military purpose, including any consequence of any of these. The detonation or discharge of any nuclear weapon shall be deemed an act of war even if done accidentally;

h.  Nuclear reaction, radiation or radioactive contamination, or any consequence of any of these and LOSS caused by these shall not be considered LOSS by fire, explosion, or smoke, whether those perils be covered or not by the Residential Property Form;

i.  Collapse, settling, shrinking, cracking, expansion or bulging of pavements, foundations, floors, walls, ceilings, patios, walkways or driveways, except as may be provided under the "Loss Coverage" portion of the Residential Property Form;

j.  Freezing of any heating, ventilating, air conditioning system or any household appliance, or by the leakage, overflow or discharge from within the system or appliance caused by freezing during any period while the RESIDENTIAL PROPERTY or OTHER STRUCTURE is vacant, unoccupied or under construction unless YOU or the BORROWER have:
    1.  maintained heat in the building, or
    2.  turned off the water supply and drained water from the system and appliances;

k.  Freezing, thawing, or the pressure or weight of water, ice or snow, whether driven by wind or not, to a fence, pavement, patio, swimming pool, foundation, retaining wall bulkhead, pier, wharf or dock;

l.  Repeated seepage or leakage of water or steam over a period of time from a plumbing, heating or air conditioning system or any household appliance;

m.  Theft of any property not attached to or part of the RESIDENTIAL PROPERTY or OTHER STRUCTURE or theft of any part of the RESIDENTIAL PROPERTY or OTHER STRUCTURE while undergoing construction, remodeling or repair;

n.  Hail, ice, snow, sleet or wind to any outdoor antennas, dishes and aerials including their lead-in wiring, supports, towers and masts;

o.  Birds, insects, rodents, reptiles, animals, fish;

p.  FUNGI, wet or dry rot, viruses, bacteria, or pathogenic organisms, including spores, scents or by-products produced or released by any of these;

q.  Acts or decisions of any person, group, governmental body or organization, including the failure to act or decide;

01A09-MFPO0001-E1103                                    3

Balboa  00010
Re: Williams v. Balboa

(PM7WF1F/01A09MFPO0001E1103)

STK# 00 0000

r.   Power outage. Power outage means the interruption of power or other utility service if the interruption takes place away from the RESIDENTIAL PROPERTY. If an ensuing loss to the RESIDENTIAL PROPERTY results from the power outage, we will pay for such ensuing loss if it is not otherwise excluded by this policy.

s.   Ordinance or Law, meaning enforcement of any ordinance or law regulating the construction, repair or demolition of a building or OTHER STRUCTURE, except as provided for under the Residential Property Form.

t.   Under paragraphs a, i, j, k, l, m, n and o, any ensuing loss caused by any of these if not otherwise excluded in this policy, is covered.

## CONDITIONS

The following conditions apply to this Residential Property Form:

1.   Period of Coverage. The Residential Property Form applies only to LOSS that occurs during the coverage period shown on the EVIDENCE OF INSURANCE.

2.   Limit of Liability. No matter how many people or entities have an insurable interest in the RESIDENTIAL PROPERTY or OTHER STRUCTURES, WE shall not be liable for an amount greater than the interest of YOU and the BORROWER or for the amount of coverage requested by YOU, as shown on the EVIDENCE OF INSURANCE, less the applicable deductible.

OUR liability shall not exceed the least of the following, less the applicable deductible stated in the EVIDENCE OF INSURANCE:
a.   The Limit of Liability that applies to the damaged structure shown in the EVIDENCE OF INSURANCE;
b.   The cost to replace or repair the damaged or destroyed structure with material of like kind and quality, without deduction for depreciation, payable after replacement or repair is completed within a reasonable amount of time after the LOSS.

3.   Fraud or Concealment. WE will not provide coverage if YOU have intentionally concealed or misrepresented any material fact or circumstance relating to this insurance. WE will not provide coverage to the BORROWER for his/her interest in the property if the BORROWER has intentionally concealed or misrepresented any material fact or circumstance relating to this insurance.

4.   YOUR duties after LOSS. When a LOSS has occurred to which the Residential Property Form may apply, YOU and the BORROWER shall see that the following duties are performed:

a.   give US or OUR agent immediate notice of the LOSS;
b.   protect the property from further damage, make reasonable and necessary repairs required to protect the property, and keep an accurate record of the cost of such repairs;
c.   exhibit the damaged property to US or OUR representatives as often as WE reasonably require and submit to examination(s) under oath;
d.   submit to US, within 60 days after WE request, YOUR signed, sworn proof of loss, which sets forth, to the best of YOUR knowledge and belief:
(1)   the time and cause of LOSS;
(2)   YOUR interest and the interest of all others in the property and all encumbrances existing thereon;
(3)   the details of any other insurance which may cover the LOSS;
(4)   any changes in the title or occupancy of the property during the term referenced on the EVIDENCE OF INSURANCE;
(5)   specifications of the damaged property and detailed estimates for repair of the damage;

5.   Loss Settlement. A LOSS will be settled as follows:

a.   OTHER STRUCTURES, at ACTUAL CASH VALUE at the time of LOSS, but not exceeding the amount necessary to repair or replace;
b.   installed carpeting, covered domestic equipment or appliances, awnings, outdoor antennas and outdoor equipment, whether or not attached to a structure, at ACTUAL CASH VALUE at the time of LOSS but not exceeding the amount necessary to repair or replace;

01A09-MFPO0001-E1103                                                      4

Balboa 00011
Re: Williams v. Balboa

(PM7\MF1F\01A09MFPO0001E1103)                                               STK# 00 0000

   c.  The one to four-unit dwelling structure included in the RESIDENTIAL PROPERTY, at replacement cost without deduction for depreciation if repair or replacement has been completed within a reasonable time after LOSS; at ACTUAL CASH VALUE until such repair or replacement is completed.

6.  Pair or Set.  In settlement of covered damage to a pair or set, WE may elect to:
   a.  Replace or repair any part of the pair or set;
   b.  Pay the difference between the ACTUAL CASH VALUE of the pair or set before and after the loss.

7.  Replacement of Glass.  WE will pay to replace glass with safety glazing materials when required by ordinance or law.

8.  Appraisal.  If YOU and WE fail to agree on the amount of LOSS, either can make a written demand upon the other that the amount of LOSS be determined by appraisal.  Within 20 days of such written demand, each party shall select a competent and disinterested appraiser and notify the other of the appraiser selected.  The two appraisers shall then select a competent and impartial umpire.  If the appraisers do not agree on an umpire within 15 days, then, at the request of YOU or US, such umpire shall be selected by a judge of a court of record in the state where the RESIDENTIAL PROPERTY is located.  The appraisers shall then appraise the LOSS.  If the appraisers submit a written proof of agreement to US, the amount agreed upon shall prevail.  If the appraisers fail to agree, they shall submit their differences to the umpire within a reasonable time.  Written agreement signed by any two of these three shall be the amount used to settle the dispute.  The appraisal award shall be considered binding as to the amount of the LOSS.  WE shall pay all the expenses of OUR chosen appraiser, and YOU shall pay all the expenses of YOUR chosen appraiser.  Each party shall also pay for its own voluntarily-incurred expenses including, but limited to, attorney fees or expert witness fees. Any other expenses of the appraisal and the compensation of the umpire shall be paid equally by YOU and US.

9.  Other Insurance.  YOU and WE agree that the insurance provided under the Residential Property Form has been requested by YOU because YOU believe that no other coverage acceptable to YOU is in force to protect YOUR interest in the RESIDENTIAL PROPERTY.

Insurance under the Residential Property Form will automatically terminate on the effective date and time of any other policy or certificate of insurance acceptable to YOU.  WE shall not make any payment for any claim or LOSS if other insurance acceptable to YOU is in force on the DATE OF LOSS.

10.  Subrogation.  WE shall be subrogated to any rights YOU have to recovery against any person(s).  However, WE shall not exercise this right against the BORROWER.  WE may require an assignment of rights of recovery from YOU to the extent that payment is made by US.  If an assignment is sought, YOU and the BORROWER shall sign and deliver all related papers, and will otherwise cooperate with US and do nothing to impair OUR subrogation rights.

11.  Suit against US.  No action may be brought unless there has been compliance with the provisions of the Residential Property Form, and the action is started within one year after the DATE OF LOSS.

12.  Repair or Replacement Option.  WE may repair or replace any part of the damaged property with equivalent property if WE have given YOU or mailed to YOU at YOUR last known address, written notice of OUR intention to do so within 30 days after WE receive YOUR signed, sworn proof of loss.

13.  Loss Payment.  WE will adjust each LOSS with YOU and will pay YOU.  If the amount of LOSS exceeds YOUR insurable interest, WE will pay the BORROWER any residual amount due for the LOSS, not exceeding the applicable Limit of Liability indicated on the EVIDENCE OF INSURANCE.  Payment for LOSS will be made within 30 days after WE reach agreement with YOU as to the amount of the LOSS, or failing that, the entry of a final judgment or the filing of an appraisal award with US.

14.  Abandonment.  WE may take all, part, or none of the property for which WE have paid YOU or the BORROWER but neither YOU nor the BORROWER can abandon any property to US without our prior written approval.

15.  No Benefit to Bailee. WE will not recognize any assignment or grant any coverage for the benefit of any person or organization holding, storing or transporting property for a fee regardless of any other provision of the Residential Property Form.

01A09-MFPO0001-E1103                                        5

**Balboa  00012**
Re: Williams v. Balboa

(PM7\MF1F\V01A09\MFPO0001E1103)

STK# 00 0000

18. Cancellation:

    a.  YOU may cancel the insurance provided under the Residential Property Form at any time by giving written notice to US and the BORROWER stating when, thereafter, such cancellation is to take effect.

    b.  The BORROWER may cancel the insurance provided under the Residential Property Form by providing proof of other insurance to YOU that is acceptable to YOU and which covers YOUR interest in the RESIDENTIAL PROPERTY and OTHER STRUCTURES. In such case, the effective date of cancellation will be the effective date of the insurance obtained by the BORROWER or the effective date of the insurance provided under the Residential Property Form, whichever is later.

    c.  WE may cancel the insurance provided under the Residential Property Form if YOU have not paid the premium and WE have given you 10 days' written notice at YOUR last address known to US. We may also cancel the insurance provided under the Residential Property Form if we discover that other insurance acceptable to YOU is in effect to protect YOUR interest in the RESIDENTIAL PROPERTY and OTHER STRUCTURES, even if such other insurance is discovered after a LOSS.

    d.  The completion of foreclosure proceedings on RESIDENTIAL PROPERTY by YOU shall terminate the insurance provided under the Residential Property Form, and notice of foreclosure by YOU to US will be YOUR request for cancellation. Cancellation will be effective on the date the RESIDENTIAL PROPERTY is conveyed to YOU or to a third party via the foreclosure process.

In the event of cancellation of the insurance provided under the Residential Property Form, any refund due will be computed on a pro-rata basis.

17. Expiration of Insurance. The Residential Property Form is written under the terms of the Master Policy that has been issued to YOU. If the Master Policy is in force upon expiration of the insurance provided under the Residential Property Form, YOU may request that new insurance under the Residential Property Form be issued to cover the RESIDENTIAL PROPERTY and OTHER STRUCTURES. If YOU do not request the issuance of new insurance under the Residential Property Form, insurance on the RESIDENTIAL PROPERTY and OTHER STRUCTURES will cease upon the expiration date of the Residential Property Form as shown on the EVIDENCE OF INSURANCE.

If, upon expiration of the Residential Property Form, the MASTER POLICY is no longer in force, then all insurance under the Residential Property Form will cease on its expiration date.

18. Changes of Provisions. No change may be made to any provision of the Residential Property Form except by written endorsement issued by US. No other written changes or oral changes will be valid. OUR request for appraisal or examination(s) under this form shall not waive any of our rights.

19. Assignment. There shall be no valid assignment of YOUR rights or the rights of the BORROWER under the Residential Property Form unless WE have given OUR advance written consent to YOU and the BORROWER.

IN WITNESS WHEREOF, Balboa Insurance Company has caused the Residential Property Form to be signed by its President and Secretary, at Irvine, California.

SECRETARY

PRESIDENT

01A09-MFPO0001-E1103

6

Balboa 00013
Re: Williams v. Balboa

March 23, 2007

**VIA OVERNIGHT MAIL**

Balboa Insurance Group
Attn: Tacey Nelson, Claim Representative

Re:     Insured:       **Billy Williams**
        Claim No.:     GM7136890,1
        D/O/L:         02-05-2006
        Loan No.:      5901-0000-0833002922
        Type of Loss:  FIRE

Dear Ms. Nelson:

Enclosed are two (2) estimates previously sent to you which reflect that the damage to our dwelling exceeds the policy limits of the insurance your company has our dwelling. However, Balboa has only paid a fraction of those damages and no contractor will do the repairs for the amount of your payment. We have repeatedly informed you of this, but you have apparently ignored our requests. As a result, foreclosure proceedings have been filed against us and our home is set for foreclosure sale in April. We dispute Balboa's claim payment and demand that full payment be made to satisfy our mortgage immediately.

Additionally, we have yet to receive a copy of the insurance policy at issue, despite numerous requests to you and to GMAC. We demand that a copy of the complete policy be delivered to us at once via facsimile at (334) 347-8578.

Please be advised that if the above requests are not honored and/or if the foreclosure sale scheduled for April 17, 2007, goes through, legal action may be taken against Balboa.

Sincerely,

*Billy, Teresa Williams*

Billy and Teresa Williams

cc:    GMAC Mortgage
       P.O. Box 25142
       Santa Ana, CA 92799-9905

       GMAC Mortgage
       P.O. Box 780
       Waterloo, IA 50704-0780

```
ENDER 5901     BRANCH 0000 LOAN ID 0833002922          IVR           # COV 01
ORTGAGOR  WILLIAMS, BILLY            ADDL N SECURED BALANCE      $31,951.07
DDRESS    678 COUNTY RD 620                 NEXT ACTIVITY DATE  05 29 2007
          ENTERPRISE, AL            36330              CODE   03
ROPERTY INFO: SQ 20 NPI 0      .              PRIOR REQ. COV AMT          $0
D FIRE1 CLASS 51 DESCRIPTION 1ST/RES      IMPOUND/TEN REQ. COV AMT    $31,951
    678 CO RD 620                                              UNITS
    ENTERPRISE AL            36330        LEGAL 41497-GMAC              -026
NSURANCE DATA:                    FLOOD ZONE X** MAP
   STATUS   FON INFORCE      EFFECTIVE  DATE 05 27 2006   WITHIN LIMITS? YES
   POLICY   B7161222         EXPIRATION DATE 05 27 2007   WAIVED? NO   OFFICER
   CARRIER  FON              CANCEL DATE              TRACK ONLY? NO
TRANS-DT  CD DOCUMENT NO  CRR DOC-DESCRIPTION     EFF-DT    THRU-DT  TRANS-AMT
4 29 2007 05                  RENEWAL NOTICE
4 26 2007 61 EMAILED CERT AS REQUESTED //ALB
1 14 2006 61 CSR/AMOUNT..CNL
1 14 2006 61 CSR/SW VALENCIA@LOSS LITIGATNS, VRFYD FON INFRCD, AND ANNL PREM
0 12 2006 61 CSR DRAFT...AKG
0 12 2006 61 CSR SPW 3RD PRTY VALENCIA@LOSS LITIGATION DEPT TRANSF TO LOSS
9 09 2006 61 OCC CHANGE FROM OCC TO TEN
       ENTER (N)EXT OR (P)REVIOUS HISTORY RECORDS OR PRESS ENTER KEY:
                ENTER (S)EARCH, (M)ENU, (R)ESTART, OR (L)OAN HISTORY:
```

# REDACTED

Balboa 00022
Re: Williams v. Balboa

```
-ENDER 5901      BRANCH 0000 LOAN ID 0833002922                                05/24/2007   09:49:18
MORTGAGOR WILLIAMS, BILLY                                    IVR                 # COV 01
ADDRESS    678 COUNTY RD 620                    ADDL N SECURED BALANCE          $31,951.07
            ENTERPRISE, AL                                  NEXT ACTIVITY DATE  05 29 2007
PROPERTY INFO: SQ 20 NPI 0                          36330            CODE 03
ID FIRE1 CLASS 51 DESCRIPTION 1ST/RES           PRIOR REQ. COV AMT                   $0
   678 CO RD 620                           IMPOUND/TEN  REQ. COV AMT          $31,951
   ENTERPRISE AL                36330               LEGAL 41497-GMAC          UNITS
NSURANCE DATA:                                 FLOOD ZONE X** MAP                 -026
   STATUS   FON INFORCE         EFFECTIVE  DATE 05 27 2006  WITHIN LIMITS? YES
   POLICY   B7161222            EXPIRATION DATE 05 27 2007  WAIVED? NO   OFFICER
   CARRIER FOH                        CANCEL DATE
TRANS-DT  CD DOCUMENT NO   CRR DOC-DESCRIPTION          TRACK ONLY? NO
                                                       EFF-DT    THRU-DT   TRANS-AMT
9 09 2006 25 U               COLL UPDATE            09 10 2006
5 31 2006 08 P           FON B7161222 FUNDED  05 27 2006 05 27 2007    537.00
5 28 2006 03                 BILL LSI POLICY   05 27 2006 05 27 2007    537.00
4 27 2006 05                 RENEWAL NOTICE
4 12 2006 61 CSR/SWC TRANS TO NORG REGARDING PAYOFF/KAP
3 17 2006 61 CSR/SWC..TR TO BALBOA CLAIMS/JNB
2 06 2006 61 N00000002678    FIRE                   02 06 2006
       ENTER (N)EXT OR (P)REVIOUS HISTORY RECORDS OR PRESS ENTER KEY:
              ENTER (S)EARCH, (M)ENU, (R)ESTART, OR (L)OAN HISTORY:
```

REDACTED

Balboa 00023
Re: Williams v. Balboa

```
                         GDB MORTGAGE TRANSACTION HISTORY      05/24/2007   09:49:23
LENDER 5901      BRANCH 0000 LOAN ID 0833002922                IVR        # COV 01
MORTGAGOR WILLIAMS, BILLY                        ADDL N SECURED BALANCE      $31,951.87
ADDRESS   678 COUNTY RD 620                      NEXT ACTIVITY DATE    05 29 2007
          ENTERPRISE, AL                  36330           CODE        03
PROPERTY INFO: SQ 20 NPI 0                       PRIOR REQ. COV AMT            $0
ID FIRE1 CLASS S1 DESCRIPTION 1ST/RES    IMPOUND/TEN REQ. COV AMT      $31,951
   678 CO RD 620                                              UNITS
   ENTERPRISE AL                  36330    LEGAL 41497-GMAC            -026
INSURANCE DATA:                            FLOOD ZONE X** MAP
   STATUS   FON INFORCE       EFFECTIVE DATE 05 27 2006  WITHIN LIMITS? YES
   POLICY   B7161222         EXPIRATION DATE 05 27 2007  WAIVED? NO   OFFICER
   CARRIER FON                  CANCEL DATE             TRACK ONLY? NO
TRANS-DT  CD DOCUMENT NO   CRR DOC-DESCRIPTION      EFF-DT       THRU-DT  TRANS-AMT
02 06 2006 65 L00000002678   004407    CLAIM 02 05 2006
01 07 2006 25 U              COLL UPDATE     01 08 2006
11 25 2005 08 P              FON B7136890  FUNDED 05 27 2005 05 27 2006    518.00
11 23 2005 03                BILL LSI POLICY 05 27 2005 05 27 2006         518.00


         ENTER (A)RCHIVED HISTORY, (P)REV HISTORY, OR PRESS ENTER KEY:
              ENTER (S)EARCH, (M)ENU, (R)ESTART, OR (L)OAN HISTORY:
   MORE HISTORY IN THE ARCHIVED AREA FOR THIS COVERAGE
```

REDACTED

Balboa 00024
Re: Williams v. Balboa

```
LENDER 5901      BRANCH 0000 LOAN ID 0833002922        05/24/2007   09:49:29
MORTGAGOR WILLIAMS, BILLY                         IVR             # COV 01
ADDRESS   678 COUNTY RD 620           ADDL N SECURED BALANCE   $31,951.07
          ENTERPRISE, AL        36330    NEXT ACTIVITY DATE 05 29 2007
PROPERTY INFO: SQ 20 MPI 0                         CODE   03
ID FIRE1 CLASS 51 DESCRIPTION 1ST/RES    PRIOR REQ. COV AMT        $0
   678 CO RD 620                IMPOUND/TEN  REQ. COV AMT   $31,951
   ENTERPRISE AL        36330        LEGAL 41497-GMAC       UNITS
INSURANCE DATA:                   FLOOD ZONE X** MAP              -026
   STATUS  FOR INFORCE     EFFECTIVE DATE 05 27 2006 WITHIN LIMITS? YES
   POLICY #7161222        EXPIRATION DATE 05 27 2007  WAIVED? NO  OFFICER
   CARRIER FOR               CANCEL DATE           TRACK ONLY? NO
 TRANS-DT  CD DOCUMENT NO  CRR DOC-DESCRIPTION    EFF-DT    THRU-DT  TRANS-AMT
10 09 2005 02                    FINAL NOTICE     05 27 2005 05 27 2006   518.00
08 31 2005 61 CK$71.37($74306.11)/#287656/LITTON LN SVC/FOH REF/RTL...CK
08 31 2005 41 N93523852250
08 25 2005 01
08 24 2005 61                    FIRST LETTER     05 27 2005 05 27 2006   518.00
08 23 2005 61 CSR/DIALER 8/24/2005 -10:24-3343474987-ALL ATTEMPTS/NO RESP-B01
08 22 2005 61 CSR/DIALER 8/23/2005 -09:52-3343474987-3RD PARTY MESSAGE   -B01
             CSR/DIALER 8/22/2005 -09:44-3343474987-REP LEFT MESSAGE     -B01
       ENTER (N)EXT OR (P)REVIOUS HISTORY RECORDS OR PRESS ENTER KEY:
             ENTER (S)EARCH, (M)ENU, (R)ESTART, OR (L)OAN HISTORY:
```

REDACTED

Balboa 00025
Re: Williams v. Balboa

```
LENDER 5901       BRANCH 0000 LOAN ID 0833002922                    IVR              # COV 01
MORTGAGOR WILLIAMS, BILLY                          ADDL N SECURED BALANCE        $31,951.07
ADDRESS   678 COUNTY RD 620                         NEXT ACTIVITY DATE   05 29 2007
          ENTERPRISE, AL                  36330                      CODE 03
PROPERTY INFO: SQ 20 NPI 0                          PRIOR REQ. COV AMT              $0
ID FIRE1 CLASS 51 DESCRIPTION 1ST/RES     INPOUND/TEN  REQ. COV AMT         $31,951
    678 CO RD 620                                                   UNITS
    ENTERPRISE AL               36330        LEGAL 41497-GMAC                -026
INSURANCE DATA:                             FLOOD ZONE X** MAP
   STATUS   FOR INFORCE       EFFECTIVE  DATE 05 27 2006  WITHIN LIMITS? YES
   POLICY  87161222           EXPIRATION DATE 05 27 2007  WAIVED? NO   OFFICER
   CARRIER FOR                CANCEL DATE                 TRACK ONLY? NO
 TRANS-DT   CD DOCUMENT NO    CRR DOC-DESCRIPTION     EFF-DT    THRU-DT  TRANS-AMT
05 29 2005 25 U                  COLL UPDATE        05 28 2005
```

```
     ENTER (N)EXT OR (P)REVIOUS HISTORY RECORDS OR PRESS ENTER KEY:
          ENTER (S)EARCH, (M)ENU, (R)ESTART, OR (L)OAN HISTORY:
```

Balboa 00026
Re: Williams v. Balboa

```
EK02           CLOSED       DIARY FUNCTION - TEXT SCREEN
01,GM7136890,000001         EXAM - 691                                    07/30/07
CLOSE         PRINT         NEXT REVIEW 10/13/06      REASSIGN TO EXAM
CURR PAGE 001 NEW PAGE                                SUPR        REVIEW DATE
02/08/06 WILLIAMS/FIRE/LPP/GMAC                       MGR         REVIEW DATE
   691    FACT: FIRE DMG LOSS REPORTED BY BORROWER DOL 02/05/06                  N
          RISK: PROPERTY LOCATED AT  678 CO RD 620 ENTERPRISE AL 36330          N
                VERIFIED IN DA SCREEN,OCCUPIED SINGLE FAMILY DWELLING           N
          COV: WRITTEN UNDER A LPP, EFF DATE 05/27/05-06 POL LIM 32,311         N
               DED 500                                                          N
          RESERVE: 2500                                                         N
          C/O: TBD                                                              N
          DMG: TBD                                                              N
          SIU: TBD                                                              N
          SAL/SUB: TBD                                                          N
          WORKPLAN: FILED & COPIED ISO REPORT, POL FUNDED, VERIFIED COVERAGE    N
                    IN DA SCREEN & ASSIGNED TO CL MLD ACK LTRS                  N
                                                                                N
          *05/27/05 IS THE FIRST TIME BALBOA PLACED THE POLICY WITH THE         N
          GMAC LOAN, HIS PRIOR MORTG CO. WAS LITTON, THIS INFORMATION WAS       N
          FOUND ON THE HCCS SCREEN*                                             N
   NO PRIOR SCREEN
   PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
           PF8-LAST PAGE      PF9-CLAIM STATUS      ENTER-NEXT PAGE      CLEAR-CANCEL
```

**Balboa 00027**
Re: Williams v. Balboa

```
EK02             CLOSED          DIARY FUNCTION - TEXT SCREEN
01,GN7136890,000001              EXAM - 691                    REASSIGN TO EXAM        07/30/07
CLOSE            PRINT           NEXT REVIEW 10/13/06           SUPR        REVIEW DATE
CURR PAGE 002 NEW PAGE                                         NGR         REVIEW DATE
02/08/06
    691          10:08AM CALLED (334-406-1138) & SPOKE W/BORROWER, OBTAINED A
(CONT.)          RECORDED STATEMENT FROM HER.

                 RS SUMMARY: SHE ADVISED SHE WAS HOME ALONE BECAUSE HER HUSBAND WAS
                 OUT ON A BUSINESS TRIP & SHE WAS COOKING BACON ON SUNDAY MORNGING
                 AROUND 8AM. SHE HEARD HER WASHER MAKING A NOISE & WENT TO THE
                 LAUNDRY ROOM TO ADJUST THE CLOTHES & WHEN SHE RETURNED TO THE
                 KITCHEN THE BACON WAS ON FIRE. SHE SAID SHE TRIED TO PUT OUT THE
                 FIRE BUT IT SPREAD TO FAST. SHE CALLED THE FIRE DEPT & THEY CAME
                 & PUT OUT THE FIRE BUT NOT BEFORE IT CAUSED DAMAGE TO EVERY ROOM
                 EXCEPT THE LIVING ROOM. SHE SAID SHE'S OWNED THE HOME FOR 23YRS &
                 THE HOUSE 49YRS OLD. SHE STATED THE THOUGHT THE STOVE WAS FREE
                 STANDING. I ADVISED HER OF THE CLAIMS PROCESS, SHE UNDERSTOOD.


                 *NO C&O NEEDED AS THE CAUSE OF THE FIRE IS DUE TO UNATTENDED

  PRESS    PF1-UPDATE DATA      PF2-PREVIOUS PAGE      PF3-NO UPDATE>MENU
           PF8-LAST PAGE        PF9-CLAIM STATUS       ENTER-NEXT PAGE       PF7-FIRST PAGE
                                                                            CLEAR-CANCEL
```

**Balboa 00028**
Re: Williams v. Balboa

```
EK02              CLOSED       DIARY FUNCTION - TEXT SCREEN
01,GM7136890,000001            EXAM - 691                              07/30/07
CLOSE        PRINT             NEXT REVIEW 10/13/06    REASSIGN TO EXAM
CURR PAGE 003 NEW PAGE                                 SUPR      REVIEW DATE
                                                       MGR       REVIEW DATE
02/08/06 COOKING, BORROWER WAS COOKING BACON*
   691
(CONT.)  PENDING RESERVE INCREASE SUGGESTION FROM THE ADJUSTER    TNELSON
02/08/06 DIARY REV DATE MODIFIED BY 691
   XXX
03/06/06 WILLIAMS/FIRE/LPP/GMAC
   691     10:55AM BORROWER CALLED, ADVISED OF SETTLEMENT, SHE UNDERSTOOD.

           PROCESSED CLAIM: INSPECTION OF FIRE DMG TO THE DWELLING FOUND KITCHEN
           FIRE AT THE STOVE IGNITED THE WALL BEHIND THE STOVE & TRAVELLED UP
           INTO THE ATTIC. FIR DMG TO THE KITCHEN W/FIRE DMG IN ADJOINING ROOMS
           SMOKE/WTR DMG TO THE OTERH ROOMS.

           THE FIRE REPORT STATES: DOL 02/02/06, MRS. WILLIAMS WAS FRYING BACON
           WHEN SHE LEFT THE KITCHEN & UPON RETURN FOUND FLAMES COMING UP AT
           THE REAR OF THE STOVE. MR. WILLIAMS WAS OUT OF TOWN & BRRW CALLED
           911.

PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
        PF8-LAST PAGE      PF9-CLAIM STATUS      ENTER-NEXT PAGE      CLEAR-CANCEL
```

Balboa 00029
Re: Williams v. Balboa

```
EK02            CLOSED      DIARY FUNCTION - TEXT SCREEN
01,GW7136890,000001         EXAM - 691              REASSIGN TO EXAM            07/30/07
CLOSE           PRINT       NEXT REVIEW 10/13/06     SUPR       REVIEW DATE
CURR PAGE 004 NEW PAGE                               MGR        REVIEW DATE
03/06/06
   691      C/O: FIRE DAMAGE CAUSED BY FRYING POT LEFT UNATTENDED                        N
 (CONT.)    DMG: DRYWALL,PAINT,INSULATION, CABINETS,CARPET/PAD                           N
            SIU: NONE CLAIM DOES NOT APPEAR FRADULENT                                    N
            SAL: NONE DMG NEEDS REPLACED                                                 N
            SUB: NONE DMG DUE TO FIRE                                                    N
                                                                                        N
            LOSS PAYMENT BREAKDOWN :              $2,279.83 (20% O&P)                    N
             $11,933.64 (RCV W/ST)                                                      N
            -$    943.68 (NON REFD DEPR)                                                 N
            $10,989.96 (SUB TOTAL)                                                       N
            -$ 3,293.47 (REFD DEPR)                                                      N
            -$    500.00 (DED)                                                           N
             $ 7,196.49 (NET PAID)                                                       N
                                                                                        N
                                                                                        N
            REFD DEPR DUE UPON PROOF OF REPAIRS/REPLACMENT                               N
                                                                                        N

  PRESS    PF1-UPDATE DATA    PF2-PREVIOUS PAGE      PF3-NO UPDATE>MENU       PF7-FIRST PAGE
           PF8-LAST PAGE      PF9-CLAIM STATUS        ENTER-NEXT PAGE         CLEAR-CANCEL
```

Balboa  00030
Re: Williams v. Balboa

```
EK02            CLOSED      DIARY FUNCTION - TEXT SCREEN
01,GN7136890,000001        EXAM - 691              REASSIGN TO EXAM          07/30/07
CLOSE        PRINT          NEXT REVIEW 10/13/06    SUPR       REVIEW DATE
CURR PAGE 005 NEW PAGE                              MGR        REVIEW DATE
03/06/06
  691    RC LTR, EST & CHECK TO GMAC LOSS DRAFT                                        N
(CONT.)   RC LTR, EST TO BORROWER                                                       N
                                                                                        N
          REVIEWED IA INVOICE IS IN COMPLIANCE ISSUING PAYMENT FOR SERVICES             N
          RENDERED. EXP: $767.21 INV#600200283260-1          TNELSON                    N
03/06/06 DIARY REV DATE MODIFIED BY 691                                                 N
  XXX                                                                                    N
03/08/06 WILLIAMS/FIRE/LPP/GMAC                                                          N
  071    SUBRO REVIEW, BORROWER LEFT UNATTENDED COOKING ON STOVE TOP CAUSING            N
          FIRE TO START.  BORRWER NEG WAS CAUSE OF LOSS, NO SUB AGAINST THE BO          N
          RRWER. SUBRO CLSD.                                                             N
03/17/06 WILLIAMS/FIRE/LPP/GMAC                                                          N
  691    8:37AM BORROWER CALLED, SAID THAT HER CONTRACTOR SAID IT WILL COST            N
          MORE, ADVISED HER TO SEND IN THE ESTIMATE & GAVE HER MY FAX #.                N
                                              TNELSON                                    N

PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
        PF8-LAST PAGE      PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

Balboa 00031
Re: Williams v. Balboa

```
EK02          CLOSED       DIARY FUNCTION - TEXT SCREEN
01,GM7136890,000001        EXAM - 691            REASSIGN TO EXAM          07/30/07
CLOSE         PRINT        NEXT REVIEW 10/13/06   SUPR      REVIEW DATE
CURR PAGE 006 NEW PAGE                            MGR       REVIEW DATE
05/01/06 WILLIAMS/FIRE/LPP/GMAC                                              N
   691     12PM RETURNED CALL TO BORROWER, NO ANSWER, LEFT MESSAGE ADVISING HIM N
           THAT THE MORTG. CO. SHOULD HAVE THE CHECK BY NOW.         TNELSON   N

           1:15PM RETURNED CALL TO BORRWER, SHE ADVISED SHE FAXED AN EST FOR   N
           THE DAMAGES 2 WKS AGO. I ADVISED HER THAT I HAVEN'T RCVD IT & TO     N
           RE-FAX THE ESTIMATE.                                     TNELSON    N
05/10/06 WILLIAMS/FIRE/LPP/GMAC                                                N
   691     RCVD ESTIMATES THROUGH THE MAIL, SENT TO IMAGING                    N
                                                                              N
           3 ESTIMATES HAVE BEEN PROVIDED BY THE BORROWER:                     N
           JERRY GENTILE: $41,500                                             N
           B&B CONSTRUCTION: $44,758                                          N
           GRIMES: $55,893                                                    N
                                                                              N
           *ALL ESTIMATE JUST GIVE A LUMP SUM, THEY DON'T BREAKDOWN HOW THEY    N
           CAME UP WITH THE PRICES.*                                          N

  PRESS    PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
           PF8-LAST PAGE      PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

Balboa 00032
Re: Williams v. Balboa

```
EK02            CLOSED        DIARY FUNCTION - TEXT SCREEN
01,GN7136890,000001          EXAM - 691                                07/30/07
CLOSE           PRINT         NEXT REVIEW 10/13/06    REASSIGN TO EXAM
CURR PAGE 007 NEW PAGE                                SUPR      REVIEW DATE
05/10/06                                              MGR       REVIEW DATE
  691           RE-INSPECTION REQUEST WAS SENT TO CL                          N
(CONT.)                                               TNELSON                 N
06/19/06  WILLIAMS/FIRE/LPP/GMAC                                              N
  691           11:25AM RCV'D CALL FR/BRRW WHO STATED SHE WAS CONTACTED BY THE ADJ  N
                A MONTH AGO & HE REQUESTED HER CONTRACTO TO FILL OUT SOME PPWRK &    N
                SEND IT BACK, WHICH SHE DID. TO THIS DATE, SHE HASN'T HEARD BACK     N
                FR/THE ADJ.                                                   N
                                                                             N
                I SENT AN EMAIL REQUESTING STATUS.            TNELSON        N
07/11/06  WILLIAMS/FIRE/LPP/GMAC                                             N
  691           3:05PM RETURNED CALL TO BORROWER (334-308-1553) ADVISED HER  N
                DAUGHTER TO HAVE MS BRRW CALL BACK, SHE UNDERSTOOD.          N
                                                                             N
                RCVD STATUS REPORT FR/THE ADJUSTER WHICH STATED HE IS IN RECEIPT  N
                OF THE CONTRACTORS EST & WILL BE REVIEWING & FORWARDING A SUPP    N
                IF NEEDED OR JUST A REPORT.           TNELSON                N
PRESS   PF1-UPDATE DATA   PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
        PF8-LAST PAGE     PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

Balboa 00033
Re: Williams v. Balboa

```
EK02           CLOSED       DIARY FUNCTION - TEXT SCREEN
01,GN7136890,000001       EXAM - 691                REASSIGN TO EXAM          07/30/07
CLOSE        PRINT       NEXT REVIEW 10/13/06        SUPR        REVIEW DATE
CURR PAGE 008 NEW PAGE                               NGR         REVIEW DATE
07/12/06 WILLIAMS/FIRE/LPP/GMAC                                               N
   691    10:15AM RETURNED CALL TO BORROWER (334-308-1553) NO ANSWER, LEFT    N
          MESSAGE THAT THE ADJUSTER IS REVIEWING THE CONTRACOTRS EST. TNELSON N
08/24/06 WILLIAMS/FIRE/LPP/GMAC                                               N
   691    PENDING SUPPLEMENT ESTIMATER FROM ADJUSTER           TNELSON        N
08/24/06 DIARY REV DATE MODIFIED BY 691                                       N
   XXX                                                                        N
09/25/06 WILLIAMS/FIRE/LPP/GMAC                                               N
   691    PENDING SUPPLEMENT ESTIMATE FROM THE ADJUSTER                       N
                                                                             N
          SENT AN EMAIL TO CL REQUESTING THE SUPPLEMENT ESTIMATE   TNELSON    N
09/25/06 DIARY REV DATE MODIFIED BY 691                                       N
   XXX                                                                        N
09/26/06 WILLIAMS/FIRE/LPP/GMAC                                               N
   691                                                                        N
                                                                             N
                                                                             N

  PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
          PF8-LAST PAGE      PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

**Balboa 00034**
Re: Williams v. Balboa

```
EK02              CLOSED        DIARY FUNCTION - TEXT SCREEN                    07/30/07
01,GN7136890,000061          EXAM - 691              REASSIGN TO EXAM
CLOSE          PRINT          NEXT REVIEW 10/13/06    SUPR         REVIEW DATE
CURR PAGE 009 NEW PAGE                                MGR          REVIEW DATE
09/26/06
  691          THE SUPPLEMENT ESTIMATE INCLUDES CHANGES THAT WOULD BE NECASSARY      M
(CONT.)        AFTER REVIEWING THE CONTRACTORS ESTIMATE. THE REPLACING ACOUSTICAL    M
               CEILING W/DRYWALL WAS NOT INCLUDED AS WELL AS THE COMPLETE REMODEL     M
               OF THE BATHROOMS. THERE IS NO REASON NOT TO CLEAN THE CERAMIC TILE,    M
               TOILET & BATHTUB IN EACH OF THE BEDROOMS.                             M
                                                                                    M
               LOSS PAYMENT BREAKDOWN :           $3,207.76 (20% O&P)               M
               $16,899.00 (RCV W/ST)                                                M
              -$    943.68 (NON REFD DEPR)                                           M
               $15,955.32 (SUB TOTAL)                                               M
              -$ 4,863.93 (REFD DEPR)                                               M
              -$   500.00 (DED)                                                     M
              -$ 7,196.49 (PRIOR PAYMENT)                                           M
               $ 3,394.90 (SUPPLEMENT)                                              M
                                                                                    M
                                                                                    M
PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
        PF8-LAST PAGE      PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

Balboa 00035
Re: Williams v. Balboa

```
EK02            CLOSED        DIARY FUNCTION - TEXT SCREEN
01,GM7136890,000001          EXAM - 691                                       07/30/07
CLOSE         PRINT          NEXT REVIEW 10/13/06      REASSIGN TO EXAM
CURR PAGE 010 NEW PAGE                                 SUPR        REVIEW DATE
09/26/06                                               MGR         REVIEW DATE
   691      RC LTR, EST & CHECK TO LOSS DRAFT                                        M
(CONT.)     RC LTR, EST TO GMAC                                                      M
09/26/06 DIARY CLOSED BY 691                           TNELSON                       M
   XXX                                                                               M
03/14/07 WILLIAMS/FIRE/LPP/GMAC                                                      M
   691      10AM BORROWER CALLED, WANTED TO KNOW WHY DIDN'T PAY OFF HER LOAN.        M
            I ADVISED HER THAT WE PAID FOR THE DAMAGED PORTION ONLY. SHE STATED      M
            THE HOUSE NEEDS TO BE TORN DOWN. I ADVISED HER THAT THE ADJUSTER         M
            REVIEWED THE CONTRACTORS ESTIMATE WHICH ALLOWED THE BATHROOMS TO BE      M
            GUTTED. I ADVISED HER I REVIEWED THE PHOTOS & THE BATHROOMS ARE NOT      M
            DAMAGED. SHE STATED SHE HAD AN ESTIMATE FOR THE REPAIRS, I ADVISED       M
            HER THE CONTRACTOR PROVIDED AN ESTIMATE TO REMODEL THE HOME VERSES       M
            PAYING FOR THE DAMAGED PORTION ONLY. I ADVISED HER THAT WE ARE           M
            STANDING BEHIND THE PAYMENTS ALREADY MADE. SHE STATED SHE WILL HAVE      M
            HER ATTY CALL ME, I ADVISED HER THAT WOULD BE FINE.        TNELSON       M

  PRESS   PF1-UPDATE DATA   PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU   PF7-FIRST PAGE
          PF8-LAST PAGE     PF9-CLAIM STATUS     ENTER-NEXT PAGE      CLEAR-CANCEL
```

Balboa 00036
Re: Williams v. Balboa

```
EK02            CLOSED       DIARY FUNCTION - TEXT SCREEN
01,GW7136890,000001          EXAM - 691                              07/30/07
CLOSE           PRINT        NEXT REVIEW 10/13/06    REASSIGN TO EXAM
CURR PAGE 011 NEW PAGE                               SUPR      REVIEW DATE
                                                     MGR       REVIEW DATE
03/21/07 WILLIAMS/FIRE/LPP/GMAC
    691        10:20AM BORROWER & HER ATTY CALL, MR STEWART, WHO WANTED TO DISCUSS    N
               THE CLAIM. HE REQUESTED A COPY OF THE POLICY, I ADVISED HIM TO         N
               CONTACT THE MORTG COMPANY, HE UNDERSTOOD.TNELSON                       N
07/30/07 WILLIAMS/FIRE/LPP/GMAC_____                                              N
    691                                                                              N
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y
                                                                                     Y

  PRESS   PF1-UPDATE DATA    PF2-PREVIOUS PAGE    PF3-NO UPDATE>MENU    PF7-FIRST PAGE
          PF8-LAST PAGE      PF9-CLAIM STATUS     ENTER-NEXT PAGE       CLEAR-CANCEL
```

Balboa 00037
Re: Williams v. Balboa

TO:        CL

FROM:    **Balboa Insurance Company**
PO Box 19702, Irvine CA 92623, 888-898-1546, Fax No. (866)336-9054
Assigned by:  Tancy Nelson Ext.: 1421    Date: February 8, 2006

# NEW LOSS ASSIGNMENT

Confirmation of Assignment Requested within 24 Hours

| | | | |
|---|---|---|---|
| Policy No.: | GM7136890, 1 | Hm Phone No: (___) ___-____ | |
| Borrower: | Billy Williams | Wk Phone No:(___) ___-____ | |
| Date of Loss: | 02/05/2006 | Type of policy: | LPP |
| Policy Limit: | $32,311.00 | Deductible: | $500.00 |
| Contact Person: | BORROWER 334-406-7738 CELL | | |
| Policy Dates: | Eff. 05/27/2005 | Exp. 05/27/2006 | |
| Location of Risk: | 678 Co Rd 620 Enterprise, AL 36330 | | |
| Mortgage Co.: | GMAC | | |
| Loan No.: | 5901-0000-0833002922 | Type of Loss: FIRE | |

| X | LPI |
|---|---|
| | HO |
| | RENTERS |

Requested Information:

[X]  Narrative of findings.

[X]  Estimate should be based on unit costs figures for material, tax and labor only
including a separate line item for overhead and profit.

[X]  Estimate should include appropriate depreciation figures on materials.

[X]  Fire/Police report.
Police Department:    [Type department name]
Case No.    [Type case number]

[X]  Bill per fee assignment **effective June 15, 2005.**

[X]  Special instructions/directions: PLEASE OBTAIN THE FIRE REPORT &
CANVOUS THE NEIGHBORHOOD. CALL ME WITH THE RESERVE & LET ME
KNOW IF A C&O IS NEEDED.

- This is a limited assignment - coverage/opinion is not to be discussed with customer.
- Complete and forward the requested information/documentation, photos and billing
**within 10 days** of receipt of the assignment. Please refer to Balboa's appraisal service
requirements for additional information.

PartAsn

**Balboa  00038**
Re: Williams v. Balboa

- Please do not overlap photos on the mounting sheet. Please do not staple adding machine tapes over the damage estimates. (Tape them to a separate page) Please do not provide two sided documents.

PartAsn

# Short Form

Claim # 200657216430

## Cunningham Lindsey Inc.

300 Century Park South
Suite 200
Birmingham, AL 35226
Phone (205) 823-8338   Fax (205) 823-8341

| | | | |
|---|---|---|---|
| **Adjuster** | David Toellner | | February 26, 2006 |
| **Phone** | | | |
| **Fax** | | | |

| | |
|---|---|
| **Insured** | Williams, Billy |
| **Loss Address** | 678 Co Rd 620, Enterprise, AL 36330 |
| **Phone Number** (334) 406-7738 | **Policy #** GM47136890 |
| **Other Phone** | **Ins Claim #** GM7136890-1 |
| **Ins Company** BALBOA INSURANCE COMPANY | **Date of Loss** 2/6/2006 |

## Coverage

| | |
|---|---|
| **Policy Type** | **Mortgagee** None Showing |
| **Effective** - | |
| **Deductible** $500.00 | |

| Coverage | Description | Coverage Amt | Value Requirement |
|---|---|---|---|
| BLDG | Coverage A - Building | $32,311.00 | None |
| APS | Coverage B - APS | $3,231.10 | None |
| UPP | Coverage UPP - Contents | $16,155.50 | None |
| ALE/FMV | Coverage D - ALE/FMV | $6,462.20 | None |

## Adjuster's Report

Assigned 2/8/2006   Contacted 2/8/2006   Inspected 2/13/2006

Apparent Cause of Loss/Scope       damage by Fire

Items Subject to Exclusions/Limitations

Salvage or Subrogation Potential

## Loss Recap

| Coverage | RC Loss | Depreciation | ACV Loss | Recov. Depr. | TOTAL |
|---|---|---|---|---|---|
| BLDG | $14,261.16 | $5,312.85 | $8,948.31 | $5,312.85 | $14,261.16 |
| **TOTALS** | $14,261.16 | $5,312.85 | $8,948.31 | $5,312.85 | $14,261.16 |

## Enclosures

| | | | | |
|---|---|---|---|---|
| ☒ Estimates | ☒ Photos | ☐ Proof of Loss | ☐ Adjuster Summary | ☐ Estimate Recap | ☐ Statement of Loss | ☐ Invoice |
| ☐ Claim Summary | ☐ Diagrams | ☐ R/C Proof | ☐ P&LR | Other: Fire Report | | |

## Recommendations

| | | | |
|---|---|---|---|
| Payment Recommendations: Initial | $8,448.31 | Deductible and insured's participation | $500.00 |
| Upon Completion | $5,312.85 | Recommended Adjustment | $11,761.16 |

Payee Williams, Billy

Inspection of fire damage to the insured dwelling found a kitchen fire at the stove ignited the wall behind the stove and travelled up into the attic. Fire damage in the kitchen with fire damage also in an adjoining bedroom. Smoke and water damage to other rooms.

We have obtained a copy of the fire report which is attached. Mrs Williams advised was frying bacon when left the kitchen and upon return found flames coming up at the rear of the stove. Mr. Williams was out of town at this time. Insured called 911 and Battens Volunteer Fire Department arrived to extinguish the fire.

We recommend closing this claim per the attached estimate. We will be closing our file and thank you for allowing Cunningham Lindsey the opportunity to handle this matter for you.

Balboa 00055
Re: Williams v. Balboa

# Estimate

| | |
|---|---|
| Claim # | 200657216430 |
| Coverage BLDG | |

## Cunningham Lindsey Inc.

**Adjuster**
David Toellner

300 Century Park South
Suite 200
Birmingham, AL 35226
Phone (205) 823-8338    Fax (205) 823-8341

February 26, 2006
Coverage A - Building

**Insured**    Williams, Billy
**Loss Address**    678 Co Rd 620, Enterprise, AL  36330
**Phone Number** (334) 406-7738

Policy #    GM47136890
Ins Claim # GM7136890-1

**Ins Company**    BALBOA INSURANCE COMPANY

Date of Loss    2/6/2006

---

### Living Room (15' x 14' 6" x 8')

315 sf Floor        608 sf Wall        315 sf Ceiling        76 lf Floor        76 lf Ceiling        2,522 cf Volume

Offset(s)    11' 6" x 8' 6"

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ $0.25 | $152.00 | $0.00 | $152.00 | |
| Replace Wallpaper | 711.36 SF @ $0.40 | $284.54 | Material | | |
| | 608 SF @ $0.34 | $206.72 | Labor | | |
| | | $491.26 | $327.51 | $163.75 | |
| Remove Carpet & Pad (SF) | 315 SF @ $0.17 | $53.55 | $0.00 | $53.55 | |
| Replace Carpet & Pad (SF) | 333.9 SF @ $1.37 | $457.44 | Material | | |
| | 315 SF @ $0.46 | $144.90 | Labor | | |
| | | $602.34 | $451.76 | $150.58 | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ $0.22 | $69.30 | $0.00 | $69.30 | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ $1.11 | $356.64 | Material | | |
| | 315 SF @ $0.29 | $91.35 | Labor | | |
| | | $447.99 | $224.00 | $223.99 | |
| Remove Crown Molding | 76 LF @ $0.18 | $13.68 | $0.00 | $13.68 | |
| Replace Crown Molding | 80.56 LF @ $1.89 | $152.26 | Material | | |
| | 76 LF @ $0.69 | $52.44 | Labor | | |
| | | $204.70 | $81.88 | $122.82 | |
| Clean Window, Casement, Wood | 76 LF @ $0.58 | $44.08 | $33.06 | $11.02 | |
| Clean Door, Interior, Pre-Hung | 5 EA @ $5.01 | $25.05 | $0.00 | $25.05 | N |
| Special Check & Test Electric | 1 EA @ $3.23 | $3.23 | $0.00 | $3.23 | N |
| | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | |
| | | $2,120.72 | $1,118.21 | $1,002.51 | |

---

### Kitchen (14' 6" x 11' 6" x 8')

167 sf Floor        416 sf Wall        167 sf Ceiling        52 lf Floor        52 lf Ceiling        1,334 cf Volume

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ $0.22 | $36.74 | $0.00 | $36.74 | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ $1.11 | $189.08 | Material | | |
| | 167 SF @ $0.29 | $48.43 | Labor | | |
| | | $237.51 | $118.76 | $118.75 | |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | |
| Clean Window, Casement, Wood | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | N |

Estimate (MS/B 0410)
Claim # 200657216430

- 1 -

Feb 26, 2006

**Balboa 00056**
Re: Williams v. Balboa

| | | Rept Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ $0.18 | $30.06 | $0.00 | $30.06 | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ $0.31 | $54.36 | Material | | |
| | 167 SF @ $0.56 | $93.52 | Labor | | |
| | | $147.88 | $26.89 | $120.99 | |
| Rem/Reset Ceiling Fixture | 1 EA @ $19.01 | $19.01 | $0.00 | $19.01 | |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 | N |
| Remove Drywall, Wall | 416 SF @ $0.16 | $66.56 | $0.00 | $66.56 | |
| Replace Drywall, Wall | 440.96 SF @ $0.39 | $171.97 | Material | | |
| | 416 SF @ $0.56 | $232.96 | Labor | | |
| | | $404.93 | $161.97 | $242.96 | |
| Paint Drywall, Wall | 416 SF @ $0.35 | $145.60 | $109.20 | $36.40 | |
| Remove Crown Molding | 52 LF @ $0.18 | $9.36 | $0.00 | $9.36 | |
| Replace Crown Molding | 55.12 LF @ $1.89 | $104.18 | Material | | |
| | 52 LF @ $0.69 | $35.88 | Labor | | |
| | | $140.06 | $56.02 | $84.04 | |
| Paint Crown Molding | 52 LF @ $0.58 | $30.16 | $22.62 | $7.54 | |
| Remove Door, Interior, Pre-Hung | 1 EA @ $10.01 | $10.01 | $0.00 | $10.01 | |
| Replace Door, Interior, Pre-Hung | 1 EA @ $221.73 | $221.73 | $110.87 | $110.86 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 | $28.74 | $21.56 | $7.18 | |
| Remove Subfloor | 167 SF @ $0.14 | $23.38 | $0.00 | $23.38 | |
| Replace Subfloor | 175.35 SF @ $0.78 | $136.77 | Material | | |
| | 167 SF @ $0.26 | $43.42 | Labor | | |
| | | $180.19 | $32.76 | $147.43 | |
| Remove Underlayment | 167 SF @ $0.12 | $20.04 | $0.00 | $20.04 | |
| Replace Underlayment | 175.35 SF @ $0.38 | $66.63 | Material | | |
| | 167 SF @ $0.22 | $36.74 | Labor | | |
| | | $103.37 | $18.79 | $84.58 | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ $0.21 | $35.07 | $0.00 | $35.07 | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ $1.35 | $238.98 | Material | | |
| | 167 SF @ $0.86 | $143.62 | Labor | | |
| | | $382.50 | $273.29 | $109.31 | |
| Rem/Reset Ceiling/Paddle Fan | 1 EA @ $43.50 | $43.50 | $0.00 | $43.50 | |
| Clean Ceiling/Paddle Fan | 1 EA @ $5.52 | $5.52 | $0.00 | $5.52 | N |
| Clean Door, Interior, Pre-Hung | 1 EA @ $3.23 | $3.23 | $0.00 | $3.23 | N |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 | $28.74 | $21.56 | $7.18 | |
| Clean Countertop, Formica | 10 LF @ $0.24 | $2.40 | $0.00 | $2.40 | N |
| Remove Cabinet, Wall (LF) | 7 LF @ $3.99 | $27.93 | $0.00 | $27.93 | |
| Replace Cabinet, Wall (LF) | 7 LF @ $129.64 | $907.48 | $362.99 | $544.49 | |
| | | $3,316.93 | $1,337.28 | $1,979.65 | |

**Family Room (17' 4" x 11' 6" x 8')**

| 217 sf Floor | 512 sf Wall | 217 sf Ceiling | 64 lf Floor | 64 lf Ceiling | 1,736 cf Volume |
|---|---|---|---|---|---|

Offset(s)   5' 7" x 3' 2"

| | | Rept Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ $0.17 | $36.89 | $0.00 | $36.89 | |
| Replace Carpet & Pad (SF) | 230.02 SF @ $1.37 | $315.13 | Material | | |
| | 217 SF @ $0.46 | $99.82 | Labor | | |
| | | $474.95 | $311.21 | $103.74 | |
| Remove Drywall, Ceiling | 217 SF @ $0.20 | $43.40 | $0.00 | $43.40 | |
| Replace Drywall, Ceiling | 227.85 SF @ $0.41 | $93.42 | Material | | |

---

Estimate (MS/B 0410)                                    - 2 -                                    Feb 26, 2006
Claim # 200657216430

Balboa 00057
Re: Williams v. Balboa

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| | 217 SF @ $0.63 | $136.71 | Labor | | | |
| | | $238.13 | $92.05 | $138.08 | | |
| Paint Drywall, Ceiling | 217 SF @ $0.49 | $106.33 | $79.75 | $26.58 | | |
| Remove Paneling, Pine | 512 SF @ $0.17 | $87.04 | $0.00 | $87.04 | | |
| Replace Paneling, Pine | 537.6 SF @ $0.70 | $376.32 | Material | | | |
| | 512 SF @ $0.44 | $225.28 | Labor | | | |
| | | $601.60 | $240.64 | $360.96 | | |
| Clean Door, Interior, Pre-Hung | 2 EA @ $3.23 | $6.46 | $0.00 | $6.46 | | N |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| | | $1,540.34 | $723.65 | $816.69 | | |

## Hall Bath (5' 10" x 7' 10" x 8')

46 sf Floor    219 sf Wall    46 sf Ceiling    27 lf Floor    27 lf Ceiling    366 cf Volume

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 219 SF @ $0.16 | $35.04 | $0.00 | $35.04 | | N |
| Clean Ceramic Floor, Thin Set | 46 SF @ $0.16 | $7.36 | $0.00 | $7.36 | | N |
| Clean Drywall, Ceiling | 46 SF @ $0.15 | $6.90 | $0.00 | $6.90 | | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 | $10.25 | $0.00 | $10.25 | | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 | $4.99 | $0.00 | $4.99 | | N |
| Clean Toilet Seat | 1 EA @ $1.47 | $1.47 | $0.00 | $1.47 | | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 | | N |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ $0.22 | $10.12 | $0.00 | $10.12 | | |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ $1.11 | $52.08 | Material | | | |
| | 46 SF @ $0.29 | $13.34 | Labor | | | |
| | | $65.42 | $32.71 | $32.71 | | |
| | | $153.14 | $32.71 | $120.43 | | |

## Bedroom (11' 6" x 11' x 8')

126 sf Floor    360 sf Wall    126 sf Ceiling    45 lf Floor    45 lf Ceiling    1,012 cf Volume

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ $0.17 | $21.42 | $0.00 | $21.42 | | |
| Replace Carpet & Pad (SF) | 133.56 SF @ $1.37 | $182.98 | Material | | | |
| | 126 SF @ $0.46 | $57.96 | Labor | | | |
| | | $240.94 | $180.71 | $60.23 | | |
| Remove Acoustical Ceiling, 12x12 | 126 SF @ $0.22 | $27.72 | $0.00 | $27.72 | | |
| Replace Acoustical Ceiling, 12x12 | 128.52 SF @ $1.11 | $142.66 | Material | | | |
| | 126 SF @ $0.29 | $36.54 | Labor | | | |
| | | $179.20 | $89.60 | $89.60 | | |
| Remove Paneling, Pine | 360 SF @ $0.17 | $61.20 | $0.00 | $61.20 | | |
| Replace Paneling, Pine | 378 SF @ $0.70 | $264.60 | Material | | | |
| | 360 SF @ $0.44 | $158.40 | Labor | | | |
| | | $423.00 | $169.20 | $253.80 | | |
| Clean Door, Interior, Pre-Hung | 2 EA @ $3.23 | $6.46 | $0.00 | $6.46 | | N |
| Special Check & Test Electric | 1 EA @ $13.54 | $13.54 | $0.00 | $13.54 | | |
| Clean Window, Casement, Wood | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 | | N |
| Remove Furring Strips, Ceiling (SF), 12" oc | 126 SF @ $0.18 | $22.68 | $0.00 | $22.68 | | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 132.3 SF @ $0.31 | $41.01 | Material | | | |

Estimate (MS/B 0410)

Claim # 200657216430

- 3 -

Feb 26, 2006

**Balboa  00058**

Re: Williams v. Balboa

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
|  | 126 SF @ $0.56 | $70.56 | Labor |  |  |  |
|  |  | $111.57 | $20.29 | $91.28 |  |  |
| Rem/Reset Ceiling Fixture | 1 EA @ $19.01 | $19.01 | $0.00 | $19.01 |  |  |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 |  | N |
|  |  | $1,138.33 | $459.80 | $678.53 |  |  |

## Roof

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ $25.16 | $251.60 | $0.00 | $251.60 |  |  |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ $164.86 | $1,648.60 | $299.75 | $1,348.85 |  |  |
| Remove Sheathing, Roof | 240 SF @ $0.12 | $28.80 | $0.00 | $28.80 |  |  |
| Replace Sheathing, Roof | 264 SF @ $0.78 | $205.92 | $37.44 | $168.48 |  |  |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ $16.81 | $42.03 | $0.00 | $42.03 |  |  |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ $118.19 | $354.57 | $141.83 | $212.74 |  |  |
| Replace Felt | 3 SQ @ $16.29 | $48.87 | $30.54 | $18.33 |  |  |
| Paint Siding, Painting | 48 SF @ $0.50 | $24.00 | $18.00 | $6.00 |  |  |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $0.15 | $7.20 | $0.00 | $7.20 |  |  |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $1.32 | $63.36 | Material |  |  |  |
|  | 0 SF @ $1.01 | $0.00 |  |  |  |  |
|  |  | $63.36 | $21.12 | $42.24 |  |  |
| Remove Gable Vent | 1 EA @ $2.53 | $2.53 | $0.00 | $2.53 |  |  |
| Replace Gable Vent | 1 EA @ $42.04 | $42.04 | $16.82 | $25.22 |  |  |
|  |  | $2,719.52 | $565.50 | $2,154.02 |  |  |

## Bathroom (8' 6" x 5' 4" x 8')

45 sf Floor      221 sf Wall      45 sf Ceiling      28 lf Floor      28 lf Ceiling      363 cf Volume

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 221 SF @ $0.16 | $35.36 | $0.00 | $35.36 |  | N |
| Clean Ceramic Floor, Thin Set | 45 SF @ $0.16 | $7.20 | $0.00 | $7.20 |  | N |
| Clean Drywall, Ceiling | 45 SF @ $0.15 | $6.75 | $0.00 | $6.75 |  | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 | $10.25 | $0.00 | $10.25 |  | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 | $5.01 | $0.00 | $5.01 |  | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 | $4.99 | $0.00 | $4.99 |  | N |
| Clean Toilet Seat | 1 EA @ $1.47 | $1.47 | $0.00 | $1.47 |  | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 | $6.58 | $0.00 | $6.58 |  | N |
|  |  | $77.61 | $0.00 | $77.61 |  |  |

## Exterior

|  |  | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Special Dumpster, 20 Yard | 1 EA @ $380.08 | $380.08 | $0.00 | $380.08 |  |  |
|  |  | $380.08 | $0.00 | $380.08 |  |  |

Balboa  00059
Re: Williams v. Balboa

| | Repl. Cost | Depr. | ACV |
|---|---|---|---|
| Estimate Totals | $11,446.67 | $4,237.15 | $7,209.52 |
| Contractor's Overhead & Profit (20%) | $2,289.33 | $847.43 | $1,441.90 |
| Total With Overhead & Profit | $13,736.00 | $5,084.58 | $8,651.42 |
| Sales Tax | $525.16 | $228.27 | $296.89 |
| Total With Tax | $14,261.16 | $5,312.85 | $8,948.31 |

Price Database Legend
All prices from TCD05D1101.

Balboa  00060
Re: Williams v. Balboa



March 6, 2006

GMAC
Loss Draft Dept.

RE:    Insured:          Billy Williams
       Claim No.:        GM7136890, 1
       Date of Loss:     02/05/2006
       Loan No.:         5901-0000-0833002922
       Type of Loss:     FIRE

Dear Loss Draft Dept.:

We are writing to provide you with a summary of the claim payment issued for your loss. The coverage limit of $32,311.00 is the maximum amount allowed. The money paid to date represents the actual cash value of your loss.

Under Section I-Conditions-Loss Settlement, certain property is settled based on actual cash value. Because the damage to your property is subject to this type of evaluation, we have based our actual cash settlement on the replacement cost of the property less depreciation. The depreciation factor applied is based on the age, use and condition of your property at the time of the loss. Our determination of the actual cash value using this formula allows our customer to receive a more beneficial settlement of the property. Please refer to the damage evaluation section of this letter for a complete breakdown.

You may recover the refundable depreciation by sending us a work completion certificate from your contractor or the receipts and invoices documenting the repair to the risk. Should you replace or repair the damage for less money than the amount allowed, we will pay the amount owed based on your actual cost. Under the terms of the policy, you have 180 days from the date of loss to file this additional claim.

**If a loss payment was not enclosed in this correspondence, then the actual cash value payment has been sent to GMAC. You may reach them at (504) 929-5728. A photocopy of our adjuster's estimate is enclosed for your records.**

**Balboa  00078**
**Re: Williams v. Balboa**

Page Two

| DAMAGE EVALUATION | |
|---|---|
| REPLACEMENT COST ESTIMATE (This is the amount it will take to properly repair your property) | $11,933.64 |
| LESS NON-REFUNDABLE DEPRECIATION (This is the amount that you are not able to recover. These items are paid at actual cash value only and include carpet and pad.) | ($943.68) |
| REPLACEMENT COST AVAILABLE (This is the total amount it will take to properly repair your property minus the non refundable depreciation) | $10,989.96 |
| LESS REFUNDABLE DEPRECIATION (This is the amount deducted from the replacement cost per your policy to determine the actual cash value payment made to you. This amount will be refunded to you once the repairs are complete for replacing drywall, painting, flooring and insulation.) | ($3,293.47) |
| LESS DEDUCTIBLE (This is the amount you are responsible for) | ($500.00) |
| ACTUAL CASH VALUE PAYMENT (This is the amount of the loss payment issued) | $7,196.49 |

In addition to the Replacement Cost Available figure noted above, appropriate Profit and Overhead totaling $2279.83 charged by a general contractor will be allowed. To make a claim for the Profit and Overhead, please submit a copy of the signed Work Authorization. If additional damages are discovered, it is your responsibility to inform us of the additional damages and allow inspection before repairs are made. Failure to do so may jeopardize your ability to recover for the full amount of the additional damages. Balboa Insurance Company reserves the right to inspect the property or require additional information prior to the release of any additional funds.

Sincerely,

*Tancy Nelson*

Tancy Nelson
Claim Representative
**Balboa Insurance Company**
1 888-898-1546, Ext. 1421

Encl.: Estimate AND CHECK

CC:   Billy Williams

TO:       CL **RE-INSPECTION RUSH ASSIGNMENT**

FROM:     **Balboa Insurance Company**
          PO Box 19702, Irvine CA 92623, 888-898-1546, Fax No. (866)336-9054
          Assigned by: Tancy Nelson Ext.: 1421    Date: May 10, 2006

# NEW LOSS ASSIGNMENT
### Confirmation of Assignment Requested within 24 Hours

Policy No.:       GM7136890, 1            Hm Phone No: (____) ____-____
Borrower:         Billy Williams          Wk Phone No:(____) ____-____
Date of Loss:     02/05/2006                      Type of policy:      LPP
Policy Limit:     $32,311.00              Deductible:          $500.00
Contact Person:   BORROWER 334-406-7738
Policy Dates:     Eff.  05/27/2005             Exp.  05/27/2006
Location of Risk: 678 Co Rd 620 Enterprise, AL 36330
Mortgage Co.:     GMAC Mortgage (LPI)
Loan No.:         5901-0000-0833002922
                                                  Type of Loss:  FIRE

| X | LPI |
| | HO |
| | RENTERS |

Requested Information:

| X | Narrative of findings. |

| X | Estimate should be based on unit costs figures for material, tax and labor only including a separate line item for overhead and profit. |

| X | Estimate should include appropriate depreciation figures on materials. |

| | Fire/Police report.
Police Department:    [Type department name]
Case No.              [Type case number] |

| X | Bill per fee assignment **effective June 15, 2005.** |

| X | Special instructions/directions: THE BORROWER PROVIDED 3 ESTIMATES FOR OVER $40K EACH. HOWEVER, THE ESTIMATE'S DIDN'T ITEMIZE HOW THEY CAME UP WITH THE PRICE. PLEASE CONTACT THE BORROWER & SET AN APPT. WITH HER & THE CONTRACTOR OF HER CHOICE. **PLEASE RUSH THIS!!!!!** CALL ME WITH YOUR FAX NUMBER SO I CAN SEND THESE ESTIMATES TO YOU. |

• This is a limited assignment - coverage/opinion is not to be discussed with customer.

PartAsn

**Balboa  00082**
Re: Williams v. Balboa

- Complete and forward the requested information/documentation, photos and billing **within 10 days** of receipt of the assignment. Please refer to Balboa's appraisal service requirements for additional information.
- Please do not overlap photos on the mounting sheet. Please do not staple adding machine tapes over the damage estimates. (Tape them to a separate page) Please do not provide two sided documents.

PartAsn

**Balboa 00083**
Re: Williams v. Balboa

5-3-06

Yancey,
    This was faxed 3 times and our
house burned Feb. 5th. We need to
get things moving. Nobody will touch
it for what the adjuster said. We
can't continue to pay for somewhere to
live and the mortgage too on a house
that can't be lived in. We want to
get this cleaned up as soon as possible.
I already let GMAC know that they
won't be foreclosing on anything to
live in if they do that. They just
want to know what the insurance is
going to do as soon as possible. Looking
forward to hearing from you soon.

                    Teresa Williams
            334- 308 -1553

My attorney told my husband to not pay,
to ~~re~~ fax this again, to send
it so you would have to sign for it.

**Balboa 00085**
Re: Williams v. Balboa

MAY. 10. 2006 10:55AM                                   NO 8531    P. 3/6

866-336-9054              Billy L. + Teresa
Att: Tancy Nelson        Williams
                         GM 7136890

Tancy,
        These are the estimates
from the contractors that would
write one. I have a list of them
that won't do burn outs, or won't
touch ours because its to much
to fix. They are as follows:

1. Billy Cotter Const.
2. Jeff Petty                7. McClean-Whittaker Cons.
3. Terry Mc Duffie           8. Prestige Const.
4. Boland Homes              9. R+J Const.
5. C+M Contractor            10. Scotty Hutto Const.
6. Jackson Const.            11. United Contracting.

They said it would cost this much to
put it back safe and to get the burnt
smell out. Some of them said if I
had enough insurance to pay GMAC
that I should do that and buy a
moble home for the lot. I don't
know the pay off or the amount it was
insured for but I guess we want to
pay it off since we will have to pay alot
with the insurance to get it fixed. I can
be reached at 334-308-1553. Thanks, Teresa Williams

**Balboa  00086**
Re: Williams v. Balboa

MAY. 10. 2006 10:55AM

# PROPOSAL

NO. 8531    P. 4/6

No. _____
Date 3-25-06
Sheet No. _____

**Proposal Submitted To:**

Name Jerry Gontile
Street Hwy 84
City New Brockton State AlA
Phone        894-0869

**Work To Be Performed At:**

Billy Williams
Street 678 County Rd 620
City Ent State Ala
Date of Plans        Architect

We hereby propose to furnish the materials and perform the labor necessary for the completion of

Replace Roof, Rafters, Docking & Shingles where Burnt.
Tear out Kitchen wall & ceiling & Replace Burnt
Framing.
Replace Sheetrock & WALLS
Flooring Bucked & Install new flooring
Replace wiring where Burnt.
Replace CARPet
Replace DOORS unit to side Room.
Get out entire Kitchen (New cabinets)
Install Insulation.
Paint Inside.

            Total = $41,500.00

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in substantial workmanlike manner for the sum of
Forty one thousand Five hundred
Dollars ($41,500.00).
with payments to be made as follows:

Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will become an extra or large over and above the estimate. All agreements contingent upon strikes, accidents or delays beyond our control. Owner to carry fire, tornado and other necessary insurance upon above work. Workmen's Compensation and Public Liability Insurance on above work to be carried out by

Respectfully submitted [signature]

Per _____

Note–This proposal may be withdrawn by us if not accepted within 5 days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payment will be made as outlined above.

Date _____

Signature _____

Signature _____

**Balboa  00087**
Re: Williams v. Balboa

MAY. 10. 2006 10:56AM                                    NO. 8531   P. 5/6

*Billy & Teresa Williams*
*198 cats rd 620*
*Alabama*

Estimate/Bill                    Contract # 537

# B&B Construction

### Quality Work Done Right the First Time
### Enterprise, Alabama
### (334) 806-7778

Work to be Performed –

*Tear out all damaged floor joist, decking, and floor covering (rug, linoleum ect) replace damaged joists decking. Tear out interior wall sheathing, replace w/ Drywall and finish to be ready to paint. Tear out and replace damaged electrical wiring and fixtures. Tear out interior ceilings and replace with drywall to be finished to be able to paint. Tear out and replace Bathroom fixtures (Tub Toilet sink vanities) Tear out + replace kitchen cabinets + sinks. Tear off all damaged roof rafters and decking + replace to original. Tear off and replace shingle roof. Tear off + replace entire damaged exterior siding + facia. Tear out + replace Front windows*

All Work listed above is to be performed for the below mentioned price, any additional work not listed above may be submitted in writing to below signed contractor, additional work not listed above may be added to said contract for an additional fee to be determined by said contractor, also any additional work may be declined by said contractor with no negative affects to regards to original agreement.

Fee to be paid as follows – A retainer of 45% of total price to be paid up front with remainder to be paid ~~immediately upon completion of job~~ *as follows, 20% to be paid upon completion of roof and the gutting of the house*

Notes –

_____

_____

_____

TOTAL  *44,758.00*

Paid _____

Balance remaining _____

Contractor                              Responsible Party
*Eric Jinman*                           _____

_____                 _____

**Balboa  00088**
Re: Williams v. Balboa

MAY. 10. 2006 10:56AM                                        NO. 8531   P. 6/6

---

*25 Years Experience  •  All Types of Roofs*

# GRIMES ROOFING
### 258 County Rd 276 ~ Enterprise, AL 36330
### Phone 894-9285

Contract No. *1896*
Sheet No. *1*
Date *25 March 06*

| Contract Submitted To | Work To Be Performed At |
|---|---|
| Name *Billy + Teresa Williams* | Street |
| Street *678 cnty Rd 620* | City *Same* State *AL* |
| City | Date of Plans |
| State *Alabama* | Architect |
| Telephone No. | |

We hereby propose to furnish all the materials and perform all the labor necessary for the completion of

*Repair exterior siding and facia, Tear off + replace roof To include damaged rafters*
*decking and shingles.*
*Replace damaged electric wiring, replace damaged Tear out and replace bathroom*
*cabinets, vanities + fixtures (Tub toilets sink ect.)*
*Tear out interior walls or ceilings, replace with sheetrock and finish with up to 6 overnight*
*Take out + replace Front windows.*                                      *10 point*
*Replace Tear out damaged flooring (water/fire) ie place flooring with Plywood, replace*
*damaged floor joists, replace electric for damaged electrical fixtures, replace*
*Kitchen sink and Tear out + replace damaged kitchen cabinets*
*Haul all debris to provided Dumpster*

All material is guaranteed to be as specified, and the above work to be performed in accordance with any drawings or specifications
submitted for the above work and completed in a professional manner for the sums of

Dollars ($ *55,893ºº* ).

with payments to be made as follows:  *45% to be paid as retainer up front, 20% upon gutting and*
*roof Done, 35% paid at completion*

Any alteration or deviation from above specifications involving extra costs, will be executed only upon written orders, and will
become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our
control. Owner to carry fire, tornado, and other necessary insurance upon above work. Public Liability Insurance on above work to
be taken out by

Respectfully submitted _____

Per _____

Note - This proposal may be withdrawn by us if not accepted within *5* days.

## ACCEPTANCE OF CONTRACT

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work as
specified. Payment will be made as outlined above.

Accepted _____        Signature _____

# Short Form

Claim # 200657216430

## Cunningham Lindsey U.S., Inc.

**Adjuster**
David Toellner

**Phone**
**Fax**

300 Century Park South
Suite 200
Birmingham, AL 35226
Phone (205) 823-8338   Fax (205) 823-8341

September 25, 2006

**Insured**   Williams, Billy
**Loss Address**   678 Co Rd 620, Enterprise, AL 36330
**Phone Number** (334) 406-7738
**Other Phone**
**Ins Company**   BALBOA INSURANCE COMPANY

**Policy #**   GM47136890
**Ins Claim #** GM7136R90-1

**Date of Loss**   2/6/2006

### Coverage

**Policy Type**
**Effective**
**Deductible**   $500.00

Mortgagee   None Showing

| Coverage | Description | Coverage Amt | Value Requirement |
|---|---|---|---|
| BLDG | Coverage A - Building | $32,311.00 | None |
| APS | Coverage B - APS | $3,331.10 | None |
| UPP | Coverage UPP - Contents | $16,155.50 | None |
| ALE/FMV | Coverage D - ALE/FMV | $6,462.20 | None |

### Adjuster's Report

**Assigned**   2/8/2006   **Contacted** 2/8/2006   **Inspected**  2/13/2006
**Apparent Cause of Loss/Scope**   damage by Fire
**Items Subject to Exclusions/Limitations**
**Salvage or Subrogation Potential**

### Loss Recap

| Coverage | RC Loss | Depreciation | ACV Loss | Recov. Depr. | TOTAL |
|---|---|---|---|---|---|
| BLDG | $20,106.76 | $7,323.04 | $12,783.72 | $7,323.04 | $20,106.76 |
| TOTALS | $20,106.76 | $7,323.04 | $12,783.72 | $7,323.04 | $20,106.76 |

### Enclosures

☒ Estimates   ☐ Photos   ☐ Proof of Loss   ☐ Adjuster Summary
☐ Claim Summary   ☐ Diagrams   ☐ RC Proof   ☐ PILR   ☐ Estimate Recap   ☐ Statement of Loss   ☐ Invoice   Other:

### Recommendations

**Payment Recommendations: Initial**   $12,283.72
**Upon Completion**   $7,323.04

**Deductible and insured's participation**   $500.00
**Recommended Adjustment**   $19,606.76

**Payee**  Williams, Billy

*Attached is the new estimate with changes as would be necessary after review of the contractors input  The replacing acoustical ceiling with drywall was not included as well as the complete remodel of the bathrooms.  There is no reason not to clean Ceramic tile toilet and bathtub in each of the bathrooms.  The two bathrooms make up about $10,000 of the contractors estimate.*

*We are concluding with this new estimate and will be closing our file.*

Short Form (MSAB 01/01)
Claim # 200657216430

- 1 -

Sep 25, 2006

Balboa  00094
Re: Williams v. Balboa

# Estimate

Claim # 200657216430
Coverage BLDG

## Cunningham Lindsey U.S., Inc.

Adjuster
David Toellner

300 Century Park South
Suite 200
Birmingham, AL  35226
Phone  (205) 823-8338   Fax  (205) 823-8341

September 25, 2006
Coverage A - Building

Insured         Williams, Billy
Loss Address    678 Co Rd 620, Enterprise, AL  36330
Phone Number  (334) 406-7738        Policy #   GM47136890
                                    Ins Claim # GM7136890-1

Ins Company   BALBOA INSURANCE COMPANY

Date of Loss    2/6/2006

---

### Living Room (15' x 14' 6" x 8')

| 315 sf Floor | 608 sf Wall | 315 sf Ceiling | 76 lf Floor | 76 lf Ceiling | 2,522 cf Volume |
|---|---|---|---|---|---|

Offset(s)   11' 6"  x  8' 6"

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ $0.25 ª | $152.00 | $0.00 | $152.00 | |
| Replace Wallpaper | 711.36 SF @ $0.40 ª | $284.54 | Material | | |
| | 608 SF @ $0.34 | $206.72 | Labor | | |
| | | $491.26 | $327.51 | $163.75 | |
| Remove Carpet & Pad (SF) | 315 SF @ $0.17 ª | $53.55 | $0.00 | $53.55 | |
| Replace Carpet & Pad (SF) | 333.9 SF @ $1.37 ª | $457.44 | Material | | |
| | 315 SF @ $0.46 | $144.90 | Labor | | |
| | | $602.34 | $451.76 | $150.58 | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ $0.22 ª | $69.30 | $0.00 | $69.30 | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ $1.11 ª | $356.64 | Material | | |
| | 315 SF @ $0.29 | $91.35 | Labor | | |
| | | $447.99 | $224.00 | $223.99 | |
| Remove Crown Molding | 76 LF @ $0.18 ª | $13.68 | $0.00 | $13.68 | |
| Replace Crown Molding | 80.56 LF @ $1.89 ª | $152.26 | Material | | |
| | 76 LF @ $0.69 | $52.44 | Labor | | |
| | | $204.70 | $81.88 | $122.82 | |
| Paint Crown Molding | 76 LF @ $0.58 ª | $44.08 | $33.06 | $11.02 | |
| Special Check & Test Electric | 1 EA @ $13.54 ª | $13.54 | $0.00 | $13.54 | |
| Remove Window, Casement, Aluminum | 5 EA @ $10.50 ᵇ | $52.50 | $0.00 | $52.50 | |
| Replace Window, Casement, Aluminum | 5 EA @ $494.56 ᵇ | $2,472.80 | $1,248.84 | $1,223.96 | |
| Remove Door Only, Interior | 1 EA @ $1.97 ª | $1.97 | $0.00 | $1.97 | |
| Replace Door Only, Interior | 1 EA @ $147.57 ᵇ | $147.57 | $49.36 | $98.21 | |
| | | $4,767.28 | $2,416.41 | $2,350.87 | |

---

### Kitchen (14' 6" x 11' 6" x 8')

| 167 sf Floor | 416 sf Wall | 167 sf Ceiling | 52 lf Floor | 52 lf Ceiling | 1,334 cf Volume |
|---|---|---|---|---|---|

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ $0.22 ª | $36.74 | $0.00 | $36.74 | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ $1.11 ª | $189.08 | Material | | |
| | 167 SF @ $0.29 | $48.43 | Labor | | |
| | | $237.51 | $118.76 | $118.75 | |

Estimate (MS/B 0410)
Claim # 200657216430

- 1 -

Sep 25, 2006

Balboa 00095
Re: Williams v. Balboa

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Special Check & Test Electric | 1 EA @ $13.54 ª | $13.54 | $0.00 | $13.54 | |
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ $0.18 ª | $30.06 | $0.00 | $30.06 | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ $0.31 ª | $54.36 | Material | | |
| | 167 SF @ $0.56 | $93.52 | Labor | | |
| | | $147.88 | $26.89 | $120.99 | |
| Remove Ceiling Fixture | 1 EA @ $10.86 ᵇ | $10.86 | $0.00 | $10.86 | |
| Replace Ceiling Fixture | 1 EA @ $140.71 ᵇ | $140.71 | $22.49 | $118.22 | |
| Remove Ceiling/Paddle Fan | 1 EA @ $16.68 ᵇ | $16.68 | $0.00 | $16.68 | |
| Replace Ceiling/Paddle Fan | 1 EA @ $290.16 ᵇ | $290.16 | $0.00 | $290.16 | |
| Remove Drywall, Wall | 416 SF @ $0.16 ª | $66.56 | $0.00 | $66.56 | |
| Replace Drywall, Wall | 440.96 SF @ $0.39 ª | $171.97 | Material | | |
| | 416 SF @ $0.56 | $232.96 | Labor | | |
| | | $404.93 | $161.97 | $242.96 | |
| Paint Drywall, Wall | 416 SF @ $0.35 ª | $145.60 | $109.20 | $36.40 | |
| Remove Crown Molding | 52 LF @ $0.18 ª | $9.36 | $0.00 | $9.36 | |
| Replace Crown Molding | 55.12 LF @ $1.89 ª | $104.18 | Material | | |
| | 52 LF @ $0.69 | $35.88 | Labor | | |
| | | $140.06 | $56.02 | $84.04 | |
| Paint Crown Molding | 52 LF @ $0.58 ª | $30.16 | $22.62 | $7.54 | |
| Remove Door, Interior, Pre-Hung | 1 EA @ $10.01 ª | $10.01 | $0.00 | $10.01 | |
| Replace Door, Interior, Pre-Hung | 1 EA @ $221.73 ª | $221.73 | $110.87 | $110.86 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 ª | $28.74 | $21.56 | $7.18 | |
| Remove Subfloor | 167 SF @ $0.14 ª | $23.38 | $0.00 | $23.38 | |
| Replace Subfloor | 175.35 SF @ $0.78 ª | $136.77 | Material | | |
| | 167 SF @ $0.26 | $43.42 | Labor | | |
| | | $180.19 | $32.76 | $147.43 | |
| Remove Underlayment | 167 SF @ $0.12 ª | $20.04 | $0.00 | $20.04 | |
| Replace Underlayment | 175.35 SF @ $0.38 ª | $66.63 | Material | | |
| | 167 SF @ $0.22 | $36.74 | Labor | | |
| | | $103.37 | $18.79 | $84.58 | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ $0.21 ª | $35.07 | $0.00 | $35.07 | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ $1.35 ª | $238.98 | Material | | |
| | 167 SF @ $0.86 | $143.62 | Labor | | |
| | | $382.60 | $273.29 | $109.31 | |
| Clean Door, Interior, Pre-Hung | 1 EA @ $3.23 ª | $3.23 | $0.00 | $3.23 | N |
| Paint Door, Interior, Pre-Hung | 1 EA @ $28.74 ª | $28.74 | $21.56 | $7.18 | |
| Clean Countertop, Formica | 10 LF @ $0.24 ª | $2.40 | $0.00 | $2.40 | N |
| Remove Cabinet, Wall (LF) | 7 LF @ $3.99 ª | $27.93 | $0.00 | $27.93 | |
| Remove Window, Casement, Aluminum | 1 EA @ $10.50 ᵇ | $10.50 | $0.00 | $10.50 | |
| Replace Window, Casement, Aluminum | 1 EA @ $494.56 ᵇ | $494.56 | $249.77 | $244.79 | |
| Replace Cabinet, Wall (LF) | 7 LF @ $129.64 ª | $907.48 | $362.99 | $544.49 | |
| | | $4,200.78 | $1,609.54 | $2,591.24 | |

---

**Family Room (17' 4" x 11' 6" x 8')**

217 sf Floor      512 sf Wall      217 sf Ceiling      64 lf Floor      64 lf Ceiling      1,736 cf Volume

---

**Balboa 00096**
Re: Williams v. Balboa

Offset(s)   5' 7" x 3' 2"

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ $0.17 a | $36.89 | $0.00 | $36.89 | | |
| Replace Carpet & Pad (SF) | 230.02 SF @ $1.37 a | $315.13 | Material | | | |
| | 217 SF @ $0.46 | $99.82 | Labor | | | |
| | | $414.85 | $311.21 | $103.74 | | |
| Remove Drywall, Ceiling | 217 SF @ $0.20 a | $43.40 | $0.00 | $43.40 | | |
| Replace Drywall, Ceiling | 227.85 SF @ $0.41 a | $93.42 | Material | | | |
| | 217 SF @ $0.63 | $136.71 | Labor | | | |
| | | $290.13 | $92.05 | $138.08 | | |
| Paint Drywall, Ceiling | 217 SF @ $0.49 a | $106.33 | $79.75 | $26.58 | | |
| Remove Paneling, Pine | 512 SF @ $0.17 a | $87.04 | $0.00 | $87.04 | | |
| Replace Paneling, Pine | 537.6 SF @ $0.70 a | $376.32 | Material | | | |
| | 512 SF @ $0.44 | $225.28 | Labor | | | |
| | | $601.60 | $240.64 | $360.96 | | |
| Remove Door Only, Interior | 2 EA @ $1.97 b | $3.94 | $0.00 | $3.94 | | |
| Replace Door Only, Interior | 2 EA @ $147.57 b | $295.14 | $0.00 | $295.14 | | |
| Special Check & Test Electric | 1 EA @ $13.54 a | $13.54 | $0.00 | $13.54 | | |
| | | $1,832.96 | $723.65 | $1,109.31 | | |

## Hall Bath (5' 10" x 7' 10" x 8')

46 sf Floor      219 sf Wall      46 sf Ceiling      27 lf Floor      27 lf Ceiling      366 cf Volume

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Clean Ceramic Wall, Thin Set | 219 SF @ $0.16 a | $35.04 | $0.00 | $35.04 | | N |
| Clean Ceramic Floor, Thin Set | 46 SF @ $0.16 a | $7.36 | $0.00 | $7.36 | | N |
| Clean Drywall, Ceiling | 46 SF @ $0.15 a | $6.90 | $0.00 | $6.90 | | N |
| Clean Bath Tub, Good | 1 EA @ $10.25 a | $10.25 | $0.00 | $10.25 | | N |
| Clean Lavatory, Porcelain Enamel | 1 EA @ $5.01 a | $5.01 | $0.00 | $5.01 | | N |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ $4.99 a | $4.99 | $0.00 | $4.99 | | N |
| Clean Toilet Seat | 1 EA @ $1.47 a | $1.47 | $0.00 | $1.47 | | N |
| Clean Ceiling Fixture | 1 EA @ $6.58 a | $6.58 | $0.00 | $6.58 | | N |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ $0.22 a | $10.12 | $0.00 | $10.12 | | |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ $1.11 a | $52.08 | Material | | | |
| | 46 SF @ $0.29 | $13.34 | Labor | | | |
| | | $65.42 | $32.71 | $32.71 | | |
| | | $153.14 | $32.71 | $120.43 | | |

## Bedroom (11' 6" x 11' x 8')

126 sf Floor      360 sf Wall      126 sf Ceiling      45 lf Floor      45 lf Ceiling      1,012 cf Volume

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ $0.17 a | $21.42 | $0.00 | $21.42 | | |
| Replace Carpet & Pad (SF) | 133.56 SF @ $1.37 a | $182.98 | Material | | | |
| | 126 SF @ $0.46 | $57.96 | Labor | | | |
| | | $240.94 | $180.71 | $60.23 | | |
| Remove Acoustical Ceiling, 12x12 | 126 SF @ $0.22 a | $27.72 | $0.00 | $27.72 | | |
| Replace Acoustical Ceiling, 12x12 | 128.52 SF @ $1.11 a | $142.66 | Material | | | |
| | 126 SF @ $0.29 | $36.54 | Labor | | | |
| | | $179.20 | $89.60 | $89.60 | | |
| Remove Paneling, Pine | 360 SF @ $0.17 a | $61.20 | $0.00 | $61.20 | | |
| Replace Paneling, Pine | 378 SF @ $0.70 a | $264.60 | Material | | | |

Estimate (MS/B 0410)
Claim # 200657216430

- 3 -

Sep 25, 2006

Balboa 00097
Re: Williams v. Balboa

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| | 360 SF @ $0.44 | $158.40 | Labor | | |
| | | $423.00 | $169.20 | $253.80 | |
| Remove Door Only, Interior | 1 EA @ $1.97 [b] | $1.97 | $0.00 | $1.97 | |
| Replace Door Only, Interior | 1 EA @ $147.57 [b] | $147.57 | $0.00 | $147.57 | |
| Special Check & Test Electric | 1 EA @ $13.54 [a] | $13.54 | $0.00 | $13.54 | |
| Remove Window, Casement, Aluminum | 1 EA @ $10.50 [b] | $10.50 | $0.00 | $10.50 | |
| Replace Window, Casement, Aluminum | 1 EA @ $494.56 [b] | $494.56 | $0.00 | $494.56 | |
| Remove Furring Strips, Ceiling (SF), 12" oc | 126 SF @ $0.18 [a] | $22.68 | $0.00 | $22.68 | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 132.3 SF @ $0.31 [a] | $41.01 | Material | | |
| | 126 SF @ $0.56 | $70.56 | Labor | | |
| | | $111.57 | $20.29 | $91.28 | |
| Remove Ceiling Fixture | 1 EA @ $10.86 [b] | $10.86 | $0.00 | $10.86 | |
| Replace Ceiling Fixture | 1 EA @ $140.71 [b] | $140.71 | $0.00 | $140.71 | |
| | | $1,907.44 | $459.80 | $1,447.64 | |

## Roof

| | | Repl. Cost | Depr. | ACV | OP RD |
|---|---|---|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ $25.16 [a] | $251.60 | $0.00 | $251.60 | |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ $164.86 [b] | $1,648.60 | $299.75 | $1,348.85 | |
| Remove Sheathing, Roof | 240 SF @ $0.12 [a] | $28.80 | $0.00 | $28.80 | |
| Replace Sheathing, Roof | 264 SF @ $0.78 [a] | $205.92 | $37.44 | $168.48 | |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ $16.81 [a] | $42.03 | $0.00 | $42.03 | |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ $118.19 [a] | $354.57 | $141.83 | $212.74 | |
| Replace Felt | 3 SQ @ $16.29 [a] | $48.87 | $30.54 | $18.33 | |
| Paint Siding, Painting | 48 SF @ $0.50 [a] | $24.00 | $18.00 | $6.00 | |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $0.15 [a] | $7.20 | $0.00 | $7.20 | |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ $1.32 [a] | $63.36 | Material | | |
| | 0 SF @ $1.01 | $0.00 | | | |
| | | $63.36 | $21.12 | $42.24 | |
| Remove Gable Vent | 1 EA @ $2.53 [a] | $2.53 | $0.00 | $2.53 | |
| Replace Gable Vent | 1 EA @ $42.04 [a] | $42.04 | $16.82 | $25.22 | |
| | | $2,719.52 | $565.50 | $2,154.02 | |

## Bathroom (8' 6" x 5' 4" x 8')

| 45 sf Floor | 221 sf Wall | 45 sf Ceiling | 28 lf Floor | 28 lf Ceiling | 363 cf Volume | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | Repl. Cost | Depr. | ACV | OP RD |
| Clean Ceramic Wall, Thin Set | | | 221 SF @ $0.16 [a] | | $35.36 | $0.00 | $35.36 | N |
| Clean Ceramic Floor, Thin Set | | | 45 SF @ $0.16 [a] | | $7.20 | $0.00 | $7.20 | N |
| Clean Drywall, Ceiling | | | 45 SF @ $0.15 [a] | | $6.75 | $0.00 | $6.75 | N |
| Clean Bath Tub, Good | | | 1 EA @ $10.25 [a] | | $10.25 | $0.00 | $10.25 | N |
| Clean Lavatory, Porcelain Enamel | | | 1 EA @ $5.01 [a] | | $5.01 | $0.00 | $5.01 | N |
| Clean Toilet/Water Closet, Floor Mounted | | | 1 EA @ $4.99 [a] | | $4.99 | $0.00 | $4.99 | N |
| Clean Toilet Seat | | | 1 EA @ $1.47 [a] | | $1.47 | $0.00 | $1.47 | N |
| Clean Ceiling Fixture | | | 1 EA @ $6.58 [a] | | $6.58 | $0.00 | $6.58 | N |
| | | | | | $77.61 | $0.00 | $77.61 | |

Balboa 00098

Re: Williams v. Balboa

## Exterior

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Special Dumpster, 20 Yard | 1 EA @ $380.08 a | $380.08 | $0.00 | $380.08 | | |
| | | $380.08 | $0.00 | $380.08 | | |

| | Repl. Cost | Depr. | ACV |
|---|---|---|---|
| Estimate Totals | $16,038.81 | $5,807.61 | $10,231.20 |
| Contractor's Overhead & Profit (20%) | $3,207.76 | $1,161.52 | $2,046.24 |
| Total With Overhead & Profit | $19,246.57 | $6,969.13 | $12,277.44 |
| Sales Tax | $860.19 | $353.91 | $506.28 |
| Total With Tax | $20,106.76 | $7,323.04 | $12,783.72 |

**Price Database Legend**
a = TCD05D1101.
b = TCD06B0504.

**Balboa 00099**
Re: Williams v. Balboa



September 26, 2006

GMAC Mortgage (LPI)
Loss Draft Dept.


RE:    Insured:          Billy Williams
       Claim No.:        GM7136890, 1
       Date of Loss:     02/05/2006
       Loan No.:         5901-0000-0833002922
       Type of Loss:     FIRE


Dear Loss Draft Dept.

We are writing to provide you with a summary of the claim payment issued for your loss. The coverage limit of $32,311.00 is the maximum amount allowed. The money paid to date represents the actual cash value of your loss.

Under Section I-Conditions-Loss Settlement, certain property is settled based on actual cash value. Because the damage to your property is subject to this type of evaluation, we have based our actual cash settlement on the replacement cost of the property less depreciation. The depreciation factor applied is based on the age, use and condition of your property at the time of the loss. Our determination of the actual cash value using this formula allows our customer to receive a more beneficial settlement of the property. Please refer to the damage evaluation section of this letter for a complete breakdown.

You may recover the refundable depreciation by sending us a work completion certificate from your contractor or the receipts and invoices documenting the repair to the risk. Should you replace or repair the damage for less money than the amount allowed, we will pay the amount owed based on your actual cost. Under the terms of the policy, you have 180 days from the date of loss to file this additional claim.

**If a loss payment was not enclosed in this correspondence, then the actual cash value payment has been sent to GMAC Mortgage (LPI). You may reach them at 866-354-7281. A photocopy of our adjuster's estimate is enclosed for your records.**


**Balboa 00107**
Re: Williams v. Balboa

Page Two

| DAMAGE EVALUATION | |
|---|---|
| REPLACEMENT COST ESTIMATE (This is the amount it will take to properly repair your property) | $16,899.00 |
| LESS NON-REFUNDABLE DEPRECIATION: (This is the amount that you are not able to recover. These items are paid at actual cash value only and include carpet and pad.) | $943.68 |
| REPLACEMENT COST AVAILABLE (This is the total amount it will take to properly repair your property minus the non-refundable depreciation) | $15,955.32 |
| LESS REFUNDABLE DEPRECIATION (This is the amount deducted from the replacement cost per your policy to determine the actual cash value payment made to you. This amount will be refunded to you once the repairs are complete for replacing drywall, painting, etc.) | $4,863.93 |
| LESS DEDUCTIBLE (This is the amount you are responsible for) | $500.00 |
| PRIOR PAYMENT | $7,196.49 |
| ACTUAL CASH VALUE PAYMENT (This is the amount of the loss payment issued) | $3,394.90 |

In addition to the Replacement Cost Available figure noted above, appropriate Profit and Overhead totaling $3,207.76 charged by a general contractor will be allowed. To make a claim for the Profit and Overhead, please submit a copy of the signed Work Authorization. If additional damages are discovered, it is your responsibility to inform us of the additional damages and allow inspection before repairs are made. Failure to do so may jeopardize your ability to recover for the full amount of the additional damages. Balboa Insurance Company reserves the right to inspect the property or require additional information prior to the release of any additional funds.

Sincerely,

*Taney Nelson*

Taney Nelson
Claim Representative
**Balboa Insurance Company**
1 888-898-1546, Ext. 1421

Encl.: Estimate **AND CHECK**

CC:    Billy Williams

**Balboa 00108**
Re: Williams v. Balboa

1      IN THE UNITED STATES DISTRICT COURT

2      FOR THE MIDDLE DISTRICT OF ALABAMA

3              SOUTHERN DIVISION

4

5  CIVIL ACTION NO.  1:07-CV-549-WHA

6

7  BILLY WILLIAMS and
   TERESA WILLIAMS,
8
              Plaintiffs,
9
   vs.
10
   BALBOA INSURANCE COMPANY,
11
              Defendant.
12

13

14

15                 DEPOSITION

16                     OF

17            DAVID NELSON TOELLNER

18              March 14, 2008

19

20

   Taken before:
21
                  Deborah Vann
22
                  Certified Court Reporter
23
                  and Notary Public

PLAINTIFF'S
EXHIBIT
4

1      form.

2          A.      That's kind of a catch 22.  We would write

3   our estimates without input of a contractor.  If there

4   was a disagreement between a local contractor, we

5   would contact that contractor and go over the

6   discrepancies and work out a compromise.

7          Q.      Okay.  So let me backtrack then.

8      Was that scenario also true at Crawford?

9          A.      Yes.

10         Q.      Was it true at Farmer's?

11         A.      Yes.

12         Q.      The contractors were not completely

13  ignored.  Their information was taken and considered;

14  right?

15         A.      Yes.

16         Q.      And where it differed from yours, there

17  would be some discussion about that?

18         A.      That's correct.

19         Q.      Do you feel that a local contractor would

20  have more knowledge concerning the cost of labor and

21  materials in the market where he works than an

22  insurance adjuster --

23                        MR. MORRISSETTE:  Object to the

1          form.

2      Q.      -- for Cunningham Lindsey, for example?

3      A.      Well, we are given the information through

4  our programs as to labor costs and material costs

5  subject to zip codes.

6      Q.      And, as the adjuster, you just have to

7  trust that the information you are getting from the

8  computer is accurate?

9              MR. MORRISSETTE:   Object to the

10             form.

11     A.      Yes.

12     Q.      You have to rely on the computer; correct?

13     A.      Yes.

14     Q.      And you have to rely on whoever it is that

15  is sitting off somewhere, wherever he is, inputting

16  the data; right?

17             MR. MORRISSETTE:   Object to the

18             form.

19     A.      Yes.

20     Q.      For example, this MSB program that was used

21  for the Williams' home, the one we are here about

22  today, you don't know who put the data into the

23  software program that was used for this loss, do you?

A.      No, I do not know.

Q.      You don't know his name or her name?

A.      Nope.

Q.      You don't know where he or she lives?

A.      No.

Q.      Or how I could get ahold of that person to ask them how they generated that document?  That's not something you know about?

A.      No, I could suggest, but --

Q.      Okay.

You have never talked to such a person, have you?

A.      No.

Q.      And you are told that they do it by zip code; correct?

A.      Correct.

Q.      Somebody told you that?

A.      Yes.

Q.      But you have never independently investigated that fact, have you?

A.      No.

Q.      Are you aware of any testing that's been done to check the accuracy of the MSB program that was used in the Williams' case against real world cost and

1    labor numbers?

2                    MR. MORRISSETTE:  Object to the

3             form.

4        A.    No.

5        Q.    Was there any type of -- while working for

6    Cunningham Lindsey, did you-all always use MSB or did

7    you use other software?

8        A.    We used the software that the specific

9    client company preferred.

10        Q.    Okay.

11        So the client company in this case was Balboa

12    Insurance; right?

13        A.    Yes.

14        Q.    And Balboa required the use of the MSB

15    software; right?

16        A.    Yes, sir.

17        Q.    If you are adjusting a loss for somebody

18    else like Farmer's, they may want you to use

19    Exactimate?

20        A.    Yes, sir.

21        Q.    Who -- I think I asked you this.  Forgive

22    me if I have.

23        Other than Balboa, can you give me a sampling of

```
 1              form.
 2      A.      Yes, sir.
 3      Q.      You could do it yourself; right?  You don't
 4  need a computer to tell you what to do?
 5      A.      It makes it easier.
 6      Q.      The computer makes it easier?
 7      A.      Yes, sir.  Neater.  Cleaner.
 8      Q.      Is there any discretion that you, as the
 9  claims adjuster, had to change the pricing information
10  that's being generated by the computer?
11      A.      Yes.
12      Q.      How would that be done?
13      A.      Manually.
14      Q.      Okay.
15  Was there any policy concerning whether or not
16  you had to check with the client company in order to
17  make such a change?
18      A.      In some cases, yes.
19      Q.      Do you know if you would have had to have
20  checked with Balboa, for example, if you wanted to
21  make any changes on the MSB-generated estimate for the
22  Williams' case?
23                      MR. MORRISSETTE:  Object to the
```

1          form.

2          A.     In most cases, I would make the change and

3     put it in my report that I had changed whatever

4     figures because of, and then justify the change.

5          Q.     Have you ever made such a change?

6          A.     Yes.

7          Q.     Can you remember specific occasions where

8     you would have made changes?

9          A.     Specifically, no.  I do remember drywall at

10    one time became in short supply and we made changes to

11    that at that time.

12         Q.     You -- did you adjust the price upward?

13         A.     Yes, sir.

14         Q.     So the -- on those occasions, the MSB

15    software was wrong?

16                    MR. MORRISSETTE:  Object to the

17                    form.

18         A.     It was different than the existing price.

19         Q.     Well, the truth is the existing price;

20    right?

21                    MR. MORRISSETTE:  Object to the

22                    form.

23         A.     Yes.

1      Q.     There is only one truth, it's either right

2   or it's wrong; correct?

3                      MR. MORRISSETTE:   Same objection.

4      A.     I would agree with that, I guess.

5      Q.     Right.

6      What matters is what are the real costs and

7   prices in this market; correct?

8      A.     Correct.

9      Q.     That's the bottom line; isn't that right?

10      A.     Yes.

11      Q.     Because that's what dictates how much it's

12   going to cost the homeowner to get the home fixed;

13   correct?

14                      MR. MORRISSETTE:   Same objection --

15                      or object to the form.

16      A.     Yes.

17                      MR. TALMADGE:   Let's take a bathroom

18                      break.

19      (Brief recess.)

20      Q.     (By Mr. Talmadge) Mr. Toellner, have you

21   ever worked as a contractor?

22      A.     I had a business called Kitchens Anew.

23      Q.     Kitchens Anew?

1      A.      In other words, we refaced kitchens.

2      Q.      Is that all you-all did?

3      A.      Right.

4      Q.      How long did you have that business?

5      A.      Couple of years.

6      Q.      Was that in Montgomery?

7      A.      Yes.

8      Q.      Have you ever worked as a general

9  contractor?

10     A.      No.

11     Q.      Do you know where contractors or builders

12  in the Enterprise, Alabama, area generally get their

13  supplies?

14     A.      I would presume Dothan would be the closest

15  major area.

16     Q.      Are you aware of any building supply stores

17  that are in Enterprise?

18     A.      Not offhand.

19     Q.      While adjusting claims over the years, did

20  you ever have an occasion to actually go to a building

21  supply store and see for yourself what materials cost?

22     A.      Yes.

23     Q.      When did you do that?

1     A.    Yes.

2     Q.    Did you ever go to any building supply

3 store in connection with the Williams' claim?

4     A.    No, sir.

5     Q.    Are you familiar with the company called

6 McKenzie and Company?

7     A.    No, sir.

8     Q.    Never heard of that company?

9     A.    No, sir.

10    Q.    Are you aware of any lawsuits that have

11 ever been filed against Balboa Insurance Company?

12    A.    No, sir.

13    Q.    Are you aware of any lawsuits that have

14 ever been filed against Tancy Nelson who is the

15 adjuster that is involved in this?

16    A.    No, sir.

17    Q.    Are you aware of any lawsuits that have

18 ever been filed against Cunningham Lindsey?

19    A.    No, sir.

20    Q.    How did you become involved in the claim

21 that's at issue in this case?

22    A.    A normal assignment.

23    Q.    How would that come in?

1   what caused the fire?

2       A.      And the origin.

3       Q.      Now, on the assignment sheet, it says that

4   your estimate should be based on unit cost figures for

5   material, tax and labor only, including a separate

6   line item for overhead and profit.

7       Do you see that part?

8       A.    Yes, sir.

9       Q.    What is that -- what does that mean in

10  terms of -- what are unit cost figures?

11      A.      Square foot, square yard.  In other words,

12  rather than saying I can paint this room for 50 bucks,

13  we need to know the square footage and the cost per

14  square foot to equal out the amount.

15      Q.      Is that type itemization needed to input

16  information into the computer software program?

17      A.    Yes, sir.

18      Q.      And then it says that the estimate should

19  include appropriate depreciation figures on

20  materials.

21      Is that what it says?

22      A.    Yes, sir.

23      Q.      And how does an adjuster such as yourself

1    determine depreciation?

2        A.      Through inspection.

3        Q.      Does the computer software program play any

4    role in that?

5        A.      Automatically figures from what we put in.

6        Q.      You put in the information.  For example,

7    the way this computer thing works is, you, as the

8    adjuster, go to the scene and you look and see what

9    type of work needs to be done.  And you input a type

10   of work, and then there is a code or something that

11   connects that type of work with a price.

12                   MR. MORRISSETTE:  Object to the

13             form.

14       Q.      The price is spit out for you; is that how

15   it works?

16                   MR. MORRISSETTE:  You mean with

17             regard to depreciation?

18                   MR. TALMADGE:  Any of it.  All of

19             it.

20                   MR. MORRISSETTE:  Object to the

21             form.

22       A.      We input the information -- I guess an

23   example of it would be -- the best way -- if I came in

1    here and I needed to clean, seal and paint the walls,

2    my measurements would show me the square footage

3    required.  The program would have a clean, seal and

4    paint area that I would put in with the square footage

5    and it would put their figure in there and multiply it

6    out giving me a net amount for that repair.

7        Q.    Okay.

8        A.    Depreciation would be based, again, upon my

9    inspection or input from the insured or something that

10   said I just purchased that carpet last week. Or if I

11   came in and looked at the carpet and they said they

12   only had it for five months or had it five years but

13   don't use that room because the daughter is in

14   college, that would adjust it, rather than a five year

15   depreciation, I may depreciate it considerably less

16   than that.

17       Q.    But in terms of how much money is given for

18   depreciation or rather is held back for depreciation,

19   the computer program determines the dollar amount?

20                   MR. MORRISSETTE:  Object to the

21                   form.

22       A.    Yes.

23       Q.    That, again, is something that, in terms of

1    generating the dollar amount, you have to trust the

2    computer to be accurate?

3                    MR. MORRISSETTE:  Object to the

4              form.

5         A.    I input the information; the computer gives

6    me the prices.

7         Q.    Right.  You are relying on the computer to

8    give you the prices?

9                    MR. MORRISSETTE:  Same objection.

10        A.    It's in the computer, yes.

11        Q.    You don't know who is on the other end

12   inputting information that results in the depreciation

13   prices, do you?

14                   MR. MORRISSETTE:  Object to the

15             form.

16        A.    No, I do not.

17        Q.    All right.

18        Another item on the Plaintiffs' Number 1, which

19   is Balboa 38, says bill per fee assignment effective

20   June 15, 2005?

21        A.    Yes, sir.

22        Q.    Was there some type of a pre-determined fee

23   contract between Cunningham Lindsey and Balboa?

1    time.

2        Q.      Do you remember -- what person gave you

3    this assignment within Cunningham?

4        A.      Probably Pat Horsely who was the secretary.

5        Q.      How would you have been chosen for this

6    assignment?

7        A.      I was the only property adjuster.

8        Q.      How many adjusters worked for Cunningham at

9    that time?

10       A.      There were two.

11       Q.      Who was the other one?

12       A.      Bill Fuqua.

13       Q.      What kind of work did he do?

14       A.      Casualty.

15       Q.      And did you-all just do work in Alabama?

16       A.      Yes.

17       Q.      Your geographic area, is it similar to what

18   your area has been for your prior employments like

19   Crawford?

20       A.      I had the entire state.

21       And, let me go back over the other one, I was

22   licensed in Georgia.  I did do some work in Georgia.

23       Q.      With Cunningham or with Crawford?

1      Q.      Did Mr. and Mrs. Williams follow you around

2  the house or did they just let you do your job?

3      A.      I believe either one or both of them were

4  in the house.

5      Q.      And when you finished your inspection, did

6  you tell the Williams anything before you left?

7      A.      Not that I'm aware of.

8      Q.      You didn't say that they would be hearing

9  from you or the insurance carrier?

10     A.      Not that I remember.

11     Q.      Can you remember anything else that

12 happened that day when you went to visit their

13 property?

14     A.      Went fishing.

15     Q.      Did you go fishing before or after the

16 inspection?

17     A.      After.

18     Q.      Where did you go fishing?

19     A.      In the pond that was back in the back.

20     Q.      Was that a pond that was owned by the

21 Williams?

22     A.      I don't know if they owned the pond or

23 not.  I knew it was there and I asked them if I

A.    No, sir.

Q.    When you are asked to do a re-inspection, does that contemplate that you would actually go back to the property and re-inspect the property?

A.    Not necessarily.

Q.    How would you know if it did or did not contemplate that scope of work?

A.    Depending on the difference -- any difference there may be regarding -- in this particular case, there were three estimates that were one-line estimates. And in order to find out what the differences were in order to do a re-inspection, we would have had to get that information to make that determination.

Q.    Okay.

So you did not feel like an actual re-inspection of the home was in order?

A.    At that time.

Q.    Did you ever go back and re-inspect the home?

A.    No, sir.

Q.    Do you feel, as we sit here today, that you should have done that?

1          MR. MORRISSETTE:  Object to the

2          form.

3     A.    I'm going to embellish.  We asked the

4  Williams which of the three contracting firms they

5  wanted to have do the work or they felt more

6  comfortable with.  At that time, we sent that

7  contractor a scope sheet for him to itemize his costs

8  so that we could see what the differences were to

9  determine if we needed to do an inspection.

10     Upon receipt of that scope with his itemized

11  prices, there were only two areas of disagreement as

12  far as the scope, and that was the bathrooms.

13     With that, there did not appear to be a reason to

14  go back at that time, and we were never requested to

15  go back after that was submitted.

16     My first time I heard about this again was four

17  or five months ago, so I was not aware that there was

18  an issue that needed re-inspection.

19     Q.    Okay.

20     Now, when you got the re-inspection assignment, I

21  guess that was around May 10th, or so, of 2006?

22     A.    Yes, sir.

23     Q.    And the fire, I believe -- if you will look

1      A.      Depending on the input I got from the
2  contractor.
3      Q.      Okay.
4      It depended on when you got the information back
5  from the contractor?
6      A.      That's correct.
7      Q.      How long would you have expected it to have
8  taken you from the date you got the information back
9  from the contractor?
10      A.      Again, it would have depended on my
11  workload at the time and --
12      Q.      Did you have a heavy workload at the time?
13      A.      Yes.
14      Q.      Do you have any idea what your workload was
15  like during the spring and summer months of 2006?
16      A.      Not offhand, no.
17      Q.      Were you working more than 20 files?
18      A.      Oh, yeah.
19      Q.      Were you working more than 50 files?
20      A.      Probably not.
21      Q.      So somewhere between 20 and 50?
22      A.      Right.
23      Q.      Probably closer to 50?

1      A.      I'm not sure.

2      Q.      About 40 files?

3      A.      I have no idea.

4      Q.      What did you consider to be a heavy

5  workload at the time?

6      A.      Well, it's not so much the heavy workload

7  as the amount of travel, extensive travel, that's

8  involved when you cover the whole state.

9      Q.      Right.  You were doing the best you could.

10  I understand.

11      A.      Yes, sir.

12      Q.      But there is a lot of work to do?

13      A.      Yes, sir.

14      Q.      There is a lot of distance to travel?

15      A.      Yes, sir.

16      Q.      And you were the only fire adjuster that

17  worked for your company?

18      A.      Yes, sir.

19      Q.      It was just you and nobody else; right?

20      A.      Yes, sir.

21      Q.      You had to do all the work?

22      A.      I believe Tom Lyles -- if Tom Lyles was the

23  manager at that time, he did do some stuff, yes.

1    Q.    Were there any reports sent on July 7th?

2    A.    No.

3    Q.    So, on the 19th, you sent another report

4    back to Tancy?

5    A.    Yes.

6    Q.    And that says that you had reviewed the

7    estimate from the contractor and you were in the

8    process of making changes for a supplemental estimate;

9    is that right?

10   A.    Yes, sir.

11   Q.    And you intended to conclude that work by

12   the 12th of July at that time?

13   A.    Yes, sir.

14   Q.    Did you conclude it by the 12th of July?

15   A.    I do not know, sir.  I don't think so.

16   Q.    Why didn't you finish in time?

17   A.    Workload.

18   Q.    All right.

19   Then there is another report on August 8th.

20   A.    Yes, sir.

21   Q.    The remarks on the report on August the 8th

22   are exactly the same as the remarks on the report from

23   July 19th, are they not?

1    versus cleaning.

2        Q.    You felt the doors and windows that he

3    wanted to replace could be cleaned; is that correct?

4        A.    Yes.

5        Q.    He felt that they could not and needed to

6    be replaced; correct?

7        A.    Yes.

8        Q.    Did you have a conversation with

9    Mr. Dingman about this?

10        A.    No, sir.

11        Q.    You just got the sheet back and looked at

12    it?

13        A.    That's correct.

14        Q.    Did you have a conversation with the

15    Williams after you got the scope sheet back from the

16    contractor?

17        A.    I don't believe so.

18        Q.    Did you have a conversation with Tancy

19    Nelson after you got the scope sheet?

20        A.    I don't believe so.

21        Q.    Did you give Tancy Nelson a copy of the

22    scope sheet?

23        A.    No, sir.

1   Q.    (By Mr. Talmadge)  All right.

2   Do you recognize the documents that are in

3   Plaintiffs' Exhibit 11?

4   A.    I have never seen these documents before.

5   Q.    Okay.

6   Do you know what they are?

7   A.    Evidently, the invoice for our work.

8   Q.    On the last page of that exhibit there is

9   an itemization of work.  And one of the entries says:

10  Receive and review contractor's estimate.

11  Do you see that?

12  A.    Yes.

13  Q.    Does it have a date by that?

14  A.    6/20.

15  Q.    Does that refresh your memory about the

16  date that you received and reviewed the contractor's

17  estimate?

18  A.    Not really.

19  Q.    Did you do the billing --

20  A.    No, sir.

21  Q.    -- for Cunningham?

22  A.    No, sir.

23  Q.    Did you keep up with your activities,

1  though, for Cunningham, write them down, how much time

2  you took?

3      A.    Kept them in the computer.

4      Q.    Would you input the information?

5      A.    Yes.

6      Q.    Did you input that information into the

7  Crawford computer?

8              MR. MORRISSETTE:  Cunningham

9              Lindsey?

10     Q.    Cunningham Lindsey, I mean.

11     A.    Yes, I would have done that.

12     Q.    Was it typical for you to input your

13 activity on the day that your activity occurred?

14     A.    Yes, sir.

15     Q.    You don't have any reason to disagree that

16 by June 20th you had that --

17     A.    According to this (indicating), yes.

18     Q.    Do you have any criticisms of the way that

19 Balboa handled this claim?

20              MR. MORRISSETTE:  Object to the

21              form.

22     A.    After it left me, I have no idea how they

23 handled the claim.

```
 1        Q.    Is it true that you were -- your final
 2   estimate -- strike that.
 3        Is it true that all of the prices listed in your
 4   final estimate were generated by the MSB program?
 5        A.    I believe that's true.
 6        Q.    In other words, you did not adjust up any
 7   prices on this project?
 8        A.    That's correct.
 9        Q.    Do you know who Candice Arthur is?
10        A.    No, sir.
11        Q.    Were you ever sued by a lady by the name of
12   Candice Arthur?
13        A.    Sued by?
14        Q.    Yes.
15        A.    I'm not aware of it.
16        Q.    Do you go by Dave Toellner sometimes?
17        A.    Yes, sir.
18        Q.    Do you have like a son that has the same
19   name?
20        A.    Yes, I do.
21        Q.    Is he David Toellner as well?
22        A.    Yes.
23        Q.    Does he go by Dave?
```

<pre>
 1                    REPORTER CERTIFICATE

 2

 3   STATE OF ALABAMA

 4   COUNTY OF HOUSTON

 5

 6       I, hereby certify that the above and foregoing

 7   deposition was taken down by me in stenotype, and the

 8   questions and answers thereto were transcribed by

 9   means of computer-aided transcription, and that the

10   foregoing represents a true and correct transcript of

11   the testimony given by said witness upon said hearing.

12       I further certify that I am neither of counsel

13   nor of kin to the parties in the action, nor am I in

14   any way interested in the result of said cause.

15       Certified this the 15th day of March, 2008.

16

17

18   _____

19   DEBORAH C. VANN

20   Certified Court Reporter

21   (334) 596-1069

22

23
</pre>



**Cunningham Lindsey U.S., Inc.**
P.O. Box 59774
Schaumburg, IL 60159 USA
Federal ID 74-0539650



## INVOICE

B060
BALBOA INSURANCE COMPANY
Tancy Nelson
ATTN: IMAGING DEPARTMENT
P.O. BOX 19702
IRVINE      CA 92623-9702

| | | | | |
|---|---|---|---|---|
| Co. Claim No.: | GM7136890-1 | Our File No.: | 200657216430 | |
| Insured: | Williams, Billy | Invoice No: | 600200283260-1 | Date: Feb-27-2006 |
| Claimant: | Billy Williams | Bill Type: | Final | |
| Agency: | | Office: | 2006 | Birmingham CSI |
| Assigned By: | | Loss Date: | Feb-06-2006 | Type: FIRE AND LIGHTNING - HO |
| Policy Number: | GM47136890 | Loss/Settlement: 11933.54 | | |

| | |
|---|---|
| Telephone/Fax/Cellular Phone | $3.07 |
| Photographs | $11.00 |
| Transportation | $88.14 |
| Appraisal Services | $640.00 |
| Miscellaneous | $25.00 |
| Terms: Due Upon Receipt    State Sales Tax | $0.00 |
| Total | $767.21 |
| Your Portion: 100.00%    ** Total Due ** | $767.21 |

Please include our invoice number **600200283260** on your remittance of US **$767.21** to the address shown above.
This assignment is being handled by    Toellner, David  who can be reached at   (205)823-8338

To serve you in the resolution of your inquiries, we have a toll free customer action line direct to our home office. Please call
**1-800-867-3885** for Customer Service and **1-866-463-9375** for Billing and payment inquiries between 8:00 a.m. and 5:00 p.m. CST.
Cunningham Lindsey is dedicated to continuous improvement of the quality of our technical skills and service delivery. Your input is
the key to that improvement so we can meet your needs and expectations.

We thank you for your business!
Please return this copy with your remittance

Balboa 00051
Re: Williams v. Balboa

**Cunningham Lindsey U.S., Inc.**
Invoice Itemization
Page 1
Sep-29-2006



| | |
|---|---|
| **Customer:** BALBOA INSURANCE COMPANY | **Our File Number:** 200657216430 |
| **Claim Number:** GM7136890-1 | **Cost Center:** Birmingham CSI |
| **Insured:** Williams, Billy | **Date of Loss:** Feb-6-2006 |
| | **Invoice #:** 600200363826-1 |

| Work Date | Description | Hours |
|---|---|---|
| 5/11/2006 | Discuss With insured | 0.00 |
| 5/11/2006 | Letter to insured including scope sheets | 0.00 |
| 5/11/2006 | Prepare Scope sheet to send to insured for her preferred contactor to complete | 0.00 |
| 6/20/2006 | Receive and Review Contractors figures on scope sheet. | 0.00 |
| 6/29/2006 | Report | 0.00 |
| 7/19/2006 | Report Third Report | 0.00 |
| 8/8/2006 | Report | 0.00 |
| 9/25/2006 | Report closing report with estimate | 0.00 |
| 9/25/2006 | Prepare estimate | 0.00 |
| | | 0.00 |

| | |
|---|---|
| Total Hours | 0.00 |
| Adjusting/Appraisal Services: | 0.00 |
| Secretarial Services: | 0.00 |
| **Total Hours** | **0.00** |

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BILLY WILLIAMS and )
TERESA WILLIAMS, )
     )
        Plaintiffs, )
     )
v. )     Case No.:  1:07-CV-549-WHA
     )
BALBOA INSURANCE COMPANY, )
     )
        Defendants. )

<u>AFFIDAVIT OF ERIC DINGMAN</u>

I, Eric Dingman, make the following affidavit:

1.     My name is Eric Dingman.  I am over the age of nineteen years and competent to make this affidavit.  I have personal knowledge of the matters set forth below.

2.     I am licensed contractor with the State of Alabama.  I have worked in and around the construction industry for much of my life.  For the past four to five years, I have owned B&B Construction in Enterprise, Alabama.   Since starting B&B Construction, I have been personally involved in the construction, renovation and remodeling of residential homes in the Enterprise area.   I am familiar with the reasonable cost of labor and materials in the Enterprise area.

3.     In the Spring of 2006, I inspected a home owned by Billy and Teresa Williams and located at 678 County Road 620, Enterprise, Alabama following a fire. The purpose of my inspection was to determine the nature and extent of the damage to the home, the scope of the work required to repair the damage and the cost to repair the damage.  I prepared an estimate in connection with my inspection, a true and correct copy



PLAINTIFF'S
EXHIBIT
5

of which is attached hereto as Exhibit "A." As set forth in the estimate, I determined that $44,738.00 was the reasonable cost of labor and materials to repair the damage caused by the fire.

4.    After I submitted the estimate, I was asked to and did complete an itemization of the estimate. A true and correct copy of the itemization is attached hereto as Exhibit "B."

5.    It is my professional opinion that the work detailed in the estimate and itemization would be necessary to repair the home based on its condition at the time of my inspection and that the charges set forth in the estimate and itemization would be reasonable and in line with the cost of labor and materials in the Enterprise area.


_____
Eric Dingman

STATE OF ALABAMA          )
DALE COUNTY                   )

Before me, the undersigned authority personally appeared Eric Dingman, whose name is signed to the foregoing affidavit and who is made known to me, and, being first duly sworn and deposed, says that he has knowledge of the facts stated in the foregoing affidavit and that the facts therein stated are true and correct.

Sworn to and subscribed before me on this the 11th day of March, 2008.


_____
Notary Public
My Commission Expires: _1/18/2010_

(SEAL)

*Billy + Teresa Williams*
*678 cnty Rd 620*
*Alabama*

Estimate/Bill

Contract # *537*

# B&B Construction

## Quality Work Done Right the First Time
### Enterprise, Alabama
### (334) 806-7778

Work to be Performed -

*Tear out all damaged floor Joist, Decking, and floor covering (rug, linoleum ect) replace damaged Joists, decking, Tear out interior wall sheathing, replace w/ Drywall and finish to be ready to paint, tear out and replace damaged electical wiring and fixtures, Tear out interior ceilings and replace with drywall to be finish to be able to paint. Tear out and replace Bathroom Fixtures (Tub, toilet, sink, vanities) Tear out + replace kitchen cabinets + sink, Tear off damaged roof rafters and decking + replace to original, Tear off and replace shingle roof, Tear off + replace exterior Damaged exterior siding + facia, Tear out + replace front windows*

All Work listed above is to be performed for the below mentioned price, any additional work not listed above may be submitted in writing to below signed contractor, additional work not listed above may be added to said contract for an additional fee to be determined by said contractor, also any additional work may be declined by said contractor with no negative affects to regards to original agreement.

Fee to be paid as follows – A retainer of 45% of total price to be paid up front with remainder to be paid ~~immediately upon completion of job.~~ *As follows, 20% to be paid upon completion of roof and the gutting of the house*

Notes -

_____
_____
_____
_____

TOTAL *44,758*

Paid _____
Balance remaining _____

Contractor
*Eric Wingman*
_____

Responsible Party
_____
_____

# Estimate   ~A190

Claim #                    200657216430
Coverage BLDG

| | |
|---|---|
| **Adjuster** David Toellner | **Cunningham Lindsey Inc.** |
| | 300 Century Park South |
| | Suite 200 |
| | Birmingham, AL 35226 |
| | Phone (205) 823-8338  Fax (205) 823-8341 |

February 26, 2006
Coverage A - Building

**Insured**    Williams, Billy
**Loss Address**   678 Co Rd 620, Enterprise, AL  36330
**Phone Number** (334) 406-7738    **Policy #**   GM47136890
          (334) 308-1555    **Ins Claim #** GM7136890-1
**Ins Company**  BALBOA INSURANCE COMPANY

Date of Loss    2/6/2006

## Living Room (15' x 14' 6" x 8')

| 315 sf Floor | 608 sf Wall | 315 sf Ceiling | 76 lf Floor | 76 lf Ceiling | 2,522 cf Volume |
|---|---|---|---|---|---|

Offset(s)    11' 6" x 8' 6"

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Wallpaper | 608 SF @ | 400 | | | | |
| Replace Wallpaper | 711.36 SF @ | 400 | | Material | | |
| | 608 SF @ | 400 | | Labor | | |
| Remove Carpet & Pad (SF) | 315 SF @ | 300 | | | | |
| Replace Carpet & Pad (SF) | 333.9 SF @ | 600 | | Material | | |
| | 315 SF @ | 1000 | | Labor | | |
| Remove Acoustical Ceiling, 12x12 | 315 SF @ | 400 | | | | |
| Replace Acoustical Ceiling, 12x12 | 321.3 SF @ | 1100 | | Material | | |
| | 315 SF @ | 1500 | | Labor | | |
| Remove Crown Molding | 76 LF @ | 100 | | | | |
| Replace Crown Molding | 80.56 LF @ | 400 | | Material | | |
| | 76 LF @ | 500 | | Labor | | |
| Paint Crown Molding | 76 LF @ | 400 | | | | |
| Clean Window, Casement, Wood | 5 EA @ | 1500 | | | | |
| Clean Door, Interior, Pre-Hung | 1 EA @ | 450 | | | | N |
| Special Check & Test Electric | 1 EA @ | | | | | N |

8350    9350

## Kitchen (14' 6" x 11' 6" x 8')

| 167 sf Floor | 416 sf Wall | 167 sf Ceiling | 52 lf Floor | 52 lf Ceiling | 1,334 cf Volume |
|---|---|---|---|---|---|

Drywall

| | | Repl. Cost | Depr. | ACV | OP | RD |
|---|---|---|---|---|---|---|
| Remove Acoustical Ceiling, 12x12 | 167 SF @ | 400 | | | | |
| Replace Acoustical Ceiling, 12x12 | 170.34 SF @ | 1000 | | Material | | |
| | 167 SF @ | 1400 | | Labor | | |
| Special Check & Test Electric | 1 EA @ | | | | | |
| Clean Window, Casement, Wood | 1 EA @ | 300 | | | | N |

Estimate (MS/B 0410)
Claim # 200657216430

- 1 -

Feb 26, 2006



EXHIBIT C

Cunningham 00022

| | | Total | |
|---|---|---|---|
| Remove Furring Strips, Ceiling (SF), 12" oc | 167 SF @ _____ | 200 | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 175.35 SF @ _____ | 400 | Material |
| | 167 SF @ _____ | | Non-Matl |
| | | 900 | |
| Rem/Reset Ceiling Fixture | 1 EA @ _____ | | |
| Clean Ceiling Fixture | 1 EA @ _____ | 250 | |
| Remove Drywall, Wall | 416 SF @ _____ | 400 | |
| Replace Drywall, Wall | 440.96 SF @ _____ | 800 | Material |
| | 416 SF @ _____ | | Non-Matl |
| | | 1450 | |
| Paint Drywall, Wall | 416 SF @ _____ | 400 | |
| Remove Crown Molding | 52 LF @ _____ | 100 | |
| Replace Crown Molding | 55.12 LF @ _____ | 400 | Material |
| | 52 LF @ _____ | | Non-Matl |
| | | 900 | |
| Paint Crown Molding | 52 LF @ _____ | 200 | |
| Remove Door, Interior, Pre-Hung | 1 EA @ _____ | 100 | |
| Replace Door, Interior, Pre-Hung | 1 EA @ _____ | 350 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ _____ | 50 | |
| Remove Subfloor | 167 SF @ _____ | 500 | |
| Replace Subfloor | 175.35 SF @ _____ | 2000 | Material |
| To Exclude damge flar joists | 167 SF @ _____ | | Non-Matl |
| | | 3200 | |
| Remove Underlayment | 167 SF @ _____ | 300 | |
| Replace Underlayment | 175.35 SF @ _____ | 600 | Material |
| | 167 SF @ _____ | | Non-Matl |
| | | 900 | |
| Remove Vinyl Sheet Flooring, .065" | 167 SF @ _____ | 100 | |
| Replace Vinyl Sheet Flooring, .065" | 177.02 SF @ _____ | 850 | Material |
| | 167 SF @ _____ | | Non-Matl |
| | | 950 | |
| Rem/Reset Ceiling/Paddle Fan | 1 EA @ _____ | 50 | |
| Clean Ceiling/Paddle Fan | 1 EA @ _____ | 250 | |
| Clean Door, Interior, Pre-Hung | 1 EA @ _____ | 400 | |
| Paint Door, Interior, Pre-Hung | 1 EA @ _____ | 50 | |
| Clean Countertop, Formica | 10 LF @ _____ | 850 | |
| Remove Cabinet, Wall (LF) | 7 LF @ _____ | 200 | 3800 |
| Replace Cabinet, Wall (LF) | 7 LF @ _____ | 2000 | |

10690    Kitchen Total  12690   3500

---

**Family Room (17' 4" x 11' 6" x 8')**

217 sf Floor    512 sf Wall    217 sf Ceiling    64 lf Floor    64 lf Ceiling    1,736 cf Volume

Offset(s)    5' 7" x 3' 2"

| | | Total | |
|---|---|---|---|
| Remove Carpet & Pad (SF) | 217 SF @ _____ | 100 | |
| Replace Carpet & Pad (SF) | 230.02 SF @ _____ | 850 | Material |
| | 217 SF @ _____ | | Non-Matl |
| | | 950 | |
| Remove Drywall, Ceiling | 217 SF @ _____ | 200 | |
| Replace Drywall, Ceiling | 227.85 SF @ _____ | 800 | Material |

Bid Sheet (MS/B 0440)
Claim # 200657216430

- 2 -

May 11, 2006

Cunningham 00023

|  |  | Total |  |
|---|---|---|---|
|  | 217 SF @ _____ | _____ | Non-Matl |
| Paint Drywall, Ceiling | | 1000 | |
| Remove Paneling, Pine | 217 SF @ _____ | 200 | |
| Replace Paneling, Pine | 512 SF @ _____ | 100 | |
|  | 537.6 SF @ _____ | 800 | Material |
|  | 512 SF @ _____ | | Non-Matl |
| remove Replace Clean Door, Interior, Pre-Hung | | 1100 | |
| Special Check & Test Electric | 2 EA @ _____ | 450 | |
|  | 1 EA @ _____ | | |
|  | **Family Room Total** | 3500 | |

### Hall Bath (5' 10" x 7' 10" x 8')

| 46 sf Floor | 219 sf Wall | 46 sf Ceiling | 27 lf Floor | 27 lf Ceiling | 366 cf Volume |
|---|---|---|---|---|---|

|  |  | Total |  |
|---|---|---|---|
| remove replace Clean Ceramic Wall, Thin Set | 219 SF @ _____ | 850 | |
| remove replace Clean Ceramic Floor, Thin Set | 46 SF @ _____ | 1400 | |
| remove replace Clean Drywall, Ceiling | 46 SF @ _____ | 800 | |
| remove replace Clean Bath Tub, Good | 1 EA @ _____ | 850 | |
| remove replace Clean Lavatory, Porcelain Enamel | 1 EA @ _____ | 600 | |
| remove replace Clean Toilet/Water Closet, Floor Mounted | 1 EA @ _____ | 300 | |
| remove replace Clean Toilet Seat | 1 EA @ _____ | 50 | |
| remove replace Clean Ceiling Fixture | 1 EA @ _____ | 150 | |
| Remove Acoustical Ceiling, 12x12 | 46 SF @ _____ | 200 | |
| Replace Acoustical Ceiling, 12x12 | 46.92 SF @ _____ | 700 | Material |
| Replace Drywall ceiling | 46 SF @ _____ | | Non-Matl |
|  | **Hall Bath Total** | 5900  5400 | |

### Bedroom (11' 6" x 11' x 8')

| 126 sf Floor | 360 sf Wall | 126 sf Ceiling | 45 lf Floor | 45 lf Ceiling | 1,012 cf Volume |
|---|---|---|---|---|---|

|  |  | Total |  |
|---|---|---|---|
| Remove Carpet & Pad (SF) | 126 SF @ _____ | 100 | |
| Replace Carpet & Pad (SF) | 133.56 SF @ _____ | 800 | Material |
|  | 126 SF @ _____ | | Non-Matl |
| Remove Acoustical Ceiling, 12x12 | | 900 | |
| Replace Acoustical Ceiling, 12x12 | 126 SF @ _____ | 200 | |
| remove replace drywall ceiling | 128.52 SF @ _____ | 800 | Material |
|  | 126 SF @ _____ | | Non-Matl |
| Remove Paneling, Pine | | 1000 | |
| Replace Paneling, Pine | 360 SF @ _____ | 200 | |
|  | 378 SF @ _____ | 1200 | Material |
|  | 360 SF @ _____ | | Non-Matl |
| Replace Clean Door, Interior, Pre-Hung | | 1400 | |
| Special Check & Test Electric | 2 EA @ _____ | 450 | |
| replace Clean Window, Casement, Wood | 1 EA @ _____ | | |
| Remove Furring Strips, Ceiling (SF), 12" oc | 1 EA @ _____ | 700 | |
| Replace Furring Strips, Ceiling (SF), 12" oc | 126 SF @ _____ | 100 | |
|  | 132.3 SF @ _____ | 400 | Material |

|  | Total |  |
|---|---|---|
|  |  | Non-Matl |
| 126 SF @ _____ |  |  |
|  | 1150 |  |
| Rem/Reset Ceiling Fixture |  |  |
| Clean Ceiling Fixture | 1 EA @ _____ | 50 |
|  | 1 EA @ _____ | 250 |
|  | Bedroom Total | 4500 |

## Roof

| | Total |  |
|---|---|---|
| Remove Truss, 6/12 Pitch, 26' | 10 EA @ _____ | 500 |
| Replace Truss, 6/12 Pitch, 26' | 10 EA @ _____ | 1100 |
| Remove Sheathing, Roof | 240 SF @ _____ | 300 |
| Replace Sheathing, Roof | 264 SF @ _____ | 900 |
| Remove Asphalt Shingles, 3 Tab | 2.5 SQ @ _____ | 600 |
| Replace Asphalt Shingles, 3 Tab | 3 SQ @ _____ | 2600 |
| Replace Felt | 3 SQ @ _____ | 300 |
| Paint Siding, Painting | 48 SF @ _____ | 600 |
| Remove Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ _____ | 300 |
| Replace Siding, Cement-Fiber, Horizontal Lap, 6 | 48 SF @ _____ | 1300 | Material |
|  | 0 SF @ _____ |  | Non-Matl |
| Remove Gable Vent |  | 8500 |
| Replace Gable Vent | 1 EA @ _____ | 50 |
|  | 1 EA @ _____ | 300 |
|  | Roof Total | 8850   8350 |

## Bathroom  (8' 6" x 5' 4" x 8')

45 sf Floor        221 sf Wall        45 sf Ceiling        28 lf Floor        28 lf Ceiling        363 cf Volume

| | Total |
|---|---|
| Clean Ceramic Wall, Thin Set | 221 SF @ _____ | 400 |
| Clean Ceramic Floor, Thin Set | 45 SF @ _____ | 500 |
| Clean Drywall, Ceiling | 45 SF @ _____ | 1100 |
| Clean Bath Tub, Good | 1 EA @ _____ | 700 |
| Clean Lavatory, Porcelain Enamel | 1 EA @ _____ | 600 |
| Clean Toilet/Water Closet, Floor Mounted | 1 EA @ _____ | 250 |
| Clean Toilet Seat | 1 EA @ _____ | 50 |
| Clean Ceiling Fixture | 1 EA @ _____ | 250 |
|  | Bathroom Total | 4750   4000 |

## Exterior

| | Total |
|---|---|
| Special Dumpster, 20 Yard | 1 EA @ _____ | 400 |
|  | Exterior Total | 400 |

| | |
|---|---|
| Total Before Overhead & Profit | 35832°° |
| Overhead & Profit | 8958°° |
| Total Bid | ~~44790°°~~ |
| | 44738°° |

Cunningham 00026