## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| **BILLY WILLIAMS and**<br>**TERESA WILLIAMS,**<br><br>    **Plaintiffs,**<br><br>**vs.**<br><br>**BALBOA INSURANCE COMPANY,**<br><br>    **Defendant.** | )<br>)<br>)<br>)<br>)<br>)    **CASE NO.    1:07-cv-549**<br>)<br>)<br>)<br>) |

### SUPPLEMENTAL EVIDENTIARY SUBMISSIONS IN SUPPORT OF DEFENDANT BALBOA'S REPLY TO PLAINTIFFS' OPPOSITION TO BALBOA INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Defendant Balboa Insurance Company hereby files the following Supplemental Evidentiary Submissions in Support of Defendant Balboa's Reply to Plaintiffs' Opposition to Balboa Insurance Company's Motion for Summary Judgment:

1.    Deposition of David Toellner, p. 47; p. 48; p. 51; p. 52; p. 71; p. 114; p. 116; p. 118; p. 120; p. 121; p. 122; p. 123; p.124

2.    Deposition of Teresa Williams, p. 47

3.    Billy Williams Deposition, p. 22; p. 40; p. 41

4.    Deposition of Tancy Nelson, p. 17; p. 18; p. 19; p. 20; p. 21; p. 22; p. 23; p. 24; p. 37; p. 38; p. 39; p. 40; p. 126; p. 127; p. 135; p. 136

*s/Henry T. Morrissette*
HENRY T. MORRISSETTE
Bar No.: 7622-E54H

OF COUNSEL:

HAND ARENDALL, L.L.C.
Post Office Box 123
Mobile, Alabama  36601

Telephone:    (251) 432-5511
Fax:            (251) 694-6375
E-Mail: hmorrissette@handarendall.com


                                    STEPHEN N. FITTS, III
                                    Bar No.: 9079-T52F

HAND ARENDALL, LLC
2001 Park Place North, Suite 1200
Birmingham, Alabama  35203
Telephone:  (205) 324-4400
Facsimile:   (205) 397-1316
E-Mail: sfitts@handarendall.com

                                    Attorneys for Defendant Balboa Insurance
                                    Company

## CERTIFICATE OF SERVICE

    I do certify that on **March 24, 2008**, I electronically filed the foregoing pleading with the Clerk of the Court using the CM/ECF system, and request the Court to serve the same electronically, on the following counsel:

Joseph Dan Talmadge , Jr.     dtalmadge@mcatlaw.com

                            _s/Henry T. Morrissette_____
                            OF COUNSEL

744129

IN THE UNITED STATES DISTRICT COURT

FOR THE MIDDLE DISTRICT OF ALABAMA

SOUTHERN DIVISION


CIVIL ACTION NO.   1:07-CV-549-WHA


BILLY WILLIAMS and
TERESA WILLIAMS,

        Plaintiffs,

vs.

BALBOA INSURANCE COMPANY,

        Defendant.



DEPOSITION

OF

DAVID NELSON TOELLNER

March 14, 2008



Taken before:

        Deborah Vann

        Certified Court Reporter

        and Notary Public

Exhibit 1 to Balboa's
Supp. Evid. Submissions

1            form.

2      A.      Yes, sir.

3      Q.      You could do it yourself; right?  You don't

4  need a computer to tell you what to do?

5      A.      It makes it easier.

6      Q.      The computer makes it easier?

7      A.      Yes, sir.  Neater.  Cleaner.

8      Q.      Is there any discretion that you, as the

9  claims adjuster, had to change the pricing information

10 that's being generated by the computer?

11     A.      Yes.

12     Q.      How would that be done?

13     A.      Manually.

14     Q.      Okay.

15     Was there any policy concerning whether or not

16 you had to check with the client company in order to

17 make such a change?

18     A.      In some cases, yes.

19     Q.      Do you know if you would have had to have

20 checked with Balboa, for example, if you wanted to

21 make any changes on the MSB-generated estimate for the

22 Williams' case?

23                      MR. MORRISSETTE:  Object to the

1          form.

2          A.      In most cases, I would make the change and

3    put it in my report that I had changed whatever

4    figures because of, and then justify the change.

5          Q.      Have you ever made such a change?

6          A.      Yes.

7          Q.      Can you remember specific occasions where

8    you would have made changes?

9          A.      Specifically, no.  I do remember drywall at

10   one time became in short supply and we made changes to

11   that at that time.

12         Q.      You -- did you adjust the price upward?

13         A.      Yes, sir.

14         Q.      So the -- on those occasions, the MSB

15   software was wrong?

16                 MR. MORRISSETTE:  Object to the

17         form.

18         A.      It was different than the existing price.

19         Q.      Well, the truth is the existing price;

20   right?

21                 MR. MORRISSETTE:  Object to the

22         form.

23         A.      Yes.

A.    I can't remember.  I can't -- I just remember doing it.

Q.    Was that after the rise of these computer programs or before?

A.    Both.

Q.    If the computer was telling you what something ought to cost, why would you need to go double check at the store?

MR. MORRISSETTE:  Object to the form.

A.    If someone, you know, specifically said no way that price could be correct, I would go.

Q.    Did that happen on numerous occasions?

A.    No.

Q.    Did it happen on less than five occasions?

A.    Yes.

Q.    When you went to the store on those less than five occasions, did you find that the computer was wrong?

A.    I don't believe so.

MR. MORRISSETTE:  Object to the form.

Q.    Did you find that the computer was right?

1    A.    Yes.

2    Q.    Did you ever go to any building supply

3 store in connection with the Williams' claim?

4    A.    No, sir.

5    Q.    Are you familiar with the company called

6 McKenzie and Company?

7    A.    No, sir.

8    Q.    Never heard of that company?

9    A.    No, sir.

10    Q.    Are you aware of any lawsuits that have

11 ever been filed against Balboa Insurance Company?

12    A.    No, sir.

13    Q.    Are you aware of any lawsuits that have

14 ever been filed against Tancy Nelson who is the

15 adjuster that is involved in this?

16    A.    No, sir.

17    Q.    Are you aware of any lawsuits that have

18 ever been filed against Cunningham Lindsey?

19    A.    No, sir.

20    Q.    How did you become involved in the claim

21 that's at issue in this case?

22    A.    A normal assignment.

23    Q.    How would that come in?

1     Q.    Do you know -- have you ever read or looked

2 at the policy?

3     A.    No, sir.

4     Q.    Do you know whether or not the Williams

5 were insured under the policy?

6.     A.    I have no idea.

7     Q.    Because you didn't know how much they would

8 have owed to the mortgage company?

9     A.    No, sir, I would not.

10     Q.    As far as you were concerned, did it matter

11 whether the borrowers were insured or not under the

12 policy?

13     A.    I was there for the house.

14     Q.    Exactly.  It -- those details didn't matter

15 to you; correct?

16     A.    No, sir.

17     Q.    You were there to do a good job of

18 estimating the loss; correct?

19     A.    Yes, sir.

20     Q.    Do you feel like you had a duty to do a

21 good job of estimating the loss?

22                MR. MORRISSETTE:  Object to the form

23            to the extent it calls for a legal

1       Record for a minute?

2               MR. TALMADGE:  Sure.

3           (Off-the-Record discussion.)

4               EXAMINATION

5   BY MR. MORRISSETTE:

6       Q.    In your -- Mr. Toellner, my name is Henry

7   Morrissette.  I want to ask you a few questions.  I

8   represent Balboa in this case.

9       In your use of the MSB program since you began

10  using it, have you found that, based on your use of

11  the program, it is reliable?

12      A.    Yes.

13              MR. TALMADGE:  Object to the form.

14      Q.    Is the use of the MSB program a standard

15  practice with the insurance companies that you have

16  dealt with?

17      A.    Yes.

18      Q.    Is it just a Balboa-used program or do

19  other people use it?

20      A.    Other people use it.

21      Q.    You mentioned your job working in the

22  kitchen remodeling business, I believe.

23      A.    Yes.

1      Q.    You testified earlier -- I believe you were

2 asked about your fee contract or Cunningham Lindsey's

3 fee contract?

4      A.    Yes, sir.

5      Q.    Does that fee vary between assignments?

6      A.    Most property claims are flat fees, which

7 are agreed on between our sales department and the

8 company.  So the amount of the estimate usually would

9 say what the fee is.  The higher the estimate, the

10 more the fee.

11      Q.    If your estimate on the Williams' claim had

12 been higher, in other words, if you had estimated that

13 the value of the damage was higher, would it have

14 resulted in more money being paid to Cunningham

15 Lindsey?

16      A.    Yes, sir.

17      Q.    Would it have resulted in more money being

18 paid to you?

19      A.    Yes, sir.

20      Q.    You took a number of photographs of the

21 home; is that correct?

22      A.    Yes, sir.

23      Q.    And Exhibit B to your declaration had

1    A.    Yes, sir.

2    Q.    Would they cover all the damage that you

3    saw in your inspection?

4    A.    Yes, sir.

5    Q.    You were asked about your fishing on the

6    property after you finished your adjusting.

7    A.    Yes, sir.

8    Q.    Did your going fishing have any impact

9    whatsoever on your inspection of the home or

10   evaluation of the claim?

11   A.    No, sir.

12   Q.    If you would turn -- turning to Plaintiffs'

13   Exhibit 3, which appears to be the short form estimate

14   followed by the estimate that you attached.

15   A.    Yes, sir.

16   Q.    You were asked about your payment

17   recommendations on the first page of Exhibit 3, which

18   is Bates label 38.  Do you see those recommendations?

19   A.    Yes, sir.

20   Q.    Did you actually compute those

21   recommendations yourself?

22   A.    They come out of the computer.

23   Q.    If you turn to the last page of that

1    A.    Yes, sir.

2    Q.    Then you add sales tax and you have total

3    with tax.

4    A.    Yes, sir.

5    Q.    You have a column for replacement costs,

6    depreciation and ACV?

7    A.    Yes, sir.

8    Q.    Does the recommendation on page 38 for

9    initial payment withhold 20 percent for overhead and

10    profit, or is the overhead and profit actually

11    included in the recommended figure?

12    A.    I am not sure.  It appears that this is a

13    recommendation with tax and overhead and profits on

14    the ACV value less the deductible of $500.

15    Q.    So the recommendation payment figure would

16    be with overhead and profit included in the initial

17    payment?

18    A.    Yes, sir.

19    Q.    Do you know how the policy deals with

20    overhead and profit?

21    A.    I have no idea.

22    Q.    Turning to Exhibit 7, which I believe is

23    going to be -- Exhibit 9, which was your final figure,

1    would the same testimony be true as to the

2    recommendation on page -- on the first page of Exhibit

3    9 regarding your recommendation and whether it takes

4    into account overhead and profit -- strike that.

5        Would the same -- strike that.

6        The payment recommendation figure on the first

7    page of page 9, does that appear -- that initial

8    payment figure appear to incorporate overhead and

9    profit from the last page of the estimate, the 20

10   percent overhead and profit?

11       A.    The recommendation is the ACV cost less the

12   deductible.

13       Q.    It would include overhead and profit in the

14   initial payment?

15       A.    Yes, sir, according to this.

16       Q.    And, again, you don't know how the policy

17   would handle overhead and profit?

18       A.    No, sir.

19       Q.    Would that be a possible explanation as to

20   why a different amount might have been paid on the

21   initial payment of the claim as opposed to the amount

22   in your -- excuse me -- the amount in the payment

23   recommendation on the first page of Exhibit 9?

1    A.    Certainly.

2    Q.    I want to refer to -- I want to refer to

3 Exhibit 6.  I believe you were asked if you agreed

4 with the scope of the work on page 87 of Exhibit 6.

5    Can you determine from 86 exactly what the scope

6 of work is intended in that estimate?

7         MR. TALMADGE:  Object to the form.

8    A.    Not really.  I mean, on a room-by-room

9 basis, for instance, replace sheetrock and walls, I

10 don't know whether that refers to just the walls or

11 the acoustical ceiling.

12    Q.    Can you determine if you agree or disagree

13 with what's written on that estimate?

14         MR. TALMADGE:  I object to the form.

15    Q.    It's document 87, part of Exhibit 6.

16    A.    I can agree that some of this work

17 obviously needs to be done.  But as far as the price

18 and the breakout of the prices and stuff like that,

19 the areas that need to be done, I really don't know.

20    Q.    All right.

21    As to Exhibit -- excuse me -- page 88 of Exhibit

22 6, can you tell from that estimate what the scope of

23 work intended by that estimate is to evaluate whether

1    you agree or disagree with the scope of work?

2        A.    It would be just the same as what the

3    previous one was.

4        Q.    The answer to my question would be?

5        A.    It would be no.

6        Q.    As to the estimate at page 89, can you tell

7    from that written estimate whether or not you agree

8    with the scope of work set forth in that estimate as

9    to being appropriate for the property?

10                MR. TALMADGE:  Object to the form.

11        A.    Again, a lot of the things that are on

12    there, like the other two, were things that needed to

13    be done, but I could not tell in what rooms and

14    exactly what needed to be done, so --

15        Q.    Because you could not tell exactly what

16    needed to be done, is that why you got the itemized

17    scope of work from -- got Miss Williams to get the

18    itemized scope of work from the contractor that she

19    had selected?

20        A.    Yes.

21        Q.    Did you use that itemized scope of work to

22    determine what the prices were -- excuse me -- to

23    determine where you fell in that scope of work?

1      MR. TALMADGE:  Object to the form.

2      MR. MORRISSETTE:  That was a

3   terrible question.

4      Q.    Did you use that itemized scope of work to

5   review in preparing your final estimate?

6      A.    Yes, sir.

7      Q.    You were asked about the scope of work and

8   whether -- what was different about the scope of work

9   in that and your final estimate.  Did -- does that

10  scope of work that is marked as Exhibit 8 provide for

11  the replacement of acoustical ceilings with drywall

12  ceilings in some places?

13     A.    Yes, sir.

14     Q.    Would that be another difference?

15     A.    Yes, sir.

16     Q.    Would it have been appropriate, in your

17  evaluation of the claim, to change the acoustical

18  ceilings to drywall ceilings?

19     A.    No, sir.  Replacing it with --

20          THE COURT REPORTER:  Excuse me.

21  What did you say?

22          THE WITNESS:  With like kind and

23  quality.  If they had an acoustical

# FREEDOM COURT REPORTING

Page 1

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE MIDDLE DISTRICT OF ALABAMA

3                  SOUTHERN DIVISION

4

5    BILLY WILLIAMS and

     TERESA WILLIAMS,

6

          Plaintiffs,

7

     vs.              CASE NO. 1:07-cv-549-WHA

8

     BALBOA INSURANCE

9    COMPANY,

10        Defendant.

11

12

13          * * * * * * * * * *

14       DEPOSITION OF TERESA GAIL WILLIAMS, taken

15   pursuant to stipulation and agreement before Sherry

16   McCaskey, Certified Court Reporter and Commissioner

17   for the State of Alabama at Large, in the Law

18   Offices of Morris, Cary, Andrews, Talmadge, Jones &

19   Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20   on Thursday, November 15, 2007, commencing at

21   approximately 10:15 a.m.

22          * * * * * * * * * *



Exhibit 2 to Balboa's
Supp. Evid. Submissions

23

**367 VALLEY AVENUE**
**(205) 397-2397 BIRMINGHAM, ALABAMA 1-877-373-3660**

**FREEDOM COURT REPORTING**

Page 47

```
 1           above-referenced mortgage loan is in default?

 2    A.     Uh-huh (positive response).

 3    Q.     And lists the amount necessary to bring the

 4           loan current; do you see that?

 5    A.     Yes, sir.

 6    Q.     And so the total amount to the bring the loan

 7           current would be $11,015?

 8    A.     Yes, sir.

 9    Q.     And you understand that means that -- that

10           doesn't mean to pay the loan; that just means

11           to bring it up to date and pay off the

12           past-due amount?

13    A.     Yes, sir.

14    Q.     And it's my understanding that after this

15           time, that no further payments had been made

16           after the date of this letter?

17    A.     No, sir.

18    Q.     That's correct, no further payments had been

19           made?

20    A.     No, sir.  No, sir.

21    Q.     Okay.  And the default on the loan as of

22           February 2006 didn't have anything to do with

 1           Balboa or the claim on the fire, did it?
```

# FREEDOM COURT REPORTING

```
 1            IN THE UNITED STATES DISTRICT COURT

 2          FOR THE MIDDLE DISTRICT OF ALABAMA

 3                  SOUTHERN DIVISION

 4

 5    BILLY WILLIAMS and

      TERESA WILLIAMS,

 6

           Plaintiffs,

 7

      vs.                    CASE NO. 1:07-cv-549-WHA

 8

      BALBOA INSURANCE

 9    COMPANY,

10           Defendant.

11

12

13          * * * * * * * * * *

14       DEPOSITION OF BILLY L. WILLIAMS, taken

15    pursuant to stipulation and agreement before Sherry

16    McCaskey, Certified Court Reporter and Commissioner

17    for the State of Alabama at Large, in the Law

18    Offices of Morris, Cary, Andrews, Talmadge, Jones &

19    Driggers, 3334 Ross Clark Circle, Dothan, Alabama,

20    on Thursday, November 15, 2007, commencing at

21    approximately 2:10 p.m.

22          * * * * * * * * * *

23
```

COPY

Exhibit 3 to Balboa's
Supp. Evid. Submissions

# FREEDOM COURT REPORTING

Page 22

1   Q.   Okay.  When did you first see the fire damage?

2   A.   It was that Sunday afternoon when I got home.

3   Q.   So you came back that same day?

4   A.   Yes, sir.

5   Q.   Now, Mr. Toellner came out and looked at the

6        property?

7   A.   Yes, sir.

8   Q.   And you were there for that?

9   A.   Yes, sir.

10  Q.   All right.  Did you have any conversations

11       with him?

12  A.   Well, when he pulled up, he got out of the

13       car.  And he noticed the fish pond down there,

14       and he asked me whose pond it was.  And I told

15       him, it was mine.  And he asked me were there

16       any fish in it.  I told him, yes, sir.  And he

17       said, he didn't ever get a change to go

18       fishing, but he kept his reels and his tackle

19       box in his vehicle.  So I told him I didn't

20       have a problem with him fishing.

21  Q.   Sure.  All right.  What else happened?

22  A.   Well, he went inside and was taking pictures

23       for a short time.  And I asked him about the

# FREEDOM COURT REPORTING

Page 40

1    Q.    Didn't even try?

2    A.    No, sir.

3    Q.    And the only thing you say is that you didn't

4          think that was sufficient money?

5    A.    It wasn't sufficient money, is my opinion.

6    Q.    Okay.

7    A.    It would have been an insult to a contractor,

8          in my -- in my opinion.

9    Q.    And that's why you never did it?

10   A.    Yes, sir.

11   Q.    Any other reason?

12   A.    Like I say, my wife handles those matters.

13   Q.    Okay.  So you thought it would be an insult to

14         offer somebody $16,000 to --

15   A.    To furnish material and do the work?  Yes,

16         sir, I did.

17   Q.    Okay.  Did you ever discuss with anybody

18         whether the bathrooms could be cleaned rather

19         than replace --

20   A.    No, sir.

21   Q.    -- the fixtures?

22   A.    No, sir.

23   Q.    You put an acoustical ceiling in the living

# FREEDOM COURT REPORTING

Page 41

1       room and -- what rooms had acoustical

2       ceilings?

3    A.    The tile -- the ceiling tiles?

4    Q.    Yes, sir.

5    A.    The bed -- the bedroom, living room, and the

6          kitchen and bathrooms.

7    Q.    And that's less expensive to replace than

8          drywall?

9    A.    I'm sure it is.

10   Q.    Because you don't have to float it?

11   A.    Uh-huh (positive response).

12   Q.    Just mud it and do all that?

13   A.    Yeah, if you just --

14   Q.    Put it up?

15   A.    -- put it up.

16   Q.    That's why people use it, isn't it?

17   A.    Yes.

18   Q.    Because it's cheaper than drywall?

19   A.    It's quicker.  You don't have any waiting

20         time, drying time, or anything like that.

21   Q.    Have you had any discussions with anybody

22         about the Balboa offer of payment for the

23         repairs to GMAC or any other aspect of the

BILLY WILLIAMS ET AL v. BALBOA INS. CO

Deposition of: TANCY NELSON    3/12/2008

1 (Pages 1 to 4)

---

**Page 1**

IN THE UNITED STATE DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
SOUTHERN DIVISION

BILLY WILLIAMS and
TERESA WILLIAMS,

    Plaintiffs,

VS.    CASE NO. 1:07-CV-549-WHA

BALBOA INSURANCE COMPANY,

    Defendant.

*************************************************

ORAL DEPOSITION OF

TANCY NELSON

March 12, 2008

Volume 1

*************************************************

ORAL DEPOSITION OF TANCY NELSON, produced as a
witness at the instance of the PLAINTIFFS, and duly
sworn, was taken in the above-styled and numbered cause
on the 12th day of March, 2008, from 10:05 a.m. to
2:52 p.m., before Tonie Thompson, Certified Shorthand
Reporter in and for the State of Texas, reported by
machine shorthand, at the offices of U.S. Legal Support,
located at 5910 North Central Expressway, Suite 100,
Dallas, Texas 75206, pursuant to the Federal Rules of
Civil Procedure and the Provisions stated on the record
or attached hereto.

---

**Page 3**

INDEX

Appearances......................................2
Exhibit Index...................................3

TANCY NELSON
    Examination by Mr. Dan Talmadge..............4
    Examination by Mr. Henry T. Morrissette......158

Signature and Changes...........................163
Reporter's Certification........................165
Further Certification...........................167

EXHIBITS
NO.    DESCRIPTION    PAGE
1    Documents produced by Balboa
    Insurance Company...................4
2    Declaration and Exhibits of
    David N. Toellner..................135
3    Documents produced by Cunningham
    Lindsey............................155

---

**Page 2**

APPEARANCES

FOR THE PLAINTIFFS:
    Mr. Dan Talmadge (Via Videoconference)
    MORRIS, CARY, ANDREWS, TALMADGE & DRIGGERS, L.L.C.
    3334 Ross Clark Circle
    Post Office Box 1649
    Dothan, Alabama 36302
    Phone: (334)702-0000
    Fax: (334)673-0077

FOR THE DEFENDANT:
    Mr. Henry T. Morrissette
    HAND ARENDALL, L.L.C.
    RSA Tower
    11 North Water Street
    Suite 30200
    Mobile, Alabama 36602
    Phone: (251)694-6364
    Fax: (251)544-1625

---

**Page 4**

PROCEEDINGS

(Witness sworn in.)

(Deposition Exhibit No. 1 marked.)

TANCY NELSON,

having been first duly sworn, testified as follows:

EXAMINATION

BY MR. TALMADGE:

Q. Ma'am, can you please tell us your name for the record.

A. Tancy Nelson.

Q. Okay. I saw in a document produced in this case a name of Tancy Newman. Was your name ever Tancy Neumann, or is that just a misprint or typo?

A. Yes, it was. That's my maiden name.

Q. Okay. And, Ms. Nelson, what is your date of birth?

A. June 6th, 1979.

Q. Other than Tancy Nelson and Tancy Neumann, have you ever been known by any other names?

A. No, sir.

Q. Where are you today?

A. Dallas, Texas.

Q. Okay. And I'm in Alabama, right?

A. Correct.

Q. And we're doing your deposition on a video

---

Exhibit 4 to Balboa's
Supp. Evid. Submissions

BILLY WILLIAMS ET AL v. BALBOA INS. CO
Deposition of: TANCY NELSON                          3/12/2008

5 (Pages 17 to 20)

---

**17**

1  to do the best she can with that.
2     **A.** – t-i-m-a-t. Okay. Sorry.
3     **Q.** What company makes Xactimate?
4     **A. I don't know.**
5     **Q.** And was that the computer program that Farmers
6  was using at the time?
7     **A. Yes.**
8     **Q.** And what about Travelers?
9     **A. Yes.**
10     **Q.** They were both using Xactimate, correct?
11     **A. Correct.**
12     **Q.** How did Xactimate work in a given claim? I
13  mean, what does the adjuster do?
14     **A. We basically plug in the square footage or the**
15  **linear feet, the scope of the damage, and the program**
16  **formulates the pricing.**
17     **Q.** Okay. How does the program formulate the
18  pricing, if you know?
19     **A. I do not know.**
20     **Q.** Just if you know.
21     **A. No, I don't know.**
22     **Q.** Okay. When you were using Xactimate, did you,
23  as the adjuster, have any ability to change the prices
24  that were being generated by the software program?
25     **A. Yes.**

---

**18**

1     **Q.** And how would you do that?
2     **A. I can't remember how I did it in the program,**
3  **to be honest with you. Because like I said -- like I**
4  **said, I haven't worked with that program in six years.**
5       **But if we did change something, we did**
6  **have to write -- have a write-in which explains why we**
7  **changed something, a reason of why the price was**
8  **changed.**
9     **Q.** Did you ever have any occasion where you recall
10  having changed prices on an Xactimate program?
11     **A. I can't remember.**
12     **Q.** I think I know your answer to the next
13  question. But do you recall ever having any dispute
14  with anyone at either Farmers or Travelers over changing
15  a price that had been generated by Xactimate?
16     **A. I don't recall.**
17     **Q.** Okay. All right. Were you given some training
18  on how to use Xactimate when you were working for
19  Allcat?
20     **A. Yes.**
21     **Q.** Did Allcat train you, or did Farmers or
22  Travelers train you?
23     **A. Allcat.**
24     **Q.** And was there a course of study that lasted a
25  number of hours or days to learn how to do the program?

---

**19**

1     **A. No. I --**
2     **Q.** What was the course of study?
3     **A. Basically hands-on training.**
4     **Q.** Hands-on training, meaning you were just --
5     **A. I sat with someone, and they showed me how to**
6  **use the program.**
7     **Q.** Did it take a long time to learn how to use the
8  program?
9     **A. I don't remember.**
10     **Q.** Now, did you quit your job with Allcat?
11     **A. Yes, I did.**
12     **Q.** And did you then immediately take a job with
13  Texas Select?
14     **A. Yes.**
15     **Q.** And what was your job with Texas Select?
16     **A. Inside claims adjuster.**
17     **Q.** Did you say "inside claims adjuster?"
18     **A. Yes.**
19     **Q.** What is an inside claims adjuster? One that
20  works inside?
21     **A. Yeah.**
22     **Q.** Or one that adjusts the losses that are on the
23  inside of a house?
24     **A. No. Inside claims adjuster basically reviews**
25  **the estimate submitted by the IA, the Independent**

---

**20**

1  Adjuster.
2       THE REPORTER: Off the record.
3       (Technical difficulties with
4       videoconferencing equipment.)
5       (Recessed from 10:27 a.m. to 10:32 a.m.)
6       (Requested portion of last question and
7       answer portion of testimony read back.)
8     **A. Then we issue payment for the damages after**
9  **reviewing the photos and estimates.**
10     **Q.** What kind of company -- strike that.
11       What type policies did Texas Select write?
12     **A. HOB.**
13     **Q.** What does that mean?
14     **A. A homeowner's B form. It's just a type of**
15  **policy.**
16     **Q.** Okay. Did Texas Select do any forced-placed or
17  lender-placed insurance?
18       MR. MORRISSETTE: Object to the form of
19  question.
20     **A. Not to my understanding.**
21     **Q.** (BY MR. TALMADGE) What is force-placed
22  insurance?
23       MR. MORRISSETTE: Object to the form of
24  the question.
25     **A. It is insurance the lender places on the**

---

---

**21**

1  borrower's property.
2  Q. (BY MR. TALMADGE) And you're familiar with
3  that term, "force-placed insurance," correct? You've
4  heard it before?
5  A. Yes.
6  Q. Is that a term commonly used in the insurance
7  business?
8  MR. MORRISSETTE: Object to the form.
9  A. Lender-placed insurance.
10  Q. (BY MR. TALMADGE) That's what y'all call it?
11  A. Yes.
12  Q. In the insurance business?
13  A. Yes.
14  Q. Now, when you were working with Texas Select as
15  an adjuster, were you charged with selecting the
16  independent, I guess, outside adjuster that would go to
17  the property?
18  A. No.
19  Q. Who did that selecting?
20  A. That would have been the person that assigns
21  the claims.
22  Q. That would have been, I guess, a supervisor of
23  yours?
24  A. Yes. I'm trying to remember. I can't remember
25  if we picked the firm or if they told us to assign it to

**22**

1  a certain firm. I can't remember.
2  Q. At any time while you were working as an
3  adjuster for Texas Select, did you ever go to any
4  property yourself to adjust the loss?
5  A. No, sir.
6  Q. Was it always a situation where you would -- an
7  independent adjuster would be used to go to the
8  property, assess the damage, and make an estimate?
9  A. Yes.
10  Q. While you were working for Texas Select, did
11  you ever use an insurance -- an independent insurance
12  adjusting company named Cunningham Lindsey?
13  A. Yes, I believe we did.
14  Q. While you were working with Texas Select, did
15  you ever personally work on a claim with an adjuster
16  named David Toellner?
17  A. I have no idea. I wouldn't be able to tell you
18  that, because I don't remember. I handle a lot of
19  claims with a lot of different adjusters, so --
20  Q. Now, were there certain guidelines or policies
21  that Texas Select had that their independent adjusters
22  had to abide by?
23  A. Yes.
24  Q. Do you understand my question?
25  A. Yes, I do. Yes, I believe they were given

**23**

1  something. I don't know for sure. I was not in charge
2  of that.
3  Q. All right. And where my question is headed is,
4  you know, I asked you earlier about Farmers and
5  Travelers and the computer programs they were using. Do
6  you remember that?
7  A. Yes.
8  Q. I'm interested in learning about what computer
9  programs Texas Select would have been using, if any.
10  A. They did not.
11  Q. Do you know why they did not?
12  A. The independent adjusting firms use the
13  program, the estimating program.
14  Q. What estimating program was used?
15  A. I believe Xactimate and Integra.
16  Q. Is Integra the same thing as Integra Claim?
17  A. Yes.
18  Q. And is the Integra Claim software made by a
19  company called MSB?
20  A. I don't know.
21  Q. Have you ever heard of a company called MSB?
22  A. Yes.
23  Q. What is MSB, to your knowledge?
24  A. I know that our company uses MSB.
25  Q. Meaning Balboa, right?

**24**

1  A. Yes.
2  Q. Do you know what MSB stands for?
3  A. No, I do not. I don't recall.
4  Q. Have you ever heard of Marshall & Swift?
5  A. I don't recall.
6  Q. And did you tell me just a few moments ago that
7  the claims adjusters for Texas -- the independent claims
8  adjusters for Texas Select would use both Xactimate and
9  the Integra Claim program?
10  MR. MORRISSETTE: Object to the form of
11  the question.
12  A. I believe they did.
13  Q. (BY MR. TALMADGE) Were there any other
14  computer software programs used by the independent
15  adjusters for Texas Select that you know of?
16  A. Not that I'm aware of.
17  Q. While you were working as a inside claims
18  adjuster for Texas Select, did you ever receive any
19  complaints from homeowners concerning the manner in
20  which you were adjusting their claims?
21  A. Not that I recall.
22  Q. Were there any lawsuits filed against you or
23  Texas Select concerning any of the claims that you
24  adjusted?
25  A. As far as my understanding, there were two,

### 37

1 Enterprise, Alabama, area would have more knowledge than
2 you about the cost of labor and materials in that area?
3        MR. MORRISSETTE:  Object to the form.
4     A.  We have the -- we have our estimating program
5 to run our numbers and our prices.
6     Q.  (BY MR. TALMADGE)  Okay.  I'm going to ask the
7 question again.  Do you think that a contractor that
8 works in the Enterprise, Alabama, area would have more
9 knowledge than you, Ms. Nelson, about the cost of labor
10 and materials in the Enterprise, Alabama market?
11        MR. MORRISSETTE:  Object to the form.
12     A.  I don't know.
13     Q.  (BY MR. TALMADGE)  Okay.  You mentioned that
14 there are local prices that are somehow input into this
15 computer system, and the reason that you know that is
16 somebody told you that, correct?
17     A.  Correct.
18     Q.  Who is the person that inputs the pricing?  Who
19 is that person?
20     A.  I do not know.
21     Q.  If I wanted to know who that was, who would I
22 ask?  Where would I go to ask him questions about how he
23 arrived at his information?
24     A.  I don't know.
25     Q.  Over the course of your claims adjusting

### 38

1 career, have you ever looked at one of these printouts
2 from a computer software program and felt like it was
3 wrong?
4     A.  Yes.
5     Q.  What did you do when you felt like it was
6 wrong?
7     A.  Contacted the firm, the independent adjusting
8 firm.
9     Q.  And what happened?
10     A.  And requested them to revise it or reinspect
11 the property.
12     Q.  How many occasions did that happen since you've
13 been an adjuster?
14     A.  I couldn't tell you.  Several.
15     Q.  Has it be more than ten times?
16     A.  Yes.
17     Q.  And when I use the word "fair," I'm talking
18 about fair from the standpoint of the homeowner, where
19 you felt like this amount for materials or for labor is
20 not fair to the homeowner.
21        MR. MORRISSETTE:  Object to the form.
22     Q.  (BY MR. TALMADGE)  Have there been occasions
23 where you felt that an item in a computer software
24 program was not fair to the homeowner?
25        MR. MORRISSETTE:  Object to the form.  You

### 39

1 mean an item in the computer software or an item in the
2 estimate she received?
3     Q.  (BY MR. TALMADGE)  Well, aren't they one in the
4 same, Ms. Nelson?
5     A.  Can you rephrase the question?
6     Q.  What I'm getting at is:  It's my understanding
7 that, as an inside claims adjuster, what happens is you
8 send the outside adjuster out and he figures out what he
9 thinks the damage is and punches in material.  And
10 there's a computer program that spits out a price for
11 that material.
12        The outside adjuster doesn't go to Lowes
13 or Wal-Mart or Townsend Building Supply to get prices.
14 The computer gives it to him, right?
15     A.  Yes.
16     Q.  Okay.  And so what I'm concerned about is the
17 computer giving the adjuster a price that is unfair, in
18 your opinion, to the homeowner.  That's what I'm asking
19 about.
20        MR. MORRISSETTE:  Object to form.
21     Q.  (BY MR. TALMADGE)  Have there been occasions
22 where you felt prices contained in a estimate generated
23 by this computer software were unfair to the homeowner?
24        MR. MORRISSETTE:  Object to the form.
25     A.  Yes.

### 40

1     Q.  (BY MR. TALMADGE)  And how many times has that
2 occurred, in your opinion?
3     A.  A few.  Several.  I couldn't tell -- I couldn't
4 tell you how many times.
5     Q.  Was it more than ten times?
6     A.  I'm sure it has been.
7     Q.  Was it more than twenty times?
8     A.  I'm sure it has been.  I've handled a lot of
9 claims.  I couldn't give you numbers on exactly how many
10 times I've disputed an estimate or not.
11     Q.  But you can remember having done that and you
12 can remember having contacted the outside adjuster and
13 brought that to their attention; is that correct?
14     A.  Yes, yes.
15        MR. MORRISSETTE:  Object to form.
16     Q.  (BY MR. TALMADGE)  And you can remember times
17 where the outside adjuster bumped up the cost reflected
18 in his estimate based on a phone call from you?
19        MR. MORRISSETTE:  Object to the form.
20     A.  That he's revised his estimate.  I can't
21 specifically say that he's upped his pricing on
22 something.
23     Q.  (BY MR. TALMADGE)  Well, in what other way
24 would he revise it?  I'm confused about that.  My
25 question was about pricing.

BILLY WILLIAMS ET AL v. BALBOA INS. CO

Deposition of:   TANCY NELSON                    3/12/2008

32 (Pages 125 to 128)

---

**125**

1    MR. MORRISSETTE: Object to form.
2    A. It -- it doesn't allow -- I -- I took my
3  figures from the actual estimate, not the form.
4    Q. (BY MR. TALMADGE) Right. And my question is:
5  Did you follow the recommendation, and I think the
6  answer is no, you did not?
7    MR. MORRISSETTE: Object to form.
8    Q. (BY MR. TALMADGE) Is that right?
9    A. No, that's not right. I did follow their
10  recommendation from the estimate.
11    Q. But not from page 94, where it says
12  Recommendations?
13    MR. MORRISSETTE: Objection, form.
14    A. No, because that's a form that they use to
15  calculate it.
16    Q. (BY MR. TALMADGE) Okay. Well, how much money
17  did you pay?
18    A. A supplement in the amount of $3,394.90.
19    Q. And that was based on the estimate figure, you
20  say, on 99?
21    A. Yes.
22    Q. And so what happened next in the life of the
23  claim?
24    A. I issued the payment to the mortgage company.
25    Q. And were you contacted by the borrower at any

---

**126**

1  time after that check was issued?
2    A. Yes. The check was issued September 26th, '06,
3  and my next contact with the borrower is March 14th,
4  '07.
5    Q. Is it your testimony that you had no contact
6  with the borrower between September 26th, 2006, and
7  March of 2007?
8    A. Yes.
9    Q. Now, on your diary note of September 26th,
10  2006, you say in your note, "The supplement estimate
11  includes changes that would be necessary after reviewing
12  the contractor's estimate," correct?
13    A. Yes.
14    Q. And you say that "replacing the acoustical
15  ceiling with drywall was not included, as well as the
16  complete remodel of the bathrooms"; is that correct?
17    A. Yes.
18    Q. And then you say, "There is no reason not to
19  clean the ceramic tile floor in the bathrooms and each
20  of" -- "and bathtub in each of the bedrooms," correct?
21    A. Yes.
22    Q. Why did you feel that way?
23    A. Because based on the photos, it looked like
24  that it could be cleaned.
25    Q. Would you agree with me that actually going to

---

**127**

1  the property yourself and inspecting it yourself would
2  put you in a better position of making that assessment,
3  as opposed to merely looking at the photograph?
4    A. I agreed with the adjuster's estimate, which
5  stated that the items could be cleaned.
6    Q. Okay. So really that was not your opinion;
7  that was the adjuster's opinion; is that correct?
8    MR. MORRISSETTE: Object to the form.
9    A. I agreed with his observation and inspection of
10  the property.
11    Q. (BY MR. TALMADGE) Based on your looking at
12  some pictures, you agreed?
13    A. Yes, I did.
14    Q. Okay. Is that the normal way to adjust a
15  claim, is to look at pictures to make your assessment,
16  or to actually examine the subject property?
17    A. My position is to look at the photos and the
18  estimates, and it's the independent adjuster who goes
19  out and inspects it.
20    Q. Can you tell what something smells like by
21  looking at a photograph?
22    A. No, you cannot.
23    Q. Do you have any personal knowledge whatsoever
24  about whether there's a smoke smell in that house?
25    A. I do not.

---

**128**

1    Q. Do you know whether or not there's a smoke
2  smell in those bathrooms that you say can be cleaned?
3    A. I do not.
4    Q. And you can't tell that from photographs, can
5  you?
6    A. No, you cannot.
7    Q. You can only tell from going there, can't you?
8    A. Right.
9    Q. Okay. Tell me about the conversation that you
10  had the -- the next conversation you had with the
11  borrower.
12    A. Do you want me to read the entry, or --
13    Q. Do you remember it? First off, do you remember
14  it?
15    A. Vaguely.
16    Q. What do you remember about it?
17    A. Just what I've read. I mean, I don't really
18  remember it that well, to be honest.
19    Q. Well, look at the entry and see if that
20  refreshes your memory about what happened in the
21  conversation.
22    A. (Witness reviews document.)
23    I advised her -- she wanted to know why we
24  didn't pay off her loan. I advised her that we only
25  owed for the damaged portions of the house.

---

BILLY WILLIAMS ET AL v. BALBOA INS. CO

Deposition of:  TANCY NELSON

3/12/2008

34 (Pages 133 to 136)

---

### 133

1   Q. Do you think it's more than 25 percent?
2   A. I really don't know.
3   Q. When did you close this claim?
4   A. I have no idea.
5   Q. Well, in looking at your -- and by the way,
6   going to Balboa 35, in case we didn't make clear for the
7   record, what you paid -- I think we did, though -- you
8   paid a supplement of $3,394.90, after getting the second
9   estimate, right, the revised estimate?
10  A. Yes, sir.
11  Q. Okay. And once you sent the check off to GMAC,
12  isn't it true that you closed your file at that time?
13  A. I don't know when I closed my file.
14  Q. Well, isn't it true that you closed your diary
15  at that time?
16  A. I don't know when I closed my diary. I don't
17  have the date on here.
18  Q. If you'll look at Balboa No. 36, there's an
19  entry for 9/26/06. Does that help?
20  A. Oh, okay. Yeah. It says "Diary closed."
21  Q. When you closed the diary, had you closed the
22  claim file?
23  A. Not always.
24  Q. In this case, had you closed the claim file?
25  A. Wait a minute. Yes.

### 134

1   Q. Isn't it true that you closed this claim file
2   without ever having seen the itemization that was
3   prepared by the contractor named Eric Deanman
4   (phonetic)?
5   A. Yes.
6   Q. Did you know that such a document existed; that
7   he had -- he had gone in on a document generated by
8   Cunningham Lindsey, that appears to have been generated
9   by the computer software program, and wrote in the
10  various prices for different work that needed to be
11  done. Do you know he did that?
12  A. No, sir, I didn't.
13  Q. Okay. Do you know that he did it now?
14  A. I do now.
15  Q. And when did you find it out; today?
16  A. Today.
17  Q. Okay. Well, if you had known that Mr. Deanman
18  went in and itemized all his work and put prices down by
19  that, is that a document that you would have liked to
20  have had before making the final decision on this claim?
21  A. I would have liked to have seen it, yes.
22  Q. Would you have considered that in your
23  adjustment of this claim?
24  A. I would have had to look at the document.
25  Q. Okay.

### 135

1   A. I would have considered it.
2       MR. TALMADGE: Okay. Henry, there is a
3   document there that I sent to the court reporter, and it
4   has a blue piece of paper on it that says either Dave
5   Toellner documents or Cunningham Lindsey documents?
6       MR. MORRISSETTE: Yes.
7       MR. TALMADGE: Okay. Could I mark that
8   one as Plaintiffs' No. 2, please, just a collective.
9       MR. MORRISSETTE: The whole thing?
10      MR. TALMADGE: Yes. The whole thing.
11      MR. MORRISSETTE: Yes.
12      (Deposition Exhibit No. 2 marked.)
13      MR. MORRISSETTE: Can I run to the
14  restroom right quick?
15      MR. TALMADGE: Yeah. Sure.
16      MR. MORRISSETTE: I'll be right back.
17      THE WITNESS: Oh, w hat am I supposed to
18  be looking at? I don't know where we're at. Sorry.
19      MR. MORRISSETTE: Anyway, you can stay
20  there.
21      MR. TALMADGE: We're off the record.
22      (Recess taken from 1:59 p.m. to 2:03 p.m.)
23      THE WITNESS: Just for clarification, I
24  knew that the adjuster, the independent adjuster
25  received an itemized estimate. I was not aware that it

### 136

1   was -- he sent a blank copy of whatever this is -- the
2   blank copy of the -- something printed out of
3   Xactimate -- I mean Integra.
4   Q. (BY MR. TALMADGE) Okay.
5   A. I wasn't aware of that.
6       MR. TALMADGE: The -- have all those
7   Cunningham Lindsey, Dave Toellner documents been marked
8   as Exhibit No. 2?
9       MR. MORRISSETTE: They have been marked
10  jointly.
11      MR. TALMADGE: Okay. That's fine.
12  Q. (BY MR. TALMADGE) If you'll look at
13  Plaintiffs' Exhibit No. 2, Ms. Nelson, and turn to the
14  page that is Bates stamped Cunningham 22.
15  A. Okay.
16  Q. And then there's Cunningham 23 and 24, 25 and
17  26. And that is the document that I'm interested in
18  talking with you about.
19      Just to be clear, is it your testimony
20  that you have never, before today, seen the document
21  that is contained in Plaintiffs' Exhibit No. 2, and
22  Bates labeled Cunningham 22 through 26?
23  A. Yes, sir. I've never seen it.
24  Q. And this document was not considered in your
25  evaluation of the claim?